**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Case No.: _____

GOVERNMENT EMPLOYEES INSURANCE
CO., GEICO INDEMNITY CO., GEICO
GENERAL INSURANCE COMPANY and
GEICO CASUALTY CO.,

       Plaintiffs,

vs.

GILBERTO SECO, M.D., MED-UNION
MEDICAL CENTER, INC., JORGE A.
GONZALEZ, ALIUSKA AMIGO, L.M.T.,
SHINUET CABRERA, SERGIO VENTO
ANGARICA, JULIO CESAR PELAEZ, F.N.P.,
LEANNE TRIGOURA, F.N.P., NEW
GENERATION REHABILITATION CENTER
INC, BRYAN ABREU, ORLANDO E. LEIVA,
M.D., PREMIUM MEDICAL CENTER CORP,
MABEL GUTIERREZ CONCEPCION, L.M.T.,
OMNIA FERNANDEZ, A.G.N.P.,
GONZALEZ'S MEDICAL CENTER, INC,
JOSE J. GONZALEZ, WILFREDO BLASINI,
M.D., ROSALVA ZEGARRA, P.A., FELIPE
DELGADO, L.M.T., and GISELA CATALINA
DE VALLE, L.M.T.,

       Defendants.
_____/

**Jury Trial Demanded**

## <u>COMPLAINT</u>

Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO General

Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), sue

Defendants and allege as follows:

1.     This action seeks to recover more than $4,015,000.00 that Defendants wrongfully

obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-

fault ("no-fault", "personal injury protection", or "PIP") insurance charges through Defendants Med-Union Medical Center, Inc. ("Med-Union Medical"), New Generation Rehabilitation Inc ("New Generation Rehab"), Premium Medical Center Corp ("Premium Medical"), and Gonzalez's Medical Center, Inc ("Gonzalez's Medical") (collectively the "Clinic Defendants"), relating to medically unnecessary, illusory, unlawful, and otherwise non-reimbursable health care services, including putative initial examinations, follow up examinations, and physical therapy services (collectively the "Fraudulent Services"), that purportedly were provided to Florida automobile accident victims ("Insureds") who were eligible for coverage under GEICO no-fault insurance policies. In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of pending, fraudulent no-fault insurance claims that Defendants have submitted or caused to be submitted through the respective Clinic Defendants, because of the fraudulent and unlawful activity set forth herein.

2.      Each and every charge submitted through the respective Clinic Defendants since at least 2014 has been fraudulent and unlawful for the reasons set forth herein.  The charts annexed hereto as Exhibits "1" – "4" set forth a large and representative sample of the fraudulent and unlawful claims that have been identified to date that have been submitted to GEICO by mail through the respective Clinic Defendants.  Defendants' interrelated fraudulent schemes began no later than 2014 and have continued uninterrupted since that time.

## THE PARTIES

3.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively, "GEICO") are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in Florida.

4.      The Defendants are as follows:

(i)     Defendant Gilberto Seco, M.D. ("Seco") resides in and is a citizen of Florida. Seco was licensed to practice medicine in Florida on August 14, 1992. Seco falsely purported to serve as medical director at Med-Union Medical, New Generation Rehab, and Premium Medical, and purported to perform or directly supervise the substantial majority of the Fraudulent Services on behalf of all of the Clinic Defendants.

(ii)    Defendant Med-Union Medical is a Florida corporation with its principal place of business in Miami, Florida. At all relevant times, Med-Union Medical falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing requirements set forth in the Florida Health Care Clinic Act (the "Clinic Act", Fla. Stat. § 400.990 et seq.). Med-Union Medical was incorporated in Florida on or about June 24, 2003 and purported to be owned and controlled by Defendants Jorge A. Gonzalez ("J.A. Gonzalez") and Aliuska Amigo, L.M.T. ("Amigo") from at least 2014 until February 2016, J.A. Gonzalez until July 2017, Shinuet Cabrera ("Cabrera") until February 2020, and Sergio Vento Angarica ("Angarica") until the present day. Med-Union Medical falsely purported to have Seco as its medical director until at least May 25, 2021 , and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers, including billing for Fraudulent Services that purportedly were performed by Defendants Seco, Julio Cesar Pelaez, F.N.P. ("Pelaez"), and Leanne Trigoura, F.N.P. ("Trigoura") (Defendants Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, Seco, Pelaez, and Trigoura collectively are referred to as the "Med-Union Medical Defendants").

(iii)   Defendant New Generation Rehab is a Florida corporation with its principal place of business in Miami, Florida. At all relevant times, New Generation Rehab falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing requirements set forth in the Clinic Act. New Generation Rehab was incorporated in Florida on or about July 7, 2016, purported to be owned and controlled by Defendant Bryan Abreu ("Abreu"), falsely purported to have Seco as its medical director until at least May 25, 2021, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers, including billing for Fraudulent Services that purportedly were performed by Defendants Seco and Orlando E. Leiva, M.D. ("Leiva") (Defendants New Generation Rehab, Abreu, Seco, and Leiva collectively are referred to as the "New Generation Rehab Defendants").

(iv)    Defendant Premium Medical is a Florida corporation with its principal place of business in Virginia Gardens, Florida. At all relevant times, Premium Medical falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing requirements set forth in the Clinic Act. Premium Medical was incorporated in Florida on or about January 15, 2019, purported to be owned and controlled by Defendant Mabel Gutierrez Concepcion, L.M.T.

("Gutierrez Concepcion"), falsely purported to have Seco as its medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers, including billing for Fraudulent Services that purportedly were performed by Defendants Seco, Omnia Fernandez, A.G.N.P. ("Fernandez"), and Gutierrez Concepcion. (Defendants Premium Medical, Gutierrez Concepcion, Seco, and Fernandez collectively are referred to as the "Premium Medical Defendants").

(v)   Defendant Gonzalez's Medical is a Florida corporation with its principal place of business in Hialeah, Florida. At all relevant times, Gonzalez's Medical falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing requirements set forth in the Clinic Act. Gonzalez's Medical was incorporated in Florida on or about April 10, 2012, purported to be owned and controlled by Defendant Jose J. Gonzalez ("J.J. Gonzalez"), falsely purported to have Wilfredo Blasini, M.D. ("Blasini") as its medical director from March 2015 to September 2017, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers, including billing for Fraudulent Services that purportedly were performed by Defendants Seco, Rosalva Zegarra, P.A. ("Zegarra"), Felipe Delgado, L.M.T. ("Delgado"), and Gisela Catalina De Valle, L.M.T. ("De Valle") (Defendants Gonzalez's Medical, J.J. Gonzalez, Seco, Zegarra, Delgado, and De Valle are referred to as the "Gonzalez's Medical Defendants").

a.   In February 2020, the Division of Investigative and Forensic Services, Bureau of Insurance Fraud began an undercover investigation into Gonzalez's Medical after receiving several tips that Seco, J.J. Gonzalez, De Valle, Delgado, and others were misleading and defrauding insurance companies. The investigation revealed that J.J. Gonzalez paid undercover participants $1,000.00 each to come to Gonzalez's Medical and pretend to receive treatment from Seco, De Valle, and Delgado. The undercover participants also met with Seco, who told them what parts of their bodies hurt and backdated prescriptions for physical therapy. As a result of this undercover investigation, Seco, De Valle, and Delgado were all arrested on May 26-27, 2021 and charged with Grand Theft in the 3rd Degree, Organized Scheme to Defraud/Conspiracy in the 3rd Degree, and Insurance Claims/False/Fraudulent in the 2nd Degree. J.J. Gonzalez was also arrested on May 26, 2021 and charged with Grand Theft in the 2nd Degree, Oranized Scheme to Defraud/Conspiracy in the 3rd Degree, Insurance Claims/False/Fraud/Solicitation in the 3rd Degree, Patient Brokering in the 3rd Degree, and Money Laundering/Unlawful Proceeds in the 3rd Degree.

(vi)   All of the natural person Defendants reside in and are citizens of Florida.

5.   Although he is not named as a Defendant in this Complaint, Tony Nguyen, D.O. ("Nguyen") is relevant to this action. Nguyen was licensed to practice medicine in Florida on July

18, 2017, and falsely purported to serve as medical director at Gonzalez's Medical from September 2017 to at least June 14, 2021.

6.      Although they are not named as Defendants in this Complaint, Workers' Rehab, Inc. ("Workers' Rehab"), ALS Medical Group, Inc. ("ALS Medical"), Imagen Medical Center Inc ("Imagen Medical"), Guadalupana.CG Inc ("Guadalupana"), and GR Rehab Center, Inc ("GR Rehab") are relevant to this action.  All are Florida corporations where Seco purported to perform or directly supervise Fraudulent Services.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.  This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") ACT). In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

8.      Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Southern District of Florida is the District where one or more of Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

I.      **Brief Overview of Pertinent Law Governing No-Fault Insurance Reimbursement**

9.      Florida requires automobile insurers to provide PIP insurance benefits ("PIP Benefits") to Insureds when they are injured in a motor vehicle accident. See Florida Motor Vehicle No-Fault Law, Fla. Stat. §§ 627.730-627.7405 (the "No-Fault Law").

10.     Under the No-Fault Law, a health care services provider who possesses an assignment of PIP Benefits from an Insured and who provides medically necessary health care services to an Insured may submit claims directly to an insurance company in order to receive payment for the medically necessary services, using the required claim forms, including the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form" or "CMS-1500" form).

11.     In order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided, medically necessary, and the bill for the service cannot misrepresent the nature, extent, or results of the service that was provided. Insurers such as GEICO are not required to pay anyone who knowingly submits a false or misleading statement relating to a PIP claim or charges. See Fla. Stat. § 627.736.

12.     Additionally, in order for a health care service to be eligible for PIP reimbursement, the applicable claim form must set forth the professional license number of the provider who personally performs or directly supervises the underlying health care service, in the line or space provided for "Signature of Physician or Supplier, Including Degrees or Credentials." See Fla. Stat. § 627.736.

13.     In addition, the No-Fault Law prohibits PIP reimbursement for massage or for services provided by unsupervised massage therapists. See Fla. Stat. § 627.736.

14.     Pursuant to the Clinic Act, health care clinics operating in Florida must – among other things – appoint a physician as a medical director who must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful", and take immediate corrective action upon discovery of a fraudulent or unlawful charge. See Fla. Stat. § 400.9935(1).  In addition, a clinic medical director must "[e]nsure that all health care practitioners at the clinic have

6

active appropriate certification or licensure for the level of care being provided." See Fla. Stat. § 400.9935(1).

15.     Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed . . . but that is not so licensed, or that is otherwise operating in violation of this part . . . is an unlawful charge." See Fla. Stat. § 400.9935(3).

## II.     Defendants' Interrelated Fraudulent Schemes

## A.     The Fraudulent Operation of the Clinic Defendants Without Legitimate Medical Directors

16.     Because the Clinic Defendants were subject to the Clinic Act, J.A. Gonzalez, Amigo, Cabrera, Angarica, Abreu, Gutierrez Concepcion, and J.J. Gonzalez (collectively the "Clinic Owner Defendants") could not operate the respective Clinic Defendants unless licensed physicians were employed as the Clinic Defendants' medical directors. However, if the Clinic Owner Defendants retained legitimate physicians to serve as the Clinic Defendants' medical directors, any such legitimate physicians actually would be obligated to fulfill the statutory requirements applicable to a clinic medical director, which would impede the Defendants' interrelated schemes, as described herein.

17.      Accordingly, J.A. Gonzalez, Amigo, Cabrera, Angarica, Abreu, and Gutierrez Concepcion each retained Seco, a licensed physician who was willing – in exchange for compensation – to falsely pose as the legitimate medical director of Med-Union Medical, New Generation Rehab, and Premium Medical, respectively.

18.     Similarly, J.J. Gonzalez retained Blasini and then Nguyen, licensed physicians who likewise were willing – in exchange for compensation – to falsely pose as the legitimate medical director of Gonzalez's Medical.

19.    In exchange for compensation from the respective Clinic Defendants, Clinic Owner Defendants, and their associates, Seco, Blasini, and Nguyen agreed to falsely represent, to the Florida Agency for Health Care Administration, to the Insureds who sought treatment at the respective Clinic Defendants, and to the insurers including GEICO that received PIP claims from the Clinic Defendants, that they were the true medical directors at the respective Clinic Defendants, and that they truly fulfilled the statutory requirements applicable to clinic medical directors at the Clinic Defendants.

