**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**Case No.:  1:21-cv-24155-FAM**

GOVERNMENT EMPLOYEES INSURANCE
CO., GEICO INDEMNITY CO., GEICO
GENERAL INSURANCE COMPANY and
GEICO CASUALTY CO.,

                                                  **Jury Trial Demand**

        Plaintiffs,

vs.

GILBERTO SECO, M.D., MED-UNION
MEDICAL CENTER, INC., JORGE A.
GONZALEZ, ALIUSKA AMIGO, L.M.T.,
SHINUET CABRERA, SERGIO VENTO
ANGARICA, NEW GENERATION
REHABILITATION CENTER INC, BRYAN
ABREU, ORLANDO E. LEIVA, M.D.,
GONZALEZ'S MEDICAL CENTER, INC,
JOSE J. GONZALEZ, and WILFREDO
BLASINI, M.D.,

        Defendants.

_____

**<u>AMENDED COMPLAINT</u>**

      Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO General

Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), sue the

Defendants and allege as follows:

      1.      This action seeks to recover more than $3,800,000.00 that the Defendants

wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of

fraudulent no-fault ("no-fault", "personal injury protection", or "PIP") insurance charges through

Defendants Med-Union Medical Center, Inc. ("Med-Union Medical"), New Generation

Rehabilitation Inc ("New Generation Rehab"), and Gonzalez's Medical Center, Inc ("Gonzalez's

Medical") (collectively the "Clinic Defendants"), relating to medically unnecessary, illusory, unlawful, and otherwise non-reimbursable health care services, including putative initial examinations, follow up examinations, and physical therapy services (collectively the "Fraudulent Services") that purportedly were provided to Florida automobile accident victims ("Insureds") who were eligible for coverage under GEICO no-fault insurance policies. In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of pending, fraudulent no-fault insurance claims that the Defendants have submitted or caused to be submitted through the respective Clinic Defendants, because of the fraudulent and unlawful activity set forth herein.

2.      The Defendants' interrelated fraudulent schemes began no later than 2014 and have continued uninterrupted since that time.

3.      Each and every charge submitted through the respective Clinic Defendants since at least 2014 has been fraudulent and unlawful for the reasons set forth herein.  The charts annexed hereto as Exhibits "1" – "3" set forth a large and representative sample of the fraudulent and unlawful claims that have been identified to date that have been submitted to GEICO by mail through the respective Clinic Defendants.

<div align="center">

**THE PARTIES**

</div>

I.      **Plaintiffs**

4.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. (collectively, "GEICO") are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in Florida.

## II.   Defendants and Other Relevant Individuals and Entities

### A.   Defendant Seco, and Associated Health Care Clinics

5.      Defendant Gilberto Seco, M.D. ("Seco") resides in and is a citizen of Florida. Seco was licensed to practice medicine in Florida on August 14, 1992. Seco falsely purported to serve as medical director at Med-Union Medical and New Generation Rehab, purported to perform or directly supervise the substantial majority of the Fraudulent Services on behalf of all of the Clinic Defendants, and caused fraudulent no-fault insurance billing to be submitted through all of the Clinic Defendants to GEICO and other insurers.

6.      As set forth below, Seco was arrested in May 2021 and charged with theft, fraud, and conspiracy crimes in connection with his fraudulent and unlawful activities at Gonzalez's Medical.

7.      Although they are not named as Defendants in this Amended Complaint, Premium Medical Center Corp ("Premium Medical"), Imagen Medical Center Inc ("Imagen Medical"), Guadalupana.CG Inc ("Guadalupana"), and GR Rehab Center, Inc ("GR Rehab") are relevant to understanding Plaintiffs' claims against Seco. Premium Medical, Workers' Rehab, ALS Medical, Imagen Medical, Guadalupana, and GR Rehab are additional Florida health care clinics where Seco also purported to perform or directly supervise large amounts of health care services and, in the case of Premium Medical, to serve as medical director.

### B.   Defendants Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Their Associates

8.      Defendant Med-Union Medical is a Florida corporation with its principal place of business in Miami, Florida.

9.      Since at least 2014, Med-Union Medical falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing and operating requirements set

forth in the Florida Health Care Clinic Act (the "Clinic Act", Fla. Stat. § 400.990 et seq.), and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

10.     Med-Union Medical was incorporated in Florida on or about June 24, 2003 and purported to be owned and controlled by Defendants: (i) Jorge A. Gonzalez ("J.A. Gonzalez") and Aliuska Amigo, L.M.T. ("Amigo") from at least 2014 until February 2016; (ii) J.A. Gonzalez from February 2016 until July 2017; (iii) Shinuet Cabrera ("Cabrera") from July 2017 until February 2020; and (iv) Sergio Vento Angarica ("Angarica") from February 2020 until the present.

11.     Med-Union Medical falsely purported to have Seco as its medical director from at least 2014 until at least May 2021.

12.     Defendant J.A. Gonzalez resides in and is a citizen of Florida. J.A. Gonzalez owned Med-Union Medical between at least 2014 and July 2017, controlled Med-Union Medical, and used Med-Union Medical as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

13.     Defendant Amigo resides in and is a citizen of Florida. Amigo co-owned Med-Union Medical with J.A. Gonzalez between at least 2014 and February 2016, controlled Med-Union Medical, and used Med-Union Medical as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

14.     Defendant Cabrera resides in and is a citizen of Florida. Cabrera owned Med-Union Medical between July 2017 and February 2020, controlled Med-Union Medical, and used Med-Union Medical as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

15.     Defendant Angarica resides in and is a citizen of Florida. Angarica owned Med-Union Medical between February 2020 and the present, controlled Med-Union Medical, and used

Med-Union Medical as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

16.     Although they have not been named as Defendants in this Amended Complaint, Julio Cesar Pelaez, A.P.R.N. ("Pelaez"), Leanne Trigoura, A.P.R.N. ("Trigoura"), and Eric Campillo, A.P.R.N. ("Campillo") are relevant to understanding Plaintiffs' claims regarding Med-Union Medical. Pelaez, Trigoura, and Campillo are advanced practice registered nurses who were employed by or associated with Med-Union Medical, and who purported to perform many of the initial and follow-up examinations at Med-Union Medical, under Seco's purported supervision.

**C.     Defendants Gonzalez's Medical, J.J. Gonzalez, Blasini, and Their Associates**

17.     Defendant Gonzalez's Medical is a Florida corporation with its principal place of business in Hialeah, Florida.

18.     Since at least 2015, Gonzalez's Medical falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing and operating requirements set forth in the Clinic Act, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

19.     Gonzalez's Medical was incorporated in Florida on or about April 10, 2012, and purported to be owned and controlled by Defendant Jose J. Gonzalez ("J.J. Gonzalez").

20.     Gonzalez's Medical falsely purported to have Defendant Wilfredo Blasini, M.D. ("Blasini") as its medical director from March 2015 to September 2017.

21.     Defendant J.J. Gonzalez resides in and is a citizen of Florida. J.J. Gonzalez owned Gonzalez's Medical, controlled Gonzalez's Medical, and used Gonzalez's Medical as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

22.     Defendant Blasini resides in and is a citizen of Florida. Blasini was licensed to practice medicine in Florida on July 22, 2008. Blasini falsely purported to serve as medical director at Gonzalez's Medical from March 2015 to September 2017, and caused fraudulent no-fault insurance billing to be submitted through Gonzalez's Medical to GEICO and other insurers.

23.     Although they have not been named as Defendants in this Amended Complaint, Tony Nguyen, D.O. ("Nguyen"), Rosalva Zegarra, P.A. ("Zegarra"), Felipe Delgado, L.M.T. ("Delgado"), and Gisela Catalina De Valle, L.M.T. ("De Valle") are relevant to understanding Plaintiffs' claims regarding Gonzalez's Medical.

24.     Nguyen was licensed to practice medicine in Florida on July 18, 2017, and falsely purported to serve as medical director at Gonzalez's Medical from September 2017 until at least June 2021.

25.     Zegarra is a former physician assistant whose physician assistant license was revoked in April 2022, was employed by or associated with Gonzalez's Medical, and purported to perform many of the Fraudulent Services at Gonzalez's Medical.

26.     Zegarra is currently incarcerated in federal prison following her 2021 conviction, in the United States District Court for the Southern District of Florida, for conspiracy to commit health care fraud and wire fraud based on allegations that she caused the submission of millions of dollars in fraudulent insurance claims through a Florida health care clinic called "Friv MD PLLC".

27.     Delgado and De Valle are massage therapists who were employed by or associated with Gonzalez's Medical, and purported to perform many of the Fraudulent Services at Gonzalez's Medical.

28.     In February 2020, the Florida Division of Investigative and Forensic Services, Bureau of Insurance Fraud began an undercover investigation into Gonzalez's Medical after

receiving several tips that Seco, J.J. Gonzalez, De Valle, Delgado, and others were misleading and defrauding insurance companies at Gonzalez's Medical.

29.     The investigation revealed that J.J. Gonzalez paid undercover participants $1,000.00 each to come to Gonzalez's Medical and pretend to receive treatment from Seco, De Valle, and Delgado. The undercover participants also met with Seco, who coached them to make false statements regarding their purported "injuries", and fraudulently and unlawfully back-dated prescriptions for physical therapy.

30.     As a result of this undercover investigation, J.J. Gonzalez, Seco, De Valle, and Delgado were all arrested in May 2021 and charged, variously, with theft, fraud, conspiracy, patient brokering, and money laundering crimes.

**D.     Defendants New Generation Rehab, Abreu, and Their Associates**

31.     Defendant New Generation Rehab is a Florida corporation with its principal place of business in Miami, Florida.

32.     Since 2016, New Generation Rehab falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing requirements set forth in the Clinic Act, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

33.     New Generation Rehab was incorporated in Florida on or about July 7, 2016, and purported to be owned and controlled by Defendant Bryan Abreu ("Abreu").

34.     New Generation Rehab falsely purported to have Seco as its medical director until at least May 2021.

35.     Defendant Abreu resides in and is a citizen of Florida. Abreu owned New Generation Rehab, controlled New Generation Rehab, and used New Generation Rehab as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

36.     Although he has not been named as a Defendant in this Amended Complaint, Orlando E. Leiva, M.D. ("Leiva") is relevant to understanding the claims regarding New Generation Rehab. Leiva was licensed to practice medicine in Florida, and purported to perform many of the Fraudulent Services at New Generation Rehab.

37.     In May 2022, Leiva was sentenced to 57 months in prison, followed by three years supervised release, and ordered to pay $2,867,770.57 in restitution, in connection with a health care fraud scheme involving three physical therapy clinics that recruited and paid kickbacks to beneficiaries of Blue Cross Blue Shield health benefit programs ("BCBS"), and submitted false claims to BCBS for services that the clinics never provided to the beneficiaries or that were not medically necessary.

## JURISDICTION AND VENUE

38.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

39.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

40.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

41.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Southern

District of Florida is the District where one or more of Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

I.     **Brief Overview of Pertinent Law Governing No-Fault Insurance Reimbursement**

42.     Florida requires automobile insurers to provide PIP insurance benefits ("PIP Benefits") to Insureds when they are injured in a motor vehicle accident. See Florida Motor Vehicle No-Fault Law, Fla. Stat. §§ 627.730-627.7405 (the "No-Fault Law").

43.     Under the No-Fault Law, a health care services provider who possesses a valid assignment of PIP Benefits from an Insured and who provides medically necessary health care services to an Insured may submit claims directly to an insurance company in order to receive payment for the medically necessary services, using the required claim forms, including the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form" or "CMS-1500" form).

44.     In order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided, medically necessary, the bill for the service must be completed properly pursuant to the applicable standards, and the bill for the service cannot misrepresent the nature, extent, or results of the service that was provided. Insurers such as GEICO are not required to pay PIP charges that fail to meet these requirements, or anyone who knowingly submits a false or misleading statement relating to a PIP claim or charges.  See Fla. Stat. § 627.736.

45.     Additionally, in order for a health care service to be eligible for PIP reimbursement, the applicable claim form must set forth the professional license number of the provider who personally performs or directly supervises the underlying health care service, in the line or space

provided for "Signature of Physician or Supplier, Including Degrees or Credentials." <u>See</u> Fla. Stat. § 627.736.

46.     In addition, the No-Fault Law prohibits PIP reimbursement for massage or for services provided by massage therapists. <u>See</u> Fla. Stat. § 627.736.

47.     Pursuant to the Clinic Act, health care clinics operating in Florida must – among other things – appoint a physician as a medical director who must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful", and take immediate corrective action upon discovery of a fraudulent or unlawful charge. <u>See</u> Fla. Stat. § 400.9935(1). In addition, a clinic medical director must "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided." <u>See</u> Fla. Stat. § 400.9935(1). More generally, health care clinic medical directors must also provide "day-to-day supervision" over their clinics. <u>See</u> 59A-33.008, F.A.C.

48.     Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed . . . but that is not so licensed, or that is otherwise operating in violation of this part . . . is an unlawful charge." <u>See</u> Fla. Stat. § 400.9935(3).

## II.     <u>The Defendants' Interrelated Fraudulent Schemes</u>

49.     As set forth below, the Defendants masterminded and implemented a series of interrelated fraudulent schemes in which they billed GEICO, or caused GEICO to be billed, more than $3,800,000.00 for medically unnecessary, illusory, unlawful and otherwise non-reimbursable services.

**A.      The Fraudulent and Unlawful Operation of the Clinic Defendants Without Legitimate Medical Directors**

**1.      The Fraudulent and Unlawful Operation of Med-Union Medical Without a Legitimate Medical Director**

50.      In or about 2014, J.A. Gonzalez and Amigo – who are not and never have been licensed as physicians – sought to use Med-Union Medical as a vehicle to submit a large volume of fraudulent and unlawful PIP billing to GEICO and other insurers.

51.      However, because Med-Union Medical was subject to the Clinic Act, J.A. Gonzalez and Amigo could not lawfully operate Med-Union Medical, or use Med-Union Medical as a vehicle to submit PIP billing to GEICO and other insurers, unless J.A. Gonzalez and Amigo recruited and retained a licensed physician to serve as Med-Union Medical's medical director.

52.      However, if J.A. Gonzalez and Amigo recruited and retained a legitimate physician to serve as a legitimate medical director at Med-Union Medical, the physician actually would be obligated to fulfill the statutory requirements applicable to a clinic medical director. By extension, any such legitimate medical director would impede J.A. Gonzalez and Amigo's ability to use Med-Union Medical as a vehicle to submit a large amount of fraudulent and unlawful PIP billing to GEICO and other Florida automobile insurers.

53.      Accordingly, J.A. Gonzalez and Amigo required a pliable physician willing to falsely pose as the "medical director" at Med-Union Medical, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director, and thereby would permit J.A. Gonzalez and Amigo to use Med-Union Medical as a vehicle to submit a large amount of fraudulent and unlawful PIP billing to GEICO and other insurers.

54.      In or about 2014, J.A. Gonzalez and Amigo recruited and retained Seco, a licensed physician who was willing to falsely pose as the legitimate medical director of Med-Union Medical.

55.     In or about early 2016, J.A. Gonzalez purchased Amigo's interest in Med-Union Medical, and thereafter retained Seco to pose as Med-Union Medical's phony medical director.

56.     Thereafter, in or about mid-2017, Cabrera -- who never has been a licensed physician -- purchased Med-Union Medical, and also retained Seco to pose as Med-Union Medical's phony medical director.

57.     Then, in or about early 2020, Angarica -- who never has been a licensed physician -- purchased Med-Union Medical, and he, too, retained Seco to pose as Med-Union Medical's phony medical director.

58.     In order to circumvent Florida law and induce the Florida Agency for Health Care Administration to maintain Med-Union Medical's clinic licensure and to permit Med-Union Medical to operate as a clinic, J.A. Gonzalez, Amigo, and Med-Union Medical, then Cabrera and Union Medical, and then Angarica and Med-Union Medical, entered into secret schemes with Seco.

59.     In exchange for compensation -- first from J.A. Gonzalez, Amigo, and Med-Union Medical, then from J.A. Gonzalez and Med-Union Medical, then from Cabrera and Med-Union Medical, and then from Angarica and Med-Union Medical -- Seco agreed to falsely represent, to the Florida Agency for Health Care Administration, to the Insureds who sought treatment at Med-Union Medical, and to the insurers including GEICO that received PIP claims from Med-Union Medical, that he was the true medical director at Med-Union Medical, and that he truly fulfilled the statutory requirements applicable to clinic medical directors at Med-Union Medical.

60.     However, Seco never genuinely served as medical director at Med-Union Medical. Instead, from the beginning of his association with Med-Union Medical as its phony "medical director", Seco ceded all day-to-day decision-making and oversight regarding health care services

at Med-Union Medical, and the resulting billing, to: (i) J.A. Gonzalez and Amigo between 2014 and early 2016; (ii) J.A. Gonzalez between early 2016 and mid-2017; (iii) Cabrera between mid-2017 and early 2020; and (iv) Angarica between early 2020 and mid-2021.

61.     Seco never legitimately served as medical director at Med-Union Medical, inasmuch as he never ensured that all health care practitioners at the clinic had active appropriate certification or licensure for the level of care being provided, never conducted systematic reviews of Med-Union Medical's billings to ensure that the billings were not fraudulent or unlawful, never even made any attempt to take any immediate corrective action regarding the fraudulent and unlawful charges at Med-Union Medical, and – to the contrary – participated in the submission of fraudulent and unlawful PIP charges through Med-Union Medical.

62.     True authority over the provision of health care services through Med-Union Medical, and the resulting billing – including the authority that would, at a legitimate clinic, be vested in the medical director – was held by: (i) J.A. Gonzalez and Amigo between 2014 and early 2016; (ii) J.A. Gonzalez between early 2016 and mid-2017; (iii) Cabrera between mid-2017 and early 2020; and (iv) Angarica between early 2020 and mid-2021.

63.     In keeping with the fact that Seco never legitimately served as medical director at Med-Union Medical, Seco simultaneously purported to serve as medical director at New Generation Rehab and Premium Medical, and purported to personally perform, or at least directly supervise, a massive number of individual health care services for all the Clinic Defendants as well as other clinics, typically at multiple locations each day.

64.     It is impossible that Seco, who was in his 70s at the time, could have performed or directly supervised such a massive number of individual health care services while also fulfilling his medical director role at Med-Union Medical.

65.     J.A. Gonzalez, Amigo, Cabrera, and Angarica used the façade of Seco's phony "appointment" as Med-Union Medical's ersatz "medical director" to do indirectly what they were forbidden from doing directly – namely, and as set forth more fully herein: (i) to operate Med-Union Medical without a legitimate medical director; (ii) to engage in unlicensed medical decision-making with respect to the Insureds who sought treatment at Med-Union Medical; (iii) to permit health care services to be provided at Med-Union Medical by individuals who lacked the proper licensure to perform the services; and (iv) to use Med-Union Medical as a vehicle to submit a massive amount of fraudulent and unlawful PIP billing to GEICO and other insurers.

66.     Seco unlawfully permitted J.A. Gonzalez and Amigo, and then Cabrera and Angarica, to dictate the manner in which Insureds would be treated at Med-Union Medical, and to dictate the manner in which health care services at Med-Union Medical would be billed to GEICO and other insurers, because he sought to continue profiting from the fraudulent PIP billing submitted through Med-Union Medical.

**2.     The Fraudulent and Unlawful Operation of Gonzalez's Medical Without a Legitimate Medical Director**

67.     In or about 2015, J.J. Gonzalez – who never has been licensed as a physician – sought to use Gonzalez's Medical as a vehicle to submit a large volume of fraudulent and unlawful PIP billing to GEICO and other insurers.

68.     However, because Gonzalez's Medical was subject to the Clinic Act, J.J. Gonzalez could not lawfully operate Gonzalez's Medical, or use Gonzalez's Medical as a vehicle to submit PIP billing to GEICO and other insurers, unless J.J. Gonzalez recruited and retained a licensed physician to serve as Gonzalez's Medical's medical director.

69.     However, if J.J. Gonzalez recruited and retained a legitimate physician to serve as a legitimate medical director at Gonzalez's Medical, the physician actually would be obligated to

14

fulfill the statutory requirements applicable to a clinic medical director. By extension, any such legitimate medical director would impede J.J. Gonzalez's ability to use Gonzalez's Medical as a vehicle to submit a large amount of fraudulent and unlawful PIP billing to GEICO and other Florida automobile insurers.

70.     Accordingly, J.J. Gonzalez required a pliable physician willing to falsely pose as the "medical director" at Gonzalez's Medical, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director, and thereby would permit J.J. Gonzalez to use Gonzalez's Medical as a vehicle to submit a large amount of fraudulent and unlawful PIP billing to GEICO and other insurers.

71.     In or about March 2015, J.J. Gonzalez recruited and retained Blasini, a licensed physician who was willing to falsely pose as the legitimate medical director of Gonzalez's Medical.

72.     In order to circumvent Florida law and induce the Florida Agency for Health Care Administration to maintain Gonzalez's Medical's clinic licensure and to permit Gonzalez's Medical to operate as a clinic, J.J. Gonzalez and Gonzalez's Medical entered into a secret scheme with Blasini.

73.     In exchange for compensation from J.J. Gonzalez and Gonzalez's Medical, Blasini agreed to falsely represent, to the Florida Agency for Health Care Administration, to the Insureds who sought treatment at Gonzalez's Medical, and to the insurers including GEICO that received PIP claims from Gonzalez's Medical, that he was the true medical director at Gonzalez's Medical, and that he truly fulfilled the statutory requirements applicable to clinic medical directors at Gonzalez's Medical.