20.    However, Seco never genuinely served as medical director for Med-Union Medical, New Generation Rehab, and Premium Medical.

21.    Likewise, Blasini and Nguyen never genuinely served as medical director for Gonzalez's Medical.

22.    Instead, from the beginning of each of their associations with the respective Clinic Defendants, Seco, Blasini, and Nguyen ceded all day-to-day decision-making and oversight regarding healthcare services at the Clinic Defendants to the respective Clinic Owner Defendants and their associates.

23.    As set forth herein, in keeping with the fact that Seco, Blasini, and Nguyen never legitimately served as medical directors at the respective Clinic Defendants, Seco, Blasini, and Nguyen: (i) never ensured that all health care practitioners at the respective Clinic Defendants had active appropriate certification or licensure for the level of care being provided; (ii) never conducted systematic reviews of the Clinic Defendants' billings to ensure that the billings were not fraudulent or unlawful; and (iii) and never even made any attempt to discover the fraudulent and unlawful charges submitted through the Clinic Defendants, much less take any immediate corrective action. See Fla. Stat. § 400.9935(1).

24.     In further keeping with the fact that Seco never legitimately served as medical director at Med-Union Medical, New Generation Rehab, and Premium Medical, Seco simultaneously purported to personally perform, or at least directly supervise, a massive number of individual health care services for all the Clinic Defendants as well as other practices, typically at multiple locations each day.

25.     It is impossible that Seco, who was in his 70s at the time, could have performed or directly supervised such a massive number of individual healthcare services while also fulfilling his medical director roles at Med-Union Medical, New Generation Rehab, and Premium Medical.

26.     In keeping with the fact that Nguyen never legitimately served as medical director at Gonzalez's Medical, Nguyen – in an August 2020 affidavit – swore, in substance, that he was typically present at Gonzalez's Medical for only a few hours each month.

27.     In his August 2020 affidavit, Nguyen also swore – in substance – that during his once-a-month visit to Gonzalez's Medical he would review only a handful of patient charts, and that he had no idea whether the handful of patient charts he reviewed constituted any significant portion of the overall number of patients who were treated each month at Gonzalez's Medical.

28.     The Clinic Owner Defendants used the façade of Seco, Blasini, and Nguyen's phony "appointments" as the respective Clinic Defendants' ersatz "medical directors" to do indirectly what they were forbidden from doing directly – namely, and as set forth more fully herein: (i) to operate health care clinics without legitimate medical directors; (ii) to engage in unlicensed medical decision-making with respect to the Insureds who sought treatment at the Clinic Defendants; (iii) to permit health care services to be provided at the Clinic Defendants by individuals who lacked the proper licensure to perform the services; and (iv) to use the Clinic

Defendants as vehicles to submit a massive amount of fraudulent and unlawful PIP billing to GEICO and other insurers.

29.     Seco, Blasini, and Nguyen unlawfully permitted the Clinic Owner Defendants to dictate every aspect of the manner in which Insureds would be treated at the respective Clinic Defendants, and to dictate every aspect of the manner in which health care services at the respective Clinic Defendants would be billed to GEICO and other insurers, because they sought to continue profiting from the fraudulent billing submitted through the Clinic Defendants.

**B.     The Fraudulent Misrepresentations Regarding the Identities of the Health Care Providers Rendering Services at the Clinic Defendants**

30.     The Defendants billed GEICO for a limited range of Fraudulent Services, namely purported: (i) initial patient examinations; (ii) follow-up patient examinations; and (iii) physical therapy services. As set forth in Exhibits "1" – "4", the purported physical therapy services constituted the vast majority of the Fraudulent Services billed through each of the Clinic Defendants to GEICO.

31.     All of the "physical therapy" services that Defendants purported to provide between at least 2014 and the present were performed – to the extent that they were performed at all – by completely unsupervised massage therapists or other unlicensed individuals, including Gutierrez Concepcion at Premium Medical and Delgado and De Valle at Gonzalez's Medical.

32.     These individuals – including Gutierrez Concepcion, Delgado, and De Valle (collectively the "Massage Therapist Defendants") – were only licensed as massage therapists. The Massage Therapist Defendants and other unlicensed individuals were never licensed as physical therapists.

33.     The Defendants were well-aware of the fact that the Clinic Defendants could not legally recover PIP Benefits for "physical therapy" or any other kinds of health care services

performed by unsupervised massage therapists such as the Massage Therapist Defendants, or other unlicensed and unsupervised individuals.

34.     Accordingly, the Defendants falsely represented – in virtually all of the claims for "physical therapy" services that they submitted or caused to be submitted through the respective Clinic Defendants to GEICO – that Seco, a licensed physician, had either performed or supervised the putative physical therapy services.

35.     In reality, Seco neither performed nor supervised any of the physical therapy services that were billed through the Clinic Defendants to GEICO.

36.     In keeping with the fact that Seco neither performed nor directly supervised any of the physical therapy services that were billed through the Clinic Defendants to GEICO, Seco – who was in his 70s at the time – often purported to personally perform or directly supervise more than 25, 30, or even 35 hours of "physical therapy" services for GEICO Insureds on individual dates, often at multiple Clinic Defendants, and multiple different locations, per day.

37.     For example:

(i)     On March 25, 2014, Med-Union Medical, J.A. Gonzalez, Amigo, and Seco purported to provide at least 70 individual physical therapy services to at least seven individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 12 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.  That same day, Seco also purported to personally perform, or at least directly supervise at least 81 additional physical therapy services purportedly provided to at least 10 additional GEICO Insureds at Gonzalez's Medical, Workers Rehab, and ALS Medical, including at least 15.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.  In all, GEICO received billing for at least 27.5 hours of services that Seco purported to personally perform, or at least directly supervise, on March 25, 2014.

(ii)    On November 6, 2014, Med-Union Medical, J.A. Gonzalez, Amigo, and Seco purported to provide at least 74 individual physical therapy services to at least nine

individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 13.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.  That same day, Seco also purported to personally perform, or at least directly supervise at least 70 <u>additional</u> physical therapy services purportedly provided to at least 10 <u>additional</u> GEICO Insureds at Gonzalez's Medical, Imagen Medical, and Guadalupana, including at least 11 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.  In all, GEICO received billing for at least 24.5 hours of services that Seco purported to personally perform, or at least directly supervise, on November 6, 2014.

(iii)   On December 6, 2016, Med-Union Medical, J.A. Gonzalez, and Seco purported to provide at least 104 individual physical therapy services to at least 14 individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally performed or at least directly supervised every one of those treatments.  What is more, those putative treatments included at least 18.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.  That same day, Seco also purported to personally perform, or at least directly supervise at least 67 <u>additional</u> physical therapy services purportedly provided to at least 10 <u>additional</u> GEICO Insureds at Gonzalez's Medical and GR Rehab, including at least 11.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.  In all, GEICO received billing for at least 30 hours of services that Seco purported to personally perform, or at least directly supervise, on December 6, 2016.

(iv)   On December 19, 2016, Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco purported to provide at least 136 individual physical therapy services to at least 20 individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 22 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seco also purported to personally perform, or at least directly supervise at least 104 <u>additional</u> physical therapy services purportedly provided to at least 14 <u>additional</u> GEICO Insureds at Med-Union Medical and GR Rehab, including at least 17.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 39.75 hours of services that Seco purported to personally perform, or at least directly supervise, on December 19, 2016.

(v)   On January 3, 2017, Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco purported to provide at least 120 individual physical therapy services to at least 18

individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 21.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seco also purported to personally perform, or at least directly supervise at least 52 <u>additional</u> physical therapy services purportedly provided to at least seven <u>additional</u> GEICO Insureds at Med-Union Medical and GR Rehab, including at least nine hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 30.25 hours of services that Seco purported to personally perform, or at least directly supervise, on January 3, 2017.

(vi)     On November 30, 2017, Gonzalez's Medical, J.J. Gonzalez, and Seco purported to provide at least 110 individual physical therapy services to at least 17 individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 18 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seco also purported to personally perform, or at least directly supervise at least 53 <u>additional</u> physical therapy services purportedly provided to at least seven <u>additional</u> GEICO Insureds at Med-Union Medical and New Generation Rehab, including at least 4.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 22.5 hours of services that Seco purported to personally perform, or at least directly supervise, on January 30, 2018.

(vii)    On December 7, 2017, Gonzalez's Medical, Gonzalez, and Seco purported to provide at least 137 individual physical therapy services to at least 21 individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 22.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seco also purported to personally perform, or at least directly supervise at least 80 <u>additional</u> physical therapy services purportedly provided to at least 10 <u>additional</u> GEICO Insureds at Med-Union Medical and New Generation Rehab, including at least 13.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 35.5 hours of services that Seco purported to personally perform, or at least directly supervise, on December 7, 2017.

(viii)   On January 30, 2018, Med-Union Medical, Cabrera, and Seco purported to provide at least 125 individual physical therapy services to at least 16 individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally

performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 22.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seco also purported to personally perform, or at least directly supervise at least 66 <u>additional</u> physical therapy services purportedly provided to at least 10 <u>additional</u> GEICO Insureds at Gonzalez's Medical and New Generation Rehab, including at least 11.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 34 hours of services that Seco purported to personally perform, or at least directly supervise, on January 30, 2018.

(ix)     On February 6, 2018, Med-Union Medical, Cabrera, and Seco purported to provide at least 124 individual physical therapy services to at least 15 individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 22.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seco also purported to personally perform, or at least directly supervise at least 67 <u>additional</u> physical therapy services purportedly provided to at least 11 <u>additional</u> GEICO Insureds at Gonzalez's Medical and New Generation Rehab, including at least 11.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 33.5 hours of services that Seco purported to personally perform, or at least directly supervise, on February 6, 2018.

(x)      On October 16, 2018, Med-Union Medical, Cabrera, and Seco purported to provide at least 112 individual physical therapy services to at least 14 individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 19.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seco also purported to personally perform, or at least directly supervise at least 64 <u>additional</u> physical therapy services purportedly provided to at least 10 <u>additional</u> GEICO Insureds at Gonzalez's Medical and New Generation Rehab, including at least 11.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 31 hours of services that Seco purported to personally perform, or at least directly supervise, on October 16, 2018.

(xi)     On November 14, 2018, New Generation Rehab, Abreu, and Seco purported to provide at least 67 individual physical therapy services to at least eight individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally performed or at least directly supervised every one of those treatments. What is

more, those putative treatments included at least 13 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seco also purported to personally perform, or at least directly supervise at least 72 <u>additional</u> physical therapy services purportedly provided to at least 10 <u>additional</u> GEICO Insureds at Med-Union Medical and Gonzalez's Medical, including at least 12.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 25.75 hours of services that Seco purported to personally perform, or at least directly supervise, on November 14, 2018.

(xii)   On December 26, 2018, New Generation Rehab, Abreu, and Seco purported to provide at least 80 individual physical therapy services to at least nine individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 15.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seco also purported to personally perform, or at least directly supervise at least 92 <u>additional</u> physical therapy services purportedly provided to at least 12 <u>additional</u> GEICO Insureds at Med-Union Medical and Gonzalez's Medical, including at least 16 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 31.75 hours of services that Seco purported to personally perform, or at least directly supervise, on December 26, 2018.

(xiii)  On January 2, 2019, New Generation Rehab, Abreu, and Seco purported to provide at least 87 individual physical therapy services to at least 10 individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 16.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seco also purported to personally perform, or at least directly supervise at least 90 <u>additional</u> physical therapy services purportedly provided to at least 12 <u>additional</u> GEICO Insureds at Med-Union Medical and Gonzalez's Medical, including at least 15.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 32 hours of services that Seco purported to personally perform, or at least directly supervise, on January 2, 2019.

(xiv)   On February 20, 2019, New Generation Rehab, Abreu, and Seco purported to provide at least 70 individual physical therapy services to at least eight individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 13.5 hours of physical therapy

services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seco also purported to personally perform, or at least directly supervise at least 77 <u>additional</u> physical therapy services purportedly provided to at least 10 <u>additional</u> GEICO Insureds at Med-Union Medical and Gonzalez's Medical, including at least 12.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 26.25 hours of services that Seco purported to personally perform, or at least directly supervise, on February 20, 2019.