74.     However, Blasini never genuinely served as medical director at Gonzalez's Medical. Instead, from the beginning of his association with Gonzalez's Medical as its phony "medical director", Blasini ceded all day-to-day decision-making and oversight regarding health care services at Gonzalez's Medical, and the resulting billing, to J.J. Gonzalez.

75.     In or about September 2017, J.J. Gonzalez recruited and retained Nguyen to replace Blasini as the fake "medical director" at Gonzalez's Medical.

76.     Like Blasini, Nguyen was willing to falsely pose as the legitimate medical director of Gonzalez's Medical.

77.     In order to circumvent Florida law and induce the Florida Agency for Health Care Administration to maintain Gonzalez's Medical's clinic licensure and to permit Gonzalez's Medical to continue operate as a clinic, J.J. Gonzalez and Gonzalez's Medical entered into a secret scheme with Nguyen, as they previously had done with Blasini.

78.     Like Blasini before him, and in exchange for compensation from J.J. Gonzalez and Gonzalez's Medical -- Nguyen agreed to falsely represent, to the Florida Agency for Health Care Administration, to the Insureds who sought treatment at Gonzalez's Medical, and to the insurers including GEICO that received PIP claims from Gonzalez's Medical, that he was the true medical director at Gonzalez's Medical, and that he truly fulfilled the statutory requirements applicable to clinic medical directors at Gonzalez's Medical.

79.     However, like Blasini, Nguyen never genuinely served as medical director at Gonzalez's Medical.  Instead, from the beginning of his association with Gonzalez's Medical as its phony "medical director", Nguyen ceded all day-to-day decision-making and oversight regarding health care services at Gonzalez's Medical, and the resulting billing, to J.J. Gonzalez.

80.     In keeping with the fact that Nguyen never legitimately served as medical director at Gonzalez's Medical, Nguyen – in an August 2020 affidavit – swore, in substance, that he was typically present at Gonzalez's Medical for only a few hours each month.

81.     In his August 2020 affidavit, Nguyen also swore – in substance – that during his once-a-month visit to Gonzalez's Medical he would review only a handful of patient charts, and that he had no idea whether the handful of patient charts he reviewed constituted any significant portion of the overall number of patients who were treated each month at Gonzalez's Medical.

82.     Neither Blasini nor Nguyen ever legitimately served as medical director at Gonzalez's Medical, inasmuch as they never ensured that all health care practitioners at the clinic had active appropriate certification or licensure for the level of care being provided, never conducted systematic reviews of Gonzalez's Medical's billings to ensure that the billings were not fraudulent or unlawful, never even made any attempt to take any immediate corrective action regarding the fraudulent and unlawful charges at Gonzalez's Medical, and – to the contrary – participated in the submission of the fraudulent and unlawful charges through Gonzalez's Medical.

83.     True authority over the provision of health care services through Gonzalez's Medical, and the resulting billing – including the authority that would, at a legitimate clinic, be vested in the medical director – was held by J.J. Gonzalez.

84.     As set forth above -- and in keeping with the fact that Gonzalez's Medical lacked a legitimate medical director -- J.J. Gonzalez, Seco, Delgado, and De Valle were arrested and charged with various crimes in May 2021 following an undercover investigation, by the Bureau of Insurance Fraud, that revealed various types of fraudulent and unlawful activity at Gonzalez's Medical.

85.     J.J. Gonzalez used the façade of Blasini and Nguyen's phony "appointments" as Gonzalez's Medical's ersatz "medical directors" to do indirectly what he was forbidden from doing directly – namely, and as set forth more fully herein: (i) to operate Gonzalez's Medical without a legitimate medical director; (ii) to engage in unlicensed medical decision-making with respect to the Insureds who sought treatment at Gonzalez's Medical; (iii) to permit health care services to be provided at Gonzalez's Medical by individuals who lacked the proper licensure to perform the services; and (iv) to use Gonzalez's Medical as a vehicle to submit a massive amount of fraudulent and unlawful PIP billing to GEICO and other insurers.

86.     Blasini and Nguyen unlawfully permitted J.J. Gonzalez to dictate the manner in which Insureds would be treated at Gonzalez's Medical, and to dictate the manner in which health care services at Gonzalez's Medical would be billed to GEICO and other insurers, because they sought to continue profiting from the fraudulent PIP billing submitted through Gonzalez's Medical.

**3.     The Fraudulent and Unlawful Operation of New Generation Rehab Without a Legitimate Medical Director**

87.     In or about 2017, Abreu – who never has been licensed as a physician – sought to use New Generation Rehab as a vehicle to submit a large volume of fraudulent PIP billing to GEICO and other insurers.

88.     However, because New Generation Rehab was subject to the Clinic Act, Abreu could not lawfully operate New Generation Rehab, or use New Generation Rehab as a vehicle to submit PIP billing to GEICO and other insurers, unless Abreu recruited and retained a licensed physician to serve as New Generation Rehab's medical director.

89.     However, if Abreu recruited and retained a legitimate physician to serve as a legitimate medical director at New Generation Rehab, the physician actually would be obligated

to fulfill the statutory requirements applicable to a clinic medical director. By extension, any such legitimate medical director would impede Abreu's ability to use New Generation Rehab as a vehicle to submit a large amount of fraudulent PIP billing to GEICO and other Florida automobile insurers.

90.     Accordingly, Abreu required a pliable physician willing to falsely pose as the "medical director" at New Generation Rehab, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director, and thereby would permit Abreu to use New Generation Rehab as a vehicle to submit a large amount of fraudulent PIP billing to GEICO and other insurers.

91.     In or about 2017, Abreu recruited and retained Seco, a licensed physician who was willing to falsely pose as the legitimate medical director of New Generation Rehab.

92.     In order to circumvent Florida law and induce the Florida Agency for Health Care Administration to maintain New Generation Rehab's clinic licensure and to permit New Generation Rehab to operate as a clinic, Abreu and New Generation Rehab entered into a secret scheme with Seco.

93.     In exchange for compensation from Abreu and New Generation Rehab, Seco agreed to falsely represent, to the Florida Agency for Health Care Administration, to the Insureds who sought treatment at New Generation Rehab, and to the insurers including GEICO that received PIP claims from New Generation Rehab, that he was the true medical director at New Generation Rehab, and that he truly fulfilled the statutory requirements applicable to clinic medical directors at New Generation Rehab.

94.     However, Seco never genuinely served as medical director at New Generation Rehab. Instead, from the beginning of his association with New Generation Rehab as its phony

"medical director", Seco ceded all day-to-day decision-making and oversight regarding health care services at New Generation Rehab, and the resulting billing, to Abreu.

95.     Seco never legitimately served as medical director at New Generation Rehab, inasmuch as he never ensured that all health care practitioners at the clinic had active appropriate certification or licensure for the level of care being provided, never conducted systematic reviews of New Generation Rehab's billings to ensure that the billings were not fraudulent or unlawful, never even made any attempt to take any immediate corrective action regarding the fraudulent and unlawful charges at New Generation Rehab and, to the contrary, participated in the submission of the fraudulent and unlawful charges.

96.     True authority over the provision of health care services through New Generation Rehab, and the resulting billing – including the authority that would, at a legitimate clinic, be vested in the medical director – was held by Abreu.

97.     In keeping with the fact that Seco never legitimately served as medical director at New Generation Rehab, Seco simultaneously purported to serve as medical director at Med-Union Medical and Premium Medical, and purported to personally perform, or at least directly supervise, a massive number of individual health care services for all the Clinic Defendants as well as other clinics, typically at multiple locations each day.

98.     It is impossible that Seco, who was in his 70s at the time, could have performed or directly supervised such a massive number of individual health care services while also fulfilling his medical director role at New Generation Rehab.

99.     Abreu used the façade of Seco's phony "appointment" as New Generation Rehab's ersatz "medical directors" to do indirectly what he was forbidden from doing directly – namely, and as set forth more fully herein: (i) to operate New Generation Rehab without a legitimate

medical director; (ii) to engage in unlicensed medical decision-making with respect to the Insureds who sought treatment at New Generation Rehab; (iii) to permit health care services to be provided at New Generation Rehab by individuals who lacked the proper licensure to perform the services; and (iv) to use New Generation Rehab as a vehicle to submit a massive amount of fraudulent and unlawful PIP billing to GEICO and other insurers.

100.    Seco unlawfully permitted Abreu to dictate the manner in which Insureds would be treated at New Generation Rehab, and to dictate the manner in which health care services at New Generation Rehab would be billed to GEICO and other insurers, because he sought to continue profiting from the fraudulent PIP billing submitted through New Generation Rehab.

**B.    The Fraudulent Misrepresentations Regarding the Identities of the Health Care Providers Rendering Services at the Clinic Defendants**

**1.    The Fraudulent Misrepresentations Regarding the Identities of the Health Care Providers Rendering Services at Med-Union Medical**

101.    Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco billed GEICO for a limited range of Fraudulent Services through Med-Union Medical, namely purported: (i) initial patient examinations; (ii) follow-up patient examinations; and (iii) physical therapy services. As set forth in Exhibit "1", the purported physical therapy services constituted the vast majority of the Fraudulent Services that Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco billed through Med-Union Medical to GEICO.

102.    All of the "physical therapy" services that Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco purported to provide between at least 2014 and the present were performed – to the extent that they were performed at all – by unsupervised massage therapists or other unlicensed individuals.

103.     Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco were well-aware of the fact that Med-Union Medical could not legally recover PIP Benefits for "physical therapy" or any other kinds of health care services performed by massage therapists, or other unlicensed and unsupervised individuals.

104.     Accordingly, Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco falsely represented – in virtually all of the claims for "physical therapy" services that they submitted or caused to be submitted through Med-Union Medical to GEICO – that Seco, a licensed physician, had either performed or directly supervised the putative physical therapy services.

105.     In reality, Seco neither performed nor supervised any of the physical therapy services that were billed through Med-Union Medical to GEICO.

106.     In keeping with the fact that Seco neither performed nor supervised any of the physical therapy services that were billed through Med-Union Medical to GEICO, Seco – who was in his 70s at the time – often purported to personally perform or directly supervise more than 15, 20, 25, or even 30 hours of "physical therapy" services for GEICO Insureds on individual dates, often at multiple different clinics and locations, per day.

107.     For example:

(i)      On November 6, 2014, Med-Union Medical, J.A. Gonzalez, Amigo, and Seco purported to provide at least 74 individual physical therapy services to at least nine individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 13.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.  That same day, Seco also purported to personally perform, or at least directly supervise at least 70 additional physical therapy services purportedly provided to at least 10 additional GEICO Insureds at Gonzalez's Medical, Imagen Medical, and Guadalupana, including at least 11 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.  In all, GEICO received billing for at least 24.5 hours of services that Seco

purported to personally perform, or at least directly supervise, on November 6, 2014.

(ii)     On December 6, 2016, Med-Union Medical, J.A. Gonzalez, and Seco purported to provide at least 104 individual physical therapy services to at least 14 individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally performed or at least directly supervised every one of those treatments.  What is more, those putative treatments included at least 18.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.  That same day, Seco also purported to personally perform, or at least directly supervise at least 67 <u>additional</u> physical therapy services purportedly provided to at least 10 <u>additional</u> GEICO Insureds at Gonzalez's Medical and GR Rehab, including at least 11.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.  In all, GEICO received billing for at least 30 hours of services that Seco purported to personally perform, or at least directly supervise, on December 6, 2016.

(iii)    On February 6, 2018, Med-Union Medical, Cabrera, and Seco purported to provide at least 124 individual physical therapy services to at least 15 individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 22.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seco also purported to personally perform, or at least directly supervise at least 67 <u>additional</u> physical therapy services purportedly provided to at least 11 <u>additional</u> GEICO Insureds at Gonzalez's Medical and New Generation Rehab, including at least 11.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 33.5 hours of services that Seco purported to personally perform, or at least directly supervise, on February 6, 2018.

(iv)    On October 16, 2018, Med-Union Medical, Cabrera, and Seco purported to provide at least 112 individual physical therapy services to at least 14 individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 19.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seco also purported to personally perform, or at least directly supervise at least 64 <u>additional</u> physical therapy services purportedly provided to at least 10 <u>additional</u> GEICO Insureds at Gonzalez's Medical and New Generation Rehab, including at least 11.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In

all, GEICO received billing for at least 31 hours of services that Seco purported to personally perform, or at least directly supervise, on October 16, 2018.

(v)    On March 2, 2020, Med-Union Medical, Angarica, and Seco purported to provide at least 61 individual physical therapy services to at least six individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 12 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seco also purported to personally perform, or at least directly supervise at least 41 <u>additional</u> physical therapy services purportedly provided to at least six <u>additional</u> GEICO Insureds at New Generation Rehab and Gonzalez's Medical, including at least 6.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 18.5 hours of services that Seco purported to personally perform, or at least directly supervise, on March 2, 2020.

108.    These are only representative examples. In the claims for physical therapy services that are identified in Exhibit "1", Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco routinely falsely represented that Seco had performed – or at least directly supervised – an impossible number of physical therapy services on individual dates, considering the amounts of services he simultaneously was purporting to perform or directly supervise at the other Clinic Defendants and other health care clinics on those same dates.

109.    It is impossible that Seco – who was relatively advanced in age at the time, and was simultaneously purporting to work multiple jobs at multiple locations – routinely performed or supervised such a high volume of physical therapy services at Med-Union Medical, and typically at other locations as well, on individual dates.

110.    Upon information and belief, the fraudulent billing for physical therapy services that Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco submitted or caused to be submitted through Med-Union Medical to GEICO constituted only a fraction of the <u>total</u> fraudulent billing for physical therapy services that Med-Union Medical, J.A. Gonzalez, Amigo,

Cabrera, Angarica, and Seco submitted through Med-Union Medical to all of the automobile insurers in the Florida automobile insurance market.

111.    For instance, it is extremely improbable, to the point of impossibility, that Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco only submitted fraudulent billing to GEICO, and that they did not simultaneously bill other automobile insurers.

112.    Thus, upon information and belief, the impossible number of physical therapy services that Seco purported to directly supervise or perform for GEICO Insureds at Med-Union Medical, the other Clinic Defendants, and at other locations on individual dates of service constituted only a fraction of the total – and even less credible -- number of physical therapy services that Seco purported to supervise or perform at Med-Union Medical, the other Clinic Defendants, and at other locations, including for individuals insured by companies other than GEICO, on those same dates of service.

113.    In keeping with the fact that Seco never legitimately fulfilled his required duties as "medical director" at Med-Union Medical, the substantial majority of the claims submitted by Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco for physical therapy services identified in Exhibit "1" falsely represented that Seco had performed or at least directly supervised the underlying physical therapy services, so as to create the false appearance that the services were eligible for PIP reimbursement.

114.    In fact, the underlying physical therapy services were not eligible for PIP reimbursement, because they had been performed – to the extent they were performed at all – by massage therapists and other unlicensed individuals.

115.    In the claims for physical therapy services identified in Exhibit "1", Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco routinely fraudulently misrepresented

that the physical therapy services were lawfully provided and eligible for PIP reimbursement, when in fact they were neither lawfully provided nor eligible for reimbursement, because:

(i) the putative physical therapy services were performed – to the extent they were performed at all – by unsupervised massage therapists or other unlicensed individuals;

(ii) Med-Union Medical could not lawfully recover PIP Benefits for the putative physical therapy services, because they were performed by massage therapists and other unlicensed individuals; and

(iii) Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco systematically falsely represented that the physical therapy services were legitimately performed or directly supervised by Seco, when in fact Seco neither performed nor supervised the purported services.

**2.     The Fraudulent Misrepresentations Regarding the Identities of the Health Care Providers Rendering Services at Gonzalez's Medical**

116.    Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco billed GEICO for a limited range of Fraudulent Services through Gonzalez's Medical, namely purported: (i) initial patient examinations; (ii) follow-up patient examinations; and (iii) physical therapy services. As set forth in Exhibit "2", the purported physical therapy services constituted the vast majority of the Fraudulent Services that Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco billed through Gonzalez's Medical to GEICO.

117.    All of the "physical therapy" services that Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco purported to provide between at least 2015 and the present were performed – to the extent that they were performed at all – by massage therapists or other unlicensed individuals, including Delgado and De Valle.

118.    Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco were well-aware of the fact that Gonzalez's Medical could not legally recover PIP Benefits for "physical therapy" or any other

kinds of health care services performed by massage therapists such as Delgado or De Valle, or other unlicensed and unsupervised individuals.

119.    Accordingly, from March 2015 to September 2017, Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco falsely represented – in virtually all of the claims for "physical therapy" services that they submitted or caused to be submitted through Gonzalez's Medical to GEICO – that Seco, a licensed physician, had either performed or directly supervised the putative physical therapy services.

120.    Then, from September 2017 to mid-2021, Gonzalez's Medical, J.J. Gonzalez, and Seco falsely represented – in virtually all of the claims for "physical therapy" services that they submitted or caused to be submitted through Gonzalez's Medical to GEICO – that Seco, a licensed physician, had either performed or directly supervised the putative physical therapy services.

121.    In reality, Seco neither performed nor supervised any of the physical therapy services that were billed through Gonzalez's Medical to GEICO.

122.    In keeping with the fact that Seco neither performed nor supervised any of the physical therapy services that were billed through Gonzalez's Medical to GEICO, Seco – who was in his 70s at the time – often purported to personally perform or directly supervise more than 25, 30, or even 35 hours of "physical therapy" services for GEICO Insureds on individual dates, often at multiple different clinics and locations, per day.

123.    For example:

(i)    On December 19, 2016, Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco purported to provide at least 136 individual physical therapy services to at least 20 individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 22 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seco also purported to personally perform, or at least directly supervise at least 104

additional physical therapy services purportedly provided to at least 14 additional GEICO Insureds at Med-Union Medical and GR Rehab, including at least 17.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 39.75 hours of services that Seco purported to personally perform, or at least directly supervise, on December 19, 2016.

(ii)    On January 3, 2017, Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco purported to provide at least 120 individual physical therapy services to at least 18 individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 21.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seco also purported to personally perform, or at least directly supervise at least 52 additional physical therapy services purportedly provided to at least seven additional GEICO Insureds at Med-Union Medical and GR Rehab, including at least nine hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 30.25 hours of services that Seco purported to personally perform, or at least directly supervise, on January 3, 2017.

(iii)   On April 18, 2017, Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco purported to provide at least 73 individual physical therapy services to at least 11 individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 17 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seco also purported to personally perform, or at least directly supervise at least 50 additional physical therapy services purportedly provided to at least six additional GEICO Insureds at Med-Union Medical and New Generation Rehab, including at least 10 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 27 hours of services that Seco purported to personally perform, or at least directly supervise, on April 18, 2017.

(iv)    On December 7, 2017, Gonzalez's Medical, J.J. Gonzalez, and Seco purported to provide at least 137 individual physical therapy services to at least 21 individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 22.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seco also purported to personally perform, or at least directly supervise at least 80 additional physical therapy services purportedly provided to at least 10 additional GEICO

Insureds at Med-Union Medical and New Generation Rehab, including at least 13.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 35.5 hours of services that Seco purported to personally perform, or at least directly supervise, on December 7, 2017.

(v)   On April 6, 2018, Gonzalez's Medical, J.J. Gonzalez, and Seco purported to provide at least 80 individual physical therapy services to at least 11 individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 19 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seco also purported to personally perform, or at least directly supervise at least 74 additional physical therapy services purportedly provided to at least eight additional GEICO Insureds at Med-Union Medical and New Generation Rehab, including at least 15 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 34 hours of services that Seco purported to personally perform, or at least directly supervise, on April 6, 2018.

124.   These are only representative examples. In the claims for physical therapy services that are identified in Exhibit "2", Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco routinely falsely represented that Seco had performed – or at least directly supervised – an impossible number of physical therapy services on individual dates, considering the amounts of services he simultaneously was purporting to perform or directly supervise at the other Clinic Defendants and other health care clinics on those same dates.

125.   It is impossible that Seco – who was relatively advanced in age at the time, and was simultaneously purporting to work multiple jobs at multiple locations – routinely performed or supervised such a high volume of physical therapy services at Gonzalez's Medical, and typically at other locations as well, on individual dates.

126.   Upon information and belief, the fraudulent billing for physical therapy services that Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco submitted or caused to be submitted through Gonzalez's Medical to GEICO constituted only a fraction of the total fraudulent billing

for physical therapy services that Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco submitted through Gonzalez's Medical to <u>all</u> of the automobile insurers in the Florida automobile insurance market.

127.     For instance, it is extremely improbable, to the point of impossibility, that Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco only submitted fraudulent billing to GEICO, and that they did not simultaneously bill other automobile insurers.

128.     Thus, upon information and belief, the impossible number of physical therapy services that Seco purported to directly supervise or perform for GEICO Insureds at Gonzalez's Medical, the other Clinic Defendants, and at other locations on individual dates of service constituted only a fraction of the <u>total</u> – and even less credible -- number of physical therapy services that Seco purported to directly supervise or perform at Gonzalez's Medical, the other Clinic Defendants, and at other locations, including for individuals insured by companies other than GEICO, on those same dates of service.

129.     In keeping with the fact that Blasini and Nguyen never legitimately fulfilled their required duties as "medical director" at Gonzalez's Medical, the substantial majority of the claims submitted by Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco for physical therapy services identified in Exhibit "2" falsely represented that Seco had performed or at least directly supervised the underlying physical therapy services, so as to create the false appearance that the services were eligible for PIP reimbursement.

130.     In fact, the underlying physical therapy services were not eligible for PIP reimbursement, because they had been performed – to the extent they were performed at all – by massage therapists and other unlicensed individuals, including Delgado and De Valle.