(xv)     On June 19, 2019, Med-Union Medical, Cabrera, and Seco purported to provide at least 108 individual physical therapy services to at least 14 individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 18.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seco also purported to personally perform, or at least directly supervise at least 62 <u>additional</u> physical therapy services purportedly provided to at least eight <u>additional</u> GEICO Insureds at Gonzalez's Medical and New Generation Rehab, including at least 11 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 29.25 hours of services that Seco purported to personally perform, or at least directly supervise, on June 19, 2019.

(xvi)    On September 12, 2019, Premium Medical, Gutierrez Concepcion, and Seco purported to provide at least 34 individual physical therapy services to at least three individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least six hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seco also purported to personally perform, or at least directly supervise at least 142 <u>additional</u> physical therapy services purportedly provided to at least 21 <u>additional</u> GEICO Insureds at Med-Union Medical, Gonzalez's Medical, and New Generation Rehab, including at least 24.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 30.75 hours of services that Seco purported to personally perform, or at least directly supervise, on September 12, 2019.

(xvii)   On October 22, 2019, Premium Medical, Gutierrez Concepcion, and Seco purported to provide at least 50 individual physical therapy services to at least six individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 8.5 hours of physical

therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seco also purported to personally perform, or at least directly supervise at least 121 additional physical therapy services purportedly provided to at least 17 additional GEICO Insureds at Med-Union Medical, Gonzalez's Medical, and New Generation Rehab, including at least 21 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 29.5 hours of services that Seco purported to personally perform, or at least directly supervise, on October 22, 2019.

(xviii)   On January 16, 2020, Premium Medical, Gutierrez Concepcion, and Seco purported to provide at least 64 individual physical therapy services to at least eight individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 10.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seco also purported to personally perform, or at least directly supervise at least 50 additional physical therapy services purportedly provided to at least seven additional GEICO Insureds at Med-Union Medical, Gonzalez's Medical, and New Generation Rehab, including at least 8.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 19.25 hours of services that Seco purported to personally perform, or at least directly supervise, on January 16, 2020.

(xix)   On February 4, 2020, Premium Medical, Gutierrez Concepcion, and Seco purported to provide at least 55 individual physical therapy services to at least seven individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 8.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seco also purported to personally perform, or at least directly supervise at least 70 additional physical therapy services purportedly provided to at least 10 additional GEICO Insureds at Med-Union Medical, Gonzalez's Medical, and New Generation Rehab, including at least 11.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 20.5 hours of services that Seco purported to personally perform, or at least directly supervise, on February 4, 2020.

(xx)   On March 2, 2020, Med-Union Medical, Angarica, and Seco purported to provide at least 61 individual physical therapy services to at least six individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally

performed or at least directly supervised every one of those treatments.  What is more, those putative treatments included at least 12 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.  That same day, Seco also purported to personally perform, or at least directly supervise at least 41 <u>additional</u> physical therapy services purportedly provided to at least six <u>additional</u> GEICO Insureds at New Generation Rehab and Gonzalez's Medical, including at least 6.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.  In all, GEICO received billing for at least 18.5 hours of services that Seco purported to personally perform, or at least directly supervise, on March 2, 2020.

38.     These are only representative examples. It is impossible that Seco – who was relatively advanced in age at the time, and was simultaneously purporting to work multiple jobs at multiple locations – routinely performed or supervised such a high volume of physical therapy services on individual dates, often at multiple of the Clinic Defendants on individual dates.

39.     Upon information and belief, the fraudulent billing for physical therapy services that the Defendants submitted or caused to be submitted through the respective Clinic Defendants to GEICO constituted only a fraction of the <u>total</u> fraudulent billing for physical therapy services that the Defendants submitted through the respective Clinic Defendants to <u>all</u> of the automobile insurers in the Florida automobile insurance market.

40.     For instance, it is extremely improbable, to the point of impossibility, that the Defendants only submitted fraudulent billing to GEICO, and that the Defendants did not simultaneously bill other automobile insurers.

41.     Thus, upon information and belief, the impossible number of physical therapy services that Seco purported to directly supervise or perform for GEICO Insureds at the Clinic Defendants and other locations on individual dates of service constituted only a fraction of the <u>total</u> number of physical therapy services that Seco purported to directly supervise or perform at

the Clinic Defendants and other locations, including for individuals insured by companies other than GEICO, on those same dates of service.

42.     In keeping with the fact that Seco, Blasini, and Nguyen never legitimately fulfilled their required duties as "medical directors" at the respective Clinic Defendants, the substantial majority of the claims submitted by Defendants for physical therapy services identified in Exhibits "1" – "4" falsely represented that Seco had performed or at least directly supervised the underlying physical therapy services, so as to create the false appearance that the services were eligible for PIP reimbursement. In fact, the underlying physical therapy services were not eligible for PIP reimbursement, because they had been performed – to the extent they were performed at all – by completely unsupervised massage therapists and other unlicensed individuals, including Gutierrez Concepcion at Premium Medical, and Delgado and De Valle at Gonzalez's Medical.

43.     In the claims for physical therapy services identified in Exhibits "1" – "4", the Defendants routinely fraudulently misrepresented that the physical therapy services were lawfully provided and eligible for PIP reimbursement, when in fact they were neither lawfully provided nor eligible for reimbursement, because:

(i)     the putative physical therapy services were performed – to the extent they were performed at all – by unsupervised massage therapists or other unlicensed individuals;

(ii)    the respective Clinic Defendants could not lawfully recover PIP Benefits for the putative physical therapy services, because they were performed by unsupervised massage therapists and other unlicensed individuals; and

(iii)   the Defendants systematically fraudulently misrepresented that the physical therapy services were legitimately performed or directly supervised by Seco, when in fact Seco neither performed nor supervised the purported services.

**C.   The Defendants' Fraudulent Treatment and Billing Protocols**

44.     In the claims identified in Exhibits "1" – "4", virtually none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

45.     Even so – and in keeping with the fact that Seco, Blasini, and Nguyen never legitimately served as medical director at any of the respective Clinic Defendants – the Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" pursuant to pre-determined, fraudulent protocols designed to maximize the billing that they could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

**1.   The Fraudulent Claims for Initial Examinations**

46.     As a first step in their fraudulent treatment and billing protocol, many of the Insureds in the claims identified in Exhibits "1" - "4" purportedly received an initial examination at the respective Clinic Defendants, with:

(i)     Seco, Pelaez, and Trigoura purporting to personally perform or directly supervise a substantial majority of the initial examinations in the claims identified in Exhibit "1";

(ii)     Seco and Leiva purporting to personally perform or directly supervise a substantial majority of the initial examinations in the claims identified in Exhibit "2";

(iii)     Seco and Fernandez purporting to personally perform or directly supervise a substantial majority of the initial examinations in the claims identified in Exhibit "3"; and

(iv)     Seco and Zegarra purporting to personally perform or directly supervise a substantial majority of the initial examinations in the claims identified in Exhibit "4".

47.     The purported initial examinations then were billed to GEICO in the following manner:

(i)     In the claims identified in Exhibit "1", Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, Seco, Pelaez, and Trigoura billed GEICO under CPT 99204 for

each initial examination that Seco, Pelaez, or Trigoura purportedly provided at Med-Union Medical.

(ii)     In the claims identified in Exhibit "2", New Generation Rehab, Abreu, Seco, and Leiva billed GEICO under CPT codes 99203 or 99205 for each initial examination that Seco or Leiva purportedly provided at New Generation Rehab.

(iii)    In the claims identified in Exhibit "3", Premium Medical, Gutierrez Conception, Seco, and Fernandez billed GEICO under CPT codes 99203 or 99204 for each initial examination that Seco or Fernandez purportedly provided at Premium Medical.

(iv)     In the claims identified in Exhibit "4", Gonzalez's Medical, Gonzalez, Blasini, Seco, and Zegarra billed GEICO under CPT code 99204 for each initial examination that Seco or Zegarra purportedly provided at Gonzalez's Medical.

48.     Pursuant to the American Medical Association's CPT Assistant, which governs reimbursement of PIP claims, at all relevant times:

(i)      the use of CPT code 99203 to bill for an initial patient examination represented – among other things – that: (a) the patient presented with problems of moderate severity; (b) the physician who conducted the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family during the examination; (c) the physician who performed the examination conducted a "detailed" physical examination; and (d) the physician who performed the examination engaged in "low complexity" medical decision-making; and

(ii)     the use of CPT code 99204 to bill for an initial patient examination represented – among other things – that: (a) the patient presented with problems of moderate to high severity; (b) the physician who conducted the examination spent at least 45 minutes of face-to-face time with the patient or the patient's family during the examination; (c) the physician who performed the examination conducted a "comprehensive" physical examination; and (d) the physician who performed the examination engaged in "moderate complexity" medical decision-making.

(iii)    the use of CPT code for 99205 to bill for an initial patient examination represented – among other things – that: (a) the patient presented with problems of moderate to high severity; (b) the physician who conducted the examination spent at least 60 minutes of face-to-face time with the patient or the patient's family during the examination; (c) the physician who performed the examination conducted a "comprehensive" physical examination; and (d) the physician who performed the examination engaged in "high complexity" medical decision-making.

49.     As set forth below, the charges for the initial examinations identified in Exhibits "1" - "4" were fraudulent in that they misrepresented the nature, extent, and results of the purported initial examinations.

**(i)      Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

50.     To the extent that the Insureds in the claims identified in Exhibits "1" - "4" had any presenting problems at all as the result of their typically minor automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as sprains and strains.

51.     For instance, in the substantial majority of the claims identified in Exhibits "1" - "4" the Insureds did not seek treatment at any hospital as the result of their accidents. To the limited extent that the Insureds in the claims identified in Exhibits "1" - "4" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis, and discharged with nothing more serious than a minor soft tissue injury diagnosis such as a sprain or strain.

52.     Furthermore, in the substantial majority of the claims identified in Exhibits "1" - "4", contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were functional following the accidents, and that no one was seriously injured in the accidents, or injured at all.

53.     Even so, in the claims for initial examinations identified in Exhibits "1" - "4", Seco, the Clinic Defendants, the Clinic Owner Defendants, Blasini, Pelaez, Trigoura, Leiva, Fernandez, and Zegarra made the following misrepresentations:

(i)      When billing GEICO for putative initial examinations using CPT code 99203 in the claims identified in Exhibits "2" – "3", they falsely represented that the Insureds presented with problems of moderate severity, when in fact the Insureds' problems were low or minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

(ii)    When billing GEICO for putative initial examinations using CPT code 99204 or 99205 in the claims identified in Exhibits "1" – "4", they falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were low or minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