131.     In the claims for physical therapy services identified in Exhibit "2", Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco routinely fraudulently misrepresented that the physical therapy services were lawfully provided and eligible for PIP reimbursement, when in fact they were neither lawfully provided nor eligible for reimbursement, because:

(i)     the putative physical therapy services were performed – to the extent they were performed at all – by massage therapists or other unlicensed individuals, including Delgado and De Valle;

(ii)    Gonzalez's Medical could not lawfully recover PIP Benefits for the putative physical therapy services, because they were performed by massage therapists and other unlicensed individuals; and

(iii)   Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco systematically falsely represented that the physical therapy services were legitimately performed or directly supervised by Seco, when in fact Seco neither performed nor supervised the purported services.

**3.      The Fraudulent Misrepresentations Regarding the Identities of the Health Care Providers Rendering Services at New Generation Rehab**

132.     New Generation Rehab, Abreu, and Seco billed GEICO for a limited range of Fraudulent Services through New Generation Rehab, namely purported: (i) initial patient examinations; (ii) follow-up patient examinations; and (iii) physical therapy services. As set forth in Exhibit "3", the purported physical therapy services constituted the vast majority of the Fraudulent Services that New Generation Rehab, Abreu, and Seco billed through New Generation Rehab to GEICO.

133.     All of the "physical therapy" services that New Generation Rehab, Abreu, and Seco purported to provide between at least 2017 and the present were performed – to the extent that they were performed at all – by massage therapists or other unlicensed individuals.

134.     New Generation Rehab, Abreu, and Seco were well-aware of the fact that New Generation Rehab could not legally recover PIP Benefits for "physical therapy" or any other kinds

of health care services performed by massage therapists, or other unlicensed and unsupervised individuals.

135.    Accordingly, New Generation Rehab, Abreu, and Seco falsely represented – in virtually all of the claims for "physical therapy" services that they submitted or caused to be submitted through New Generation Rehab to GEICO – that Seco, a licensed physician, had either performed or directly supervised the putative physical therapy services.

136.    In reality, Seco neither performed nor supervised any of the physical therapy services that were billed through New Generation Rehab to GEICO.

137.    In keeping with the fact that Seco neither performed nor supervised any of the physical therapy services that were billed through New Generation Rehab to GEICO, Seco – who was in his 70s at the time – often purported to personally perform or directly supervise more than 25, 30, or even 35 hours of "physical therapy" services for GEICO Insureds on individual dates, often at multiple different clinics and locations, per day.

138.    For example:

(i)    On November 14, 2018, New Generation Rehab, Abreu, and Seco purported to provide at least 67 individual physical therapy services to at least eight individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 13 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seco also purported to personally perform, or at least directly supervise at least 72 additional physical therapy services purportedly provided to at least 10 additional GEICO Insureds at Med-Union Medical and Gonzalez's Medical, including at least 12.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 25.75 hours of services that Seco purported to personally perform, or at least directly supervise, on November 14, 2018.

(ii)    On December 26, 2018, New Generation Rehab, Abreu, and Seco purported to provide at least 80 individual physical therapy services to at least nine individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally

performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 15.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seco also purported to personally perform, or at least directly supervise at least 92 <u>additional</u> physical therapy services purportedly provided to at least 12 <u>additional</u> GEICO Insureds at Med-Union Medical and Gonzalez's Medical, including at least 16 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 31.75 hours of services that Seco purported to personally perform, or at least directly supervise, on December 26, 2018.

(iii)   On January 2, 2019, New Generation Rehab, Abreu, and Seco purported to provide at least 87 individual physical therapy services to at least 10 individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 16.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seco also purported to personally perform, or at least directly supervise at least 90 <u>additional</u> physical therapy services purportedly provided to at least 12 <u>additional</u> GEICO Insureds at Med-Union Medical and Gonzalez's Medical, including at least 15.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 32 hours of services that Seco purported to personally perform, or at least directly supervise, on January 2, 2019.

(iv)   On February 20, 2019, New Generation Rehab, Abreu, and Seco purported to provide at least 70 individual physical therapy services to at least eight individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 13.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seco also purported to personally perform, or at least directly supervise at least 77 <u>additional</u> physical therapy services purportedly provided to at least 10 <u>additional</u> GEICO Insureds at Med-Union Medical and Gonzalez's Medical, including at least 12.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 26.25 hours of services that Seco purported to personally perform, or at least directly supervise, on February 20, 2019.

(v)   On July 2, 2019, New Generation Rehab, Abreu, and Seco purported to provide at least 55 individual physical therapy services to at least six individual Insureds, and falsely contended in the resulting bills to GEICO that Seco personally performed or at least directly supervised every one of those treatments. What is more, those

putative treatments included at least 12 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seco also purported to personally perform, or at least directly supervise at least 113 <u>additional</u> physical therapy services purportedly provided to at least 16 <u>additional</u> GEICO Insureds at Med-Union Medical and Gonzalez's Medical, including at least 24 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 36 hours of services that Seco purported to personally perform, or at least directly supervise, on July 2, 2019.

139. These are only representative examples. In the claims for physical therapy services that are identified in Exhibit "3", New Generation Rehab, Abreu, and Seco routinely falsely represented that Seco had performed – or at least directly supervised – an impossible number of physical therapy services on individual dates, considering the amounts of services he simultaneously was purporting to perform or directly supervise at the other Clinic Defendants and other health care clinics on those same dates.

140. It is impossible that Seco – who was relatively advanced in age at the time, and was simultaneously purporting to work multiple jobs at multiple locations – routinely performed or supervised such a high volume of physical therapy services at New Generation Rehab, and typically at other locations as well, on individual dates.

141. Upon information and belief, the fraudulent billing for physical therapy services that New Generation Rehab, Abreu, and Seco submitted or caused to be submitted through New Generation Rehab to GEICO constituted only a fraction of the <u>total</u> fraudulent billing for physical therapy services that New Generation Rehab, Abreu, and Seco submitted through New Generation Rehab to <u>all</u> of the automobile insurers in the Florida automobile insurance market.

142. For instance, it is extremely improbable, to the point of impossibility, that New Generation Rehab, Abreu, and Seco only submitted fraudulent billing to GEICO, and that they did not simultaneously bill other automobile insurers.

143.    Thus, upon information and belief, the impossible number of physical therapy services that Seco purported to directly supervise or perform for GEICO Insureds at New Generation Rehab, the other Clinic Defendants, and at other locations on individual dates of service constituted only a fraction of the <u>total</u> – and even less credible -- number of physical therapy services that Seco purported to directly supervise or perform at New Generation Rehab, the other Clinic Defendants, and at other locations, including for individuals insured by companies other than GEICO, on those same dates of service.

144.    In keeping with the fact that Seco never legitimately fulfilled his required duties as "medical director" at New Generation Rehab, the substantial majority of the claims submitted by New Generation Rehab, Abreu, and Seco for physical therapy services identified in Exhibit "3" falsely represented that Seco had performed or at least directly supervised the underlying physical therapy services, so as to create the false appearance that the services were eligible for PIP reimbursement.

145.    In fact, the underlying physical therapy services were not eligible for PIP reimbursement, because they had been performed – to the extent they were performed at all – by massage therapists and other unlicensed individuals.

146.    In the claims for physical therapy services identified in Exhibit "3", New Generation Rehab, Abreu, and Seco routinely fraudulently misrepresented that the physical therapy services were lawfully provided and eligible for PIP reimbursement, when in fact they were neither lawfully provided nor eligible for reimbursement, because:

(i)    the putative physical therapy services were performed – to the extent they were performed at all – by unsupervised massage therapists or other unlicensed individuals;

    (ii)      New Generation Rehab could not lawfully recover PIP Benefits for the putative physical therapy services, because they were performed by massage therapists and other unlicensed individuals; and

    (iii)    New Generation Rehab, Abreu, and Seco systematically falsely represented that the physical therapy services were legitimately performed or directly supervised by Seco, when in fact Seco neither performed nor supervised the purported services.

## C.    The Defendants' Fraudulent and Unlawful Treatment and Billing Protocols

147.    In the claims identified in Exhibits "1" – "3", the vast majority of the Insureds whom the Defendants purported to treat at the respective Clinic Defendants were involved in minor accidents, to the extent that they were involved in any actual accidents at all.

148.    At the same time, in the claims identified in Exhibits "1" – "3", almost none of the Insureds whom the Defendants purported to treat at the respective Clinic Defendants suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

149.    Even so, in the claims identified in Exhibits "1" – "3", the Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" that was provided pursuant to pre-determined, fraudulent protocols designed to maximize the billing that they could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

150.    The Defendants purported to provide their pre-determined fraudulent treatment protocols to the Insureds in the claims identified in Exhibits "1" – "3" without regard for the Insureds' individual symptoms or presentation, or – in most cases – the total absence of any actual continuing medical problems arising from any actual automobile accidents.

151.    Each step in the Defendants' fraudulent treatment protocols was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent

step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent PIP billing for each Insured.

152.    No legitimate physician, chiropractor, physical therapist, clinic, or other health care provider would permit the fraudulent treatment and billing protocols described below to proceed under his, her, or its auspices.

153.    The Defendants permitted the fraudulent treatment and billing protocols described below to proceed under their auspices because: (i) the Clinic Defendants were, at all relevant times, operating in violation of the Clinic Act, without legitimate medical directors who legitimately fulfilled their statutory duties as medical directors; (ii) all decision-making with respect to medical care and billing at the Clinic Defendants was vested entirely with non-physicians – specifically J.A. Gonzalez, Amigo, Cabrera, and Angarica at Med-Union Medical, J.J. Gonzalez at Gonzalez's Medical, and Abreu at New Generation Rehab – in violation of Florida law; (iii) virtually all of the putative "physical therapy" services that purportedly were provided to Insureds through the Clinic Defendants were provided – to the extent that they were provided at all – by massage therapists or unlicensed individuals without legitimate oversight and supervision, in further violation of Florida law; and (iv) the Defendants sought to profit from the fraudulent billing they submitted to GEICO and other insurers.

**1.      The Fraudulent and Unlawful Treatment and Billing Protocol at Med-Union Medical**

**a.      The Fraudulent and Unlawful Initial Examinations at Med-Union Medical**

154.    Beginning in 2019, Med-Union Medical purported to provide the Insureds in the claims identified in Exhibit "1" with initial examinations.

155.    Seco, Pelaez, Trigoura, and Campillo purported to personally perform or directly supervise a substantial majority of these initial examinations.

156.    Between 2019 and February 2020, Med-Union Medical, Cabrera, and Seco billed GEICO under CPT code 99204 for each initial examination of an Insured that Seco, Pelaez, Trigoura, and Campillo purported to perform or directly supervise at Med-Union Medical.

157.    Then, between at least February 2020 and May 2021, Med-Union Medical, Angarica, and Seco billed GEICO under CPT code 99204 for each initial examination of an Insured that Seco, Pelaez, Trigoura, and Campillo purported to perform or directly supervise at Med-Union Medical.

158.    Pursuant to the American Medical Association's CPT Assistant, which governs reimbursement of PIP claims, at all relevant times the use of CPT code 99204 to bill for an initial patient examination represented – among other things – that: (i) the patient presented with problems of moderate to high severity; (ii) the physician or other health care provider who conducted the examination spent at least 45 minutes of face-to-face time with the patient or the patient's family during the examination; (iii) the physician or other health care provider who performed the examination conducted a "comprehensive" physical examination; and (iv) the physician or other health care provider who performed the examination engaged in "moderate complexity" medical decision-making.

159.    In the claims for initial examinations identified in Exhibit "1", the charges for the initial examinations were fraudulent in that they misrepresented Med-Union Medical's eligibility to collect PIP Benefits in the first instance.

160.    In fact, and as set forth herein, Med-Union Medical never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing and operating requirements set forth in the Clinic Act.

161.     As set forth below, the charges for the initial examinations identified in Exhibit "1" also were fraudulent in that they misrepresented the nature, extent, and results of the initial examinations.

**(i)     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

162.     To the extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their typically minor automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as sprains and strains.

163.     For instance, in the substantial majority of the claims identified in Exhibit "1", the Insureds did not seek treatment at any hospital as the result of their accidents. To the limited extent that the Insureds in the claims identified in Exhibit "1" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis, and discharged with nothing more serious than a minor soft tissue injury diagnosis such as a sprain or strain.

164.     Furthermore, in the substantial majority of the claims identified in Exhibit "1" contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were functional following the accidents, and that no one was seriously injured in the accidents, or injured at all.

165.     Even so, by billing GEICO for putative initial examinations using CPT code 99204 in the claims identified in Exhibit "1", Med-Union Medical, Cabrera, Angarica, and Seco falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were low or minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

166.     For example:

(i)     On May 2, 2019, an Insured named AV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AV's vehicle was drivable following the accident.

The police report further indicated that AV was not injured and did not complain of any pain at the scene.  In keeping with the fact that AV was not seriously injured, AV did not visit any hospital emergency room following the accident.  To the extent that AV experienced any health problems at all as a result of the accident, they were of low or minimal severity.  Even so, following a purported initial examination of AV by Pelaez on May 7, 2019, Med-Union Medical, Cabrera, and Seco billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ii)     On June 2, 2019, an Insured named AN was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that AN's vehicle was drivable following the accident.  The police report further indicated that AN was not injured and did not complain of any pain at the scene.  In keeping with the fact that AN was not seriously injured, AN did not visit any hospital emergency room following the accident.  To the extent that AN experienced any health problems at all as a result of the accident, they were of low or minimal severity.  Even so, following a purported initial examination of AN by Trigoura on June 4, 2019, Med-Union Medical, Cabrera, and Seco billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iii)    On March 26, 2020, an Insured named SM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that SM's vehicle was drivable following the accident.  The police report further indicated that SM was not injured and did not complain of any pain at the scene.  In keeping with the fact that SM was not seriously injured, SM did not visit any hospital emergency room following the accident.  To the extent that SM experienced any health problems at all as a result of the accident, they were of low or minimal severity.  Even so, following a purported initial examination of AN by Campillo on March 27, 2020, Med-Union Medical, Angarica, and Seco billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iv)     On April 7, 2020, an Insured named YC was involved in an automobile accident. The contemporaneous police report indicated that YC was not seriously injured and refused medical attention at the scene. In keeping with the fact that YC was not seriously injured, YC did not visit any hospital emergency room following the accident.  To the extent that YC experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of YC by Campillo on April 16, 2020, Med-Union Medical, Angarica, and Seco billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

167.    These are only representative examples. In the claims for initial examinations under CPT code 99204 that are identified in Exhibit "1", Med-Union Medical, Cabrera, Angarica, and Seco routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to: (i) create a false basis for their charges for the examinations under CPT code 99204, because examinations billable under CPT code 99204 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity; and (ii) create a false basis for the laundry list of other Fraudulent Services that they purported to provide to the Insureds.

**(ii)    Misrepresentations Regarding "Comprehensive" Physical Examinations**

168.    In addition, in the claims for initial examinations identified in Exhibit "1", when Med-Union Medical, Cabrera, Angarica, and Seco billed GEICO for the putative initial examinations using CPT code 99204, they falsely represented that the physicians and other health care providers who purported to conduct or directly supervise the examinations – typically Seco, Pelaez, and Trigoura – provided "comprehensive" physical examinations to the Insureds who purportedly received the examinations.

169.    Pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the examining physician or health care provider either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

170.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician or other health care provider has not conducted a general examination of multiple patient organ systems unless the physician or provider has documented findings with respect to at least eight organ systems.

171.    The CPT Assistant recognizes the following organ systems:

(i)      constitutional symptoms (<u>e.g.</u>, fever, weight loss);

(ii)     eyes;

(iii)    ears, nose, mouth, throat;

(iv)     cardiovascular;

(v)      respiratory;

(vi)     gastrointestinal;

(vii)    genitourinary;

(viii)   musculoskeletal;

(ix)     integumentary (skin and/or breast);

(x)      neurological;

(xi)     psychiatric;

(xii)    endocrine;

(xiii)   hematologic/lymphatic; and

(xiv)    allergic/immunologic

172.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician
or other health care provider has not conducted a complete examination of a patient's
musculoskeletal organ system unless the physician or provider has documented findings with
respect to:

(i)      at least three of the following: (a) standing or sitting blood pressure; (b) supine
         blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f)
         height; or (g) weight;

(ii)     the general appearance of the patient – <u>e.g.</u>, development, nutrition, body habits,
         deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)  coordination, deep tendon reflexes, and sensation; and

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

173.    However, with respect to the claims for initial examinations under CPT code 99204 that are identified in Exhibit "1", neither Seco, Pelaez, Trigoura, Campillo, nor any other physician or other health care provider associated with Med-Union Medical ever legitimately documented a general examination of multiple patient organ systems or a complete examination of a single patient organ system.

174.    For example:

(i)     On September 5, 2017, Med-Union Medical, Cabrera, and Seco billed GEICO under CPT code 99204 for an initial examination of an Insured named JM that Seco purported to perform, and thereby represented that they had provided a "comprehensive" physical examination to JM. However, Seco did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(ii)    On June 4, 2019, Med-Union Medical, Cabrera, and Seco billed GEICO under CPT code 99204 for an initial examination of an Insured named AN that Trigoura purported to perform, and thereby represented that they had provided a "comprehensive" physical examination to AN. However, Trigoura did not document findings with respect to at least eight of the Insured's organ systems, nor

did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(iii)     On November 5, 2019, Med-Union Medical, Cabrera, and Seco billed GEICO under CPT code 99204 for an initial examination of an Insured named RR that Pelaez purported to perform, and thereby represented that they had provided a "comprehensive" physical examination to RR. However, Pelaez did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(iv)     On December 3, 2019, Med-Union Medical, Cabrera, and Seco billed GEICO under CPT code 99204 for an initial examination of an Insured named EG that Pelaez purported to perform, and thereby represented that they had provided a "comprehensive" physical examination to EG. However, Pelaez did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(v)     On June 26, 2020, Med-Union Medical, Angarica, and Seco billed GEICO under CPT code 99204 for an initial examination of an Insured named CL that Campillo purported to perform, and thereby represented that they had provided a "comprehensive" physical examination to CL. However, Campillo did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

175.     These are only representative examples. In the claims for initial examinations identified in Exhibit "1", Med-Union Medical, Cabrera, Angarica, and Seco routinely falsely represented that they provided "comprehensive" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT code 99204, because examinations billable under CPT code 99204 are reimbursable at higher rates than examinations that are not "comprehensive".

**(iii)**     **Misrepresentations Regarding the Extent of Medical Decision-Making**

176.     Moreover, in the claims for initial examinations identified in Exhibit "1", when Med-Union Medical, Cabrera, Angarica, and Seco billed GEICO for putative initial examinations using CPT code 99204, they falsely represented that the physicians or health care providers who purported

to conduct the examinations – typically Seco, Pelaez, Trigoura, and Campillo – engaged in some legitimate, moderate complexity medical decision-making in connection with the examinations.

177.    In actuality, the purported initial examinations did not involve any legitimate medical decision-making at all.

178.    For example, in the claims for initial examinations identified in Exhibit "1": (i) the initial examinations did not involve the retrieval, review, or analysis of any meaningful amount of medical records, diagnostic tests, or other information; (ii) there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they had any ongoing complaints arising from automobile accidents at all; and (iii) neither Seco, Pelaez, Trigoura, Campillo, nor any other health care provider associated with Med-Union Medical, considered any significant number of diagnoses or treatment options for Insureds during the initial examinations, and instead provided a substantially similar, pre-determined sprain/strain or similar soft tissue injury "diagnoses" for every Insured, regardless of their true individual circumstances or presentation.