54.    For example:

(i)    On March 10, 2016, an Insured named EV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that EV's vehicle was drivable following the accident. The police report further indicated that EV was not injured and did not complain of any pain at the scene. In keeping with the fact that EV was not seriously injured, EV did not visit any hospital emergency room following the accident. To the extent that EV experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of EV on March 12, 2016, Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco billed GEICO for an initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ii)    On August 29, 2017, an Insured named JM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, sideswipe collision, and that JM's vehicle was drivable following the accident. The police report further indicated that JM was not injured and did not complain of any pain at the scene. In keeping with the fact that JM was not seriously injured, JM did not visit any hospital emergency room following the accident. To the extent that JM experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of JM on September 5, 2017, Med-Union Medical, Cabrera, and Seco billed GEICO for an initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iii)    On October 15, 2018, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured. In keeping with the fact that MC was not seriously injured, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of MC on October 17, 2018, New Generation Rehab, Abreu, Seco, and Leiva billed GEICO for an initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iv)     On November 9, 2018, an Insured named JE was involved in an automobile accident. The contemporaneous police report indicated that JE was not injured and did not complain of any pain at the scene.  In keeping with the fact that JE was not seriously injured, JE did not visit any hospital emergency room following the accident.  To the extent that JE experienced any health problems at all as a result of the accident, they were of low or minimal severity.  Even so, following a purported initial examination of JE on November 13, 2018, New Generation Rehab, Abreu, Seco, and Leiva billed GEICO for an initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(v)      On May 2, 2019, an Insured named AV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AV's vehicle was drivable following the accident. The police report further indicated that AV was not injured and did not complain of any pain at the scene.  In keeping with the fact that AV was not seriously injured, AV did not visit any hospital emergency room following the accident.  To the extent that AV experienced any health problems at all as a result of the accident, they were of low or minimal severity.  Even so, following a purported initial examination of AV on May 7, 2019, Med-Union Medical, Cabrera, Seco, and Pelaez billed GEICO for an initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vi)     On June 2, 2019, an Insured named AN was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that AN's vehicle was drivable following the accident. The police report further indicated that AN was not injured and did not complain of any pain at the scene.  In keeping with the fact that AN was not seriously injured, AN did not visit any hospital emergency room following the accident.  To the extent that AN experienced any health problems at all as a result of the accident, they were of low or minimal severity.  Even so, following a purported initial examination of AN on June 4, 2019, Med-Union Medical, Cabrera, Seco, and Trigoura billed GEICO for an initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vii)    On November 13, 2019, an Insured named AG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that AG's vehicle was drivable following the accident.  The police report further indicated that AG was not injured and did not complain of any pain at the scene.  In keeping with the fact that AG was not seriously injured, AG did not visit any hospital emergency room following the accident.  To the extent that AG experienced any health problems at all as a result of the accident, they were of low or minimal severity.  Even so, following a purported initial examination of AG on November 14, 2019, Gonzalez's Medical,

J.J. Gonzalez, and Seco billed GEICO for an initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(viii)   On November 26, 2019, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that JC's vehicle was drivable following the accident. The police report further indicated that JC was not injured and did not complain of any pain at the scene.  In keeping with the fact that JC was not seriously injured, JC did not visit any hospital emergency room following the accident.  To the extent that JC experienced any health problems at all as a result of the accident, they were of low or minimal severity.  Even so, following a purported initial examination of JC on December 4, 2019, Premium Medical, Gutierrez Concepcion, Seco, and Fernandez billed GEICO for an initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ix)   On December 4, 2019, an Insured named YM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that YM's vehicle was drivable following the accident.  The police report further indicated that YM was not injured and did not complain of any pain at the scene.  In keeping with the fact that YM was not seriously injured, YM did not visit any hospital emergency room following the accident.  To the extent that YM experienced any health problems at all as a result of the accident, they were of low or minimal severity.  Even so, following a purported initial examination of YM on December 9, 2019, Gonzalez's Medical, J.J. Gonzalez, and Seco billed GEICO for an initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(x)   On December 22, 2019, an Insured named MT was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that MT's vehicle was drivable following the accident.  The police report further indicated that MT was not injured and did not complain of any pain at the scene.  In keeping with the fact that MT was not seriously injured, MT did not visit any hospital emergency room following the accident.  To the extent that MT experienced any health problems at all as a result of the accident, they were of low or minimal severity.  Even so, following a purported initial examination of MT on December 26, 2019, Premium Medical, Gutierrez Concepcion, Seco, and Fernandez billed GEICO for an initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

55.   These are only representative examples. In the claims for initial examinations identified in Exhibits "1" - "4", Seco, the Clinic Defendants, the Clinic Owner Defendants, Blasini,

Pelaez, Trigoura, Leiva, Fernandez, and Zegarra routinely falsely represented that the Insureds presented with problems of either moderate severity or moderate to high severity in order to: (i) create a false basis for their charges for the examinations under CPT codes 99203, 99204 or 99205, respectively, because examinations billable under CPT codes 99203, 99204 and 99205 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity; and (ii) create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds.

**(ii)     Misrepresentations Regarding "Comprehensive" or "Detailed" Physical Examinations**

56.     In addition, in the claims for initial examinations identified in Exhibits "1" - "4", when Seco, the Clinic Defendants, the Clinic Owner Defendants, Blasini, Pelaez, Trigoura, Leiva, Fernandez, and Zegarra billed GEICO for putative initial examinations, they made the following misrepresentations regarding the nature and extent of the physical examinations that Seco, Pelaez, Trigoura, Leiva, Fernandez, and Zegarra purported to provide to the Insureds:

(i)     When billing GEICO for putative initial examinations using CPT code 99203 in the claims identified in Exhibits "2" – "3", they falsely represented that the physicians who purported to conduct the examinations – namely Leiva and Fernandez – conducted "detailed" physical examinations of the Insureds who purportedly received the examinations.

(ii)     When billing GEICO for putative initial examinations using CPT code 99204 or 99205 in the claims identified in Exhibits "1" – "4", they falsely represented that the physicians and other healthcare providers who purported to conduct the examinations – namely Seco, Pelaez, Trigoura, Leiva, Fernandez, and Zegarra – conducted "comprehensive" physical examinations of the Insureds who purportedly received the examinations.

57.     In fact, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibits "2" - "3", neither Seco, Leiva, Fernandez, nor any other physician or healthcare provider associated with New Generation Rehab and Premium Medical, ever conducted a "detailed" patient examination because: (i) pursuant to the CPT Assistant, a "detailed" physical

examination requires – among other things – that the physician or other healthcare provider performing the examination document an extended examination of the affected body areas and other symptomatic or related organ systems; but (ii) neither Seco, Leiva, Fernandez, nor any other physician or healthcare associated with New Generation Rehab and Premium Medical ever documented an extended examination of the Insureds' musculoskeletal systems or any of the Insureds' other systems.

58.     Additionally, with respect to the claims for initial examinations under CPT codes 99204 and 99205 that are identified in Exhibits "1" – "4", neither Seco, Pelaez, Trigoura, Leiva, Fernandez, Zegarra, nor any other physician or healthcare provider associated with the Clinic Defendants, ever conducted a "comprehensive" patient examination because: (i) pursuant to the CPT Assistant, a "comprehensive" physical examination requires – among other things – that the physician or other healthcare provider performing the examination document a general examination of multiple patient organ systems or a complete examination of a single patient organ system; but (ii) neither Seco, Pelaez, Trigoura, Leiva, Fernandez, Zegarra, nor any other physician or other healthcare provider associated with the Clinic Defendants ever documented a general examination of multiple patient organ systems or a complete examination of a single patient organ system.

59.     For example:

(i)     On July 9, 2014, Gonzalez's Medical, J.J. Gonzalez, and Seco billed GEICO under CPT code 99204 for an initial examination of an Insured named MW that Seco purported to perform, and thereby represented that they had provided a "comprehensive" physical examination to MW. However, Seco did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(ii)    On August 5, 2015, Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco billed GEICO under CPT code 99204 for an initial examination of an Insured named NN that Seco purported to perform, and thereby represented that they had provided a "comprehensive" physical examination to NN. However, Seco did not document

findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(iii)    On March 9, 2017, New Generation Rehab, Abreu, Seco and Leiva billed GEICO under CPT code 99205 for an initial examination of an Insured named NC that Leiva purported to perform, and thereby represented that they had provided a "comprehensive" physical examination to NC. However, Leiva did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(iv)    On February 1, 2018, Gonzalez's Medical, J.J. Gonzalez, and Seco billed GEICO under CPT code 99204 for an initial examination of an Insured named LR that Seco purported to perform, and thereby represented that they had provided a "comprehensive" physical examination to LR. However, Seco did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(v)    On August 15, 2019, Gonzalez's Medical, J.J. Gonzalez, Seco, and Zegarra billed GEICO under CPT code 99204 for an initial examination of an Insured named JT that Zegarra purported to perform, and thereby represented that they had provided a "comprehensive" physical examination to JT. However, Zegarra did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(vi)    On August 19, 2019, Premium Medical, Gutierrez Concepcion, Seco, and Fernandez billed GEICO under CPT code 99204 for an initial examination of an Insured named MC that Fernandez purported to perform, and thereby represented that they had provided a "comprehensive" physical examination to MC. However, Fernandez did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(vii)    On October 16, 2019, Premium Medical, Gutierrez Concepcion, Seco, and Fernandez billed GEICO under CPT code 99204 for an initial examination of an Insured named YB that Fernandez purported to perform, and thereby represented that they had provided a "comprehensive" physical examination to YB. However, Fernandez did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(viii)    On November 5, 2019, Med-Union Medical, Cabrera, Seco and Pelaez billed GEICO under CPT code 99204 for an initial examination of an Insured named RR

that Pelaez purported to perform, and thereby represented that they had provided a "comprehensive" physical examination to RR. However, Pelaez did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(ix)    On December 3, 2019, Med-Union Medical, Cabrera, Seco and Pelaez billed GEICO under CPT code 99204 for an initial examination of an Insured named EG that Pelaez purported to perform, and thereby represented that they had provided a "comprehensive" physical examination to EG. However, Pelaez did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(x)    On December 16, 2019, New Generation Rehab, Abreu, Seco and Leiva billed GEICO under CPT code 99205 for an initial examination of an Insured named CM that Leiva purported to perform, and thereby represented that they had provided a "comprehensive" physical examination to CM. However, Leiva did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

60.    These are only representative examples. In the claims for initial examinations identified in Exhibits "1" - "4", Seco, the Clinic Defendants, the Clinic Owner Defendants, Blasini, Pelaez, Trigoura, Leiva, Fernandez, and Zegarra routinely falsely represented that they provided either "detailed" or "comprehensive" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT codes 99203, 99204, or 99205 because examinations billable under CPT codes 99203, 99204 and 99205 are reimbursable at higher rates than examinations that are neither "detailed" nor "comprehensive".

**(iii)    Misrepresentations Regarding the Extent of Medical Decision-Making**

61.    Moreover, in the claims for initial examinations identified in Exhibits "1" - "4", when Seco, the Clinic Defendants, the Clinic Owner Defendants, Blasini, Pelaez, Trigoura, Leiva, Fernandez, and Zegarra billed GEICO for putative initial examinations, they made the following

misrepresentations regarding the extent of medical decision-making that was required in connection with the examinations:

   (i)     When billing GEICO for putative initial examinations using CPT code 99203 in the claims identified in Exhibits "2" – "3", they falsely represented that the physicians who purported to conduct the examinations – namely Leiva and Fernandez – engaged in some legitimate, low complexity medical decision-making in connection with the examinations.

   (ii)    When billing GEICO for putative initial examinations using CPT code 99204 in the claims identified in Exhibits "1", "3", and "4", they falsely represented that the physicians or healthcare providers who purported to conduct the examinations – namely Seco, Pelaez, Trigoura, Fernandez and Zegarra– engaged in some legitimate, moderate complexity medical decision-making in connection with the examinations.

   (iii)   When billing GEICO for putative initial examinations using CPT code 99205 in the claims identified in Exhibits "2", they falsely represented that the physician who purported to conduct the examinations – namely Leiva – engaged in some legitimate, high complexity medical decision-making in connection with the examinations.

   62.     In actuality, the purported initial examinations did not involve any legitimate medical decision-making at all.

   63.     For example, in the claims for initial examinations identified in Exhibits "1" - "4": (i) the initial examinations did not involve the retrieval, review, or analysis of any meaningful amount of medical records, diagnostic tests, or other information; (ii) there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all; and (iii) Seco, Pelaez, Trigoura, Leiva, Fernandez, and Zegarra did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations, and instead – at the direction of the respective Clinic Defendants and Clinic Owner Defendants – provided a substantially similar, pre-determined sprain/strain or similar soft tissue injury "diagnoses" for every Insured, regardless of their true individual circumstances or presentation.