179.    For example:

(i)    On May 5, 2019, an Insured named DD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DD's vehicle was drivable following the accident. The police report further indicated that DD was not injured and did not complain of any pain at the scene. In keeping with the fact that DD was not seriously injured, DD did not visit any hospital emergency room following the accident. To the extent that DD experienced any health problems at all as the result of the accident, they were of low or minimal severity. On May 7, 2019, Pelaez purported to conduct an initial examination of DD at Med-Union Medical. To the extent that Pelaez performed the examination in the first instance, Pelaez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Pelaez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Pelaez provided DD with the same, phony, list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither DD's presenting problems, nor the treatment plan

provided to DD by Med-Union Medical, Cabrera, Seco, and Pelaez presented any risk of significant complications, morbidity, or mortality. To the contrary, DD did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Med-Union Medical, Cabrera, Seco, and Pelaez consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to DD. Even so, Med-Union Medical, Cabrera, and Seco billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Pelaez engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ii)     On June 2, 2019, an Insured named AN was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that AN's vehicle was drivable following the accident.  The police report further indicated that AN was not injured and did not complain of any pain at the scene.  In keeping with the fact that AN was not seriously injured, AN did not visit any hospital emergency room following the accident.  To the extent that AN experienced any health problems at all as a result of the accident, they were of low or minimal severity. On June 4, 2019, Trigoura purported to conduct an initial examination of AN at Med-Union Medical. To the extent that Trigoura performed the examination in the first instance, Trigoura did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Trigoura did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Trigoura provided AN with the same, phony, list of objectively unverifiable soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither AN's presenting problems, nor the treatment plan provided to AN by Med-Union Medical, Cabrera, Seco, and Trigoura presented any risk of significant complications, morbidity, or mortality. To the contrary, AN did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Med-Union Medical, Cabrera, Seco, and Trigoura consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to AN. Even so, Med-Union Medical, Cabrera, and Seco billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Trigoura engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iii)    On August 19, 2019, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JR's vehicle was drivable following the accident. The police report further indicated that JR was not injured and did not complain of any pain at the scene. In keeping with the fact that JR was not seriously injured, JR did not visit any hospital emergency room following the accident. To the extent that JR experienced any health problems at all as the result of the accident, they were of low or minimal severity. On August 20, 2019, Pelaez purported to conduct an initial examination of JR at Med-Union Medical. To the extent that Pelaez performed the examination in the first instance, Pelaez did not retrieve, review, or analyze any

significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Pelaez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Pelaez provided JR with the same, phony, list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JR's presenting problems, nor the treatment plan provided to JR by Med-Union Medical, Cabrera, Seco, and Pelaez presented any risk of significant complications, morbidity, or mortality. To the contrary, JR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Med-Union Medical, Cabrera, Seco, and Pelaez consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JR. Even so, Med-Union Medical, Cabrera, and Seco billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Pelaez engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iv)     On February 22, 2020, an Insured named MG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MG's vehicle was drivable following the accident. The police report further does not indicate that MG complained of any pain or injury at the scene. In keeping with the fact that MG was not seriously injured, MG did not visit any hospital emergency room following the accident. To the extent that MG experienced any health problems at all as the result of the accident, they were of low or minimal severity. On March 2, 2020, MG received a purported initial examination from Campillo at Med-Union Medical. To the extent that the examination was performed in the first instance, Campillo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Campillo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Campillo provided MG with the same, phony, list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MG's presenting problems, nor the treatment plan provided to MG by Med-Union Medical, Angarica, and Seco, presented any risk of significant complications, morbidity, or mortality. To the contrary, MG did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Med-Union Medical, Angarica, and Seco consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to MG. Even so, Med-Union Medical, Angarica, and Seco billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Campillo engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(v)      On March 26, 2020, an Insured named SM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that SM's vehicle was drivable following the accident. The police report further does not indicate that SM complained of any pain or injury at

the scene. In keeping with the fact that SM was not seriously injured, SM did not visit any hospital emergency room following the accident. To the extent that SM experienced any health problems at all as the result of the accident, they were of low or minimal severity. On March 27, 2020, SM received a purported initial examination from Campillo at Med-Union Medical. To the extent that the examination was performed in the first instance, Campillo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Campillo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Campillo provided SM with the same, phony, list of objectively unverifiable soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither SM's presenting problems, nor the treatment plan provided to SM by Med-Union Medical, Angarica, and Seco, presented any risk of significant complications, morbidity, or mortality. To the contrary, SM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Med-Union Medical, Angarica, and Seco consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to SM. Even so, Med-Union Medical, Angarica, and Seco billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Campillo engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

180.     These are only representative examples. In the claims for initial examinations identified in Exhibit "1", Med-Union Medical, Cabrera, Angarica, and Seco routinely falsely represented that the purported examinations involved legitimate, moderately complex medical decision-making in order to create a false basis for their charges for the examinations under CPT code 99204, because examinations billable under CPT code 99204 are reimbursable at higher rates than examinations that do not require any moderately complex medical decision-making.

181.     In keeping with the fact that their putative "diagnoses" were pre-determined and phony, Seco, Pelaez, Trigoura, and Campillo – at the direction of Med-Union Medical, Cabrera, and Angarica – frequently issued substantially identical, phony "diagnoses", on or about the same date, to two or more Insureds who had been involved in a the same underlying accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that they were differently situated.

182.    For example:

(i)     On April 18, 2019, two Insureds – FR and WR – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Med-Union Medical for initial examinations by Pelaez on the <u>exact same date</u>, April 22, 2019. FR and WR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that FR and WR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Pelaez – at the direction of Cabrera and Med-Union Medical – provided FR and WR with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(ii)    On May 2, 2019, two Insureds – AR and DD – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Med-Union Medical for initial examinations by Pelaez on the <u>exact same date</u>, May 7, 2019. AR and DD were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AR and DD suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Pelaez – at the direction of Cabrera and Med-Union Medical – provided AR and DD with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(iii)   On June 2, 2019, two Insureds – FN and AN – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Med-Union Medical for initial examinations by Pelaez and Trigoura on the <u>exact same date</u>, June 4, 2019. FN and AN were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that FN and AN suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Pelaez and Trigoura – at the direction of Cabrera and Med-Union Medical – provided FN and AN with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(iv)    On March 26, 2020, two Insureds – LB and SM – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Med-Union Medical for initial examinations by Campillo on the <u>exact same date</u>, March 27, 2020. LB and SM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that LB and SM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Campillo – at the direction of Angarica and Med-

Union Medical – provided LB and SM with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(v)      On June 23, 2020, two Insureds – IF and CL – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Med-Union Medical for initial examinations by Seco on the <u>exact same date</u>, June 26, 2019. IF and CL were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that IF and CL suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Seco – at the direction of Angarica and Med-Union Medical – provided IF and CL with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

183.    These are only representative examples. In the claims for initial examinations identified in Exhibit "1", Seco, Pelaez, Trigoura, and Campillo – at the direction of Med-Union Medical, Cabrera, and Angarica -- frequently issued substantially identical, phony "diagnoses", on or about the same date, to two or more Insureds who had been involved in a the same underlying accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that they were differently situated.

184.    Based on these phony and pre-determined soft tissue injury "diagnoses", Seco, Pelaez, Trigoura, and Campillo – at the direction of Med-Union Medical, Cabrera, and Angarica -- directed virtually every Insured to return to Med-Union Medical up to five times each week for medically unnecessary "physical therapy", which was performed – to the extent that it was performed at all – by unsupervised massage therapists or other unlicensed individuals.

185.    The false "diagnoses" contained within the initial examination reports were included to give the false impression that the initial examinations entailed some legitimate medical decision-making, to create a false basis for the charges under CPT code 99204, and to create a false

justification for the other Fraudulent Services that Med-Union Medical purported to provide to the Insureds.

186.    In the claims for initial examinations identified in Exhibit "1", Med-Union Medical, Cabrera, Angarica, and Seco routinely fraudulently misrepresented that the examinations were lawfully provided and eligible for PIP reimbursement, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature, extent, and results of the examinations; and

(iii)   Med-Union Medical never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it was unlawfully operated without a legitimate medical director.

187.    In this context, Seco – who purported to serve as the "medical director" at Med-Union Medical – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1). Had Seco done so, he would have put a stop to these fraudulent charges for initial examinations.

**b.      The Fraudulent and Unlawful Follow-Up Examinations at Med-Union Medical**

188.    Beginning in 2019, Med-Union Medical purported to provide most of the Insureds in the claims identified in Exhibit "1" with multiple, fraudulent follow-up examinations, in addition to the fraudulent initial examinations.

189.    Seco, Pelaez, Trigoura, and Campillo purported to personally perform or directly supervise a substantial majority of the follow-up examinations at Med-Union Medical.

190.    Between 2019 and February 2020, Med-Union Medical, Cabrera, and Seco billed GEICO under CPT codes 99213, 99214, or 99215 for each follow-up examination that Seco, Pelaez, Trigoura, and Campillo purportedly provided at Med-Union Medical.

191.    Between at least February 2020 and May 2021, Med-Union Medical, Angarica, and Seco billed GEICO under CPT codes 99213, 99214, or 99215 for each follow-up examination that Seco, Pelaez, Trigoura, and Campillo purportedly provided at Med-Union Medical.

192.    Pursuant to the CPT Assistant, at all relevant times the use of CPT code 99213 to bill for a follow-up examination represented – among other things – that: (i) the patient presented with problems of low to moderate severity; and (ii) the physician or other health care provider performed at least two of the following three components during the examination: (a) took an "expanded problem focused" patient history; (b) conducted an "expanded problem focused physical examination"; and (c) engaged in medical decision-making of "low complexity".

193.    Pursuant to the CPT Assistant, at all relevant times the use of CPT code 99214 to bill for a follow-up examination represented – among other things – that: (i) the patient presented with problems of moderate to high severity; and (ii) the physician or other health care provider performed at least two of the following three components during the examination: (a) took a "detailed" patient history; (b) conducted a "detailed" physical examination; and (c) engaged in medical decision-making of "moderate complexity".

194.    Pursuant to the CPT Assistant, at all relevant times the use of CPT code 99215 to bill for a follow-up examination represented – among other things – that: (i) the patient presented with problems of moderate to high severity; and (ii) the physician or other health care provider performed at least two of the following three components during the examination: (a) took a "comprehensive"

patient history; (b) conducted a "comprehensive" physical examination; and (c) engaged in medical decision-making of "high complexity".

195.     In the claims for follow-up examinations identified in Exhibit "1", the charges for the follow-up examinations were fraudulent in that they misrepresented Med-Union Medical's eligibility to collect PIP Benefits in the first instance.

196.     In fact, and as set forth herein, Med-Union Medical never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing and operating requirements set forth in the Clinic Act.

197.     As set forth below, the charges for the follow-up examinations identified in Exhibit "1" also were fraudulent in that they misrepresented the nature, extent, and results of the initial examinations.

**(i)     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

198.     To the extent that the Insureds in the claims identified in Exhibit "1" suffered any injuries at all in their automobile accidents, the injuries almost always were minor soft tissue injuries such as sprains and strains, which were of minimal severity, even at their onset.

199.     Minor soft tissue injuries such as strains and sprains virtually always resolve after a short course of conservative treatment or no treatment at all. By the time the Insureds in the claims identified in Exhibit "1" presented for their putative follow-up examinations – typically weeks after their minor accidents – the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or else their presenting problems were minimal.

200.     Even so, in the claims for the follow-up examinations identified in Exhibit "1", Med-Union Medical, Cabrera, Angarica, and Seco made the following misrepresentations:

(i)       When billing GEICO for putative follow-up examinations using CPT code 99213 in the claims identified in Exhibit "1", they falsely represented that the Insureds

presented with problems of low to moderate severity, when in fact the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

(ii)     When billing GEICO for putative follow-up examinations using CPT code 99214 in the claims identified in Exhibit "1, they falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

(iii)    When billing GEICO for putative follow-up examinations using CPT code 99215 in the claims identified in Exhibit "1", they falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

201.    For example:

(i)     On June 2, 2019, an Insured named AN was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that AN's vehicle was drivable following the accident.  The police report further indicated that AN was not injured and did not complain of any pain at the scene.  In keeping with the fact that AN was not seriously injured, AN did not visit any hospital emergency room following the accident.  To the extent that AN experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset.  Even so, following a purported follow-up examination of AN by Pelaez on August 1, 2019, Med-Union Medical, Cabrera, and Seco billed GEICO for the follow-up examination using CPT code 99215, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ii)    On August 19, 2019, an Insured named MM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that MM's vehicle was drivable following the accident. The police report further indicated that MM was not injured and did not complain of any pain at the scene. In keeping with the fact that MM was not seriously injured, MM did not visit any hospital emergency room following the accident. To the extent that MM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset. Even so, following a purported follow-up examination of MM by Pelaez on October 31, 2019 – more than two months after the accident – Med-Union Medical, Cabrera, and Seco billed GEICO for the follow-up examination using CPT code 99215 and thereby falsely represented that MM presented with problems of moderate to high severity.

(iii)   On February 22, 2020, an Insured named MG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed collision, and that MG's vehicle was drivable following the accident. The

police report further indicated that MG was not injured and did not complain of any pain at the scene. In keeping with the fact that MG was not seriously injured, MG did not visit any hospital emergency room following the accident. To the extent that MG experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset. Even so, following a purported follow-up examination of MG by Campillo on March 30, 2020 – approximately five weeks after the accident – Med-Union Medical, Angarica, and Seco billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that MG presented with problems of moderate to high severity.

(iv)     On March 26, 2020, an Insured named SM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that SM's vehicle was drivable following the accident. The police report further indicated that SM was not injured and did not complain of any pain at the scene. In keeping with the fact that SM was not seriously injured, SM did not visit any hospital emergency room following the accident. To the extent that SM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset. Even so, following a purported follow-up examination of SM by Seco on April 24, 2020 – approximately one month after the accident – Med-Union Medical, Angarica, and Seco billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that SM presented with problems of moderate to high severity.

(v)     On April 7, 2020, an Insured named YC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. The police report further indicated that YC was not injured. In keeping with the fact that YC was not seriously injured, YC did not visit any hospital emergency room following the accident. To the extent that YC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset. Even so, following a purported follow-up examination of YC by Campillo on May 18, 2020 – approximately one and a half months after the accident – Med-Union Medical, Angarica, and Seco billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that YC presented with problems of moderate to high severity.

202.     These are only representative examples. In the claims for follow-up examinations identified in Exhibit "1", Med-Union Medical, Cabrera, Angarica, and Seco routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to: (i) create a false basis for their charges for the examinations under CPT codes 99213, 99214, or 99215, because examinations billable under CPT codes 99213, 99214, and 99215 are reimbursable at higher rates than examinations involving presenting problems of minimal

severity, or no severity; and (ii) create a false basis for the laundry list of other Fraudulent Services that they purported to provide to the Insureds.

**(ii)     Misrepresentations Regarding the Nature, Extent, and Results of the Follow-Up Examinations**

203.    What is more, in the claims for follow-up examinations identified in Exhibit "1", neither Seco, Pelaez, Trigoura, Campillo, nor any other physician or other health care provider associated with Med-Union Medical, took any legitimate patient histories, conducted any legitimate physical examinations, or engaged in any legitimate medical decision-making at all.

204.    Rather, following the purported follow-up examinations, Seco, Pelaez, Trigoura, and Campillo – at the direction of Med-Union Medical, Cabrera, and Angarica – simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and either (ii) referred the Insureds for even more medically unnecessary physical therapy services, despite the fact that the Insureds often already had received extensive physical therapy services that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

205.    The phony "follow-up examinations" that Med-Union Medical, Cabrera, Angarica, and Seco purported to provide to the Insureds in the claims identified in Exhibit "1" therefore were medically useless, and played no legitimate role in the treatment or care of the Insureds, because the putative "results" of the examinations were prearranged to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment they walked into Med-Union Medical's offices.

206.    In the claims for follow-up examinations identified in Exhibit "1", Med-Union Medical, Cabrera, Angarica, and Seco routinely fraudulently misrepresented that the examinations

were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)   Med-Union Medical never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it unlawfully was operated without a legitimate medical director.

**c.     The Fraudulent and Unlawful "Physical Therapy" at Med-Union Medical**

207.    In keeping with the fact that the purported "results" of the examinations were pre-determined, and had no legitimate connection to the Insureds' true medical circumstances or presentation, Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco:

(i)     caused virtually every Insured to receive two to four months of purported physical therapy treatments, typically beginning with physical therapy five or four times per week for the first several weeks of treatment, followed by physical therapy four or three times per week thereafter; and

(ii)    caused virtually every Insured to receive substantially identical types of physical therapy services, including: (i) hot/cold packs; (ii) mechanical traction; (iii) electrical stimulation; (iv) ultrasound therapy; (v) therapeutic exercises; and (vi) neuromuscular reeducation.

See Exhibit "1".

208.    In a legitimate clinical setting, each individual patient's physical therapy schedule, and the specific physical therapy modalities that will be used, must be tailored to the specific patient's circumstances, symptomatology, and presentation.

209.    In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy is constantly adjusted for each individual patient based on each patient's individual

treatment progress, as assessed during each patient's follow-up examinations and on an ongoing basis as they receive the physical therapy.

210.     By contrast, at Med-Union Medical, the nature and extent of the physical therapy that each Insured purportedly received was pre-determined and had no legitimate connection to the Insureds' individual circumstances, presentation, or progress through the Med-Union Medical fraudulent treatment and billing protocol. The purported "physical therapy" provided through Med-Union Medical to GEICO Insureds therefore was medically useless.

211.     Furthermore, in the claims for physical therapy services identified in Exhibit "1", the charges were fraudulent, unlawful, and non-reimbursable because the billing falsely represented that Seco had performed or directly supervised the services, when in fact the "physical therapy" services unlawfully were performed – to the extent that they were performed at all – by unsupervised massage therapists or other unlicensed individuals associated with Med-Union Medical.

**2.     The Fraudulent and Unlawful Treatment and Billing Protocol at Gonzalez's Medical**

**a.     The Fraudulent and Unlawful Initial Examinations at Gonzalez's Medical**

212.     As an initial step in its fraudulent treatment and billing protocol, Gonzalez's Medical purported to provide the Insureds in the claims identified in Exhibit "2" with initial examinations.

213.     Seco and Zegarra, under Seco's purported supervision, purported to personally perform or directly supervise a substantial majority of these initial examinations.

214.     Between March 2015 and September 2017, Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco billed GEICO under CPT code 99204 for each initial examination of an Insured that Seco and Zegarra purported to perform or directly supervise at Gonzalez's Medical.

215.     Then, between at least September 2017 and June 2021, Gonzalez's Medical, J.J. Gonzalez, and Seco billed GEICO under CPT code 99204 for each initial examination of an Insured that Seco and Zegarra purported to perform or directly supervise at Gonzalez's Medical.

216.     Pursuant to the American Medical Association's CPT Assistant, which governs reimbursement of PIP claims, at all relevant times the use of CPT code 99204 to bill for an initial patient examination represented – among other things – that: (i) the patient presented with problems of moderate to high severity; (ii) the physician or other health care provider who conducted the examination spent at least 45 minutes of face-to-face time with the patient or the patient's family during the examination; (iii) the physician or other health care provider who performed the examination conducted a "comprehensive" physical examination; and (iv) the physician or other health care provider who performed the examination engaged in "moderate complexity" medical decision-making.

217.     In the claims for initial examinations identified in Exhibit "2", the charges for the initial examinations were fraudulent in that they misrepresented Gonzalez's Medical's eligibility to collect PIP Benefits in the first instance.

218.     In fact, and as set forth herein, Gonzalez's Medical never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing and operating requirements set forth in the Clinic Act.

219.     As set forth below, the charges for the initial examinations identified in Exhibit "2" also were fraudulent in that they misrepresented the nature, extent, and results of the initial examinations.

**(i)      Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

220.      To the extent that the Insureds in the claims identified in Exhibit "2" had any presenting problems at all as the result of their typically minor automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as sprains and strains.

221.      For instance, in the substantial majority of the claims identified in Exhibit "2", the Insureds did not seek treatment at any hospital as the result of their accidents. To the limited extent that the Insureds in the claims identified in Exhibit "2" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis, and discharged with nothing more serious than a minor soft tissue injury diagnosis such as a sprain or strain.

222.      Furthermore, in the substantial majority of the claims identified in Exhibit "2" contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were functional following the accidents, and that no one was seriously injured in the accidents, or injured at all.

223.      Even so, by billing GEICO for putative initial examinations using CPT code 99204 in the claims identified in Exhibit "2", Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were low or minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

224.      For example:

(i)      On March 10, 2016, an Insured named EV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that EV's vehicle was drivable following the accident.  The police report further indicated that EV was not injured and did not complain of any pain at the scene.  In keeping with the fact that EV was not seriously injured, EV did not visit any hospital emergency room following the accident.  To the extent that EV experienced any health problems at all as a result of the accident, they were of low or minimal severity.  Even so, following a purported initial examination of EV on March 12, 2016, Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco billed

GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ii)     On April 18, 2017, an Insured named DG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed collision, and that DG's vehicle was drivable following the accident.  The police report further indicated that DG was not injured and did not complain of any pain at the scene.  In keeping with the fact that DG was not seriously injured, DG did not visit any hospital emergency room following the accident.  To the extent that DG experienced any health problems at all as a result of the accident, they were of low or minimal severity.  Even so, following a purported initial examination of DG on April 18, 2017, Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iii)    On June 29, 2018, an Insured named AR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that AR's vehicle was drivable following the accident.  The police report further indicated that AR was not injured and did not complain of any pain at the scene.  In keeping with the fact that AR was not seriously injured, AR did not visit any hospital emergency room following the accident.  To the extent that AR experienced any health problems at all as a result of the accident, they were of low or minimal severity.  Even so, following a purported initial examination of AR on July 2, 2018, Gonzalez's Medical, J.J. Gonzalez, and Seco billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iv)    On November 13, 2019, an Insured named AG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that AG's vehicle was drivable following the accident.  The police report further indicated that AG was not injured and did not complain of any pain at the scene.  In keeping with the fact that AG was not seriously injured, AG did not visit any hospital emergency room following the accident.  To the extent that AG experienced any health problems at all as a result of the accident, they were of low or minimal severity.  Even so, following a purported initial examination of AG on November 14, 2019, Gonzalez's Medical, J.J. Gonzalez, and Seco billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(v)     On December 4, 2019, an Insured named YM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that YM's vehicle was drivable following the

accident.  The police report further indicated that YM was not injured and did not complain of any pain at the scene.  In keeping with the fact that YM was not seriously injured, YM did not visit any hospital emergency room following the accident.  To the extent that YM experienced any health problems at all as a result of the accident, they were of low or minimal severity.  Even so, following a purported initial examination of YM on December 9, 2019, Gonzalez's Medical, J.J. Gonzalez, and Seco billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

225.    These are only representative examples. In the claims for initial examinations identified in Exhibit "2", Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to: (i) create a false basis for their charges for the examinations under CPT code 99204, because examinations billable under CPT code 99204 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity; and (ii) create a false basis for the laundry list of other Fraudulent Services that they purported to provide to the Insureds.

**(ii)    Misrepresentations Regarding "Comprehensive" Physical Examinations**

226.    In addition, in the claims for initial examinations identified in Exhibit "2", when Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco billed GEICO for the putative initial examinations using CPT code 99204, they falsely represented that the physicians and other health care providers who purported to conduct the examinations – typically Seco and Zegarra – conducted "comprehensive" physical examinations of the Insureds who purportedly received the examinations.

227.    Pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the examining physician or health care provider either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

228.     Pursuant to the CPT Assistant, in the context of patient examinations, a physician or other health care provider has not conducted a general examination of multiple patient organ systems unless the physician or provider has documented findings with respect to at least eight organ systems.