   64.     For example:

(i)     On April 18, 2017, an Insured named DG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that DG's vehicle was drivable following the accident. The police report further indicated that DG was not injured and did not complain of any pain at the scene. In keeping with the fact that DG was not seriously injured, DG did not visit any hospital emergency room following the accident. To the extent that DG experienced any health problems at all as the result of the accident, they were of low or minimal severity. On April 18, 2017, Seco purported to conduct an initial examination of DG at Gonzalez's Medical. To the extent that Seco performed the examination in the first instance, Seco did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Seco did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Seco provided DG with the same, phony, list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither DG's presenting problems, nor the treatment plan provided to DG by Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco presented any risk of significant complications, morbidity, or mortality. To the contrary, DG did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to DG. Even so, Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Seco engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ii)    On May 29, 2018, an Insured named AR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that AR's vehicle was drivable following the accident. The police report further indicated that AR was not injured and did not complain of any pain at the scene. In keeping with the fact that AR was not seriously injured, AR did not visit any hospital emergency room following the accident. To the extent that AR experienced any health problems at all as the result of the accident, they were of low or minimal severity. On July 7, 2018, Seco purported to conduct an initial examination of AR at Gonzalez's Medical. To the extent that Seco performed the examination in the first instance, Seco did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Seco did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Seco provided AR with the same, phony, list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither AR's presenting problems, nor the treatment plan provided to AR by Gonzalez's Medical, J.J. Gonzalez, and Seco presented any risk of significant complications, morbidity, or mortality. To the contrary, AR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gonzalez's Medical, J.J. Gonzalez, and Seco consisted of medically

unnecessary physical therapy services, which did not pose the least bit of risk to AR. Even so, Gonzalez's Medical, J.J. Gonzalez, and Seco billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Seco engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iii)    On September 23, 2018, an Insured named FJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a one-car, low-impact collision, and that FJ's vehicle was drivable following the accident. The police report further indicated that FJ was not injured and did not complain of any pain at the scene. In keeping with the fact that FJ was not seriously injured, FJ did not visit any hospital emergency room following the accident. To the extent that FJ experienced any health problems at all as the result of the accident, they were of low or minimal severity. On September 25, 2018, Zegarra purported to conduct an initial examination of FJ at Gonzalez's Medical. To the extent that Zegarra performed the examination in the first instance, Zegarra did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Zegarra did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Zegarra provided FJ with the same, phony, list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither FJ's presenting problems, nor the treatment plan provided to FJ by Gonzalez's Medical, J.J. Gonzalez, and Zegarra presented any risk of significant complications, morbidity, or mortality. To the contrary, FJ did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gonzalez's Medical, J.J. Gonzalez, and Zegarra consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to FJ. Even so, Gonzalez's Medical, J.J. Gonzalez, and Zegarra billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Zegarra engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iv)    On November 9, 2018, an Insured named JE was involved in an automobile accident. The contemporaneous police report indicated that JE was not injured and did not complain of any pain at the scene. In keeping with the fact that JE was not seriously injured, JE did not visit any hospital emergency room following the accident. To the extent that JE experienced any health problems at all as the result of the accident, they were of low or minimal severity. On November 13, 2018, Leiva purported to conduct an initial examination of JE at New Generation Rehab. To the extent that Leiva performed the examination in the first instance, Leiva did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Leiva did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Leiva provided JE with the same, phony, list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither

JE's presenting problems, nor the treatment plan provided to JE by New Generation Rehab, Abreu, and Leiva presented any risk of significant complications, morbidity, or mortality. To the contrary, JE did not need any significant treatment at all as a result of the accident, and the treatment plan provided by New Generation Rehab, Abreu, and Leiva consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JE. Even so, New Generation Rehab, Abreu, and Leiva billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that Leiva engaged in some legitimate, high complexity medical decision-making during the purported examination.

(v)     On November 9, 2018, an Insured named JF was involved in an automobile accident. The contemporaneous police report indicated that JF was not injured and did not complain of any pain at the scene. In keeping with the fact that JF was not seriously injured, JF did not visit any hospital emergency room following the accident. To the extent that JF experienced any health problems at all as the result of the accident, they were of low or minimal severity. On November 13, 2018, Leiva purported to conduct an initial examination of JF at New Generation Rehab. To the extent that Leiva performed the examination in the first instance, Leiva did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Leiva did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Leiva provided JF with the same, phony, list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JF's presenting problems, nor the treatment plan provided to JF by New Generation Rehab, Abreu, and Leiva presented any risk of significant complications, morbidity, or mortality. To the contrary, JF did not need any significant treatment at all as a result of the accident, and the treatment plan provided by New Generation Rehab, Abreu, and Leiva consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JF. Even so, New Generation Rehab, Abreu, and Leiva billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that Leiva engaged in some legitimate, high complexity medical decision-making during the purported examination.

(vi)    On May 5, 2019, an Insured named DD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DD's vehicle was drivable following the accident. The police report further indicated that DD was not injured and did not complain of any pain at the scene. In keeping with the fact that DD was not seriously injured, DD did not visit any hospital emergency room following the accident. To the extent that DD experienced any health problems at all as the result of the accident, they were of low or minimal severity. On May 7, 2019, Pelaez purported to conduct an initial examination of DD at Med-Union Medical. To the extent that Pelaez performed the examination in the first instance, Pelaez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Pelaez did not consider

any significant number of diagnoses or management options in connection with the examination. Instead, Pelaez provided DD with the same, phony, list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither DD's presenting problems, nor the treatment plan provided to DD by Med-Union Medical, Cabrera, and Pelaez presented any risk of significant complications, morbidity, or mortality. To the contrary, DD did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Med-Union Medical, Cabrera, and Pelaez consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to DD. Even so, Med-Union Medical, Cabrera, and Pelaez billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Pelaez engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vii)   On August 19, 2019, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JR's vehicle was drivable following the accident. The police report further indicated that JR was not injured and did not complain of any pain at the scene. In keeping with the fact that JR was not seriously injured, JR did not visit any hospital emergency room following the accident. To the extent that JR experienced any health problems at all as the result of the accident, they were of low or minimal severity. On August 20, 2019, Pelaez purported to conduct an initial examination of JR at Med-Union Medical. To the extent that Pelaez performed the examination in the first instance, Pelaez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Pelaez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Pelaez provided JR with the same, phony, list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JR's presenting problems, nor the treatment plan provided to JR by Med-Union Medical, Cabrera, and Pelaez presented any risk of significant complications, morbidity, or mortality. To the contrary, JR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Med-Union Medical, Cabrera, and Pelaez consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JR. Even so, Med-Union Medical, Cabrera, and Pelaez billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Pelaez engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(viii)  On September 19, 2019, an Insured named FC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that FC's vehicle was drivable following the accident. The police report further does not indicate that FC complained of any pain at the scene. In keeping with the fact that FC was not seriously injured, FC did not visit any hospital emergency room following the accident. To the extent that FC

experienced any health problems at all as the result of the accident, they were of low or minimal severity. On September 23, 2019, Fernandez purported to conduct an initial examination of FC at Premium Medical. To the extent that Fernandez performed the examination in the first instance, Fernandez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Fernandez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Fernandez provided FC with the same, phony, list of objectively unverifiable soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither FC's presenting problems, nor the treatment plan provided to FC by Premium Medical, Gutierrez Concepcion, and Fernandez presented any risk of significant complications, morbidity, or mortality. To the contrary, FC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Premium Medical, Gutierrez Concepcion, and Fernandez consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to FC. Even so, Premium Medical, Gutierrez Concepcion, and Fernandez billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Fernandez engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ix)    On February 22, 2020, an Insured named MG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MG's vehicle was drivable following the accident. The police report further does not indicate that MG complained of any pain or injury at the scene. In keeping with the fact that MG was not seriously injured, MG did not visit any hospital emergency room following the accident. To the extent that MG experienced any health problems at all as the result of the accident, they were of low or minimal severity. On March 2, 2020, MG received a purported initial examination at Med-Union Medical. To the extent that the examination was performed in the first instance, the nurse practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the nurse practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the nurse practitioner provided MG with the same, phony, list of objectively unverifiable soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither MG's presenting problems, nor the treatment plan provided to MG by Med-Union Medical, Angarica, and Seco, presented any risk of significant complications, morbidity, or mortality. To the contrary, MG did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Med-Union Medical, Angarica, and Seco consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to MG. Even so, Med-Union Medical, Angarica, and Seco billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the nurse

35

practitioner engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(x)     On March 26, 2020, an Insured named SM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that SM's vehicle was drivable following the accident. The police report further does not indicate that SM complained of any pain or injury at the scene. In keeping with the fact that SM was not seriously injured, SM did not visit any hospital emergency room following the accident. To the extent that SM experienced any health problems at all as the result of the accident, they were low or minimal severity. On March 27, 2020, SM received a purported initial examination at Med-Union Medical. To the extent that the examination was performed in the first instance, the nurse practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the nurse practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the nurse practitioner provided SM with the same, phony, list of objectively unverifiable soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither SM's presenting problems, nor the treatment plan provided to SM by Med-Union Medical, Angarica, and Seco, presented any risk of significant complications, morbidity, or mortality. To the contrary, SM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Med-Union Medical, Angarica, and Seco consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to SM. Even so, Med-Union Medical, Angarica, and Seco billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the nurse practitioner engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

65.     In keeping with the fact that these putative "diagnoses" were pre-determined and phony, Seco, Pelaez, Trigoura, Leiva, Fernandez, and Zegarra – at the direction of the respective Clinic Defendants and Clinic Owner Defendants – frequently issued substantially identical, phony "diagnoses", on or about the same date, to two or more Insureds who had been involved in a the same underlying accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that they were differently situated.

66.     For example:

(i)     On September 29, 2017, two Insureds – LP and GG – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at

36

Gonzalez's Medical for initial examinations by Seco on the <u>exact same date</u>, October 5, 2017. LP and GG were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that LP and GG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Gonzalez's Medical and Seco – at the direction of J.J. Gonzalez – provided LP and GG with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(ii)     On September 23, 2018, <u>three</u> Insureds – FJ, HC and YC – were involved in the same automobile accident. Thereafter – incredibly – all three Insureds presented at Gonzalez's Medical for initial examinations by Zegarra on the <u>exact same date</u>, September 25, 2018. FJ, HC and YC were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that FJ, HC and YC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Gonzalez's Medical and Zegarra – at the direction of J.J. Gonzalez – provided FJ, HC and YC with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to all three of them.

(iii)    On November 9, 2018, <u>three</u> Insureds – JE, GE, and JF – were involved in the same automobile accident. Thereafter – incredibly – all three Insureds presented at New Generation Rehab for initial examinations by Leiva on the <u>exact same date</u>, November 13, 2018. JE, GE, and JF were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JE, GE, and JF suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, New Generation Rehab and Leiva – at the direction of Abreu and Seco – provided JE, GE, and JF with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(iv)     On January 9, 2019, two Insureds – EM and YB – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Gonzalez's Medical for initial examinations by Seco on the <u>exact same date</u>, January 18, 2019. EM and YB were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that EM and YB suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Gonzalez's Medical and Seco – at the direction of J.J. Gonzalez – provided EM and YB with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(v)     On January 18, 2019, two Insureds – DV and DV – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at New Generation Rehab for initial examinations by Leiva on the <u>exact same date</u>, January 18, 2019. DV and DV were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that DV and DV suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, New Generation Rehab and Leiva – at the direction of Abreu and Seco – provided DV and DV with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(vi)    On February 8, 2019, two Insureds – MA and OL – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at New Generation Rehab for initial examinations by Leiva on the <u>exact same date</u>, February 12, 2019. MA and OL were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MA and OL suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, New Generation Rehab and Leiva – at the direction of Abreu and Seco – provided MA and OL with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(vii)   On April 18, 2019, two Insureds – FR and WR – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Med-Union Medical for initial examinations by Pelaez on the <u>exact same date</u>, April 22, 2019. FR and WR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that FR and WR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Med-Union Medical and Pelaez – at the direction of Cabrera and Seco – provided FR and WR with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(viii)  On June 2, 2019, two Insureds – FN and AN – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Med-Union Medical for initial examinations by Pelaez and Trigoura on the <u>exact same date</u>, June 4, 2019. FN and AN were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that FN and AN suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Med-Union Medical, Pelaez and Trigoura– at the direction of Cabrera and Seco – provided FN and AN with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical

course of medically unnecessary treatment to both of them.