229.     The CPT Assistant recognizes the following organ systems:

(i)      constitutional symptoms (e.g., fever, weight loss);

(ii)     eyes;

(iii)    ears, nose, mouth, throat;

(iv)     cardiovascular;

(v)      respiratory;

(vi)     gastrointestinal;

(vii)    genitourinary;

(viii)   musculoskeletal;

(ix)     integumentary (skin and/or breast);

(x)      neurological;

(xi)     psychiatric;

(xii)    endocrine;

(xiii)   hematologic/lymphatic; and

(xiv)    allergic/immunologic

230.     Pursuant to the CPT Assistant, in the context of patient examinations, a physician or other health care provider has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician or provider has documented findings with respect to:

(i)     at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)   palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)    examination of gait and station;

(vi)   examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)  inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii) coordination, deep tendon reflexes, and sensation; and

(ix)   mental status, including orientation to time, place and person, as well as mood and affect.

231.    However, with respect to the claims for initial examinations under CPT code 99204 that are identified in Exhibit "2", neither Seco, Zegarra, nor any other physician or other health care provider associated with Gonzalez's Medical ever legitimately documented a general examination of multiple patient organ systems or a complete examination of a single patient organ system.

232.    For example:

(i)     On July 9, 2014, Gonzalez's Medical, J.J. Gonzalez, and Seco billed GEICO under CPT code 99204 for an initial examination of an Insured named MW that Seco purported to perform, and thereby represented that they had provided a "comprehensive" physical examination to MW. However, Seco did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(ii)     On August 5, 2015, Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco billed GEICO under CPT code 99204 for an initial examination of an Insured named NN that Seco purported to perform, and thereby represented that they had provided a "comprehensive" physical examination to NN. However, Seco did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(iii)    On February 1, 2018, Gonzalez's Medical, J.J. Gonzalez, and Seco billed GEICO under CPT code 99204 for an initial examination of an Insured named LR that Seco purported to perform, and thereby represented that they had provided a "comprehensive" physical examination to LR. However, Seco did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(iv)     On August 15, 2019, Gonzalez's Medical and J.J. Gonzalez billed GEICO under CPT code 99204 for an initial examination of an Insured named JT that Zegarra purported to perform, and thereby represented that they had provided a "comprehensive" physical examination to JT. However, Zegarra did not document findings with respect to at least eight of the Insured's organ systems, nor did she document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(v)      On December 9, 2019, Gonzalez's Medical, J.J. Gonzalez, and Seco billed GEICO under CPT code 99204 for an initial examination of an Insured named YM that Seco purported to perform, and thereby represented that they had provided a "comprehensive" physical examination to YM. However, Seco did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

233.     These are only representative examples. In the claims for initial examinations identified in Exhibit "2", Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco routinely falsely represented that they provided "comprehensive" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT code 99204, because examinations billable under CPT code 99204 are reimbursable at higher rates than examinations that are not "comprehensive".

**(iii)      Misrepresentations Regarding the Extent of Medical Decision-Making**

234.     Moreover, in the claims for initial examinations identified in Exhibit "2", when Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco billed GEICO for putative initial examinations using CPT code 99204, they falsely represented that the physicians or health care providers who purported to conduct the examinations – typically Seco and Zegarra – engaged in some legitimate, moderate complexity medical decision-making in connection with the examinations.

235.     In actuality, the purported initial examinations did not involve any legitimate medical decision-making at all.

236.     For example, in the claims for initial examinations identified in Exhibit "2": (i) the initial examinations did not involve the retrieval, review, or analysis of any meaningful amount of medical records, diagnostic tests, or other information; (ii) there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they had any ongoing complaints arising from automobile accidents at all; and (iii) neither Seco, Zegarra, nor any other health care provider associated with Gonzalez's, considered any significant number of diagnoses or treatment options for Insureds during the initial examinations, and instead provided a substantially similar, pre-determined sprain/strain or similar soft tissue injury "diagnoses" for every Insured, regardless of their true individual circumstances or presentation.

237.     For example:

(i)     On August 3, 2015, an Insured named NN was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that NN's vehicle was drivable following the accident. The police report further indicated that NN was not injured and did not complain of any pain at the scene. In keeping with the fact that NN was not seriously injured, NN did not visit any hospital emergency room following the accident. To the extent that

NN experienced any health problems at all as the result of the accident, they were of low or minimal severity. On August 5, 2015, Seco purported to conduct an initial examination of NN at Gonzalez's Medical. To the extent that Seco performed the examination in the first instance, Seco did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Seco did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Seco provided NN with the same, phony, list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither NN's presenting problems, nor the treatment plan provided to NN by Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco presented any risk of significant complications, morbidity, or mortality. To the contrary, NN did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to NN. Even so, Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Seco engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ii)    On April 18, 2017, an Insured named DG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that DG's vehicle was drivable following the accident. The police report further indicated that DG was not injured and did not complain of any pain at the scene. In keeping with the fact that DG was not seriously injured, DG did not visit any hospital emergency room following the accident. To the extent that DG experienced any health problems at all as the result of the accident, they were of low or minimal severity. On April 18, 2017, Seco purported to conduct an initial examination of DG at Gonzalez's Medical. To the extent that Seco performed the examination in the first instance, Seco did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Seco did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Seco provided DG with the same, phony, list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither DG's presenting problems, nor the treatment plan provided to DG by Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco presented any risk of significant complications, morbidity, or mortality. To the contrary, DG did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to DG. Even so, Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Seco engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iii)   On May 29, 2018, an Insured named AR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that AR's vehicle was drivable following the accident. The police report further indicated that AR was not injured and did not complain of any pain at the scene. In keeping with the fact that AR was not seriously injured, AR did not visit any hospital emergency room following the accident. To the extent that AR experienced any health problems at all as the result of the accident, they were of low or minimal severity. On July 7, 2018, Seco purported to conduct an initial examination of AR at Gonzalez's Medical. To the extent that Seco performed the examination in the first instance, Seco did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Seco did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Seco provided AR with the same, phony, list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither AR's presenting problems, nor the treatment plan provided to AR by Gonzalez's Medical, J.J. Gonzalez, and Seco presented any risk of significant complications, morbidity, or mortality. To the contrary, AR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gonzalez's Medical, J.J. Gonzalez, and Seco consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to AR. Even so, Gonzalez's Medical, J.J. Gonzalez, and Seco billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Seco engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iv)   On September 23, 2018, an Insured named FJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a one-car, low-impact collision, and that FJ's vehicle was drivable following the accident. The police report further indicated that FJ was not injured and did not complain of any pain at the scene. In keeping with the fact that FJ was not seriously injured, FJ did not visit any hospital emergency room following the accident. To the extent that FJ experienced any health problems at all as the result of the accident, they were of low or minimal severity. On September 25, 2018, Zegarra purported to conduct an initial examination of FJ at Gonzalez's Medical. To the extent that Zegarra performed the examination in the first instance, Zegarra did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Zegarra did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Zegarra provided FJ with the same, phony, list of objectively unverifiable soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither FJ's presenting problems, nor the treatment plan provided to FJ by Gonzalez's Medical, J.J. Gonzalez, and Zegarra presented any risk of significant complications, morbidity, or mortality. To the contrary, FJ did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gonzalez's Medical, J.J. Gonzalez, and Zegarra

consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to FJ. Even so, Gonzalez's Medical and J.J. Gonzalez billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Zegarra engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vi)     On December 4, 2019, an Insured named YM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that YM's vehicle was drivable following the accident.  The police report further indicated that YM was not injured and did not complain of any pain at the scene.  In keeping with the fact that YM was not seriously injured, YM did not visit any hospital emergency room following the accident.  To the extent that YM experienced any health problems at all as a result of the accident, they were of low or minimal severity. On December 9, 2019, Seco purported to conduct an initial examination of YM at Gonzalez's Medical. To the extent that Seco performed the examination in the first instance, Seco did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Seco did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Seco provided YM with the same, phony, list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither YM's presenting problems, nor the treatment plan provided to YM by Gonzalez's Medical, J.J. Gonzalez, and Seco presented any risk of significant complications, morbidity, or mortality. To the contrary, YM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Gonzalez's Medical, J.J. Gonzalez, and Seco consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to YM. Even so, Gonzalez's Medical, J.J. Gonzalez, and Seco billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Seco engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

238.     These are only representative examples. In the claims for initial examinations identified in Exhibit "2", Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco routinely falsely represented that the purported examinations involved legitimate, moderately complex medical decision-making in order to create a false basis for their charges for the examinations under CPT code 99204, because examinations billable under CPT code 99204 are reimbursable at higher rates than examinations that do not require any moderately complex medical decision-making.

239.    In keeping with the fact that his putative "diagnoses" were pre-determined and phony, Seco and Zegarra – at the direction of Gonzalez's Medical and J.J. Gonzalez – frequently issued substantially identical, phony "diagnoses", on or about the same date, to two or more Insureds who had been involved in a the same underlying accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that they were differently situated.

240.    For example:

(i)     On September 29, 2017, two Insureds – LP and GG – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Gonzalez's Medical for initial examinations by Seco on the <u>exact same date</u>, October 5, 2017. LP and GG were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that LP and GG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Seco – at the direction of Gonzalez's Medical and J.J. Gonzalez – provided LP and GG with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(ii)    On November 23, 2017, <u>four</u> Insureds – MA, ZG, RG, and RS – were involved in the same automobile accident. Thereafter – incredibly – all four Insureds presented at Gonzalez's Medical for initial examinations by Seco over the course of November 28-29, 2017. MA, ZG, RG, and RS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MA, ZG, RG, and RS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Seco – at the direction of Gonzalez's Medical and J.J. Gonzalez – provided MA, ZG, RG, and RS with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to all four of them.

(iii)   On September 23, 2018, <u>three</u> Insureds – FJ, HC, and YC – were involved in the same automobile accident. Thereafter – incredibly – all three Insureds presented at Gonzalez's Medical for initial examinations by Zegarra on the <u>exact same date</u>, September 25, 2018. FJ, HC, and YC were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that FJ, HC, and YC suffered any injuries at all in their accident, the injuries were different. Even so, at the

conclusion of the purported initial examinations, Zegarra – at the direction of Gonzalez's Medical and J.J. Gonzalez – provided FJ, HC, and YC with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to all three of them.

(iv)     On January 9, 2019, two Insureds – EM and YB – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Gonzalez's Medical for initial examinations by Seco on the <u>exact same date</u>, January 18, 2019. EM and YB were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that EM and YB suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Seco – at the direction of Gonzalez's Medical and J.J. Gonzalez – provided EM and YB with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(v)      On July 19, 2019, <u>three</u> Insureds – FJ, HC, and YC – were involved in the same automobile accident. Thereafter – incredibly – all three Insureds presented at Gonzalez's Medical for initial examinations by Zegarra on the <u>exact same date</u>, September 25, 2018. FJ, HC, and YC were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that FJ, HC, and YC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Zegarra – at the direction of Gonzalez's Medical and J.J. Gonzalez – provided FJ, HC, and YC with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to all three of them.

241.     These are only representative examples. In the claims for initial examinations identified in Exhibit "2", Seco and Zegarra – at the direction of Gonzalez's Medical and J.J. Gonzalez -- frequently issued substantially identical, phony "diagnoses", on or about the same date, to two or more Insureds who had been involved in a the same underlying accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that they were differently situated.

242.     Based on these phony and pre-determined soft tissue injury "diagnoses", Seco and Zegarra – at the direction of Gonzalez's Medical and J.J. Gonzalez -- directed virtually every

Insured to return to Gonzalez's Medical up to five times each week for medically unnecessary "physical therapy", which was performed – to the extent that it was performed at all – by completely unsupervised massage therapists or other unlicensed individuals.

243.    The false "diagnoses" contained within the initial examination reports were included to give the false impression that the initial examinations entailed some legitimate medical decision-making, to create a false basis for the charges under CPT code 99204, and to create a false justification for the other Fraudulent Services that Gonzalez's Medical purported to provide to the Insureds.

244.    In the claims for initial examinations identified in Exhibit "2", Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco routinely fraudulently misrepresented that the examinations were lawfully provided and eligible for PIP reimbursement, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature, extent, and results of the examinations; and

(iii)   Gonzalez's Medical never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it was unlawfully operated without a legitimate medical director.

245.    In this context, Blasini and Nguyen – who purported to serve as the "medical directors" at Gonzalez's Medical – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1). Had Blasini or Nguyen done so, put a stop to these fraudulent charges for initial examinations.

**b.    The Fraudulent and Unlawful Follow-Up Examinations at Gonzalez's Medical**

246.    Gonzalez's Medical also purported to provide most of the Insureds in the claims identified in Exhibit "2" with multiple, fraudulent follow-up examinations, in addition to the fraudulent initial examinations.

247.    Seco and Zegarra purported to personally perform or directly supervise a substantial majority of the follow-up examinations at Med-Union Medical.

248.    Between March 2015 and September 2017, Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco billed GEICO under CPT codes 99213 or 99214 for each initial examination of an Insured that Seco and Zegarra purported to perform or directly supervise at Gonzalez's Medical.

249.    Then, between at least September 2017 and June 2021, Gonzalez's Medical, J.J. Gonzalez, and Seco billed GEICO under CPT codes 99213 or 99214 for each initial examination of an Insured that Seco and Zegarra purported to perform or directly supervise at Gonzalez's Medical.

250.    Pursuant to the CPT Assistant, at all relevant times the use of CPT code 99213 to bill for a follow-up examination represented – among other things – that: (i) the patient presented with problems of low to moderate severity; and (ii) the physician or other health care provider performed at least two of the following three components during the examination: (a) took an "expanded problem focused" patient history; (b) conducted an "expanded problem focused physical examination"; and (c) engaged in medical decision-making of "low complexity".

251.    Pursuant to the CPT Assistant, at all relevant times the use of CPT code 99214 to bill for a follow-up examination represented – among other things – that: (i) the patient presented with problems of moderate to high severity; and (ii) the physician or other health care provider performed at least two of the following three components during the examination: (a) took a "detailed" patient

history; (b) conducted a "detailed" physical examination; and (c) engaged in medical decision-making of "moderate complexity".

252.    In the claims for follow-up examinations identified in Exhibit "2", the charges for the follow-up examinations were fraudulent in that they misrepresented Gonzalez's Medical's eligibility to collect PIP Benefits in the first instance.

253.    In fact, and as set forth herein, Gonzalez's Medical never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing and operating requirements set forth in the Clinic Act.

254.    As set forth below, the charges for the follow-up examinations identified in Exhibit "2" also were fraudulent in that they misrepresented the nature, extent, and results of the initial examinations.

**(i)      Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

255.    To the extent that the Insureds in the claims identified in Exhibit "2" suffered any injuries at all in their automobile accidents, the injuries almost always were minor soft tissue injuries such as sprains and strains, which were of minimal severity, even at their onset.

256.    Minor soft tissue injuries such as strains and sprains virtually always resolve after a short course of conservative treatment or no treatment at all. By the time the Insureds in the claims identified in Exhibit "2" presented for their putative follow-up examinations – typically weeks after their minor accidents – the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or else their presenting problems were minimal.

257.    Even so, in the claims for the follow-up examinations identified in Exhibit "2", Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco made the following misrepresentations:

(i)      When billing GEICO for putative follow-up examinations using CPT code 99213 in the claims identified in Exhibit "2", they falsely represented that the Insureds

presented with problems of low to moderate severity, when in fact the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

(ii)     When billing GEICO for putative follow-up examinations using CPT code 99214 in the claims identified in Exhibit "2, they falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

258.   For example:

(i)     On May 7, 2016, an Insured named YP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YP's vehicle was drivable following the accident. The police report further indicated that YP was not injured and did not complain of any pain at the scene. In keeping with the fact that YP was not seriously injured, YP did not visit any hospital emergency room following the accident. To the extent that YP experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset. Even so, following a purported follow-up examination of YP by Zegarra on July 25, 2016 – approximately three months after the accident – Gonzalez's Medical, J.J. Gonzalez, and Blasini billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that YP presented with problems of moderate to high severity.

(ii)     On June 29, 2018, an Insured named AR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that AR's vehicle was drivable following the accident.  The police report further indicated that AR was not injured and did not complain of any pain at the scene.  In keeping with the fact that AR was not seriously injured, AR did not visit any hospital emergency room following the accident.  To the extent that AR experienced any health problems at all as a result of the accident, they were of low or minimal severity.  Even so, following a purported follow-up examination of AR on September 11, 2018, Gonzalez's Medical, J.J. Gonzalez, and Seco billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iii)     On July 25, 2018, an Insured named KG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that KG's vehicle was drivable following the accident. The police report further indicated that KG was not injured and did not complain of any pain at the scene. In keeping with the fact that KG was not seriously injured, KG did not visit any hospital emergency room following the accident. To the extent that KG experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset. Even so, following a purported follow-up examination of KG by Zegarra on October 11, 2018 – approximately three months

after the accident – Gonzalez's Medical and J.J. Gonzalez billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that KG presented with problems of moderate to high severity.

(iv)     On January 9, 2019, an Insured named YB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that YB was not injured and did not complain of any pain at the scene. In keeping with the fact that YB was not seriously injured, YB did not visit any hospital emergency room following the accident. To the extent that YB experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset. Even so, following a purported follow-up examination of YB by Seco on March 4, 2019, Gonzalez's Medical, Seco, and J.J. Gonzalez billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that YB presented with problems of low to moderate severity.

(v)      On December 4, 2019, an Insured named YG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that YG's vehicle was drivable following the accident. The police report further indicated that YG was not injured and did not complain of any pain at the scene. In keeping with the fact that YG was not seriously injured, YG did not visit any hospital emergency room following the accident. To the extent that YG experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset. Even so, following a purported follow-up examination of YG by Seco on December 23, 2019, Gonzalez's Medical, Seco, and J.J. Gonzalez billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that YG presented with problems of low to moderate severity.

259.     These are only representative examples. In the claims for follow-up examinations identified in Exhibit "2", Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to: (i) create a false basis for their charges for the examinations under CPT codes 99213 or 99214, because examinations billable under CPT codes 99213 or 99214 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity; and (ii) create a false basis for the laundry list of other Fraudulent Services that they purported to provide to the Insureds.

**(ii)      Misrepresentations Regarding the Nature, Extent, and Results of the Follow-Up Examinations**

260.    What is more, in the claims for follow-up examinations identified in Exhibit "2", neither Seco, Zegarra, nor any other physician or other health care provider associated with Gonzalez's Medical, took any legitimate patient histories, conducted any legitimate physical examinations, or engaged in any legitimate medical decision-making at all.

261.    Rather, following the purported follow-up examinations, Seco and Zegarra – at the direction of Gonzalez's Medical and J.J. Gonzalez – simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and either (ii) referred the Insureds for even more medically unnecessary physical therapy services, despite the fact that the Insureds often already had received extensive physical therapy services that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

262.    The phony "follow-up examinations" that Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco purported to provide to the Insureds in the claims identified in Exhibit "2" therefore were medically useless, and played no legitimate role in the treatment or care of the Insureds, because the putative "results" of the examinations were prearranged to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment they walked into Gonzalez's Medical's offices.

263.    In the claims for follow-up examinations identified in Exhibit "2", Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)   Gonzalez's Medical never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it unlawfully was operated without a legitimate medical director.

**c.      The Fraudulent and Unlawful "Physical Therapy" at Gonzalez's Medical**

264.    In keeping with the fact that the purported "results" of the examinations were pre-determined, and had no legitimate connection to the Insureds' true medical circumstances or presentation, Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco:

(i)     caused virtually every Insured to receive two to four months of purported physical therapy treatments, typically beginning with physical therapy five or four times per week for the first several weeks of treatment, followed by physical therapy four or three times per week thereafter; and

(ii)    caused virtually every Insured to receive substantially identical <u>types</u> of physical therapy services, including: (i) hot/cold packs; (ii) mechanical traction; (iii) electrical stimulation; (iv) ultrasound therapy; (v) therapeutic exercises; and (vi) neuromuscular reeducation.

<u>See</u> Exhibit "2".

265.    In a legitimate clinical setting, each individual patient's physical therapy schedule, and the specific physical therapy modalities that will be used, must be tailored to the specific patient's circumstances, symptomatology, and presentation.

266.    In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy is constantly adjusted for each individual patient based on each patient's individual treatment progress, as assessed during each patient's follow-up examinations and on an ongoing basis as they receive the physical therapy.

267.     By contrast, at Gonzalez's Medical, the nature and extent of the physical therapy that each Insured purportedly received was pre-determined and had no legitimate connection to the Insureds' individual circumstances, presentation, or progress through the Gonzalez's Medical fraudulent treatment and billing protocol. The purported "physical therapy" provided through Gonzalez's Medical to GEICO Insureds therefore was medically useless.

268.     Furthermore, in the claims for physical therapy services identified in Exhibit "2", the charges were fraudulent, unlawful, and non-reimbursable because the billing falsely represented that Seco had performed or directly supervised the services, when in fact the "physical therapy" services were performed – to the extent that they were performed at all – by unsupervised massage therapists or other unlicensed individuals associated with Gonzalez's Medical, including Delgado and De Valle.

### 3.     The Fraudulent and Unlawful Treatment and Billing Protocol at New Generation Rehab

#### a.     The Fraudulent and Unlawful Initial Examinations at New Generation Rehab

269.     As an initial step in its fraudulent treatment and billing protocol, New Generation Rehab purported to provide the Insureds in the claims identified in Exhibit "3" with initial examinations.

270.     Seco and Leiva purported to personally perform or directly supervise a substantial majority of these initial examinations.

271.     New Generation Rehab, Abreu, and Seco then billed GEICO under CPT code 99205 for almost every initial examination of an Insured that Seco and Leiva purported to perform or directly supervise at New Generation Rehab.