(ix)    On September 6, 2019, two Insureds – AG and FA – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Premium Medical for initial examinations by Fernandez on the <u>exact same date</u>, September 10, 2019. AG and FA were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AG and FA suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Premium Medical and Fernandez – at the direction of Gutierrez Concepcion and Seco– provided AG and FA with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(x)    On December 22, 2019, two Insureds – MT and GN – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Premium Medical for initial examinations by Fernandez on the <u>exact same date</u>, December 26, 2019. MT and GN were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MT and GN suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Premium Medical and Fernandez – at the direction of Gutierrez Concepcion and Seco – provided MT and GN with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

67.    Based on these phony and pre-determined soft tissue injury "diagnoses", Seco, Pelaez, Trigoura, Leiva, Fernandez, and Zegarra – at the direction of the respective Clinic Defendants and Clinic Owner Defendants – virtually every Insured was directed to return to the respective Clinic Defendants up to five times each week for medically unnecessary "physical therapy", which was performed – to the extent that it was performed at all – by completely unsupervised massage therapists or other unlicensed individuals, including Gutierrez Concepcion at Premium Medical and Delgado and De Valle at Gonzalez's  Medical.

68.    The false "diagnoses" contained within the initial examination reports were included to give the false impression that the initial examinations entailed some legitimate medical decision-making, to create a false basis for the charges under CPT codes 99203, 99204, and 99205, and to

create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

69.     In the claims for initial examinations identified in Exhibits "1" – "4", Seco, the Clinic Defendants, the Clinic Owner Defendants, Blasini, Pelaez, Trigoura, Leiva, Fernandez, and Zegarra routinely fraudulently misrepresented that the examinations were lawfully provided and eligible for PIP reimbursement, when in fact they were neither lawfully provided nor reimbursable, because:

     (i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

     (ii)     the charges for the putative examinations misrepresented the nature, extent, and results of the examinations; and

     (iii)     the Clinic Defendants never were eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as they unlawfully were operated without legitimate medical directors.

70.     In this context, Seco – who purported to serve as the "medical director" at Med-Union Medical, New Generation Rehab, and Premium Medical – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1). Had Seco done so, he would have observed and put a stop to these fraudulent charges for initial examinations.

71.     Likewise, Blasini and Nguyen – who purported to serve as the "medical director" at Gonzalez's Medical, did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1). Had Blasini and Nguyen done so, they would have observed and put a stop to these fraudulent charges for initial examinations.

**2.      The Fraudulent Claims for Follow-Up Examinations**

72.      In addition to the fraudulent initial examinations, most of the Insureds in the claims

identified in Exhibits "1" - "4" purportedly received multiple, fraudulent follow-up examinations at

the respective Clinic Defendants, with:

(i)      Seco, Pelaez, and Trigoura purporting to personally perform or directly supervise a
         substantial majority of the follow-up examinations at Med-Union Medical;

(ii)     Seco and Leiva purporting to personally perform or directly supervise a substantial
         majority of the follow-up examinations at New Generation Rehab;

(iii)    Seco and Fernandez purporting to personally perform or directly supervise a
         substantial majority of the follow-up examinations at Premium Medical; and

(iv)     Seco and Zegarra purporting to personally perform or directly supervise a
         substantial majority of the follow-up examinations at Gonzalez's Medical.

73.      The purported follow-up examinations then were billed to GEICO in the following

manner:

(i)      In the claims identified in Exhibit "1", Med-Union Medical, J.A. Gonzalez, Amigo,
         Cabrera, Angarica, Seco, Pelaez, and Trigoura billed GEICO under CPT codes
         99213, 99214, or 99215 for each follow-up examination that Seco, Pelaez, and
         Trigoura purportedly provided at Med-Union Medical.

(ii)     In the claims identified in Exhibit "2", New Generation Rehab, Abreu, Seco, and
         Leiva billed GEICO under CPT codes 99213, 99214, or 99215 for each follow-up
         examination that Leiva purportedly provided at New Generation Rehab.

(iii)    In the claims identified in Exhibit "3", Premium Medical, Gutierrez Conception,
         Seco, and Fernandez billed GEICO under CPT codes 99213 or 99214 for each
         follow-up examination that Seco and Fernandez purportedly provided at Premium
         Medical.

(iv)     In the claims identified in Exhibit "4", Gonzalez's Medical, J.J. Gonzalez, Seco, and
         Zegarra billed GEICO under CPT codes 99213, or 99214 for each follow-up
         examination that Seco and Zegarra purportedly provided at Gonzalez's Medical.

74.      Pursuant to the CPT Assistant, at all relevant times the use of CPT code 99213 to bill

for a follow-up examination represented – among other things – that: (i) the patient presented with

problems of low to moderate severity; and (ii) the physician or other healthcare provider performed

41

at least two of the following three components during the examination: (a) took an "expanded problem focused" patient history; (b) conducted an "expanded problem focused physical examination"; and (c) engaged in medical decision-making of "low complexity".

75.     Pursuant to the CPT Assistant, at all relevant times the use of CPT code 99214 to bill for a follow-up examination represented – among other things – that: (i) the patient presented with problems of moderate to high severity; and (ii) the physician or other healthcare provider performed at least two of the following three components during the examination: (a) took a "detailed" patient history; (b) conducted a "detailed" physical examination; and (c) engaged in medical decision-making of "moderate complexity".

76.     Pursuant to the CPT Assistant, at all relevant times the use of CPT code 99215 to bill for a follow-up examination represented – among other things – that: (i) the patient presented with problems of moderate to high severity; and (ii) the physician or other healthcare provider performed at least two of the following three components during the examination: (a) took a "comprehensive" patient history; (b) conducted a "comprehensive" physical examination; and (c) engaged in medical decision-making of "high complexity".

77.     As set forth below, the charges for the follow-up examinations identified in Exhibits "1" – "4" misrepresented the nature, extent, and results of the purported follow-up examinations.

**(i)     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

78.     To the extent that the Insureds in the claims identified in Exhibits "1" - "4" suffered any injuries at all in their automobile accidents, the injuries almost always were minor soft tissue injuries such as sprains and strains, which were of low or minimal severity, even at their onset.

79.     Minor soft tissue injuries such as strains and sprains virtually always resolve after a short course of conservative treatment or no treatment at all. By the time the Insureds in the claims

identified in Exhibits "1" - "4" presented for their putative follow-up examinations – typically weeks after their minor accidents – the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or else their presenting problems were minimal.

80.     Even so, in the claims for the follow-up examinations identified in Exhibits "1" - "4", Seco, the Clinic Defendants, the Clinic Owner Defendants, Blasini, Pelaez, Trigoura, Leiva, Fernandez, and Zegarra made the following misrepresentations:

(i)     When billing GEICO for putative follow-up examinations using CPT code 99213 in the claims identified in Exhibits "1" – "4", they falsely represented that the Insureds presented with problems of low to moderate severity, when in fact the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

(ii)    When billing GEICO for putative follow-up examinations using CPT code 99214 in the claims identified in Exhibits "1" – "4", they falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

(iii)   When billing GEICO for putative follow-up examinations using CPT code 99215 in the claims identified in Exhibits "1- 2", they falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

81.     For example:

(i)     On May 7, 2016, an Insured named YP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YP's vehicle was drivable following the accident. The police report further indicated that YP was not injured and did not complain of any pain at the scene. In keeping with the fact that YP was not seriously injured, YP did not visit any hospital emergency room following the accident. To the extent that YP experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset. Even so, following a purported follow-up examination of YP on July 25, 2016 – approximately three months after the accident – Gonzalez's Medical, J.J. Gonzalez, Blasini, and Zegarra billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that YP presented with problems of moderate to high severity.

(ii)    On August 29, 2017, an Insured named JM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed,

sideswipe collision, and that JM's vehicle was drivable following the accident. The police report further indicated that JM was not injured and did not complain of any pain at the scene. In keeping with the fact that JM was not seriously injured, JM did not visit any hospital emergency room following the accident. To the extent that JM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset.  Even so, following a purported follow-up examination of JM on November 1, 2017 – more than two months after the accident – Med-Union Medical, Cabrera, and Seco billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that JM presented with problems of moderate severity.

(iii)     On July 25, 2018, an Insured named KG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that KG's vehicle was drivable following the accident. The police report further indicated that KG was not injured and did not complain of any pain at the scene. In keeping with the fact that KG was not seriously injured, KG did not visit any hospital emergency room following the accident. To the extent that KG experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset. Even so, following a purported follow-up examination of KG on October 11, 2018 – approximately three months after the accident – Gonzalez's Medical, J.J. Gonzalez, and Zegarra billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that KG presented with problems of moderate to high severity.

(iv)     On November 9, 2018, an Insured named GE was involved in an automobile accident. The contemporaneous police report indicated that GE was not injured and did not complain of any pain at the scene. In keeping with the fact that GE was not seriously injured, GE did not visit any hospital emergency room following the accident. To the extent that GE experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset.  Even so, following a purported follow-up examination of GE on December 3, 2018 – approximately one month after the accident – New Generation Rehab, Abreu, Leiva, and Seco billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that MS presented with problems of moderate severity.

(v)     On January 16, 2019, an Insured named MS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that MS's vehicle was drivable following the accident. The police report further indicated that MS was not injured and did not complain of any pain at the scene. In keeping with the fact that MS was not seriously injured, MS did not visit any hospital emergency room following the accident. To the extent that MS experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset.  Even so, following a purported follow-up examination of MS on February 11, 2019 – approximately one month after the accident – New Generation Rehab, Abreu,

Leiva, and Seco billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that MS presented with problems of moderate severity.

(vi)    On August 19, 2019, an Insured named MM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that MM's vehicle was drivable following the accident. The police report further indicated that MM was not injured and did not complain of any pain at the scene. In keeping with the fact that MM was not seriously injured, MM did not visit any hospital emergency room following the accident. To the extent that MM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset. Even so, following a purported follow-up examination of MM on October 31, 2019 – more than two months after the accident – Med-Union Medical, Cabrera, Pelaez, and Seco billed GEICO for the follow-up examination using CPT code 99215 and thereby falsely represented that MM presented with problems of moderate to high severity.

(vii)    On November 26, 2019, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that JC's vehicle was drivable following the accident. The police report further indicated that JC was not injured and did not complain of any pain at the scene. In keeping with the fact that JC was not seriously injured, JC did not visit any hospital emergency room following the accident. To the extent that JC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset. Even so, following a purported follow-up examination of JC on January 23, 2020 – approximately two months after the accident – Premium Medical, Gutierrez Concepcion, Fernandez, and Seco billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that JC presented with problems of moderate to high severity.

(viii)    On December 22, 2019, an Insured named GN was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that GN's vehicle was drivable following the accident. The police report further indicated that GN was not injured and did not complain of any pain at the scene. In keeping with the fact that GN was not seriously injured, GN did not visit any hospital emergency room following the accident. To the extent that GN experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset. Even so, following a purported follow-up examination of GN on February 10, 2020 – approximately two months after the accident – Premium Medical, Gutierrez Concepcion, Fernandez, and Seco billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that GN presented with problems of moderate to high severity.

(ix)    On March 26, 2020, an Insured named SM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed,

rear-end collision, and that SM's vehicle was drivable following the accident. The police report further indicated that SM was not injured and did not complain of any pain at the scene. In keeping with the fact that SM was not seriously injured, SM did not visit any hospital emergency room following the accident. To the extent that SM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset. Even so, following a purported follow-up examination of SM on April 24, 2020 – approximately one month after the accident – Med-Union Medical, Angarica, and Seco billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that SM presented with problems of moderate to high severity.

(x)     On April 7, 2020, an Insured named YC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. The police report further indicated that YC was not injured. In keeping with the fact that YC was not seriously injured, YC did not visit any hospital emergency room following the accident. To the extent that YC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset. Even so, following a purported follow-up examination of YC on May 18, 2020 – approximately one and a half months after the accident – Med-Union Medical, Angarica, and Seco billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that YC presented with problems of moderate to high severity.

82.     These are only representative examples. In the claims for follow-up examinations identified in Exhibits "1" - "4", Seco, the Clinic Defendants, the Clinic Owner Defendants, Blasini, Pelaez, Trigoura, Leiva, Fernandez and Zegarra routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to: (i) create a false basis for their charges for the examinations under CPT codes 99213, 99214, or 99215, because examinations billable under CPT codes 99213, 99214, and 99215 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity; and (ii) create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds.