272.     Pursuant to the American Medical Association's CPT Assistant, which governs reimbursement of PIP claims, at all relevant times the use of CPT code 99205 to bill for an initial

patient examination represented – among other things – that: (i) the patient presented with problems of moderate to high severity; (ii) the physician or other health care provider who conducted the examination spent at least 60 minutes of face-to-face time with the patient or the patient's family during the examination; (iii) the physician or other health care provider who performed the examination conducted a "comprehensive" physical examination; and (iv) the physician or other health care provider who performed the examination engaged in "high complexity" medical decision-making.

273.    In the claims for initial examinations identified in Exhibit "3", the charges for the initial examinations were fraudulent in that they misrepresented New Generation Rehab's eligibility to collect PIP Benefits in the first instance.

274.    In fact, and as set forth herein, New Generation Rehab never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing and operating requirements set forth in the Clinic Act.

275.    As set forth below, the charges for the initial examinations identified in Exhibit "3" also were fraudulent in that they misrepresented the nature, extent, and results of the initial examinations.

**(i)**     **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

276.    To the extent that the Insureds in the claims identified in Exhibit "3" had any presenting problems at all as the result of their typically minor automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as sprains and strains.

277.    For instance, in the substantial majority of the claims identified in Exhibit "3", the Insureds did not seek treatment at any hospital as the result of their accidents. To the limited extent that the Insureds in the claims identified in Exhibit "3" did seek treatment at a hospital following

their accidents, they virtually always were briefly observed on an outpatient basis, and discharged with nothing more serious than a minor soft tissue injury diagnosis such as a sprain or strain.

278.    Furthermore, in many of the claims identified in Exhibit "3", contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were functional following the accidents, and that no one was seriously injured in the accidents, or injured at all.

279.    Even so, by billing GEICO for putative initial examinations using CPT code 99205 in the claims identified in Exhibit "3", New Generation Rehab, Abreu, and Seco falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were low or minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

280.    For example:

(i)    On February 23, 2017, an Insured named NC was involved in an automobile accident. In keeping with the fact that NC was not seriously injured, NC did not visit any hospital emergency room following the accident, and instead presented at New Generation Rehab with no injuries more serious than minor sprains or strains. To the extent that NC experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of NC by Seco on March 9, 2017, New Generation Rehab, Abreu, and Seco billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ii)    On July 2, 2018, an Insured named NM was involved in an automobile accident. In keeping with the fact that NM was not seriously injured, NM did not visit any hospital emergency room following the accident, and instead presented at New Generation Rehab with no injuries more serious than minor sprains or strains. To the extent that NM experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of NM by Leiva on July 3, 2018, New Generation Rehab, Abreu, and Seco billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iii)     On October 15, 2018, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MC's vehicle was drivable following the accident.  The police report further indicated that MC was not injured.  In keeping with the fact that MC was not seriously injured, MC did not visit any hospital emergency room following the accident.  To the extent that MC experienced any health problems at all as a result of the accident, they were of low or minimal severity.  Even so, following a purported initial examination of MC by Leiva on October 17, 2018, New Generation Rehab, Abreu, and Seco billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iv)     On November 9, 2018, an Insured named JE was involved in an automobile accident. The contemporaneous police report indicated that JE was not injured and did not complain of any pain at the scene.  In keeping with the fact that JE was not seriously injured, JE did not visit any hospital emergency room following the accident.  To the extent that JE experienced any health problems at all as a result of the accident, they were of low or minimal severity.  Even so, following a purported initial examination of JE on November 13, 2018, New Generation Rehab, Abreu, and Seco billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(v)      On December 14, 2019, an Insured named CM was involved in an automobile accident. In keeping with the fact that CM was not seriously injured, CM did not visit any hospital emergency room following the accident, and instead presented at New Generation Rehab with no injuries more serious than minor sprains or strains. To the extent that CM experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of CM by Seco on December 16, 2019, New Generation Rehab, Abreu, and Seco billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

281.     These are only representative examples. In the claims for initial examinations identified in Exhibit "3", New Generation Rehab, Abreu, and Seco routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to: (i) create a false basis for their charges for the examinations under CPT code 99205, because examinations billable under CPT code 99205 are reimbursable at higher rates than examinations involving presenting problems

of low severity, minimal severity, or no severity; and (ii) create a false basis for the laundry list of other Fraudulent Services that they purported to provide to the Insureds.

**(ii)      Misrepresentations Regarding "Comprehensive" Physical Examinations**

282.    In addition, in the claims for initial examinations identified in Exhibit "3", when New Generation Rehab, Abreu, Blasini, and Seco billed GEICO for the putative initial examinations using CPT code 99205, they falsely represented that the physicians and other health care providers who purported to conduct the examinations – typically Seco and Leiva – conducted "comprehensive" physical examinations of the Insureds who purportedly received the examinations.

283.    Pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the examining physician or health care provider either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

284.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician or other health care provider has not conducted a general examination of multiple patient organ systems unless the physician or provider has documented findings with respect to at least eight organ systems.

285.    The CPT Assistant recognizes the following organ systems:

(i)      constitutional symptoms (e.g., fever, weight loss);

(ii)     eyes;

(iii)    ears, nose, mouth, throat;

(iv)    cardiovascular;

(v)     respiratory;

(vi)    gastrointestinal;

    (vii)    genitourinary;

    (viii)   musculoskeletal;

    (ix)    integumentary (skin and/or breast);

    (x)    neurological;

    (xi)    psychiatric;

    (xii)   endocrine;

    (xiii)   hematologic/lymphatic; and

    (xiv)   allergic/immunologic

286.  Pursuant to the CPT Assistant, in the context of patient examinations, a physician or other health care provider has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician or provider has documented findings with respect to:

    (i)    at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

    (ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

    (iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

    (iv)   palpation of lymph nodes in neck, axillae, groin, and/or other location;

    (v)    examination of gait and station;

    (vi)   examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

    (vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)   coordination, deep tendon reflexes, and sensation; and

(ix)   mental status, including orientation to time, place and person, as well as mood and affect.

287.   However, with respect to the claims for initial examinations under CPT code 99205 that are identified in Exhibit "3", neither Seco, Leiva, nor any other physician or other health care provider associated with New Generation Rehab ever legitimately documented a general examination of multiple patient organ systems or a complete examination of a single patient organ system.

288.   For example:

(i)   On March 9, 2017, New Generation Rehab, Abreu, and Seco billed GEICO under CPT code 99205 for an initial examination of an Insured named NC that Leiva purported to perform, and thereby represented that they had provided a "comprehensive" physical examination to NC. However, Leiva did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(ii)   On July 3, 2018, New Generation Rehab, Abreu, and Seco billed GEICO under CPT code 99205 for an initial examination of an Insured named NM that Leiva purported to perform, and thereby represented that they had provided a "comprehensive" physical examination to NM. However, Leiva did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(iii)   On October 17, 2018, New Generation Rehab, Abreu, and Seco billed GEICO under CPT code 99205 for an initial examination of an Insured named MC that Leiva purported to perform, and thereby represented that they had provided a "comprehensive" physical examination to MC. However, Leiva did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(iv)   On January 18, 2019, New Generation Rehab, Abreu, and Seco billed GEICO under CPT code 99205 for an initial examination of an Insured named DV that Leiva purported to perform, and thereby represented that they had provided a "comprehensive" physical examination to DV. However, Leiva did not document

findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(v)     On December 16, 2019, New Generation Rehab, Abreu, and Seco billed GEICO under CPT code 99205 for an initial examination of an Insured named CM that Leiva purported to perform, and thereby represented that they had provided a "comprehensive" physical examination to CM. However, Leiva did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

289.    These are only representative examples. In the claims for initial examinations identified in Exhibit "3", New Generation Rehab, Abreu, Seco routinely falsely represented that they provided "comprehensive" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT code 99205, because examinations billable under CPT code 99205 are reimbursable at higher rates than examinations that are not "comprehensive".

**(iii)     Misrepresentations Regarding the Extent of Medical Decision-Making**

290.    Moreover, in the claims for initial examinations identified in Exhibit "3", when New Generation Rehab, Abreu, and Seco billed GEICO for putative initial examinations using CPT code 99205, they falsely represented that the physicians or health care providers who purported to conduct the examinations – typically Seco and Leiva – engaged in some legitimate, high complexity medical decision-making in connection with the examinations.

291.    In actuality, the purported initial examinations did not involve any legitimate medical decision-making at all.

292.    For example, in the claims for initial examinations identified in Exhibit "3": (i) the initial examinations did not involve the retrieval, review, or analysis of any meaningful amount of medical records, diagnostic tests, or other information; (ii) there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury

complaints, to the extent that they had any ongoing complaints arising from automobile accidents at all; and (iii) neither Seco, Leiva, nor any other health care provider associated with Gonzalez's, considered any significant number of diagnoses or treatment options for Insureds during the initial examinations, and instead provided a substantially similar, pre-determined sprain/strain or similar soft tissue injury "diagnoses" for every Insured, regardless of their true individual circumstances or presentation.

293.   For example:

(i)   On October 15, 2018, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MC's vehicle was drivable following the accident.  The police report further indicated that MC was not injured.  In keeping with the fact that MC was not seriously injured, MC did not visit any hospital emergency room following the accident.  To the extent that MC experienced any health problems at all as a result of the accident, they were of low or minimal severity.  On October 17, 2018, Leiva purported to conduct an initial examination of MC at New Generation Rehab. To the extent that Leiva performed the examination in the first instance, Leiva did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Leiva did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Leiva provided MC with the same, phony, list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MC's presenting problems, nor the treatment plan provided to JE by New Generation Rehab, Abreu, and Leiva presented any risk of significant complications, morbidity, or mortality. To the contrary, MC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by New Generation Rehab, Abreu, and Leiva consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to MC. Even so, New Generation Rehab, Abreu, and Seco billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that Leiva engaged in some legitimate, high complexity medical decision-making during the purported examination.

(ii)   On November 9, 2018, an Insured named JE was involved in an automobile accident. The contemporaneous police report indicated that JE was not injured and did not complain of any pain at the scene. In keeping with the fact that JE was not seriously injured, JE did not visit any hospital emergency room following the accident. To the extent that JE experienced any health problems at all as the result of the accident, they were of low or minimal severity. On November 13, 2018,

Leiva purported to conduct an initial examination of JE at New Generation Rehab. To the extent that Leiva performed the examination in the first instance, Leiva did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Leiva did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Leiva provided JE with the same, phony, list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JE's presenting problems, nor the treatment plan provided to JE by New Generation Rehab, Abreu, and Leiva presented any risk of significant complications, morbidity, or mortality. To the contrary, JE did not need any significant treatment at all as a result of the accident, and the treatment plan provided by New Generation Rehab, Abreu, and Leiva consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JE. Even so, New Generation Rehab, Abreu, and Seco billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that Leiva engaged in some legitimate, high complexity medical decision-making during the purported examination.

(iii)    On November 9, 2018, an Insured named JF was involved in an automobile accident. The contemporaneous police report indicated that JF was not injured and did not complain of any pain at the scene. In keeping with the fact that JF was not seriously injured, JF did not visit any hospital emergency room following the accident. To the extent that JF experienced any health problems at all as the result of the accident, they were of low or minimal severity. On November 13, 2018, Leiva purported to conduct an initial examination of JF at New Generation Rehab. To the extent that Leiva performed the examination in the first instance, Leiva did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Leiva did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Leiva provided JF with the same, phony, list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JF's presenting problems, nor the treatment plan provided to JF by New Generation Rehab, Abreu, and Leiva presented any risk of significant complications, morbidity, or mortality. To the contrary, JF did not need any significant treatment at all as a result of the accident, and the treatment plan provided by New Generation Rehab, Abreu, and Leiva consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JF. Even so, New Generation Rehab, Abreu, and Seco billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that Leiva engaged in some legitimate, high complexity medical decision-making during the purported examination.

294.    These are only representative examples. In the claims for initial examinations identified in Exhibit "3", New Generation Rehab, Abreu, and Seco routinely falsely represented that

the purported examinations involved legitimate, highly complex medical decision-making in order to create a false basis for their charges for the examinations under CPT code 99205, because examinations billable under CPT code 99205 are reimbursable at higher rates than examinations that do not require any highly complex medical decision-making.

295.    In keeping with the fact that his putative "diagnoses" were pre-determined and phony, Leiva – at the direction of New Generation Rehab, Abreu, and Seco – frequently issued substantially identical, phony "diagnoses", on or about the same date, to two or more Insureds who had been involved in a the same underlying accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that they were differently situated.

296.    For example:

(i)     On November 9, 2018, <u>three</u> Insureds – JE, GE, and JF – were involved in the same automobile accident. Thereafter – incredibly – all three Insureds presented at New Generation Rehab for initial examinations by Leiva on the <u>exact same date</u>, November 13, 2018. JE, GE, and JF were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JE, GE, and JF suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Leiva – at the direction of New Generation Rehab, Abreu, and Seco – provided EM and YB with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(ii)    On January 18, 2019, two Insureds – DV and DV – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at New Generation Rehab for initial examinations by Leiva on the <u>exact same date</u>, January 18, 2019. DV and DV were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that DV and DV suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Leiva – at the direction of New Generation Rehab, Abreu, and Seco – provided DV and DV with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(iii)   On February 8, 2019, two Insureds – MA and OL – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at New Generation Rehab for initial examinations by Leiva on the <u>exact same date</u>, February 12, 2019. MA and OL were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MA and OL suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Leiva – at the direction of New Generation Rehab, Abreu, and Seco – provided MA and OL with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

297.   These are only representative examples. In the claims for initial examinations identified in Exhibit "3", Leiva – at the direction of New Generation Rehab, Abreu, and Seco -- frequently issued substantially identical, phony "diagnoses", on or about the same date, to two or more Insureds who had been involved in a the same underlying accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that they were differently situated.

298.   Based on these phony and pre-determined soft tissue injury "diagnoses", Seco and Leiva – at the direction of New Generation Rehab and Abreu -- directed virtually every Insured to return to New Generation Rehab up to five times each week for medically unnecessary "physical therapy", which was performed – to the extent that it was performed at all – by completely unsupervised massage therapists or other unlicensed individuals.

299.   The false "diagnoses" contained within the initial examination reports were included to give the false impression that the initial examinations entailed some legitimate medical decision-making, to create a false basis for the charges under CPT code 99205, and to create a false justification for the other Fraudulent Services that New Generation Rehab purported to provide to the Insureds.

300.     In the claims for initial examinations identified in Exhibit "3", New Generation Rehab, Abreu, and Seco routinely fraudulently misrepresented that the examinations were lawfully provided and eligible for PIP reimbursement, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature, extent, and results of the examinations; and

(iii)   New Generation Rehab never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it was unlawfully operated without a legitimate medical director.

301.     In this context, Seco – who purported to serve as the "medical director" at New Generation Rehab – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." <u>See</u> Fla. Stat. § 400.9935(1). Had Seco done so, they would have observed and put a stop to these fraudulent charges for initial examinations.

**b.      The Fraudulent and Unlawful Follow-Up Examinations at New Generation Rehab**

302.     New Generation Rehab also purported to provide most of the Insureds in the claims identified in Exhibit "3" with multiple, fraudulent follow-up examinations, in addition to the fraudulent initial examinations.

303.     Seco and Leiva purported to personally perform or directly supervise a substantial majority of the follow-up examinations at New Generation Rehab.

304.     New Generation Rehab, Abreu, and Seco then billed GEICO under CPT codes 99213 or 99214 for almost every follow-up examination of an Insured that Seco and Leiva purported to perform or directly supervise at New Generation Rehab.

305.     Pursuant to the CPT Assistant, at all relevant times the use of CPT code 99213 to bill for a follow-up examination represented – among other things – that: (i) the patient presented with problems of low to moderate severity; and (ii) the physician or other health care provider performed at least two of the following three components during the examination: (a) took an "expanded problem focused" patient history; (b) conducted an "expanded problem focused physical examination"; and (c) engaged in medical decision-making of "low complexity".

306.     Pursuant to the CPT Assistant, at all relevant times the use of CPT code 99214 to bill for a follow-up examination represented – among other things – that: (i) the patient presented with problems of moderate to high severity; and (ii) the physician or other health care provider performed at least two of the following three components during the examination: (a) took a "detailed" patient history; (b) conducted a "detailed" physical examination; and (c) engaged in medical decision-making of "moderate complexity".

307.     In the claims for follow-up examinations identified in Exhibit "3", the charges for the follow-up examinations were fraudulent in that they misrepresented New Generation Rehab's eligibility to collect PIP Benefits in the first instance.

308.     In fact, and as set forth herein, New Generation Rehab never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing and operating requirements set forth in the Clinic Act.

309.     As set forth below, the charges for the follow-up examinations identified in Exhibit "3" also were fraudulent in that they misrepresented the nature, extent, and results of the initial examinations.

**(i)      Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

310.     To the extent that the Insureds in the claims identified in Exhibit "3" suffered any injuries at all in their automobile accidents, the injuries almost always were minor soft tissue injuries such as sprains and strains, which were of minimal severity, even at their onset.

311.     Minor soft tissue injuries such as strains and sprains virtually always resolve after a short course of conservative treatment or no treatment at all. By the time the Insureds in the claims identified in Exhibit "3" presented for their putative follow-up examinations – typically weeks after their minor accidents – the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or else their presenting problems were minimal.

312.     Even so, in the claims for the follow-up examinations identified in Exhibit "3", New Generation Rehab, Abreu, and Seco made the following misrepresentations:

(i)      When billing GEICO for putative follow-up examinations using CPT code 99213 in the claims identified in Exhibit "3", they falsely represented that the Insureds presented with problems of low to moderate severity, when in fact the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

(ii)     When billing GEICO for putative follow-up examinations using CPT code 99214 in the claims identified in Exhibit "3", they falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

313.     For example:

(i)      On February 23, 2017, an Insured named NC was involved in an automobile accident. In keeping with the fact that NC was not seriously injured, NC did not visit any hospital emergency room following the accident, and instead presented at New Generation Rehab with no injuries more serious than minor sprains or strains. To the extent that NC experienced any health problems at all as a result of the

accident, they were of low or minimal severity at the outset. Even so, following a purported follow-up examination of NC by Leiva on March 23, 2017, New Generation Rehab, Abreu, and Seco billed GEICO for the initial examination using CPT code 99213, and thereby falsely represented that the follow-up examination involved presenting problems of low to moderate severity.

(ii)   On October 15, 2018, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured. In keeping with the fact that MC was not seriously injured, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset. Even so, following a purported initial examination of MC by Leiva on November 1, 2018, New Generation Rehab, Abreu, and Seco billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that the initial examination involved presenting problems of low to moderate to high severity.

(iii)   On November 9, 2018, an Insured named JE was involved in an automobile accident. The contemporaneous police report indicated that JE was not injured and did not complain of any pain at the scene. In keeping with the fact that JE was not seriously injured, JE did not visit any hospital emergency room following the accident. To the extent that JE experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset. Even so, following a purported follow-up examination of JE by Leiva on December 4, 2018, New Generation Rehab, Abreu, and Seco billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that the initial examination involved presenting problems of low to moderate severity.

(iv)   On November 9, 2018, an Insured named GE was involved in an automobile accident. The contemporaneous police report indicated that GE was not injured and did not complain of any pain at the scene. In keeping with the fact that GE was not seriously injured, GE did not visit any hospital emergency room following the accident. To the extent that GE experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset. Even so, following a purported follow-up examination of GE by Leiva on December 3, 2018 – approximately one month after the accident – New Generation Rehab, Abreu, and Seco billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that MS presented with problems of low to moderate severity.

(v)   On January 16, 2019, an Insured named MS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that MS's vehicle was drivable following the accident. The police report further indicated that MS was not injured and did not

complain of any pain at the scene. In keeping with the fact that MS was not seriously injured, MS did not visit any hospital emergency room following the accident. To the extent that MS experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset.  Even so, following a purported follow-up examination of MS by Leiva on February 11, 2019 – approximately one month after the accident – New Generation Rehab, Abreu, and Seco billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that MS presented with problems of low to moderate severity.

314.    These are only representative examples. In the claims for follow-up examinations identified in Exhibit "3", New Generation Rehab, Abreu, and Seco routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to: (i) create a false basis for their charges for the examinations under CPT codes 99213 or 99214, because examinations billable under CPT codes 99213 or 99214 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity; and (ii) create a false basis for the laundry list of other Fraudulent Services that they purported to provide to the Insureds.

**(ii)    Misrepresentations Regarding the Nature, Extent, and Results of the Follow-Up Examinations**

315.    What is more, in the claims for follow-up examinations identified in Exhibit "3", neither Seco, Leiva, nor any other physician or other health care provider associated with New Generation Rehab, took any legitimate patient histories, conducted any legitimate physical examinations, or engaged in any legitimate medical decision-making at all.

316.    Rather, following the purported follow-up examinations, Seco and Leiva – at the direction of New Generation Rehab and Abreu – simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and either (ii) referred the Insureds for even more medically unnecessary physical therapy services, despite the fact that the Insureds often already had received extensive physical therapy services that supposedly had not been successful in resolving

their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

317.    The phony "follow-up examinations" that New Generation Rehab, Abreu, Leiva, and Seco purported to provide to the Insureds in the claims identified in Exhibit "3" therefore were medically useless, and played no legitimate role in the treatment or care of the Insureds, because the putative "results" of the examinations were prearranged to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment they walked into New Generation Rehab's offices.

318.    In the claims for follow-up examinations identified in Exhibit "3", New Generation Rehab, Abreu, and Seco routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)   New Generation Rehab never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it unlawfully was operated without a legitimate medical director.