(ii)     **Misrepresentations Regarding the Nature, Extent, and Results of the Follow-Up Examinations**

83.     What is more, in the claims for follow-up examinations identified in Exhibits "1" - "4", neither Seco, Pelaez, Trigoura, Leiva, Fernandez, Zegarra, nor any other physician or other healthcare provider associated with the Clinic Defendants, took any legitimate patient histories, conducted any legitimate physical examinations, or engaged in any legitimate medical decision-making at all.

84.     Rather, following the purported follow-up examinations, Seco, Pelaez, Trigoura, Leiva, Fernandez, and Zegarra – at the direction of the respective Clinic Defendants and Clinic Owner Defendants – simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and either (ii) referred the Insureds for even more medically unnecessary physical therapy services, despite the fact that the Insureds often already had received extensive physical therapy services that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

85.     The phony "follow-up examinations" that Seco, the Clinic Defendants, the Clinic Owner Defendants, Blasini, Pelaez, Trigoura, Leiva, Fernandez, and Zegarra purported to provide to the Insureds in the claims identified in Exhibits "1" - "4" therefore were medically useless, and played no legitimate role in the treatment or care of the Insureds, because the putative "results" of the examinations were prearranged to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment they walked into the Clinic Defendants' offices.

86.     In the claims for follow-up examinations identified in Exhibits "1" - "4", Seco, the Clinic Defendants, the Clinic Owner Defendants, Blasini, Pelaez, Trigoura, Leiva, Fernandez, and

Zegarra routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)   the Clinic Defendants never were eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as they unlawfully were operated without legitimate medical directors.

## 3.     The Fraudulent Claims for "Physical Therapy"

87.     In keeping with the fact that the purported "results" of the follow-up examinations were pre-determined, and had no legitimate connection to the Insureds' true medical circumstances or presentation:

(i)     the Clinic Owner Defendants, Clinic Defendants, Seco, Blasini, Pelaez, Trigoura, Leiva, Fernandez, Zegarra, and the Massage Therapist Defendants caused virtually every Insured to receive two to four months of purported physical therapy treatments, typically beginning with physical therapy five or four times per week for the first several weeks of treatment, followed by physical therapy four or three times per week thereafter; and

(ii)    the Clinic Owner Defendants, Clinic Defendants, Seco, Blasini, Pelaez, Trigoura, Leiva, Fernandez, Zegarra, and the Massage Therapist Defendants caused virtually every Insured to receive substantially identical <u>types</u> of physical therapy services, including: (i) hot/cold packs; (ii) mechanical traction; (iii) electrical stimulation; (iv) ultrasound therapy; (v) therapeutic exercises; and (vi) neuromuscular reeducation. <u>See</u> Exhibits "1" – "4".

88.     In a legitimate clinical setting, each individual patient's physical therapy schedule, and the specific physical therapy modalities that will be used, must be tailored to the specific patient's circumstances, symptomatology, and presentation.

89.     In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy is constantly adjusted for each individual patient based on each patient's individual

treatment progress, as assessed during each patient's follow-up examinations and on an ongoing basis as they receive the physical therapy.

90. By contrast, at each of the Clinic Defendants, the nature and extent of the physical therapy that each Insured purportedly received was pre-determined and had no legitimate connection to the Insureds' individual circumstances, presentation, or progress through the Defendants' fraudulent treatment and billing protocols. The purported "physical therapy" provided through each of the Clinic Defendants to GEICO Insureds therefore was medically useless.

91. Furthermore, in the claims for physical therapy services identified in Exhibits "1" – "4", the charges were fraudulent, unlawful, and non-reimbursable because the billing falsely represented that Seco had performed or directly supervised the services, when in fact the "physical therapy" services were performed – to the extent that they were performed at all – by unsupervised massage therapists or other unlicensed individuals associated with each of the Clinic Defendants, including Gutierrez Concepcion at Premium Medical, and Delgado and De Valle at Gonzalez's Medical.

## III.   **The Fraudulent Claims the Defendants Submitted or Caused to be Submitted to GEICO**

92. To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of HCFA-1500 forms, treatment reports, and claims through the respective Clinic Defendants to GEICO, containing thousands of individual charges, seeking payment for the Fraudulent Services that the Defendants were not entitled to receive. In particular:

(i)   The Med-Union Medical Defendants submitted or caused to be submitted thousands of HCFA-1500 forms, treatment reports, and claims through Med-Union Medical to GEICO;

(ii)   The New Generation Rehab Defendants submitted or caused to be submitted thousands of HCFA-1500 forms, treatment reports, and claims through New Generation Rehab to GEICO;

(iii)  The Premium Medical Defendants submitted or caused to be submitted thousands of HCFA-1500 forms, treatment reports, and claims through Premium Medical to GEICO; and

(iv)  The Gonzalez's Medical Defendants submitted or caused to be submitted thousands of HCFA-1500 forms, treatment reports, and claims through Gonzalez's Medical to GEICO.

93.  The claims that the Defendants submitted or caused to be submitted to GEICO were

false and misleading in the following, material respects:

(i)  The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Clinic Defendants were in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance. In fact, the Clinic Defendants never were in compliance with the Clinic Act, and never were eligible to collect PIP Benefits, because they were operated without legitimate medical directors who legitimately fulfilled the statutory requirements applicable to clinic medical directors.

(ii)  The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement. In fact, the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement, because: (a) they were medically unnecessary and provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; and (b) in the case of the physical therapy services, because they were performed by unsupervised massage therapists and other unlicensed individuals.

(iii)  The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv)  The HCFA-1500 forms and treatment reports submitted by and on behalf of the Defendants frequently misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided, in order to increase the amount of reimbursement the Defendants could unlawfully obtain.

IV.    **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

94.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of charges to GEICO. Even so, the Defendants knowingly misrepresented and concealed facts related to the Clinic Defendants in an effort to prevent discovery: (i) that the Clinic Defendants lacked legitimate medical directors, and therefore were ineligible to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were provided – to the extent that they were provided at all – by unsupervised massage therapists or other unlicensed individuals, and therefore were not eligible for PIP reimbursement; and (iii) that the Fraudulent Services were medically unnecessary.

95.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $4,015,000.00.

96.    GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it commenced this action.

**FIRST CAUSE OF ACTION**
**Against Med-Union Medical, New Generation Rehab, Premium Medical, and Gonzalez's Medical**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

97.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-96 above.

98.    There is an actual case in controversy between GEICO and each of the Clinic Defendants regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

99.     The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because they unlawfully were operated in violation of the Clinic Act's medical director and operating requirements.

100.    The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided or billed to GEICO.

101.    The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO for purported physical therapy because the underlying Fraudulent Services were not performed by individuals who actually were licensed to perform the pertinent services, or else constituted non-reimbursable massage.

102.    The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

103.    The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

104.    The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

105.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Med-Union Medical, New Generation Rehab, Premium Medical, and Gonzalez's Medical have no right to receive payment for any pending bills submitted to GEICO.

**SECOND CAUSE OF ACTION**
**Against J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

106.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-96 above.

107.    Med-Union Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

108.    J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco knowingly have conducted and/or participated, directly or indirectly, in the conduct of Med-Union Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over six years seeking payments that Med-Union Medical was not eligible to receive under the No-Fault Law because: (i) Med-Union Medical unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Med-Union Medical Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for

the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

109.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

110.    Med-Union Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco operated Med-Union Medical, inasmuch as Med-Union Medical was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for Med-Union Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Med-Union Medical Defendants continue to attempt collection on the fraudulent billing submitted through Med-Union Medical to the present day.

111.    Med-Union Medical is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Med-Union Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

112.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,676,000.00 pursuant to the fraudulent bills submitted through the Med-Union Medical enterprise.

113.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against J.A. Gonzalez, Amigo, Cabrera, Angarica, Seco, Pelaez, and Trigoura**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

114.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-96 above.

115.    Med-Union Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

116.    J.A. Gonzalez, Amigo, Cabrera, Angarica, Seco, Pelaez, and Trigoura are or were employed by or associated with the Med-Union Medical enterprise.

117.    J.A. Gonzalez, Amigo, Cabrera, Angarica, Seco, Pelaez, and Trigoura knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Med-Union Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over six years seeking payments that Med-Union Medical was not eligible to receive under the No-Fault Law because: (i) Med-Union Medical unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Med-Union Medical Defendants, rather than to treat or otherwise benefit the Insureds who

purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

118.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

119.    J.A. Gonzalez, Amigo, Cabrera, Angarica, Seco, Pelaez, and Trigoura knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

120.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,676,000.00 pursuant to the fraudulent bills submitted through the Med-Union Medical enterprise.

121.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against the Med-Union Medical Defendants**
**(Under Fla. Stat. 501.201 <u>et</u>. <u>seq</u>.)**

122.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-96 above.

123.    The Med-Union Medical Defendants are actively engaged in trade and commerce in the State of Florida.

124.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

125.    The Med-Union Medical Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

126.    The bills and supporting documents submitted or caused to be submitted by the Med-Union Medical Defendants to GEICO were fraudulent in that they misrepresented: (i) Med-Union Medical's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

127.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of the Med-Union Medical Defendants has been materially injurious to GEICO and its Insureds.

128.    The conduct of the Med-Union Medical Defendants was the actual and proximate cause of the damages sustained by GEICO.

129.    The Med-Union Medical Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $1,676,000.00.

130.    By reason of the Med-Union Medical Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

## FIFTH CAUSE OF ACTION
### Against the Med-Union Medical Defendants
### (Common Law Fraud)

131.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-96 above.

132.    The Med-Union Medical Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through Med-Union Medical for the Fraudulent Services.

133.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Med-Union Medical was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Med-Union Medical never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

134.    The Med-Union Medical Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Med-Union Medical that were not reimbursable.

135.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,676,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Med-Union Medical Defendants through Med-Union Medical.

136.     The Med-Union Medical Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

137.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**SIXTH CAUSE OF ACTION**
**Against the Med-Union Medical Defendants**
**(Unjust Enrichment)**

138.     GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-96 above.

139.     As set forth above, the Med-Union Medical Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

140.     When GEICO paid the bills and charges submitted or caused to be submitted by the Med-Union Medical Defendants through Med-Union Medical, it reasonably believed that it was legally obligated to make such payments based on the Med-Union Medical Defendants' improper, unlawful, and/or unjust acts.

141.     The Med-Union Medical Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Med-Union Medical Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

142.     The Med-Union Medical Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

143.     By reason of the above, the Med-Union Medical Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,676,000.00.

## SEVENTH CAUSE OF ACTION
### Against Abreu and Seco
### (Violation of RICO, 18 U.S.C. § 1962(c))

144.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-96 above.

145.     New Generation Rehab is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

146.     Abreu and Seco knowingly have conducted and/or participated, directly or indirectly, in the conduct of New Generation Rehab's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that New Generation Rehab was not eligible to receive under the No-Fault Law because: (i) New Generation Rehab unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially

enrich the New Generation Rehab Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

147.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

148.   New Generation Rehab's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Abreu and Seco operated New Generation Rehab, inasmuch as New Generation Rehab was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for New Generation Rehab to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the New Generation Rehab Defendants continue to attempt collection on the fraudulent billing submitted through New Generation Rehab to the present day.

149.   New Generation Rehab is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by New Generation Rehab in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

150.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $386,000.00 pursuant to the fraudulent bills submitted through the New Generation Rehab enterprise.

151.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
### Against Abreu, Seco, and Leiva
### (Violation of RICO, 18 U.S.C. § 1962(d))

152.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-96 above.

153.    New Generation Rehab is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

154.    Abreu, Seco, and Leiva are or were employed by or associated with the New Generation Rehab enterprise.

155.    Abreu, Seco, and Leiva knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of New Generation Rehab's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that New Generation Rehab was not eligible to receive under the No-Fault Law because: (i) New Generation Rehab unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically

necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the New Generation Rehab Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

156.     A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

157.     Abreu, Seco, and Leiva knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

158.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $386,000.00 pursuant to the fraudulent bills submitted through the New Generation Rehab enterprise.

159.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
### Against the New Generation Rehab Defendants
### (Under Fla. Stat. 501.201 et. seq.)

160.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-96 above.

161.     The New Generation Rehab Defendants are actively engaged in trade and commerce in the State of Florida.

162.     GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

163.     The New Generation Rehab Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

164.     The bills and supporting documents submitted or caused to be submitted by the New Generation Rehab Defendants to GEICO were fraudulent in that they misrepresented: (i) New Generation Rehab's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

165.     Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of the New Generation Rehab Defendants has been materially injurious to GEICO and its Insureds.