**c.    The Fraudulent and Unlawful "Physical Therapy" at New Generation Rehab**

319.    In keeping with the fact that the purported "results" of the examinations were pre-determined, and had no legitimate connection to the Insureds' true medical circumstances or presentation, New Generation Rehab, Abreu, and Seco:

(i)     caused virtually every Insured to receive two to four months of purported physical therapy treatments, typically beginning with physical therapy five or four times per

week for the first several weeks of treatment, followed by physical therapy four or three times per week thereafter; and

(ii)    caused virtually every Insured to receive substantially identical <u>types</u> of physical therapy services, including: (i) hot/cold packs; (ii) mechanical traction; (iii) electrical stimulation; (iv) ultrasound therapy; (v) therapeutic exercises; and (vi) neuromuscular reeducation.

<u>See</u> Exhibit "3".

320.    In a legitimate clinical setting, each individual patient's physical therapy schedule, and the specific physical therapy modalities that will be used, must be tailored to the specific patient's circumstances, symptomatology, and presentation.

321.    In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy is constantly adjusted for each individual patient based on each patient's individual treatment progress, as assessed during each patient's follow-up examinations and on an ongoing basis as they receive the physical therapy.

322.    By contrast, at New Generation Rehab, the nature and extent of the physical therapy that each Insured purportedly received was pre-determined and had no legitimate connection to the Insureds' individual circumstances, presentation, or progress through the New Generation Rehab fraudulent treatment and billing protocol. The purported "physical therapy" provided through New Generation Rehab to GEICO Insureds therefore was medically useless.

323.    Furthermore, in the claims for physical therapy services identified in Exhibit "3", the charges were fraudulent, unlawful, and non-reimbursable because the billing falsely represented that Seco had performed or directly supervised the services, when in fact the "physical therapy" services unlawfully were performed – to the extent that they were performed at all – by unsupervised massage therapists or other unlicensed individuals associated with New Generation Rehab.

## III.   The Fraudulent Claims the Defendants Submitted or Caused to be Submitted to GEICO

324.   To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of HCFA-1500 forms, treatment reports, and claims through the respective Clinic Defendants to GEICO, containing thousands of individual charges, seeking payment for the Fraudulent Services that the Defendants were not entitled to receive. In particular:

(i)     Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco submitted or caused to be submitted thousands of HCFA-1500 forms, treatment reports, and claims through Med-Union Medical to GEICO.

(ii)    Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco submitted or caused to be submitted thousands of HCFA-1500 forms, treatment reports, and claims through Gonzalez's Medical to GEICO.

(iii)   New Generation Rehab, Abreu, and Seco submitted or caused to be submitted thousands of HCFA-1500 forms, treatment reports, and claims through New Generation Rehab to GEICO.

325.   The claims that the Defendants submitted or caused to be submitted to GEICO were false and misleading in the following, material respects:

(i)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Clinic Defendants were in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance. In fact, the Clinic Defendants never were in compliance with the Clinic Act, and never were eligible to collect PIP Benefits, because they were operated without legitimate medical directors who legitimately fulfilled the statutory requirements applicable to clinic medical directors.

(ii)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement. In fact, the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement, because: (a) they were medically unnecessary and provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; and (b) in the case of the physical therapy services, because they were performed by massage therapists and other unlicensed and unsupervised individuals, and because the resulting billing falsely represented that the services were performed or directly supervised by Seco.

(iii)   The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv)   The HCFA-1500 forms and treatment reports submitted by and on behalf of the Defendants frequently misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided, in order to increase the amount of reimbursement the Defendants could unlawfully obtain.

## IV.   The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

326.   The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of charges to GEICO. Even so, the Defendants knowingly misrepresented and concealed facts related to the respective Clinic Defendants in an effort to prevent discovery: (i) that the Clinic Defendants lacked legitimate medical directors, and therefore were ineligible to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were provided – to the extent that they were provided at all – by unsupervised massage therapists or other unlicensed individuals, and therefore were not eligible for PIP reimbursement; and (iii) that the Fraudulent Services were medically unnecessary.

327.   GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $3,800,000.00.

328.   GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it commenced this action.

## FIRST CAUSE OF ACTION
### Against Med-Union Medical
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

329.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-16, 38-66, 101-115, 147-211, and 324-328, above.

330.    There is an actual case in controversy between GEICO and Med-Union Medical regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

331.    Med-Union Medical has no right to receive payment for any pending bills submitted to GEICO because it unlawfully was operated in violation of the Clinic Act's medical director and operating requirements.

332.    Med-Union Medical has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided or billed to GEICO.

333.    Med-Union Medical has no right to receive payment for any pending bills submitted to GEICO for purported physical therapy because the underlying Fraudulent Services were not performed by individuals who actually were licensed to perform the pertinent services, or else constituted non-reimbursable massage.

334.    Med-Union Medical has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

335.    Med-Union Medical has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

336.    Med-Union Medical has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

337.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Med-Union Medical has no right to receive payment for any pending bills submitted to GEICO.

<p style="text-align:center"><strong><u>SECOND CAUSE OF ACTION</u></strong><br><strong>Against J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco</strong><br><strong>(Violation of RICO, 18 U.S.C. § 1962(c))</strong></p>

338.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-16, 38-66, 101-115, 147-211, and 324-328, above.

339.    Med-Union Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

340.    J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco knowingly have conducted and/or participated, directly or indirectly, in the conduct of Med-Union Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over six years seeking payments that Med-Union Medical was not eligible to receive under the No-Fault Law because: (i) Med-Union Medical unlawfully was operated in violation of the Clinic Act's medical director and licensing

requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

341.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

342.    In particular, between 2014 and February 2016, J.A. Gonzalez and Amigo owned and controlled Med-Union Medical, and directed its affairs. During that same period, Seco falsely posed as Med-Union Medical's medical director so as to enable it to operate, performed many of the phony patient examinations that were billed through Med-Union Medical, and falsely purported to perform or directly supervise virtually all of the "physical therapy" services that were billed through Med-Union Medical, which made the Fraudulent Services appear to be eligible for PIP reimbursement, when in fact they were not. Together, J.A. Gonzalez, Amigo, and Seco submitted all of the fraudulent and unlawful Med-Union Medical billing identified in Exhibit "1" with dates of mailing between 2014 and February 2016, or caused it to be submitted.

343.    Between February 2016 and July 2017, J.A. Gonzalez owned and controlled Med-Union Medical, and directed its affairs. During that same period, Seco falsely posed as Med-Union Medical's medical director so as to enable it to operate, performed many of the phony patient

examinations that were billed through Med-Union Medical, and falsely purported to perform or directly supervise virtually all of the "physical therapy" services that were billed through Med-Union Medical, which made the Fraudulent Services appear to be eligible for PIP reimbursement, when in fact they were not. Together, J.A. Gonzalez and Seco submitted all of the fraudulent and unlawful Med-Union Medical billing identified in Exhibit "1" with dates of mailing between February 2016 and July 2017, or caused it to be submitted.

344.    Between July 2017 and February 2020, Cabrera owned and controlled Med-Union Medical, and directed its affairs. During that same period, Seco falsely posed as Med-Union Medical's medical director so as to enable it to operate, performed many of the phony patient examinations that were billed through Med-Union Medical, and falsely purported to perform or directly supervise virtually all of the "physical therapy" services that were billed through Med-Union Medical, which made the Fraudulent Services appear to be eligible for PIP reimbursement, when in fact they were not. Together, Cabrera and Seco submitted all of the fraudulent and unlawful Med-Union Medical billing identified in Exhibit "1" with dates of mailing between July 2017 and February 2020, or caused it to be submitted.

345.    Between February 2020 and May 2021, Angarica owned and controlled Med-Union Medical, and directed its affairs. During that same period, Seco falsely posed as Union Medical's medical director so as to enable it to operate, performed many of the phony patient examinations that were billed through Med-Union Medical, and falsely purported to perform or directly supervise virtually all of the "physical therapy" services that were billed through Med-Union Medical, which made the Fraudulent Services appear to be eligible for PIP reimbursement, when in fact they were not. Together, Angarica and Seco submitted all of the fraudulent and

unlawful Med-Union Medical billing identified in Exhibit "1" with dates of mailing between February 2020 and May 2021, or caused it to be submitted.

346.    Med-Union Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco operated Med-Union Medical, inasmuch as Med-Union Medical was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for Med-Union Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Med-Union Medical continues to attempt collection on its fraudulent billing to the present day.

347.    Med-Union Medical is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Med-Union Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

348.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,676,000.00 pursuant to the fraudulent bills submitted through the Med-Union Medical enterprise.

349.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**Against J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

350.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-16, 38-66, 101-115, 147-211, and 324-328, above.

351.     Med-Union Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

352.     J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco are or were employed by or associated with the Med-Union Medical enterprise.

353.     J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Med-Union Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over six years seeking payments that Med-Union Medical was not eligible to receive under the No-Fault Law because: (i) Med-Union Medical unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying

Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

354.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

355.    In particular, between 2014 and February 2016, J.A. Gonzalez and Amigo owned and controlled Med-Union Medical, and directed its affairs. During that same period, Seco falsely posed as Med-Union Medical's medical director so as to enable it to operate, performed many of the phony patient examinations that were billed through Med-Union Medical, and falsely purported to perform or directly supervise virtually all of the "physical therapy" services that were billed through Med-Union Medical, which made the Fraudulent Services appear to be eligible for PIP reimbursement, when in fact they were not. Together, J.A. Gonzalez, Amigo, and Seco submitted all of the fraudulent and unlawful Med-Union Medical billing identified in Exhibit "1" with dates of mailing between 2014 and February 2016, or caused it to be submitted.

356.    Between February 2016 and July 2017, J.A. Gonzalez owned and controlled Med-Union Medical, and directed its affairs. During that same period, Seco falsely posed as Med-Union Medical's medical director so as to enable it to operate, performed many of the phony patient examinations that were billed through Med-Union Medical, and falsely purported to perform or directly supervise virtually all of the "physical therapy" services that were billed through Med-Union Medical, which made the Fraudulent Services appear to be eligible for PIP reimbursement, when in fact they were not. Together, J.A. Gonzalez and Seco submitted all of the fraudulent and

unlawful Med-Union Medical billing identified in Exhibit "1" with dates of mailing between February 2016 and July 2017, or caused it to be submitted.

357.    Between July 2017 and February 2020, Cabrera owned and controlled Med-Union Medical, and directed its affairs. During that same period, Seco falsely posed as Med-Union Medical's medical director so as to enable it to operate, performed many of the phony patient examinations that were billed through Med-Union Medical, and falsely purported to perform or directly supervise virtually all of the "physical therapy" services that were billed through Med-Union Medical, which made the Fraudulent Services appear to be eligible for PIP reimbursement, when in fact they were not. Together, Cabrera and Seco submitted all of the fraudulent and unlawful Med-Union Medical billing identified in Exhibit "1" with dates of mailing between July 2017 and February 2020, or caused it to be submitted.

358.    Between February 2020 and May 2021, Angarica owned and controlled Med-Union Medical, and directed its affairs. During that same period, Seco falsely posed as Union Medical's medical director so as to enable it to operate, performed many of the phony patient examinations that were billed through Med-Union Medical, and falsely purported to perform or directly supervise virtually all of the "physical therapy" services that were billed through Med-Union Medical, which made the Fraudulent Services appear to be eligible for PIP reimbursement, when in fact they were not. Together, Angarica and Seco submitted all of the fraudulent and unlawful Med-Union Medical billing identified in Exhibit "1" with dates of mailing between February 2020 and May 2021, or caused it to be submitted.

359.    Accordingly, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other

automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

360.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,676,000.00 pursuant to the fraudulent bills submitted through the Med-Union Medical enterprise.

361.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION
**Against Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco**
**(Under Fla. Stat. 501.201 et. seq.)**

362.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-16, 38-66, 101-115, 147-211, and 324-328, above.

363.    Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco are actively engaged in trade and commerce in the State of Florida.

364.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

365.    Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

366.    The bills and supporting documents submitted or caused to be submitted by Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco to GEICO were fraudulent and unlawful in that they misrepresented: (i) Med-Union Medical's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to

GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

367.    In particular, between 2014 and February 2016, Med-Union Medical provided an ostensibly legitimate health care clinic through which billing for the Fraudulent Services could be submitted to GEICO and other insurers, and -- together with J.A. Gonzalez, Amigo, and Seco -- caused the submission of the billing for the Fraudulent Services. J.A. Gonzalez and Amigo owned and controlled Med-Union Medical, and directed its affairs. During that same period, Seco falsely posed as Med-Union Medical's medical director so as to enable it to operate, performed many of the phony patient examinations that were billed through Med-Union Medical, and falsely purported to perform or directly supervise virtually all of the "physical therapy" services that were billed through Med-Union Medical, which made the Fraudulent Services appear to be eligible for PIP reimbursement, when in fact they were not. Together, J.A. Gonzalez, Amigo, Seco, and Med-Union Medical submitted all of the fraudulent and unlawful Med-Union Medical billing identified in Exhibit "1" with dates of mailing between 2014 and February 2016, or caused it to be submitted.

368.    Between February 2016 and July 2017, Med-Union Medical provided an ostensibly legitimate health care clinic through which billing for the Fraudulent Services could be submitted to GEICO and other insurers , and -- together with J.A. Gonzalez and Seco -- caused the submission of the billing for the Fraudulent Services. J.A. Gonzalez owned and controlled Med-Union Medical, and directed its affairs. During that same period, Seco falsely posed as Med-Union Medical's medical director so as to enable it to operate, performed many of the phony patient examinations that were billed through Med-Union Medical, and falsely purported to perform or directly supervise virtually all of the "physical therapy" services that were billed through Med-Union Medical, which made the Fraudulent Services appear to be eligible for PIP reimbursement,

when in fact they were not. Together, Med-Union Medical, J.A. Gonzalez and Seco submitted all of the fraudulent and unlawful Med-Union Medical billing identified in Exhibit "1" with dates of mailing between February 2016 and July 2017, or caused it to be submitted.

369.    Between July 2017 and February 2020, Med-Union Medical provided an ostensibly legitimate health care clinic through which billing for the Fraudulent Services could be submitted to GEICO and other insurers, and -- together with Cabrera and Seco -- caused the submission of the billing for the Fraudulent Services. Cabrera owned and controlled Med-Union Medical, and directed its affairs. During that same period, Seco falsely posed as Med-Union Medical's medical director so as to enable it to operate, performed many of the phony patient examinations that were billed through Med-Union Medical, and falsely purported to perform or directly supervise virtually all of the "physical therapy" services that were billed through Med-Union Medical, which made the Fraudulent Services appear to be eligible for PIP reimbursement, when in fact they were not. Together, Med-Union Medical, Cabrera, and Seco submitted all of the fraudulent and unlawful Med-Union Medical billing identified in Exhibit "1" with dates of mailing between July 2017 and February 2020, or caused it to be submitted.

370.    Between February 2020 and May 2021, Med-Union Medical provided an ostensibly legitimate health care clinic through which billing for the Fraudulent Services could be submitted to GEICO and other insurers, and -- together with Angarica and Seco -- caused the submission of the billing for the Fraudulent Services. Angarica owned and controlled Med-Union Medical, and directed its affairs. During that same period, Seco falsely posed as Union Medical's medical director so as to enable it to operate, performed many of the phony patient examinations that were billed through Med-Union Medical, and falsely purported to perform or directly supervise virtually all of the "physical therapy" services that were billed through Med-Union

Medical, which made the Fraudulent Services appear to be eligible for PIP reimbursement, when in fact they were not. Together, Med-Union Medical, Angarica, and Seco submitted all of the fraudulent and unlawful Med-Union Medical billing identified in Exhibit "1" with dates of mailing between February 2020 and May 2021, or caused it to be submitted.

371.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco has been materially injurious to GEICO and its Insureds.

372.    The conduct of Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco was the actual and proximate cause of the damages sustained by GEICO.

373.    Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco's unfair and deceptive acts have caused GEICO to sustain damages of at least $1,676,000.00.

374.    By reason of Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

<div align="center">

**FIFTH CAUSE OF ACTION**
**Against Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco**
**(Common Law Fraud)**

</div>

375.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-16, 38-66, 101-115, 147-211, and 324-328, above.

376.    Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through Med-Union Medical for the Fraudulent Services.

377.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Med-Union Medical was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Med-Union Medical never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

378.    Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Med-Union Medical that were not reimbursable.

379.    In particular, between 2014 and February 2016, Med-Union Medical provided an ostensibly legitimate health care clinic through which billing for the Fraudulent Services could be submitted to GEICO and other insurers, and -- together with J.A. Gonzalez, Amigo, and Seco -- caused the submission of the billing for the Fraudulent Services. J.A. Gonzalez and Amigo owned and controlled Med-Union Medical, and directed its affairs. During that same period, Seco falsely posed as Med-Union Medical's medical director so as to enable it to operate, performed many of the phony patient examinations that were billed through Med-Union Medical, and falsely purported to perform or directly supervise virtually all of the "physical therapy" services that were

billed through Med-Union Medical, which made the Fraudulent Services appear to be eligible for PIP reimbursement, when in fact they were not. Together, J.A. Gonzalez, Amigo, Seco, and Med-Union Medical submitted all of the fraudulent and unlawful Med-Union Medical billing identified in Exhibit "1" with dates of mailing between 2014 and February 2016, or caused it to be submitted.

380.    Between February 2016 and July 2017, Med-Union Medical provided an ostensibly legitimate health care clinic through which billing for the Fraudulent Services could be submitted to GEICO and other insurers , and -- together with J.A. Gonzalez and Seco -- caused the submission of the billing for the Fraudulent Services. J.A. Gonzalez owned and controlled Med-Union Medical, and directed its affairs. During that same period, Seco falsely posed as Med-Union Medical's medical director so as to enable it to operate, performed many of the phony patient examinations that were billed through Med-Union Medical, and falsely purported to perform or directly supervise virtually all of the "physical therapy" services that were billed through Med-Union Medical, which made the Fraudulent Services appear to be eligible for PIP reimbursement, when in fact they were not. Together, Med-Union Medical, J.A. Gonzalez and Seco submitted all of the fraudulent and unlawful Med-Union Medical billing identified in Exhibit "1" with dates of mailing between February 2016 and July 2017, or caused it to be submitted.

381.    Between July 2017 and February 2020, Med-Union Medical provided an ostensibly legitimate health care clinic through which billing for the Fraudulent Services could be submitted to GEICO and other insurers, and -- together with Cabrera and Seco -- caused the submission of the billing for the Fraudulent Services. Cabrera owned and controlled Med-Union Medical, and directed its affairs. During that same period, Seco falsely posed as Med-Union Medical's medical director so as to enable it to operate, performed many of the phony patient examinations that were billed through Med-Union Medical, and falsely purported to perform or directly supervise virtually

all of the "physical therapy" services that were billed through Med-Union Medical, which made the Fraudulent Services appear to be eligible for PIP reimbursement, when in fact they were not. Together, Med-Union Medical, Cabrera, and Seco submitted all of the fraudulent and unlawful Med-Union Medical billing identified in Exhibit "1" with dates of mailing between July 2017 and February 2020, or caused it to be submitted.

382.    Between February 2020 and May 2021, Med-Union Medical provided an ostensibly legitimate health care clinic through which billing for the Fraudulent Services could be submitted to GEICO and other insurers, and -- together with Angarica and Seco -- caused the submission of the billing for the Fraudulent Services. Angarica owned and controlled Med-Union Medical, and directed its affairs. During that same period, Seco falsely posed as Union Medical's medical director so as to enable it to operate, performed many of the phony patient examinations that were billed through Med-Union Medical, and falsely purported to perform or directly supervise virtually all of the "physical therapy" services that were billed through Med-Union Medical, which made the Fraudulent Services appear to be eligible for PIP reimbursement, when in fact they were not. Together, Med-Union Medical, Angarica, and Seco submitted all of the fraudulent and unlawful Med-Union Medical billing identified in Exhibit "1" with dates of mailing between February 2020 and May 2021, or caused it to be submitted.

383.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,676,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco through Med-Union Medical.

384.     Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

385.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### SIXTH CAUSE OF ACTION
**Against Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco**
**(Unjust Enrichment)**

386.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-16, 38-66, 101-115, 147-211, and 324-328, above.

387.     As set forth above, Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

388.     When GEICO paid the bills and charges submitted or caused to be submitted by Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco through Med-Union Medical, it reasonably believed that it was legally obligated to make such payments based on Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco's improper, unlawful, and/or unjust acts.

389.     Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that they voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

390.     Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

391.     By reason of the above, Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,676,000.00.

<div align="center">

**SEVENTH CAUSE OF ACTION**
**Against Gonzalez's Medical**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

</div>

392.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-7, 17-30, 38-49, 67-86, 116-131, 147-153, 212-268, and 324-328, above.

393.     There is an actual case in controversy between GEICO and Gonzalez's Medical regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

394.     Gonzalez's Medical has no right to receive payment for any pending bills submitted to GEICO because it unlawfully was operated in violation of the Clinic Act's medical director and operating requirements.

395.     Gonzalez's Medical has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided or billed to GEICO.

396.     Gonzalez's Medical has no right to receive payment for any pending bills submitted to GEICO for purported physical therapy because the underlying Fraudulent Services were not performed by individuals who actually were licensed to perform the pertinent services, or else constituted non-reimbursable massage.

397.    Gonzalez's Medical has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

398.    Gonzalez's Medical has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

399.    Gonzalez's Medical has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

400.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Gonzalez's Medical has no right to receive payment for any pending bills submitted to GEICO.

## EIGHTH CAUSE OF ACTION
### Against J.J. Gonzalez, Blasini, and Seco
### (Violation of RICO, 18 U.S.C. § 1962(c))

401.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-7, 17-30, 38-49, 67-86, 116-131, 147-153, 212-268, and 324-328, above.