166.     The conduct of the New Generation Rehab Defendants was the actual and proximate cause of the damages sustained by GEICO.

167.     The New Generation Rehab Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $386,000.00.

168.     By reason of the New Generation Rehab Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

**TENTH CAUSE OF ACTION**
**Against the New Generation Rehab Defendants**
**(Common Law Fraud)**

169.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-96 above.

170.     The New Generation Rehab Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through New Generation Rehab for the Fraudulent Services.

171.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that New Generation Rehab was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact New Generation Rehab never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

172.     The New Generation Rehab Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through New Generation Rehab that were not reimbursable.

173.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $386,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the New Generation Rehab Defendants through New Generation Rehab.

174.     The New Generation Rehab Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

175.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## ELEVENTH CAUSE OF ACTION
### Against the New Generation Rehab Defendants
### (Unjust Enrichment)

176.     GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-96 above.

177.     As set forth above, the New Generation Rehab Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

178.     When GEICO paid the bills and charges submitted or caused to be submitted by the New Generation Rehab Defendants through New Generation Rehab, it reasonably believed that it

was legally obligated to make such payments based on the New Generation Rehab Defendants' improper, unlawful, and/or unjust acts.

179.    The New Generation Rehab Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the New Generation Rehab Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

180.    The New Generation Rehab Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

181.    By reason of the above, the New Generation Rehab Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $386,000.00.

**TWELFTH CAUSE OF ACTION**
**Against Gutierrez Concepcion and Seco**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

182.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-96 above.

183.    Premium Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

184.    Gutierrez Concepcion and Seco knowingly have conducted and/or participated, directly or indirectly, in the conduct of Premium Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over one year seeking payments that Premium Medical was not eligible to receive under the No-Fault Law because: (i) Premium Medical unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent

Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Premium Medical Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

185.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

186.   Premium Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Gutierrez Concepcion and Seco operated Premium Medical, inasmuch as Premium Medical was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for Premium Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Premium Medical Defendants continue to attempt collection on the fraudulent billing submitted through Premium Medical to the present day.

187.   Premium Medical is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Premium Medical in pursuit of inherently unlawful

goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

188.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $179,000.00 pursuant to the fraudulent bills submitted through the Premium Medical enterprise.

189.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THIRTEENTH CAUSE OF ACTION**
**Against Gutierrez Concepcion, Seco, and Fernandez**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

190.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-96 above.

191.    Premium Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

192.    Gutierrez Concepcion, Seco, and Fernandez are or were employed by or associated with the Premium Medical enterprise.

193.    Gutierrez Concepcion, Seco, and Fernandez knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Premium Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over one year seeking payments that Premium Medical was not eligible to receive under the No-Fault Law because: (i) Premium Medical unlawfully was operated in violation of the Clinic Act's medical

director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Premium Medical Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

194.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

195.    Gutierrez Concepcion, Seco, and Fernandez knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

196.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $179,000.00 pursuant to the fraudulent bills submitted through the Premium Medical enterprise.

197.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**FOURTEENTH CAUSE OF ACTION**
**Against the Premium Medical Defendants**
**(Under Fla. Stat. 501.201 et. seq.)**

198.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-96 above.

199.     The Premium Medical Defendants are actively engaged in trade and commerce in the State of Florida.

200.     GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

201.     The Premium Medical Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

202.     The bills and supporting documents submitted or caused to be submitted by the Premium Medical Defendants to GEICO were fraudulent in that they misrepresented: (i) Premium Medical's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

203.     Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of the Premium Medical Defendants has been materially injurious to GEICO and its Insureds.

204.     The conduct of the Premium Medical Defendants was the actual and proximate cause of the damages sustained by GEICO.

205.     The Premium Medical Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $179,000.00.

206.     By reason of the Premium Medical Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

## FIFTEENTH CAUSE OF ACTION
### Against the Premium Medical Defendants
### (Common Law Fraud)

207.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-96 above.

208.     The Premium Medical Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through Premium Medical for the Fraudulent Services.

209.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Premium Medical was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Premium Medical never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

210.   The Premium Medical Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Premium Medical that were not reimbursable.

211.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $179,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Premium Medical Defendants through Premium Medical.

212.   The Premium Medical Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

213.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SIXTEENTH CAUSE OF ACTION
### Against the Premium Medical Defendants
### (Unjust Enrichment)

214.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-96 above.

215.   As set forth above, the Premium Medical Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

216.   When GEICO paid the bills and charges submitted or caused to be submitted by the Premium Medical Defendants through Premium Medical, it reasonably believed that it was legally

obligated to make such payments based on the Premium Medical Defendants' improper, unlawful, and/or unjust acts.

217.    The Premium Medical Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Premium Medical Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

218.    The Premium Medical Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

219.    By reason of the above, the Premium Medical Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $179,000.00.

**SEVENTEENTH CAUSE OF ACTION**
**Against J.J. Gonzalez and Blasini**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

220.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-96 above.

221.    Gonzalez's Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

222.    J.J. Gonzalez and Blasini knowingly have conducted and/or participated, directly or indirectly, in the conduct of Gonzalez's Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over six years seeking payments that Gonzalez's Medical was not eligible to receive under the No-Fault Law because: (i) Gonzalez's Medical unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying

Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Gonzalez's Medical Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

223.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

224.    Gonzalez's Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which J.J. Gonzalez and Blasini operated Gonzalez's Medical, inasmuch as Gonzalez's Medical was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for Gonzalez's Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Gonzalez's Medical Defendants continue to attempt collection on the fraudulent billing submitted through Gonzalez's Medical to the present day.

225.    Gonzalez's Medical is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Gonzalez's Medical in pursuit of inherently

unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

226.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,772,000.00 pursuant to the fraudulent bills submitted through the Gonzalez's Medical enterprise.

227.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**EIGHTEENTH CAUSE OF ACTION**
**Against J.J. Gonzalez, Seco, Blasini, Zegarra, Delgado, and De Valle**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

228.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-96 above.

229.   Gonzalez's Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

230.   J.J. Gonzalez, Seco, Blasini, Zegarra, Delgado, and De Valle are or were employed by or associated with the Gonzalez's Medical enterprise.

231.   J.J. Gonzalez, Seco, Blasini, Zegarra, Delgado, and De Valle knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Gonzalez's Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over six years seeking payments that Gonzalez's Medical was not eligible to receive under the No-Fault Law because: (i) Gonzalez's Medical unlawfully was operated in violation of

the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Gonzalez's Medical Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

232.     A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4". Each such mailing was made in furtherance of the mail fraud scheme.

233.     J.J. Gonzalez, Seco, Blasini, Zegarra, Delgado, and De Valle knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

234.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,772,000.00 pursuant to the fraudulent bills submitted through the Gonzalez's Medical enterprise.

235.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## NINETEENTH CAUSE OF ACTION
### Against the Gonzalez's Medical Defendants
### (Under Fla. Stat. 501.201 et. seq.)

236.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-96 above.

237.    The Gonzalez's Medical Defendants are actively engaged in trade and commerce in the State of Florida.

238.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

239.    The Gonzalez's Medical Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

240.    The bills and supporting documents submitted or caused to be submitted by the Gonzalez's Medical Defendants to GEICO were fraudulent in that they misrepresented: (i) Gonzalez's Medical's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

241.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of the Gonzalez's Medical Defendants has been materially injurious to GEICO and its Insureds.

242.    The conduct of the Gonzalez's Medical Defendants was the actual and proximate cause of the damages sustained by GEICO.

243.    The Gonzalez's Medical Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $1,772,000.00.

244.   By reason of the Gonzalez's Medical Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

**TWENTIETH CAUSE OF ACTION**
**Against the Gonzalez's Medical Defendants**
**(Common Law Fraud)**

245.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-96 above.

246.   The Gonzalez's Medical Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through Gonzalez's Medical for the Fraudulent Services.

247.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Gonzalez's Medical was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Gonzalez's Medical never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

248.     The Gonzalez's Medical Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Gonzalez's Medical that were not reimbursable.

249.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,772,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Gonzalez's Medical Defendants through Gonzalez's Medical.

250.     The Gonzalez's Medical Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

251.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### TWENTY-FIRST CAUSE OF ACTION
**Against the Gonzalez's Medical Defendants**
**(Unjust Enrichment)**

252.     GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-96 above.

253.     As set forth above, the Gonzalez's Medical Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

254.     When GEICO paid the bills and charges submitted or caused to be submitted by the Gonzalez's Medical Defendants through Gonzalez's Medical, it reasonably believed that it was

legally obligated to make such payments based on the Gonzalez's Medical Defendants' improper, unlawful, and/or unjust acts.

255.    The Gonzalez's Medical Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Gonzalez's Medical Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

256.    The Gonzalez's Medical Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

257.    By reason of the above, the Gonzalez's Medical Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,772,000.00.

## JURY DEMAND

258.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Med-Union Medical, New Generation Rehab, Premium Medical, and Gonzalez's Medical, for a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Med-Union Medical, New Generation Rehab, Premium Medical, and Gonzalez's Medical have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,676,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against J.A. Gonzalez, Amigo, Cabrera, Angarica, Seco, Pelaez, and Trigoura, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,676,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, Seco, Pelaez, and Trigoura, compensatory damages in an amount to be determined at trial but in excess of $1,676,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

E.      On the Fifth Cause of Action against Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, Seco, Pelaez, and Trigoura, compensatory damages in an amount to be determined at trial but in excess of $1,676,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, Seco, Pelaez, and Trigoura, more than $1,676,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against Abreu and Seco, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $386,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.      On the Eighth Cause of Action against Abreu, Seco, and Leiva, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $386,000.00,

together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.      On the Ninth Cause of Action against New Generation Rehab, Abreu, Seco, and Leiva, compensatory damages in an amount to be determined at trial but in excess of $386,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

J.      On the Tenth Cause of Action against New Generation Rehab, Abreu, Seco, and Leiva, compensatory damages in an amount to be determined at trial but in excess of $386,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

K.      On the Eleventh Cause of Action against New Generation Rehab, Abreu, Seco, and Leiva, more than $386,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

L.      On the Twelfth Cause of Action against Gutierrez Concepcion and Seco, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $179,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

M.      On the Thirteenth Cause of Action against Gutierrez Concepcion, Seco, and Fernandez, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $179,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

N.      On the Fourteenth Cause of Action against Premium Medical, Gutierrez Concepcion, Seco, and Fernandez, compensatory damages in an amount to be determined at trial

but in excess of $179,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

O.      On the Fifteenth Cause of Action against Premium Medical, Gutierrez Concepcion, Seco, and Fernandez, compensatory damages in an amount to be determined at trial but in excess of $179,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

P.      On the Sixteenth Cause of Action against Premium Medical, Gutierrez Concepcion, Seco, and Fernandez, more than $179,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

Q.      On the Seventeenth Cause of Action against J.J. Gonzalez and Blasini, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,772,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

R.      On the Eighteenth Cause of Action against J.J. Gonzalez, Seco, Blasini, Zegarra, Delgado, and De Valle, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,772,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

S.      On the Nineteenth Cause of Action against Gonzalez's Medical, J.J. Gonzalez, Seco, Blasini, Zegarra, Delgado, and De Valle, compensatory damages in an amount to be determined at trial but in excess of $1,772,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

T.      On the Twentieth Cause of Action against Gonzalez's Medical, J.J. Gonzalez, Seco, Blasini, Zegarra, Delgado, and De Valle, compensatory damages in an amount to be determined

84

at trial but in excess of $1,772,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

U.      On the Twenty-First Cause of Action against Gonzalez's Medical, J.J. Gonzalez, Seco, Blasini, Zegarra, Delgado, and De Valle, more than $1,772,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated:          November 29, 2021

*/s/ John P. Marino*
John P. Marino (FBN 814539)
Lindsey R. Trowell (FBN 678783)
Kristen Wenger (FBN 92136)
SMITH, GAMBRELL & RUSSELL, LLP
50 North Laura Street, Suite 2600
Jacksonville, Florida 32202
Phone:  (904) 598-6100
Facsimile:  (904) 598-6204
ltrowell@sgrlaw.com
jmarino@sgrlaw.com
kwenger@sgrlaw.com

*Attorneys for Plaintiffs*