402.    Gonzalez's Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

403.    J.J. Gonzalez, Blasini, and Seco knowingly have conducted and/or participated, directly or indirectly, in the conduct of Gonzalez's Medical's affairs through a pattern of

racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over six years seeking payments that Gonzalez's Medical was not eligible to receive under the No-Fault Law because: (i) Gonzalez's Medical unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich J.J. Gonzalez, Blasini, and Seco, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

404. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

405. In particular, between March 2015 and September 2017, J.J. Gonzalez owned and controlled Gonzalez's Medical, and directed its affairs. During that same period, Blasini falsely posed as Gonzalez's Medical's medical director so as to enable it to operate, and Seco performed many of the phony patient examinations that were billed through Gonzalez's Medical, and falsely purported to perform or directly supervise virtually all of the "physical therapy" services that were billed through Gonzalez's Medical, which made the Fraudulent Services appear to be eligible for PIP reimbursement, when in fact they were not. Together, J.J. Gonzalez, Blasini, and Seco

submitted all of the fraudulent and unlawful Gonzalez's Medical billing identified in Exhibit "2" with dates of mailing between March 2015 and September 2017, or caused it to be submitted.

406.    Between September 2017 and May 2021, J.J. Gonzalez owned and controlled Gonzalez's Medical, and directed its affairs. During that same period, Seco performed many of the phony patient examinations that were billed through Gonzalez's Medical, and falsely purported to perform or directly supervise virtually all of the "physical therapy" services that were billed through Gonzalez's Medical, which made the Fraudulent Services appear to be eligible for PIP reimbursement, when in fact they were not. Together, J.J. Gonzalez and Seco submitted all of the fraudulent and unlawful Gonzalez's Medical billing identified in Exhibit "2" with dates of mailing between September 2017 and May 2021, or caused it to be submitted.

407.    Gonzalez's Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which J.J. Gonzalez, Blasini, and Seco operated Gonzalez's Medical, inasmuch as Gonzalez's Medical was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for Gonzalez's Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Gonzalez's Medical continues to attempt collection on its fraudulent billing to the present day.

408.    Gonzalez's Medical is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Gonzalez's Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

409.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,772,000.00 pursuant to the fraudulent bills submitted through the Gonzalez's Medical enterprise.

410.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### NINTH CAUSE OF ACTION
**Against J.J. Gonzalez, Blasini, and Seco**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

411.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-7, 17-30, 38-49, 67-86, 116-131, 147-153, 212-268, and 324-328, above.

412.     Gonzalez's Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

413.     J.J. Gonzalez, Blasini, and Seco are or were employed by or associated with the Gonzalez's Medical enterprise.

414.     J.J. Gonzalez, Blasini, and Seco knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Gonzalez's Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over six years seeking payments that Gonzalez's Medical was not eligible to receive under the No-Fault Law because: (i) Gonzalez's Medical unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were

provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich J.J. Gonzalez, Blasini, and Seco, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

415.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

416.    In particular, between March 2015 and September 2017, J.J. Gonzalez owned and controlled Gonzalez's Medical, and directed its affairs. During that same period, Blasini falsely posed as Gonzalez's Medical's medical director so as to enable it to operate, and Seco performed many of the phony patient examinations that were billed through Gonzalez's Medical, and falsely purported to perform or directly supervise virtually all of the "physical therapy" services that were billed through Gonzalez's Medical, which made the Fraudulent Services appear to be eligible for PIP reimbursement, when in fact they were not. Together, J.J. Gonzalez, Blasini, and Seco submitted all of the fraudulent and unlawful Gonzalez's Medical billing identified in Exhibit "2" with dates of mailing between March 2015 and September 2017, or caused it to be submitted.

417.    Between September 2017 and May 2021, J.J. Gonzalez owned and controlled Gonzalez's Medical, and directed its affairs. During that same period, Seco performed many of the phony patient examinations that were billed through Gonzalez's Medical, and falsely purported to perform or directly supervise virtually all of the "physical therapy" services that were billed

through Gonzalez's Medical, which made the Fraudulent Services appear to be eligible for PIP reimbursement, when in fact they were not. Together, J.J. Gonzalez and Seco submitted all of the fraudulent and unlawful Gonzalez's Medical billing identified in Exhibit "2" with dates of mailing between September 2017 and May 2021, or caused it to be submitted.

418.    Accordingly, J.J. Gonzalez, Blasini, and Seco knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

419.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,772,000.00 pursuant to the fraudulent bills submitted through the Gonzalez's Medical enterprise.

420.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### TENTH CAUSE OF ACTION
**Against Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco**
**(Under Fla. Stat. 501.201 et. seq.)**

421.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-7, 17-30, 38-49, 67-86, 116-131, 147-153, 212-268, and 324-328, above.

422.    Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco are actively engaged in trade and commerce in the State of Florida.

423.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

424.     Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

425.     The bills and supporting documents submitted or caused to be submitted by Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco to GEICO were fraudulent and unlawful in that they misrepresented: (i) Gonzalez's Medical's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

426.     In particular, between March 2015 and September 2017, Gonzalez's Medical provided an ostensibly legitimate health care clinic through which billing for the Fraudulent Services could be submitted to GEICO and other insurers, and -- together with J.J. Gonzalez, Blasini, and Seco -- caused the submission of the billing for the Fraudulent Services. J.J. Gonzalez owned and controlled Gonzalez's Medical, and directed its affairs. During that same period, Blasini falsely posed as Gonzalez's Medical's medical director so as to enable it to operate, and Seco performed many of the phony patient examinations that were billed through Gonzalez's Medical, and falsely purported to perform or directly supervise virtually all of the "physical therapy" services that were billed through Gonzalez's Medical, which made the Fraudulent Services appear to be eligible for PIP reimbursement, when in fact they were not. Together, J.J. Gonzalez, Blasini, Seco, and Gonzalez's Medical submitted all of the fraudulent and unlawful Gonzalez's Medical billing identified in Exhibit "2" with dates of mailing between March 2015 and September 2017, or caused it to be submitted.

427.     Between September 2017 and May 2021, Gonzalez's Medical provided an ostensibly legitimate health care clinic through which billing for the Fraudulent Services could be submitted to GEICO and other insurers , and -- together with J.J. Gonzalez and Seco -- caused the submission of the billing for the Fraudulent Services. J.J. Gonzalez owned and controlled Gonzalez's Medical, and directed its affairs. During that same period, Seco performed many of the phony patient examinations that were billed through Gonzalez's Medical, and falsely purported to perform or directly supervise virtually all of the "physical therapy" services that were billed through Gonzalez's Medical, which made the Fraudulent Services appear to be eligible for PIP reimbursement, when in fact they were not. Together, Gonzalez's Medical, J.J. Gonzalez, and Seco submitted all of the fraudulent and unlawful Med-Union Medical billing identified in Exhibit "2" with dates of mailing between September 2017 and May 2021, or caused it to be submitted.

428.     Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco has been materially injurious to GEICO and its Insureds.

429.     The conduct of Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco was the actual and proximate cause of the damages sustained by GEICO.

430.     Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco's unfair and deceptive acts have caused GEICO to sustain damages of at least $1,772,000.00.

431.     By reason of Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

### ELEVENTH CAUSE OF ACTION
**Against Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco**
**(Common Law Fraud)**

432.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-7, 17-30, 38-49, 67-86, 116-131, 147-153, 212-268, and 324-328, above.

433.    Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through Gonzalez's Medical for the Fraudulent Services.

434.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Gonzalez's Medical was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Gonzalez's Medical never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

435.    Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Gonzalez's Medical that were not reimbursable.

436.   In particular, between March 2015 and September 2017, Gonzalez's Medical provided an ostensibly legitimate health care clinic through which billing for the Fraudulent Services could be submitted to GEICO and other insurers, and -- together with J.J. Gonzalez, Blasini, and Seco -- caused the submission of the billing for the Fraudulent Services. J.J. Gonzalez owned and controlled Gonzalez's Medical, and directed its affairs. During that same period, Blasini falsely posed as Med-Union Medical's medical director so as to enable it to operate, and Seco performed many of the phony patient examinations that were billed through Med-Union Medical, and falsely purported to perform or directly supervise virtually all of the "physical therapy" services that were billed through Med-Union Medical, which made the Fraudulent Services appear to be eligible for PIP reimbursement, when in fact they were not. Together, J.J. Gonzalez, Blasini, Seco, and Gonzalez's Medical submitted all of the fraudulent and unlawful Gonzalez's Medical billing identified in Exhibit "2" with dates of mailing between March 2015 and September 2017, or caused it to be submitted.

437.   Between September 2017 and May 2021, Gonzalez's Medical provided an ostensibly legitimate health care clinic through which billing for the Fraudulent Services could be submitted to GEICO and other insurers, and -- together with J.J. Gonzalez and Seco -- caused the submission of the billing for the Fraudulent Services. J.J. Gonzalez owned and controlled Gonzalez's Medical, and directed its affairs. During that same period, Seco performed many of the phony patient examinations that were billed through Med-Union Medical, and falsely purported to perform or directly supervise virtually all of the "physical therapy" services that were billed through Gonzalez's Medical, which made the Fraudulent Services appear to be eligible for PIP reimbursement, when in fact they were not. Together, Gonzalez's Medical, J.J. Gonzalez, and Seco

submitted all of the fraudulent and unlawful Med-Union Medical billing identified in Exhibit "2" with dates of mailing between September 2017 and May 2021, or caused it to be submitted.

438.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,772,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by J.J. Gonzalez, Blasini, Seco, and Gonzalez's Medical through Gonzalez's Medical.

439.    J.J. Gonzalez, Blasini, Seco, and Gonzalez's Medical's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

440.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWELFTH CAUSE OF ACTION
### Against Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco
### (Unjust Enrichment)

441.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-7, 17-30, 38-49, 67-86, 116-131, 147-153, 212-268, and 324-328, above.

442.    As set forth above, Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

443.    When GEICO paid the bills and charges submitted or caused to be submitted by Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco through Gonzalez's Medical, it reasonably believed that it was legally obligated to make such payments based on Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco's improper, unlawful, and/or unjust acts.

444.     Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that they voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

445.     Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

446.     By reason of the above, Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,772,000.00.

<div align="center">

**THIRTEENTH CAUSE OF ACTION**
**Against New Generation Rehab**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

</div>

447.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-7, 31-49, 87-100, 132-153, and 269-328, above.

448.     There is an actual case in controversy between GEICO and New Generation Rehab regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

449.     New Generation Rehab has no right to receive payment for any pending bills submitted to GEICO because it unlawfully was operated in violation of the Clinic Act's medical director and operating requirements.

450.     New Generation Rehab has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided or billed to GEICO.

451.     New Generation Rehab has no right to receive payment for any pending bills submitted to GEICO for purported physical therapy because the underlying Fraudulent Services

were not performed by individuals who actually were licensed to perform the pertinent services, or else constituted non-reimbursable massage.

452.    New Generation Rehab has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich New Generation Rehab, Abreu, and Seco, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

453.    New Generation Rehab has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

454.    New Generation Rehab has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

455.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that New Generation Rehab has no right to receive payment for any pending bills submitted to GEICO.

<div align="center">

**FOURTEENTH CAUSE OF ACTION**
**Against Abreu and Seco**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

</div>

456.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-7, 31-49, 87-100, 132-153, and 269-328, above.

457.    New Generation Rehab is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

458.    Abreu and Seco knowingly have conducted and/or participated, directly or indirectly, in the conduct of New Generation Rehab's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that New Generation Rehab was not eligible to receive under the No-Fault Law because: (i) New Generation Rehab unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Abreu and Seco, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

459.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

460.    In particular, Abreu owned and controlled New Generation Rehab, and directed its affairs. Seco falsely posed as New Generation Rehab's medical director so as to enable it to operate, performed many of the phony patient examinations that were billed through New Generation Rehab, and falsely purported to perform or directly supervise virtually all of the "physical therapy" services that were billed through New Generation Rehab, which made the

Fraudulent Services appear to be eligible for PIP reimbursement, when in fact they were not. Together, Abreu and Seco submitted all of the fraudulent and unlawful New Generation Rehab billing identified in Exhibit "3", or caused it to be submitted.

461.   New Generation Rehab's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Abreu and Seco operated New Generation Rehab, inasmuch as New Generation Rehab was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for New Generation Rehab to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that New Generation Rehab continues to attempt collection on its fraudulent billing to the present day.

462.   New Generation Rehab is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by New Generation Rehab in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

463.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $386,000.00 pursuant to the fraudulent bills submitted through the New Generation Rehab enterprise.

464.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## FIFTEENTH CAUSE OF ACTION
### Against Abreu and Seco
### (Violation of RICO, 18 U.S.C. § 1962(d))

465.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-7, 31-49, 87-100, 132-153, and 269-328, above.

466.    New Generation Rehab is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

467.    Abreu and Seco are or were employed by or associated with the New Generation Rehab enterprise.

468.    Abreu and Seco knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of New Generation Rehab's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that New Generation Rehab was not eligible to receive under the No-Fault Law because: (i) New Generation Rehab unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Abreu and Seco, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

469. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

470. In particular, Abreu owned and controlled New Generation Rehab, and directed its affairs. Seco falsely posed as New Generation Rehab's medical director so as to enable it to operate, performed many of the phony patient examinations that were billed through New Generation Rehab, and falsely purported to perform or directly supervise virtually all of the "physical therapy" services that were billed through New Generation Rehab, which made the Fraudulent Services appear to be eligible for PIP reimbursement, when in fact they were not. Together, Abreu and Seco submitted all of the fraudulent and unlawful New Generation Rehab billing identified in Exhibit "3", or caused it to be submitted.

471. Accordingly, Abreu and Seco knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

472. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $386,000.00 pursuant to the fraudulent bills submitted through the New Generation Rehab enterprise.

473. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**SIXTEENTH CAUSE OF ACTION**
**Against New Generation Rehab, Abreu, Blasini, and Seco**
**(Under Fla. Stat. 501.201 et. seq.)**

474.     GEICO incorporates, as though fully set forth herein, each and every allegation in

paragraphs 1-7, 31-49, 87-100, 132-153, and 269-328, above.

475.     New Generation Rehab, Abreu, and Seco are actively engaged in trade and

commerce in the State of Florida.

476.     GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

477.     New Generation Rehab, Abreu, and Seco engaged in unfair, deceptive, and

unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of

their scheme to illegally obtain PIP Benefits from GEICO.

478.     The bills and supporting documents submitted or caused to be submitted by New

Generation Rehab, Abreu, and Seco to GEICO were fraudulent and unlawful in that they

misrepresented: (i) New Generation Rehab's eligibility to collect PIP Benefits in the first instance;

(ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the

Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were

performed in the first instance.

479.     In particular, New Generation Rehab provided an ostensibly legitimate health care

clinic through which billing for the Fraudulent Services could be submitted to GEICO and other

insurers, and -- together with Abreu and Seco -- caused the submission of the billing for the

Fraudulent Services. Abreu owned and controlled New Generation Rehab, and directed its affairs.

During that same period, Seco falsely posed as New Generation Rehab's medical director so as to

enable it to operate, and Seco performed many of the phony patient examinations that were billed

through New Generation Rehab, and falsely purported to perform or directly supervise virtually

all of the "physical therapy" services that were billed through New Generation Rehab, which made

the Fraudulent Services appear to be eligible for PIP reimbursement, when in fact they were not.

Together, Abreu, Seco, and New Generation Rehab submitted all of the fraudulent and unlawful

New Generation Rehab billing identified in Exhibit "3", or caused it to be submitted.

480.    Such acts and practices offend public policy and are immoral, unethical, oppressive,

and unscrupulous.  Additionally, the conduct of New Generation Rehab, Abreu, Blasini, and Seco

has been materially injurious to GEICO and its Insureds.

481.    The conduct of New Generation Rehab, Abreu, Blasini, and Seco was the actual

and proximate cause of the damages sustained by GEICO.

482.    New Generation Rehab, Abreu, Blasini, and Seco's unfair and deceptive acts have

caused GEICO to sustain damages of at least $386,000.00.

483.    By reason of New Generation Rehab, Abreu, Blasini, and Seco's conduct, GEICO

is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

## SEVENTEENTH CAUSE OF ACTION
### Against New Generation Rehab, Abreu, and Seco
### (Common Law Fraud)

484.    GEICO incorporates, as though fully set forth herein, each and every allegation in

paragraphs 1-7, 31-49, 87-100, 132-153, and 269-328, above.

485.    New Generation Rehab, Abreu, and Seco intentionally and knowingly made false

and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in

the course of submitting, or causing to be submitted, thousands of fraudulent charges through New

Generation Rehab for the Fraudulent Services.

486.    The false and fraudulent statements of material fact and acts of fraudulent

concealment include: (i) in every claim, the representation that that New Generation Rehab was in

compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact New Generation Rehab never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

487.    New Generation Rehab, Abreu, and Seco intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through New Generation Rehab that were not reimbursable.

488.    In particular, New Generation Rehab provided an ostensibly legitimate health care clinic through which billing for the Fraudulent Services could be submitted to GEICO and other insurers, and -- together with Abreu and Seco -- caused the submission of the billing for the Fraudulent Services. Abreu owned and controlled New Generation Rehab, and directed its affairs. During that same period, Seco falsely posed as New Generation Rehab's medical director so as to enable it to operate, and Seco performed many of the phony patient examinations that were billed through New Generation Rehab, and falsely purported to perform or directly supervise virtually all of the "physical therapy" services that were billed through New Generation Rehab, which made the Fraudulent Services appear to be eligible for PIP reimbursement, when in fact they were not. Together, Abreu, Seco, and New Generation Rehab submitted all of the fraudulent and unlawful New Generation Rehab billing identified in Exhibit "3", or caused it to be submitted.

489.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $386,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by Abreu, Seco, and New Generation Rehab through New Generation Rehab.

490.    Abreu, Seco, and New Generation Rehab's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

491.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### EIGHTEENTH CAUSE OF ACTION
**Against New Generation Rehab, Abreu, and Seco**
**(Unjust Enrichment)**

492.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-7, 31-49, 87-100, 132-153, and 269-328, above.

493.    As set forth above, New Generation Rehab, Abreu, and Seco have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

494.    When GEICO paid the bills and charges submitted or caused to be submitted by New Generation Rehab, Abreu, and Seco through New Generation Rehab, it reasonably believed that it was legally obligated to make such payments based on New Generation Rehab, Abreu, and Seco's improper, unlawful, and/or unjust acts.

495. New Generation Rehab, Abreu, and Seco have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that they voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

496. New Generation Rehab, Abreu, and Seco's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

497. By reason of the above, New Generation Rehab, Abreu, and Seco have been unjustly enriched in an amount to be determined at trial, but in no event less than $386,000.00.

## JURY DEMAND

498. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A. On the First Cause of Action against Med-Union Medical, for a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Med-Union Medical has no right to receive payment for any pending bills submitted to GEICO;

B. On the Second Cause of Action against J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco, for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,676,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C. On the Third Cause of Action against J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco, for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,676,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco, for compensatory damages in an amount to be determined at trial but in excess of $1,676,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

E.      On the Fifth Cause of Action against Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco, for compensatory damages in an amount to be determined at trial but in excess of $1,676,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco, for more than $1,676,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action Against Gonzalez's Medical, for a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Gonzalez's Medical has no right to receive payment for any pending bills submitted to GEICO;

H.      On the Eighth Cause of Action against J.J. Gonzalez, Blasini, and Seco, for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,772,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.      On the Ninth Cause of Action against J.J. Gonzalez, Blasini, and Seco, for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,772,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

J.     On the Tenth Cause of Action against Gonzalez's Medical, J.J. Gonzalez, Seco, and Blasini, for compensatory damages in an amount to be determined at trial but in excess of $1,772,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

K.     On the Eleventh Cause of Action against Gonzalez's Medical, J.J. Gonzalez, Seco, and Blasini, for compensatory damages in an amount to be determined at trial but in excess of $1,772,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

L.     On the Twelfth Cause of Action against Gonzalez's Medical, J.J. Gonzalez, Seco, and Blasini, for more than $1,772,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

M.     On the Thirteenth Cause of Action against New Generation Rehab, for a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that New Generation Rehab has no right to receive payment for any pending bills submitted to GEICO;

N.     On the Fourteenth Cause of Action against Abreu and Seco, for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $386,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

O.     On the Fifteenth Cause of Action against Abreu and Seco, for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $386,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

P.      On the Sixteenth Cause of Action against New Generation Rehab, Abreu, and Seco, for compensatory damages in an amount to be determined at trial but in excess of $386,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

Q.      On the Seventeenth Cause of Action against New Generation Rehab, Abreu, and Seco, for compensatory damages in an amount to be determined at trial but in excess of $386,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

R.      On the Eighteenth Cause of Action against New Generation Rehab, Abreu, and Seco, for more than $386,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated:      May 20, 2021

<div style="margin-left:40%">

*/s/ Kristen L. Wenger*
John P. Marino (FBN 814539)
Lindsey R. Trowell (FBN 678783)
Kristen Wenger (FBN 92136)
SMITH, GAMBRELL & RUSSELL, LLP
50 North Laura Street, Suite 2600
Jacksonville, Florida 32202
Phone:  (904) 598-6100
Facsimile:  (904) 598-6204
ltrowell@sgrlaw.com
jmarino@sgrlaw.com
kwenger@sgrlaw.com

*-and-*

Christina Bezas (admitted *pro hac vice*)
New York Bar No. 5247556
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11550
Phone:  (516) 357-3000
Facsimile:  (516) 357-3333
christina.bezas@rivkin.com
*Attorneys for Plaintiffs*

</div>

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 20, 2022, I electronically filed the foregoing document with the Clerk

of the Court using the CM/ECF system, which will provide notice and ca copy of this Amended

Complaint to all counsel of record.


            */s/ Kristen L. Wenger*    
            Attorney