UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO. 21-24155-CIV-MORENO/GOODMAN

GOVERNMENT EMPLOYEES
INSURANCE CO., et al.,

      Plaintiffs,

v.

Gilberto Seco, M.D., et al.,

      Defendants.

_____/

## REPORT AND RECOMMENDATIONS ON SUMMARY JUDGMENT MOTIONS

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs") filed the instant action against three Florida healthcare clinics and individuals associated with those clinics[1] for engaging in allegedly fraudulent billing practices which purportedly resulted in GEICO wrongfully paying more than

---

[1] The Amended Complaint asserts claims against the following Defendants: Med-Union Medical Center, Inc. ("Med-Union Medical"), New Generation Rehabilitation Inc ("New Generation Rehab"), and Gonzalez's Medical Center, Inc ("Gonzalez's Medical" and collectively, "Clinic Defendants"); Gilberto Seco, M.D. ("Seco"); Jose J. Gonzalez ("J.J. Gonzalez"); Jorge A. Gonzalez ("J.A. Gonzalez"); Aliuska Amigo, L.M.T. ("Amigo"); Shinuet Cabrera ("Cabrera"); Sergio Vento Angarica ("Angarica"); Bryan Abreu ("Abreu"); and Wilfredo Blasini, M.D. ("Blasini"). [ECF No. 61].

$3,800,000.00 in benefits under GEICO no-fault insurance policies. [ECF No. 61].

GEICO and Defendants Gonzalez's Medical, Seco, and J.J. Gonzalez ("Gonzalez's Medical Defendants") filed cross motions for summary judgment. [ECF Nos. 86; 90]. The parties filed responses [ECF Nos. 99-100], optional replies [ECF Nos. 103-04], and (with leave of court) Seco filed a sur-reply [ECF No. 117].

Senior United States District Judge Federico A. Moreno referred to the Undersigned "any and all pretrial matters" pursuant to 28 U.S.C. § 636. [ECF No. 101]. For the reasons discussed in detail below, the Undersigned **respectfully recommends** that the District Court **grant in part and deny in part** Plaintiffs' summary judgment motion and **deny** Defendants' summary judgment motion.

I.   **Background**

In the operative Amended Complaint, GEICO alleges 18 causes of action: declaratory judgment against Med-Union Medical (Count 1); violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq., against J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco (Counts 2 and 3); violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201, et seq., against Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco (Count 4); common law fraud against Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco (Count 5); unjust enrichment against Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco (Count 6); declaratory judgment against

2

Gonzalez's Medical (Count 7); RICO violations against J.J. Gonzalez, Blasini, and Seco (Counts 8 and 9); FDUTPA violations against Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco (Count 10); common law fraud against Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco (Count 11); unjust enrichment against Gonzalez's Medical, J.J. Gonzalez, Blasini, and Seco (Count 12); declaratory judgment against New Generation Rehab (Count 13); RICO violations against Abreu and Seco (Counts 14 and 15); FDUTPA violations against New Generation Rehab, Abreu, Blasini, and Seco (Count 16); common law fraud against New Generation Rehab, Abreu, and Seco (Count 17); and unjust enrichment against New Generation Rehab, Abreu, and Seco (Count 18). [ECF No. 61].

Defendant Blasini is no longer in this case. Plaintiffs and Blasini filed a stipulation of dismissal without prejudice pursuant to Fed. R. Civ. Proc. 4l(a)(1). [ECF No. 85]; *see also* [ECF No. 90, p. 4 n.3 ("GEICO is not moving for summary judgment against Blasini as GEICO has settled with Blasini.")].[2]

Pursuant to Judge Moreno's Order [ECF No. 95], the Clerk entered a default against Defendants Seco, J.A. Gonzalez, Amigo, New Generation Rehab, and Abreu for failing to attend mediation. [ECF No. 102]. The Court later set aside the default against Defendants Seco, J.A. Gonzalez, and Amigo. [ECF Nos. 120; 127]. The Clerk's Default

---

[2]     Some of the documents filed by the parties contain two sets of page numbers. To avoid confusion, the Undersigned cites to the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

remains in place against Defendants Generation Rehab and Abreu. [ECF No. 102].[3]

The Court has issued rulings on Defendants' motion to exclude Plaintiffs' expert (Dr. James Dillard) and the parties' respective motions *in limine*. [ECF Nos. 129-30; 132; 139]. To the extent these pretrial rulings are relevant to the issues raised on summary judgment, those rulings will be discussed in the applicable sections of this Report and Recommendations.

## II.    Factual Background

The facts in this section are generated from the paragraphs in the statements of fact or responses to the statements of facts which the respective opposing party expressly agreed are undisputed. [ECF Nos. 87; 89; 97-98]. For those purported facts which the opposing party classified as partly disputed, the Undersigned includes only the undisputed portions. The Undersigned will retain the paragraph numbering used by the parties. The abbreviation "N/A" means that the paragraph is disputed. The Undersigned sometimes changed the wording of an undisputed fact for stylistic and/or grammatical purposes. In addition, to enhance readability, I removed the specific record citations. They can be found in the source document, if needed.

---

[3]    Plaintiffs' motion for a default final judgment against Defendants Generation Rehab and Abreu [ECF No. 131] is addressed in a separate Report and Recommendations.

If a party argued that a fact was disputed but did not provide record evidence to support the contention, then I deemed the fact to be undisputed if otherwise supported by record evidence.

At times, a party challenged a fact as disputed but analysis demonstrates that the undisputed fact is not actually disputed. Instead, a party was at times merely offering an additional, but not contradictory, point.

To provide a factually-simple analogy, assume that a plaintiff in a garden-variety car collision personal injury case submits an affidavit (in support of a summary judgment motion) that the traffic light at issue was red for the defendant driver. Assume that the defendant submits a response, arguing that the fact is "disputed," and files a supporting affidavit saying (only) that it was storming and the visibility was poor. The weather and visibility might be additional facts leading to another point or argument, but they do not prevent the fact about the traffic light being red from being treated as undisputed.

This analogy applies even if the party opposing the summary judgment motion offered several additional facts to support the notion that the undisputed fact is actually disputed. Thus, if the hypothetical affidavit mentioned above also explained that it was storming, the visibility was poor, the radio was on loud, it was dusk, the driver was changing stations on the car radio, the windshield wipers were inoperable and the plaintiff was speeding, none of these additional facts would cause the undisputed fact that the light was red for the defendant driver to somehow be deemed a disputed fact.

5

Defendants submitted the declarations of Seco [ECF Nos. 97-1; 89-2], J.J. Gonzalez [ECF No. 89-1], and Cabrera [ECF No. 97-2] in support of their Statement of Facts [ECF No. 89] or in opposition to Plaintiffs' Statement of Facts [ECF No. 97]. Plaintiffs argued in both their reply in support of their summary judgment motion [ECF No. 103] and in a motion *in limine* [ECF No. 106] that the Court should disregard (1) the declarations of Seco (because he was a defaulted defendant at the time) and (2) portions of the declarations of J.J. Gonzalez and Cabrera because -- as lay witnesses -- they cannot render expert opinions.

The Undersigned issued an Order [ECF No. 130] granting the motion as to the at-issue portions of the J.J. Gonzalez and Cabrera declarations and denying the motion as to Seco because Seco's default had been vacated.

Concerning the J.J. Gonzalez and Cabrera declarations, the Undersigned ruled that:

> The prohibited topics are: (i) the **legitimacy and necessity of the supposed healthcare services** provided and billed through Gonzalez's Medical or Med-Union Medical; (ii) whether the physicians or other healthcare providers who worked at Gonzalez's Medical or Med-Union Medical acted within the **accepted standards of the medical community**; (iii) the **sufficiency of the medical documentation** generated by the healthcare providers at Gonzalez's Medical or Med-Union Medical; (iv) the **legitimacy and extent of the supposed medical decision-making** engaged in by the physicians or other healthcare providers at Gonzalez's Medical or Med-Union Medical; (v) the **nature and extent of the injuries** that the patients at Gonzalez's Medical or Med-Union Medical supposedly sustained; (vi) the **appropriateness of the billing codes** used to bill for Gonzalez's Medical's or Med-Union Medical's services; and (vii) whether Gonzalez's Medical's

or Med-Union Medical's purported **medical directors met their treatment and oversight obligations**.

*Id.* at 10 n.2 (emphasis added).

The Order stated that:

[it] does not preclude [J.J.]Gonzalez and Cabrera from testifying at trial; it merely prohibits them from offering impermissible lay opinion testimony on myriad medical and medical billing issues because they are not doctors and lack the competence to offer professional and expert opinions about these issues. **But the ruling also means that the Court will not consider for summary judgment purposes the off-limits topics in their declarations**.

*Id.* at 2 (emphasis added).

Thus, in addressing the facts below, to the extent a fact is supported *solely* through the declaration of J.J. Gonzalez and/or Cabrera <u>and</u> the fact at issue concerns one of the "prohibited topics" listed above, the Undersigned will deem that fact unsupported because J.J. Gonzalez and Cabrera are not competent to render expert-type opinions. Conversely, if Defendants seek to dispute a fact by relying *solely* on the declaration of J.J. Gonzalez and/or Cabrera <u>and</u> the fact at issue concerns one of the "prohibited topics" listed above, then the Undersigned will deem that fact not disputed because Defendants cannot rely on the declaration of J.J. Gonzalez or Cabrera on a "prohibited topic."

Plaintiffs also argue (in their reply [ECF No. 103]), that the Court should disregard Seco's declaration [ECF No. 89-2] and supplemental declaration [ECF No. 97-1] "to the extent they contradict Seco's own deposition testimony" concerning the nature of the services rendered by the massage therapists in this case. [ECF No. 103, p. 4]. Plaintiffs

7

note that Seco testified at his deposition that the massage therapists would perform

physical therapy services whereas in his declaration and supplemental declaration he

"attempts to cast the services performed by massage therapists at the Clinic Defendants

as 'passive modalities' or 'simple therapeutic modalities' constituting 'medical services.'"

*Id.* (citing [ECF Nos. 88-3, pp. 63:19-25; 76:8-14; 99:9-25; 107:6-9; 135:5-15; 97-1, ¶ 3, 4; 89-

2, ¶ 6]).

Plaintiffs raise the same argument concerning the declarations of J.J. Gonzalez and

Cabrera: "J.J. Gonzalez and Cabrera too attempt to now recast these services as 'passive

modalities' constituting 'medical services', these contentions also contradict their

deposition testimony." [ECF No. 103, p. 4 n.2 (citing [ECF Nos. 88-9, pp. 25:9-14, 21-25;

26:1; 116:4-25; 117:1-2; 88-6, pp. 24:15-18; 25:2-11])]. Leaving aside the impropriety of

raising an argument in a footnote,[4] the Undersigned's ruling on Plaintiffs' motion *in

limine* prohibits J.J. Gonzalez and Cabrera from rendering these expert-type opinions.

[ECF No. 130].

Although it is not expressly listed as one of the seven "prohibited topics" [ECF No.

130, p. 10 n.2], the prohibition against J.J. Gonzalez and Cabrera rendering expert-type

---

[4]      *See Sony Music Ent. v. Vital Pharms., Inc.*, No. 21-22825-CIV, 2022 WL 4771858, at
*13 (S.D. Fla. Sept. 14, 2022) ("[A]ddressing legal arguments in footnotes is an incorrect
method to present substantive arguments on the merits or otherwise request relief from
the Court."); *Zuma Seguros, CA v. World Jet of Delaware, Inc.*, No. 15-22626-CIV, 2017 WL
4237874, at *9 (S.D. Fla. Sept. 25, 2017) ("[B]urying a substantive argument in a footnote
(only) is impermissible and waives the argument.").

testimony necessarily extends to their attestations that the services provided to the GEICO insureds were therapeutic modalities as opposed to physical therapy services.

While the Undersigned also ruled that J.J. Gonzalez and Cabrera were not "prohibited from testifying about other *general* topics, such as 'how the doctors and therapists conducted intakes, processed patients, and assigned treatment modalities,'"[5] a statement concerning the *nature* of the services provided to the GEICO insureds (i.e., therapeutic modalities, medical services, physical therapy services, etc.) is beyond the general topics J.J. Gonzalez and Cabrera may testify to as lay witnesses.

Unlike J.J. Gonzalez and Cabrera, Plaintiffs have not argued that Seco (a medical doctor) is not qualified to attest to the nature of the services provided by the Clinic Defendants. Instead, Plaintiffs seek to apply the sham affidavit rule to exclude the portions of Seco's two declarations addressing this topic.

The Undersigned allowed Seco to file a sur-reply. [ECF No. 116]. In his sur-reply, Seco argued that the Court should not apply the sham affidavit rule. [ECF No. 117].[6] The Undersigned agrees.

---

[5]     [ECF No. 130, p. 10 (citing *Gov't Emps. Ins. Co. v. Gomez-Cortes*, No. 20-21558-CIV, 2022 WL 2173377, at *5 (S.D. Fla. June 15, 2022))].

[6]     In his sur-reply, Seco also argues that the Court should consider the declarations of J.J. Gonzalez and Cabrera because they consist of lay testimony (as opposed to expert testimony). [ECF No. 117, pp. 2-6]. But, as discussed above, in the Order on Plaintiffs' motion *in limine* [ECF No. 130], the Undersigned rejected the argument that the contested paragraphs of the J.J. Gonzalez and Cabrera declarations were lay testimony (as opposed to impermissible expert testimony).

The sham affidavit rule provides that: "an affidavit may be disregarded as a sham when a party or witness first gives **clear answers to unambiguous questions** at a deposition and then tries to create an issue of fact with an affidavit which merely contradicts, **without explanation**, the previously-provided clear testimony." *Gov't Emps. Ins. Co. v. Seco*, No. 21-24155-CIV, 2023 WL 2866383, at *8 (S.D. Fla. Feb. 17, 2023) (citing (*Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986) (emphasis added)). "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, **without explanation**, previously given clear testimony." *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) (emphasis added).

Plaintiffs argue that Seco's declarations meet the sham affidavit standard because "Seco now attempts to cast the services performed by massage therapists at the Clinic Defendants as 'passive modalities' or 'simple therapeutic modalities' constituting 'medical services'" when he previously testified during his deposition "that he would order the <u>physical therapy</u> services and that the massage therapists would perform the <u>physical therapy</u> services at the Clinic Defendants." [ECF No. 103, p. 4 (emphasis in original)].

Seco argues that the Court should not apply the rule because in one of his declarations he clarified "that the nomenclature 'physical therapy' is 'loosely' used by

medical providers." [ECF No. 117, p. 6 (citing [ECF No. 97-1, ¶ 3])]. He notes that medical providers are not attorneys and "it is unreasonable to expect health care providers to qualify the legal nuance that is being litigated here by the parties' counsel." *Id.* at 7.

He also notes that he "was not asked a pointed question regarding whether the services are 'physical therapy' or 'medical' treatment" during his deposition. *Id.*

The Undersigned has reviewed the cited-to portions of Seco's deposition testimony[7] which Plaintiffs contend are contradicted by Seco's declarations and finds that the application of the sham affidavit rule is not warranted here.

In the cited pages, both the attorney taking the deposition and Seco used the term "physical therapy" to describe the services provided to the GEICO insureds, but Seco provides an explanation in his supplemental declaration for his purported misuse of that term:

> 3.     Although G[EICO] uses the nomenclature "physical therapy," to describe the therapeutic modalities that were provided by the therapists in this case, the nomenclature is incorrect and misleading. **Admittedly, I have also misused nomenclature loosely as well. But this requires clarification because of overlap**. Specifically, the modalities provided in this case, which are simple therapeutic modalities in which physical agents or handheld devices are used, **fall within the common practice of physical therapy, massage, and medicine**.
>
> 4.     The modalities provided by the therapists in this case constitutes as medical services rather than physical therapy or massage therapy services because I do not practice physical therapy, nor massage. I practice medicine. And the therapists provided the modalities under my

---

[7]     *See* Seco's Deposition Transcript [ECF 88-3, pp. 63:19-25; 76:8-14; 99:9-25; 107:6-9; 135:5-15].

supervision1 and incident to my practice as a medical physician and medical director.

[ECF No. 97-1, ¶¶ 3-4 (emphasis added)].

In *Tippens*, the Eleventh Circuit reversed a summary judgment for the defendant after holding that the affidavit was not inherently inconsistent with the deposition testimony and should therefore have been considered in the summary judgment motion assessment. 805 F.2d at 954. *Tippens* further held that "[a] definite distinction must be made between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence." *Id.* at 953.

The Undersigned views Seco's explanation for the "misused nomenclature" with a healthy dose of skepticism. Nonetheless, it is well-established that the Court cannot make credibility determinations at this juncture. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); *see also Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("As a general principle, a [litigant]'s testimony cannot be discounted on summary judgment unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to the laws of nature."); *Mangesh v. Stokes*, No. 3:16CV446-MCR-GRJ, 2018 WL 3142940, at *1 (N.D. Fla. June 27,

2018) ("Credibility determinations are not proper on summary judgment, and even self-serving testimony can be a basis for denying summary judgment.").

Given the nature of Seco's deposition testimony (where he was not asked directly whether the therapists were providing physical therapy or medical care) and the explanation provided concerning the purported misuse of the term "physical therapy," Seco's attestations concerning the nature of the services provided by the therapists should not be excluded under the sham affidavit rule. *See Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1307 (11th Cir. 2016) (noting that "the rule should be applied 'sparingly because of the harsh effect it may have on a party's case.'" (quoting *Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1316 (11th Cir. 2007))). To be sure, Seco's trial testimony may well be shaken badly during cross-examination designed to convince the jury that he substantively changed his testimony for strategic reasons. A jury could determine that Seco's explanation for his significant change in language is not credible and is actually an after-the-fact story intended to provide grounds to prevent an adverse summary judgment ruling. But the Court cannot make that credibility finding now.

With these rulings in mind, the Undersigned turns to the parties' respective statements of fact.

13

A.      **Plaintiffs' Statement of Facts**

**Med-Union Medical Center, Inc.**

1.      **General Background**

1.      Defendant Med-Union Medical is a Florida corporation that purported to be properly licensed as a healthcare clinic under the Florida Health Care Clinic Act, Fla. Stat. § 400.990 et seq. (the "Clinic Act").

2.      Med-Union Medical was incorporated in Florida on June 24, 2003.

3.      Between 2014 and 2021, Med-Union Medical purported to provide initial examinations, follow-up examinations, and healthcare services to GEICO insureds, and then sought reimbursement for those purported healthcare services from GEICO as the assignee of the GEICO insureds' Personal Injury Protection ("PIP") benefits. [Defendants dispute that the healthcare services provided constituted "physical therapy" services. Defendants cite Seco's Supplemental Declaration [ECF No. 97-1, ¶¶ 2-4]. As discussed above, for summary judgment purposes, the Undersigned will consider evidence from Seco, a medical doctor, about the nature of the services provided at the Clinic Defendants.].

4.      Between January 2014 and May 2021, Med-Union Medical submitted PIP billing to GEICO for tens of thousands of individual healthcare services that it purportedly provided to GEICO insureds. [Defendants dispute that the healthcare

services provided to the GEICO insureds constituted physical therapy, as opposed to medical services.].

5.      Between January 2014 and May 2021, GEICO paid Med-Union Medical at least $1,567,829.03 in response to claims for PIP benefits submitted through Med-Union Medical to GEICO. [Defendants dispute that GEICO "relied" on the claim submissions, as a legal conclusion.].

6.      Between January 2014 and January 2020, GEICO paid Med-Union Medical at least $1,531,629.03 in response to claims for PIP benefits submitted through Med-Union Medical for healthcare services. [Defendants dispute that the healthcare services provided to the GEICO insureds constituted physical therapy, as opposed to medical services.].

7.      At the time when GEICO paid the billing, GEICO did not know that the patient examinations and the physical therapy services billed through Med-Union Medical to GEICO had been performed without supervision by individuals other than Seco. The claims were either certified as legitimate by Seco or a purported healthcare provider with their "SIGNATURE ON FILE." [The Undersigned disregarded Cabrera's declaration to the extent it concerns prohibited topics but reworded this paragraph to conform with the cited source material, Victoria Spring's declaration [ECF No. 88-2, ¶¶ 15, 18].].

8.     Med-Union Medical deposited the checks GEICO issued in payment of its PIP claims, and it has not returned the money.

9.     In addition, GEICO has received PIP billing from Med-Union Medical that remains unpaid, and Med-Union Medical can pursue collection on much of this unpaid billing.

10.     Between at least mid-2013 and early 2015, and also between at least early 2016 and mid-2017, Defendant J.A. Gonzalez purported to be the owner of Med-Union Medical.

11.     Between at least early 2015 and early 2016, Defendant Amigo purported to be the owner of Med-Union Medical.

12.     From at least mid-2017 until January 2020, Defendant Cabrera purported to be the owner of Med-Union Medical.

13.     From at least February 2020 until the present, Defendant Angarica purported to be the owner of Med-Union Medical.

14.     Defendant Seco purported to serve as Med-Union Medical's medical director between December 2013 and May 2021.

15.     Seco is not board certified in any medical specialty.

16.     Between February 2020 and May 2021, there was no physical therapist employed by or associated with Med-Union Medical.

16

17.     During Seco's putative tenure as medical director at Med-Union Medical, Med- Union Medical either: (i) listed Seco's license number in Box 31 of the HCFA-1500 forms; or (ii) did not list any healthcare providers' name or license number and instead wrote "SIGNATURE ON FILE" in Box 31 of the HCFA-1500 forms submitted through Med-Union Medical to GEICO seeking payment for patient examinations and physical therapy services.

18.     *See* Paragraph 7.

19.     Med-Union Medical billed GEICO for its healthcare services using current procedural terminology ("CPT") codes.

20.     N/A

21.     N/A

> **2.     Alleged Misrepresentations Regarding Patient Examinations at Med-Union Medical**

22.     When many GEICO insureds first presented at Med-Union Medical seeking treatment, they purportedly received an initial examination.

23.     Med-Union Medical also purported to provide many GEICO insureds with follow-up examinations.

24.     The billing submitted through Med-Union Medical to GEICO for patient examinations stated either Seco's license number or only "SIGNATURE ON FILE" in Box 31 of the Healthcare Financing Administration insurance claim forms (the "HCFA-1500" or "CMS-1500" form) that were used to bill for the examinations.

25.     Med-Union Medical billed the initial examinations to GEICO, or caused them to be billed to GEICO, under CPT code 99204, resulting in charges of $375.00 for each initial examination that Med-Union Medical purported to provide.

26.     Med-Union Medical submitted, or caused to be submitted, a purported examination report to GEICO for each initial examination of GEICO insureds that it purported to provide.

27.     Pursuant to the American Medical Association ("AMA") guidelines for the use of CPT codes, the use of CPT code 99204 to bill for an initial patient examination represents -- among other things -- that: (i) the patient presented with health problems of moderate to high severity; (ii) the examination involved at least 45 minutes of face-to-face time with the patient or patient's family; (iii) the physician performed a "comprehensive" physical examination and took a "comprehensive" history; and (iv) the examination required the examining physician to engage in legitimate, "moderate complexity" medical decision-making.

28.     The initial examinations billed through Med-Union Medical to GEICO were typically billed under CPT code 99204. [The facts asserted in this paragraph were partially disputed. The Undersigned reworded this paragraph to include only the undisputed portions.].

29.     Dr. Dillard opined that because the information contained in the Defendants' treatment notes was boilerplate, repetitive, or exaggerated and did not

document the required elements of a comprehensive examination or history, the examinations did not legitimately entail 45 minutes of face-to-face time with the patients or their families. [Although the cited portion of Cabrera's deposition does not address the fact asserted in this paragraph, the Undersigned nonetheless reworded this paragraph to conform with the source material, Dr. Dillard's expert report, [ECF No. 88-1].].

30.    N/A

31.    At Med-Union Medical, most patients were diagnosed with substantially identical soft tissue injuries. [This paragraph is partially disputed. The Undersigned has reworded it to omit the disputed portion.].

32.    Med-Union Medical reported that most of the patients treated by Med-Union Medical suffered from an "emergency medical condition."

33.    N/A

34.    The contemporaneous police reports for the patients typically reflected only minor accidents.

35.    The contemporaneous police reports for the patients typically indicated that the patients did not suffer any serious injuries as a result of the automobile accidents.

36.    The patients usually did not go to the hospital. Instead, they were seen at Med-Union Medical's office on a non-emergency basis.

37.    The patients usually presented as fully ambulatory.

38.     At Med-Union Medical, the patients were diagnosed with soft tissue injuries. [This paragraph is partially disputed. The Undersigned has reworded it to omit the disputed portion.].

39.     Med-Union Medical billed the follow-up examinations to GEICO under CPT codes 99213, 99214, or 99215, resulting in charges of $160.00 for each follow-up examination under CPT code 99213, $250.00 for each follow-up examination under CPT code 99214, and $325.00 for each follow-up examination under CPT code 99215 that Med-Union Medical purported to provide.

40.     Pursuant to the AMA guidelines for the use of CPT codes, the use of CPT code 99213 to bill for a follow-up patient examination represents -- among other things -- that: (i) the patient presented with health problems of low to moderate severity; and (ii) the examining physician or other healthcare provider performed and documented at least two of the following three components: (a) took an "expanded problem focused" patient history; (b) conducted an "expanded problem focused physical examination"; and (c) engaged in medical decision-making of "low complexity."

41.     Pursuant to the AMA guidelines for the use of CPT codes, the use of CPT code 99214 to bill for a follow-up patient examination represents -- among other things -- that: (i) the patient presented with problems of moderate to high severity; and (ii) the examining physician or other healthcare provider performed and documented at least two of the following three components: (a) took a "detailed" patient history; (b)

conducted a "detailed" physical examination; and (c) engaged in medical decision-making of "moderate complexity."

42.     Pursuant to the AMA guidelines for the use of CPT codes, the use of CPT code 99215 to bill for a follow-up patient examination represents -- among other things -- that: (i) the patient presented with problems of moderate to high severity; and (ii) the examining physician or other healthcare provider performed and documented at least two of the following three components: (a) took a "comprehensive" patient history; (b) conducted a "comprehensive" physical examination; and (c) engaged in medical decision-making of "high complexity."

43.     N/A

44.     N/A

45.     N/A

> **3.     Alleged Misrepresentations Regarding "Physical Therapy" Services at Med-Union Medical**

46.     N/A

47.     Med-Union Medical billed the at-issue healthcare services to GEICO, or caused them to be billed to GEICO, under: (i) CPT code 97010 for putative hot/cold pack treatments, typically resulting in a charge of $15.00; (ii) CPT code 97012, for putative mechanical traction, typically resulting in a charge of $38.28; (iii) CPT code 97014, for putative electrical stimulation, typically resulting in a charge of $30.00; (iv) CPT code 97018, for putative paraffin bath therapy, resulting in a charge of $25.00; (v) CPT code

97022, for putative whirlpool, resulting in a charge of $47.00; (vi) CPT code 97032, for putative electrical stimulation, resulting in a charge of $44.02; (vii) CPT code 97034, for putative contrast therapy, resulting in a charge of $41.30; (viii) CPT code 97035, for putative ultrasound, resulting in a charge of $31.26; (ix) CPT code 97110, for putative therapeutic exercises, typically resulting in a charge of either $69.12 or $69.24; (x) CPT code 97112, for putative neuromuscular reeducation, typically resulting in a charge of either $72.00 or $72.20; (xi) CPT code 97116, for putative gait training, resulting in a charge of $55.00; (xii) CPT code 97140, for putative manual therapy, typically resulting in a charge of $64.88; (xiii) CPT code 97530, for putative therapeutic activity therapy, typically resulting in a charge of $75.62; and (xiv) Health Care Common Procedure Coding System ("HCPCS") code S8948, for putative laser therapy, resulting in a charge of $75.00. [The parties dispute that the billed-for healthcare services constituted "physical therapy."].

48.     The billing submitted through Med-Union Medical for the healthcare services had either Seco's license number or just "SIGNATURE ON FILE" in Box 31 of the HCFA-1500 forms that were used to bill for the healthcare services. [The parties dispute that the billed-for healthcare services constituted "physical therapy."].

49.     Seco never personally performed any of the billed-for healthcare services at Med-Union Medical. [The parties dispute that the billed-for healthcare services constituted "physical therapy."].

50.     Between at least January 2014 and January 2020, all of the healthcare services billed through Med-Union Medical to GEICO were performed by healthcare providers who held massage therapy licenses. [The parties dispute that the billed-for healthcare services constituted "physical therapy."].

51.     Between February 2020 and May 2021, the healthcare services billed through Med-Union Medical to GEICO were performed by healthcare providers who held a massage therapy license or physical therapist assistant license. [The parties dispute that the billed-for healthcare services constituted "physical therapy."].

52.     Between February 2020 and May 2021, the healthcare services billed through Med-Union Medical to GEICO were performed without the supervision of either a licensed physical therapist or a board-certified physician. [The parties dispute that the billed-for healthcare services constituted "physical therapy."].

53.     Seco was not physically present at Med-Union Medical on a daily basis.

54.     In fact, Seco was physically present at Med-Union Medical only one to three times a month.

55.     During the period of time when Seco purported to perform -- or at least directly supervise -- the healthcare services at Med-Union Medical, Seco simultaneously purported to personally perform or directly supervise a massive number of individual healthcare services that were billed to GEICO through numerous healthcare clinics and

practices in Florida. [Defendants add that Seco purported to exercise either direct **or indirect supervision** of the healthcare services.].

56.    N/A

57.    N/A

58.    N/A

59.    Med-Union Medical provided the vast majority of GEICO-insured patients with substantially similar healthcare sessions. [A portion of this paragraph is disputed by Seco's declaration. The Undersigned has reworded it to omit the disputed portion.].

60.    Med-Union Medical's Florida Agency for Health Care Administration healthcare clinic license application stated that Med-Union Medical would provide massage therapy services, but not physical therapy services.

### 4.    Alleged Absence of a Legitimate Medical Director at Med-Union Medical

61.    During Seco's purported tenure as a medical director at Med-Union Medical, Seco also purported to serve as medical director at numerous other healthcare clinics.

62.    During Seco's purported tenure as medical director at Med-Union Medical, Seco also purported to personally perform and/or legitimately supervise healthcare services at other healthcare clinics in Florida.

63.    During Seco's purported tenure as medical director at Med-Union Medical, Seco was physically present at Med-Union Medical only once or twice a month.

64.    Seco acknowledged that he is not aware of how many hours per week the massage therapists worked at Med-Union Medical.

65.    Seco did not recall the names of the massage therapists at Med-Union Medical and believed there were one or two massage therapists at that clinic. [The Undersigned reworded this fact to conform with the cited portion of Seco's deposition transcript.].

66.    N/A

67.    Seco typically reviewed between two and ten patient files during any of his supposed "systematic reviews" of Med-Union Medical's billing, and he was not sure how many patients treated each month at Med-Union Medical.

68.    N/A

69.    N/A

70.    N/A

71.    N/A

<u>**New Generation Rehabilitation Center Inc.**</u>

1.    **General Background**

72.    Defendant New Generation Rehab is a Florida corporation that purported to be properly licensed as a healthcare clinic under the Clinic Act.

73.    New Generation Rehab was incorporated in Florida on July 7, 2016.

74.     Between 2017 and 2021, New Generation Rehab purported to provide initial examinations, follow-up examinations, and healthcare services to GEICO insureds, and then sought reimbursement for PIP benefits. [The parties dispute that the healthcare services constituted physical therapy.].

75.     Between at least March 2017 and May 2021, New Generation Rehab submitted no-fault insurance billing to GEICO for thousands of individual healthcare services that it purportedly provided to GEICO insureds. [The parties dispute that the billed-for healthcare services constituted physical therapy.].

76.     Between March 2017 and May 2021, GEICO paid New Generation Rehab $354,644.73 in response to the claims for PIP benefits submitted through New Generation Rehab to GEICO. [Defendants dispute that GEICO "relied" on the claim submissions, as a legal conclusion.].

77.     Between March 2017 and May 2021, GEICO paid New Generation Rehab at least $314,698.29 in response to claims for PIP benefits submitted through New Generation Rehab for purported healthcare services. [The parties dispute that the billed-for healthcare services constituted physical therapy.].

78.     At the time when GEICO paid the billing, GEICO did not know that the patient examinations and the healthcare services billed through New Generation Rehab to GEICO had been performed without supervision by individuals other than Seco. The claims were certified as legitimate by Seco. [The Undersigned reworded this paragraph

to conform with the cited source material, Victoria Spring's declaration [ECF No. 88-2, ¶¶ 49, 52], and to account for the parties' dispute concerning physical therapy versus medical care.].

79.     New Generation Rehab deposited the checks GEICO issued in payment of its PIP claims, and it has not returned the money.

80.     In addition, GEICO has received PIP billing from New Generation Rehab that remains unpaid, and New Generation Rehab can pursue collection on much of this unpaid billing.

81.     Between July 2016 and the present, Defendant Abreu purported to be the owner of New Generation Rehab.

82.     Defendant Seco purported to serve as New Generation Rehab's medical director between September 2016 and May 2021.

83.     Between at least March 2017 and May 2021, Defendant Seco also purported to personally perform, or at least directly supervise, the purported healthcare services billed through New Generation Rehab to GEICO. [Defendants add that Seco purported to exercise either direct **or indirect** supervision of the healthcare services.].

84.     During Seco's putative tenure as medical director at New Generation Rehab, New Generation Rehab represented in Box 31 of the HCFA-1500 forms submitted through New Generation Rehab to GEICO seeking reimbursement for PIP benefits that Seco either personally performed, or at least directly supervised, all of the patient

examinations and the healthcare services that were billed through New Generation Rehab to GEICO. [Defendants add that Seco purported to exercise either direct **or indirect** supervision of the healthcare services. The Undersigned also replaced the term "physical therapy services" with "healthcare services" in light of the parties' dispute. Box 31 will be addressed in the analysis portion of this Report and Recommendation.].

85.     At the time when GEICO paid the billing, GEICO did not know that the patient examinations and the healthcare services billed through New Generation Rehab to GEICO had been performed without supervision by individuals other than Seco. [Defendants dispute this paragraph because they maintain that at New Generation Rehab, the massage therapists performed the at-issue healthcare services under Seco's **indirect** supervision. [ECF No. 89-2, ¶¶ 7-8].].

86.     New Generation Rehab billed GEICO for its healthcare services using CPT codes.

### 2.     Alleged Misrepresentations Regarding Patient Examinations at New Generation Rehab

87.     When many GEICO insureds first presented at New Generation Rehab seeking treatment, they purportedly received an initial examination.

88.     New Generation Rehab also purported to provide many GEICO insureds with follow-up examinations.

89.     The billing submitted through New Generation Rehab to GEICO for patient examinations represented in Box 31 of the HCFA-1500 form that Seco either personally

performed, or at least directly supervised, all of the patient examinations that were billed through New Generation Rehab to GEICO. [Defendants add that Seco purported to exercise either direct **or indirect** supervision of the healthcare services. Box 31 will be addressed in the analysis portion of this Report and Recommendations.].

90.      New Generation Rehab billed the initial examinations to GEICO, or caused them to be billed to GEICO, under CPT code 99205, resulting in charges of $431.06 for each initial examination that New Generation Rehab purported to provide.

91.      New Generation Rehab submitted, or caused to be submitted, a purported examination report to GEICO for each initial examination of GEICO insureds that it purported to provide.

92.      Pursuant to the AMA guidelines for the use of CPT codes, the use of CPT code 99205 to bill for an initial patient examination represents -- among other things -- that: (i) the patient presented with health problems of moderate to high severity; (ii) the examination involved at least 60 minutes of face-to-face time with the patient or patient's family; (iii) the physician performed a "comprehensive" physical examination and took a "comprehensive" history; and (iv) the examination required the examining physician to engage in legitimate, "high complexity" medical decision-making.

93.      The initial examinations billed through New Generation Rehab to GEICO were typically billed under CPT code 99205. The GEICO-insured patients seeking treatment at New Generation Rehab were diagnosed with soft tissue injuries. [The facts

asserted in this paragraph were partially disputed. The Undersigned reworded this paragraph to include only the undisputed portions.].

94.     Dr. Dillard opined that because the information contained in the Defendants' treatment notes was boilerplate, repetitive, or exaggerated and did not document the required elements of a comprehensive examination or history, the examinations did not legitimately entail 60 minutes of face-to-face time with the patients or their families. [The Undersigned reworded this paragraph to conform with the source material, Dr. Dillard's expert report, [ECF No. 88-1].].

95.     N/A

96.     At New Generation Rehab, most patients were diagnosed with substantially identical soft tissue injuries. [This paragraph is partially disputed. The Undersigned has reworded it to omit the disputed portion.].

97.     New Generation Rehab reported that most of the patients treated by New Generation Rehab suffered from an "emergency medical condition."

98.     N/A

99.     The contemporaneous police reports for the patients typically reflected only minor accidents.

100.     The contemporaneous police reports for the patients typically indicated that the patients did not suffer any serious injuries as a result of the automobile accidents.

101.    The patients usually did not go to the hospital, and instead were seen at New Generation's office on a non-emergency basis. [Defendants deny this fact and cite to Seco's supplemental declaration but do not provide a specific paragraph number. Therefore, this fact is deemed admitted.].

102.    The patients usually presented as fully ambulatory.

103.    N/A

104.    New Generation Rehab billed the follow-up examinations to GEICO under CPT codes 99213 or 99214, typically resulting in charges of $197.00 for each follow-up examination under CPT code 99213 and between $176.95 and $299.04.

105.    N/A

106.    N/A

107.    N/A

**3.    Alleged Misrepresentations Regarding "Physical Therapy" Services at New Generation Rehab**

108.    N/A

109.    New Generation Rehab billed the at-issue healthcare services to GEICO, or caused them to be billed to GEICO, under: (i) CPT code 97010 for putative hot/cold pack treatments, typically resulting in a charge of $10.00; (ii) CPT code 97012, for putative mechanical traction, typically resulting in a charge of $31.12; (iii) CPT code 97014, for putative electrical stimulation, typically resulting in a charge of $23.50; (iv) CPT code 97018, for putative paraffin bath therapy, typically resulting in a charge of $19.50; (v) CPT

code 97026, for putative infrared light therapy, resulting in a charge of $45.00; (vi) CPT code 97035, for putative ultrasound, typically resulting in a charge of $24.04; (vii) CPT code 97110, for putative therapeutic exercises, typically resulting in a charge of either $50.44 or $65.72; (viii) CPT code 97112, for putative neuromuscular reeducation, typically resulting in a charge of either $60.00 or $74.52; (ix) CPT code 97140, for putative manual therapy, typically resulting in a charge of either $50.00 or $58.74; (x) CPT code 97535 for putative "self-care" training, resulting in a charge of $75.00; and (xi) CPT code 97530, for putative therapeutic activity therapy, typically resulting in a charge of $75.62. [The parties dispute that the billed-for healthcare services constituted "physical therapy."].

110.    The billing submitted through New Generation Rehab for the healthcare services identified Seco in Box 31 of the HCFA-1500 forms. [The parties dispute that the billed-for healthcare services constituted "physical therapy" and the representations made in Box 31. Box 31 will be addressed in the analysis portion of this Report and Recommendations].

111.    Seco never personally performed any of the billed-for healthcare services at New Generation Rehab. [The parties dispute that the billed-for healthcare services constituted "physical therapy."].

112.    Between March 2017 and May 2021, all of the healthcare services billed through New Generation Rehab to GEICO were performed by healthcare providers who

held massage therapy licenses. [The parties dispute that the billed-for healthcare services constituted "physical therapy."].

113.    Defendant Seco was not physically present at New Generation Rehab on a daily basis.

114.    In fact, Seco was physically present at New Generation Rehab only once or twice a month.

115.    During the period of time when Seco purported to perform -- or at least directly supervise -- the healthcare services at New Generation Rehab, Seco simultaneously purported to personally perform or directly supervise a massive number of individual healthcare services that were billed to GEICO through numerous healthcare clinics and practices in Florida. [Defendants add that Seco purported instead to directly supervise the services at Gonzalez's Medical, and **indirectly supervise** the services at the other facilities.].

116.    N/A

117.    N/A

118.    N/A

119.    N/A

120.    New Generation Rehab's Florida Agency for Health Care Administration healthcare clinic license application stated that New Generation Rehab would provide general medicine and massage therapy services, but not physical therapy services.

### 4.   Alleged Absence of a Legitimate Medical Director at New Generation Rehab

121.   During Seco's purported tenure as a medical director at New Generation Rehab, Seco also purported to serve as medical director at numerous other health care clinics.

122.   During Seco's purported tenure as medical director at New Generation Rehab, Seco also purported to personally perform and/or legitimately supervise healthcare services at other healthcare clinics in Florida. [Defendants add that Seco purported instead to directly supervise the services at Gonzalez's Medical and **indirectly supervise** the services at the other facilities.].

123.   During Seco's purported tenure as medical director at New Generation Rehab, Seco was physically present at New Generation Rehab only once or twice a month.

124.   Seco acknowledged that he never saw two massage therapists at New Generation Rehab. [The Undersigned reworded this fact to conform with the cited portion of Seco's deposition transcript.].

125.   N/A

126.   In fact, Seco typically reviewed between two and ten patient files during any of his supposed "systematic reviews" of New Generation Rehab's billing, and he was not sure how many patients treated each month at New Generation Rehab.

127.   N/A

128.   N/A

129.    N/A

130.    N/A

**Gonzalez's Medical Center, Inc.**

1.      **General Background**

131.    Defendant Gonzalez's Medical is a Florida corporation that purported to be properly licensed as a healthcare clinic under the Clinic Act.

132.    Gonzalez's Medical was incorporated in Florida on April 10, 2012.

133.    Between 2015 and 2021, Gonzalez's Medical purported to provide initial examinations, follow-up examinations, and healthcare services to GEICO insureds, and then sought reimbursement for PIP benefits. [The parties dispute that the healthcare services constituted "physical therapy."].

134.    Between at least March 2015 and June 2021, Gonzalez's Medical submitted PIP billing to GEICO for thousands of individual healthcare services that it purportedly provided to GEICO insureds. [The parties dispute that the billed-for healthcare services constituted "physical therapy."].

135.    Between March 2015 and May 2021, GEICO paid Gonzalez's Medical $1,326,473.77 in response to claims for PIP benefits submitted through Gonzalez's Medical to GEICO. [Defendants dispute that GEICO "relied" on the claim submissions, as a legal conclusion.].

136.    Between March 2015 and May 2021, GEICO paid Gonzalez's Medical at least $869,247.19 in response to the claims for PIP benefits submitted through Gonzalez's Medical for purported healthcare services. [Defendants dispute that the healthcare services provided to the GEICO insureds constituted physical therapy, as opposed to medical services.].

137.    N/A [Seco's declaration attests that "[a]t Gonzalez['s] Medical, [he] personally evaluated the G[EICO] insureds, and [he] prescribed the therapeutic modalites [sic] based on [his] evaluations. Licensed massage therapists provided the prescribed modalities at Gonzalez['s] Medical under [his] direct on-site supervision." [ECF No. 89-2, ¶ 4 (emphasis in original)].].

138.    Gonzalez's Medical deposited the checks GEICO issued in payment of its PIP claims, and it has not returned the money.

139.    In addition, GEICO has received PIP billing from Gonzalez's Medical that remains unpaid, and Gonzalez's Medical can pursue collection on much of this unpaid billing.

140.    Between April 2012 and the present, Defendant J.J. Gonzalez purported to be the owner of Gonzalez's Medical.

141.    Defendant Blasini purported to serve as Gonzalez's Medical's medical director from March 2015 until August 2017.

142.    Then a physician named Tony Nguyen, D.O. ("Nguyen") purported to serve as Gonzalez's Medical's medical director from September 2017 until at least June 2021.

143.    Between at least March 2015 and June 2021, Seco purported to personally perform, or at least directly supervise the vast majority of the purported healthcare services billed through Gonzalez's Medical to GEICO.

144.    The billing submitted through Gonzalez's Medical to GEICO for patient examinations represented in Box 31 of the HCFA-1500 form that Seco either personally performed, or at least directly supervised, the vast majority of the patient examinations and physical therapy services that were billed through Gonzalez's Medical to GEICO. [Defendants add that Seco purported to exercise either direct **or indirect** supervision of the healthcare services. Box 31 will be addressed in the analysis portion of this Report and Recommendations.]

145.    N/A

146.    Gonzalez's Medical billed GEICO for its healthcare services using CPT codes.

**2.    Alleged Misrepresentations Regarding Patient Examinations at Gonzalez's Medical**

147.    When many GEICO insureds first presented at Gonzalez's Medical seeking treatment, they purportedly received an initial examination.

148.    Gonzalez's Medical also purported to provide many GEICO insureds with follow-up examinations.

149.    The vast majority of the billing submitted through Gonzalez's Medical to GEICO for patient examinations represented in Box 31 of the HCFA-1500 form that Seco either personally performed, or at least directly supervised, the patient examinations that were billed through Gonzalez's Medical to GEICO. [Defendants purport to dispute this fact, citing an ambiguity in the CMS instructions. But in response to paragraph 145, they state that: "**Dr. Seco personally performed the patient examinations** and directly supervised the therapeutic services **at Gonzalez'[s] Medical**." [ECF No. 97, ¶ 145].

150.    Gonzalez's Medical billed the initial examinations to GEICO, or caused them to be billed to GEICO, under CPT code 99204, resulting in charges of $320.00 or $330.00 for each initial examination that Gonzalez's Medical purported to provide.

151.    Gonzalez's Medical submitted, or caused to be submitted, a purported examination report to GEICO for each initial examination of GEICO insureds that it purported to provide.

152.    The initial examinations billed through Gonzalez's Medical to GEICO were typically billed under CPT code 99204. [The facts asserted in this paragraph were partially disputed. The Undersigned reworded this paragraph to include only the undisputed portions.].

153.   Dr. Dillard opined that because the information contained in the Defendants' treatment notes was boilerplate, repetitive, or exaggerated and did not document the required elements of a comprehensive examination or history, the examinations did not legitimately entail 45 minutes of face-to-face time with the patients or their families. [Although the cited portion of J.J. Gonzalez's deposition does not address the fact asserted in this paragraph, the Undersigned nonetheless reworded this paragraph to conform with the source material, Dr. Dillard's expert report, [ECF No. 88-1].].

154.   N/A

155.   At Gonzalez's Medical, the healthcare providers who purported to provide patient examinations to GEICO-insured patients purported to diagnose most patients with substantially identical soft tissue injuries. [Defendants seek to dispute an inference, not a fact, therefore this fact is deemed undisputed.].

156.   Gonzalez's Medical reported that most of the patients treated by Gonzalez's Medical suffered from an "emergency medical condition." [Defendants seek to dispute an inference, not a fact, so this fact is therefore deemed undisputed.].

157.   N/A

158.   The contemporaneous police reports for the patients typically reflected only minor accidents.

159.    The contemporaneous police reports for the patients typically indicated that the patients did not suffer any serious injuries as a result of the automobile accidents.

160.    The patients usually did not go to the hospital. Instead, they were seen at Gonzalez's Medical on a non-emergency basis.

161.    The patients usually presented as fully ambulatory.

162.    At Gonzalez's Medical, the patients were diagnosed with soft tissue injuries. [This paragraph is partially disputed. The Undersigned has reworded it to omit the disputed portion.].

163.    Gonzalez's Medical billed the follow-up examinations to GEICO under CPT codes 99213 or 99214, typically resulting in charges of either $180.00 or $200.00 for each follow-up examination under CPT code 99213 and typically resulting in charges of $220.00 for each follow- up examination under CPT code 99214 that Gonzalez's Medical purported to provide.

164.    N/A

165.    N/A

166.    N/A

**3.    Alleged Misrepresentations Regarding "Physical Therapy" Services at Gonzalez's Medical**

167.    N/A

168.    Gonzalez's Medical billed the at-issue healthcare services to GEICO, or caused them to be billed to GEICO, under: (i) CPT code 97010 for putative hot/cold pack

treatments, typically resulting in a charge of either $20.00 or $30.00; (ii) CPT code 97012, for putative mechanical traction, typically resulting in a charge of either $37.00 or $47.00; (iii) CPT code 97014, for putative electrical stimulation, typically resulting in a charge of $35.00; (iv) CPT code 97018, for putative paraffin bath therapy, typically resulting in a charge of $20.00; (v) CPT code 97032, for putative electrical stimulation, resulting in a charge of $37.00; (vi) CPT code 97035, for putative ultrasound, typically resulting in a charge of $35.00; (vii) CPT code 97039, for putative vital wrap therapy, typically resulting in a charge of $30.00; (viii) CPT code 97110, for putative therapeutic exercises, typically resulting in a charge of $60.00; (ix) CPT code 97112, for putative neuromuscular reeducation, typically resulting in a charge of either $75.00 or $85.00; (x) CPT code 97535 for putative "self-care" training, typically resulting in a charge of either $65.00 or $75.00; and (xi) Health Care Common Procedure Coding System ("HCCPCS") code G0283, for putative electrical stimulation, typically resulting in a charge of $35.00. [The parties dispute that the billed-for healthcare services constituted "physical therapy."].

169.    Between at least March 2015 and June 2021, the billing submitted through Gonzalez's Medical for healthcare services identified Seco in Box 31 of the HCFA-1500 forms, and therefore represented that Seco had personally performed, or at least directly supervised, the purported healthcare services. [This paragraph is partially disputed. The Undersigned reworded it to omit the disputed portion.].

41

170.     Seco never personally performed any of the billed-for healthcare services at Gonzalez's Medical. [The parties dispute that the billed-for healthcare services constituted "physical therapy."].

171.     Between March 2015 and May 2021, all of the healthcare services billed through Gonzalez's Medical to GEICO were performed by healthcare providers who held massage therapy licenses. [The parties dispute that the billed-for healthcare services constituted "physical therapy."].

172.     Defendant Seco was typically physically present at Gonzalez's Medical between three to five days per week for between seven and eight hours.

173.     During the period of time when Seco purported to perform -- or at least directly supervise -- the healthcare services at Gonzalez's Medical, Seco simultaneously purported to personally perform or directly supervise a massive number of individual healthcare services that were billed to GEICO through numerous healthcare clinics and practices in Florida. [Defendants add that Seco either directly or indirectly supervised the patient care activities at said facilities.].

174.   N/A

175.   N/A

176.   N/A

177.   N/A

178.    Gonzalez's Medical's Florida Agency for Health Care Administration healthcare clinic license application stated that Gonzalez's Medical would provide general medicine, x-ray, and massage therapy services, but not physical therapy services.

### 4.    Alleged Absence of a Legitimate Medical Director at Gonzalez's Medical

179.    During Blasini's purported tenure as a medical director at Gonzalez's Medical, Blasini also purported to serve as medical director at numerous other healthcare clinics.

180.    During Nguyen's purported tenure as medical director at Gonzalez's Medical, Nguyen also purported to serve as medical director at numerous other healthcare clinics.

181.    During Blasini's purported tenure as medical director at Gonzalez's Medical, Blasini was physically present at Gonzalez's Medical only once or twice a month.

182.    During Nguyen's purported tenure as medical director at Gonzalez's Medical, Nguyen was physically present at Gonzalez's Medical only one time per month, for a few hours each time.

183.    N/A [Although Defendants cite solely the declaration of J.J. Gonzalez, the cited paragraphs [ECF No. 89-1, ¶¶ 10-12] concern facts which a lay person may attest to based on his or her observations and are therefore sufficient to dispute this paragraph.].

184.    In fact, Blasini reviewed between five to seven patient files during any of his supposed "systematic reviews" of Gonzalez's Medical billing, and he did not know how many patients treated each month at Gonzalez's Medical.

185.    N/A [Although Defendants cite solely the declaration of J.J. Gonzalez, the cited paragraphs [ECF No. 89-1, ¶¶ 10-12] concern facts which a lay person may attest to based on his or her observations and are therefore sufficient to dispute this paragraph.].

186.    Nguyen reviewed five patient files during any of his systematic reviews of Gonzalez's Medical's billing, and Nguyen did not know how many patients treated each month at Gonzalez's Medical. [Defendants partially dispute this paragraph, claiming it is unsupported by the direct testimony of Nguyen, but they do not cite to any specific page(s) or attach a copy of the relevant excerpt.].

187.    N/A

188.    N/A

189.    N/A

190.    N/A

191.    N/A

192.    N/A

193.    N/A

**B.      Defendants' Statement of Facts**

At the outset, the Undersigned notes that GEICO's failure to adhere to the protocol

set forth in Local Rule 56.1 makes the Court's job more difficult. Instead of simply

responding to whether a purported fact was deemed disputed or undisputed, for many

of the paragraphs in Plaintiffs' opposition statement of facts [ECF No. 98], GEICO chose

to interject extraneous issues in paragraph-long objections.

Local Rule 56.1 states that "[a] motion for summary judgment and the opposition

to it shall each be accompanied by a separate and contemporaneously filed and served

Statement of Material Facts." S.D. Fla. L.R. 56.1(a)(1). The rule also requires that:

> An opponent's Statement of Material Facts **. . . clearly challenge any**
> **purportedly material fact asserted by the movant that the opponent**
> **contends is genuinely in dispute**. An opponent's Statement of Material
> Facts also **may thereafter assert additional material facts that the**
> **opponent contends serve to defeat the motion for summary judgment**.

*Id.* at 56.1(a)(2) (emphasis added).

It requires that an opponent's statement of material facts adhere to the following

format:

> (A) In addition to complying with the requirements of sub-section (b)(1), an
> opponent's Statement of Material Facts shall correspond with the order and
> paragraph numbering format used by the movant, but it shall not repeat
> the text of the movant's paragraphs.
>
> (B) An opponent's Statement of Material Facts shall use, as the very first
> word in each paragraph-by-paragraph response, the word "disputed" or
> "undisputed."
>
> (C) If an opponent's Statement of Material Facts disputes a fact in the
> movant's Statement of Material Facts, **then the evidentiary citations**

**supporting the opponent's position must be limited to evidence specific to that particular dispute**.

(D) **Any additional facts that an opponent contends are material to the motion for summary judgment shall be numbered and placed immediately after the opponent's response to the movant's Statement of Material Facts**. The additional facts shall use separately numbered paragraphs beginning with the next number following the movant's last numbered paragraph. The additional facts shall be separately titled as "Additional Facts[.]"

*Id.* at 56.1(b)(2) (emphasis added).

"'[F]ailure to comply with [L]ocal [R]ule 56.1 is not a mere technicality. The rule is designed to help the court identify and organize the issues in the case.'" *State Farm Mut. Auto. Ins. Co. v. Muse*, No. 20-13319, 2022 WL 413417, at *4 (11th Cir. Feb. 10, 2022) (quoting *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1302 (11th Cir. 2009)).

When a party properly complies with Local Rule 56.1, it is relatively easy for a court to determine whether there is a genuine disputed issue of fact. Basically, all a court needs to do is look at the opposing statement of material facts on a paragraph-by-paragraph basis and quickly see whether any paragraphs are designated as disputed. When a party does not comply with the Local Rule, however, then it is exceedingly difficult for a court to discern if there is a factual dispute concerning a specific paragraph.

A court needs to review the entire opposing statement of facts and determine whether any particular sentence or paragraph is, in fact, a vague reference to some type of actual rebuttal evidence which might generate a disputed issue of material fact. This

46

can be an arduous process, and, in any event, generates unnecessary work for the court and its staff.[8]

In *Fernandez v. Crystal Cruises, LLC*, this Court found that a litigant had failed to comply with Local Rule 56.1 where the "[opposing] statement of facts offer[ed] long narrative responses to [the moving party's statement of] facts with which she disagree[d]; in these responses, **she introduce[d] not only new facts**, but also new legal claims." No. 19-CV-22886, 2021 WL 6693757, at *8 (S.D. Fla. Mar. 29, 2021) (emphasis added). Here, Plaintiffs' opposing statement of facts [ECF No. 98] unnecessarily taxed the Court's resources.

Nonetheless, despite GEICO's non-compliance and the additional and unnecessary work it created for the Court, the Undersigned will proceed to summarize the undisputed facts pertaining to Defendants' summary judgment motion, as follows:

1. GEICO insureds in the underlying claims were evaluated by Seco, at Gonzalez's Medical. [GEICO states that not *all* of the patient evaluations at Gonzalez's

---

[8] "Failure to follow the letter and spirit of this imperative local rule imposes on the Court 'an arduous process, and, in any event, generates unnecessary work for the court and its staff.'" *Inspirations Nevada LLC v. Med Pro Billing, Inc.*, No. 20-CV-60268, 2021 WL 4523616, at *2 (S.D. Fla. Oct. 2, 2021)(internal citation omitted); *Bejerano v. Flex Fla. Corp.*, No. 18-20049-CIV, 2020 WL 4059604, at *3 (S.D. Fla. July 20, 2020) ("Not only does Local Rule 56.1, like the other local rules, have the force of law, it also serves more than a technical purpose: '[T]he rules clear procedural directive is intended to reduce confusion and prevent the Court from having to scour the record and perform time-intensive fact searching.'" (citing *United States v. Marder*, 183 F. Supp. 3d 1231, 1235 (S.D. Fla. 2016)); *Levin v. Nationwide Home Loans, Inc.*, No. 13-60306-CIV, 2014 WL 11531634, at *1 (S.D. Fla. Mar. 14, 2014)).

Medical were done by Seco and disputes the legitimacy of the examinations and the decision-making process. GEICO quarrels with facts outside the scope of this paragraph.].

2.      Based on this evaluation and diagnosis of the GEICO insureds, Seco prescribed passive therapeutic modalities that required the use of simple handheld devices. [GEICO disputes the legitimacy of the medical evaluations, the types of services performed, and the term "passive therapeutic modalities." It contends that the services were unlawfully performed and medically unnecessary. GEICO also asserts that the services provided were "advanced physical therapy services" but the cited paragraph in Ms. Spring's declaration [ECF No. 88-2, ¶ 90] does not discuss this topic and while the cited excerpts from J.J. Gonzalez and Seco's depositions use the term "physical therapy," they are silent on whether Defendants provided "**advanced** physical therapy services."].

3.      The prescribed modalities are common to the practice of massage therapy, medicine, and physical therapy. ["GEICO disputes that the purported 'physical therapy' services at Gonzalez's Medical were common to the practice of massage therapy, medicine, and physical therapy" but cites to *no* record evidence to support this sentence. GEICO also contends that the healthcare services rendered were "advanced physical therapy services," but none of the pinpoint citations listed by GEICO support this fact and its expert does not even use the term "advanced physical therapy" in his report.].

4.     The therapeutic modalities were provided to the GEICO insureds incident to the medical practice, or services, of Seco. [GEICO disputes the legitimacy of the supervision provided or whether the services were "incident to" Seco's medical practice.].

5.     Licensed massage therapists provided the therapeutic services at Gonzalez's Medical under the direct supervision of Seco. [GEICO disputes the legitimacy of Seco's supervision.].

6.     Gonzalez's Medical billed for the initial and follow up examinations with CPT Codes 99204 and 99214.

7.     Gonzalez's Medical transmitted the treatment records with the 1500 HCFA invoices for GEICO's review before the claims were paid. [GEICO disputes the legitimacy of the healthcare services provided at Gonzalez's Medical and whether they were lawfully performed, or medically necessary. GEICO further states it "did not know that the underlying bills were fraudulent, unlawful or otherwise ineligible for reimbursement or that the patient examinations and the physical therapy services billed through Gonzalez's Medical to GEICO had been performed without supervision by individuals other than Seco."].

8.     The examination reports transmitted to GEICO for review memorialized a history, the type of exam performed, and Seco's medical decision making. [GEICO

disputes the legitimacy of the examination reports, including patient histories, exam results or that it reflected medical decision-making.].

9.      Defendants Gonzalez's Medical, J.J. Gonzalez, and Seco disclosed all material facts in their possession to support their opinion that the exams were properly coded rather than upcoded. [GEICO disputes the accuracy of the information provided in the reports.].

10.     GEICO paid the exam charges without down-coding or objecting to the fact that examination reports did not support the coding. [GEICO disputes facts outside the scope of this paragraph, such as the legitimacy of the exams provided, the fraudulent nature of Defendants' billing paperwork, and awareness that they were upcoded.].

11.     N/A [The Undersigned omits this fact because it is not supported by the record. As discussed in the Analysis section, the record contains sufficient facts upon which a jury could determine that Seco had superior knowledge.].

12.     GEICO's expert, Dr. Dillard, admitted that GEICO could have determined from a cursory review of examination reports that the exams were upcoded. [GEICO disputes that this establishes it knew or should have known that the charges were upcoded.].

13.     [Defendants did not include a paragraph 13 in their Statement of Facts.].

14.    Dr. Dillard acknowledged that two physicians can come to different conclusions about how to adjudicate CPT Codes. [GEICO disputes facts not asserted in this paragraph.].

15.    Dr. Dillard's opinion that the treatment was medically unnecessary, or below the standard of care, is based on his review of the treatment records Defendants submitted to GEICO for review. [GEICO disputes assertions which are not made in this paragraph.].

16.    Dr. Dillard acknowledged that whether a patient's treatment is medically necessary is a matter of opinion and that two physicians may disagree or come to opposite conclusions. [GEICO disputes that Gonzalez's Medical's billing was the result of honestly-held opinions.].

17.    GEICO paid the therapeutic charges without objecting to the fact that treatment records allegedly did not establish that the services were medically necessary. [GEICO disputes facts outside the scope of this paragraph, such as the legitimacy of Defendants' billing; whether any of the treatments and services were lawfully performed, or medically necessary; and GEICO's awareness of Defendants' fraudulent activities.].

18.    Defendants Gonzalez's Medical, J.J. Gonzalez, and Seco disclosed to GEICO all material facts in their possession to support their opinion that the prescribed therapeutic services were medically necessary on a case-by-case basis. [GEICO asserts that the examination reports were falsified and contained affirmative misrepresentations,

51

the billed-for services were not lawfully performed or medically necessary and were provided pursuant to a predetermined protocol without regard to a patient's specific circumstances. GEICO also disputes that it had knowledge of Defendants' purported misconduct.].

    19.    N/A

    20.    N/A

## III.    Legal Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citation omitted). Thus, the Court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party must "show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). If the movant does so, then "the burden shift[s] to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Id.* A genuine factual dispute exists "if

the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999). The opposing party must proffer more than "a mere scintilla of evidence" to show "that the jury could reasonably find for that party." *Cf. Abbes v. Embraer Servs., Inc.*, 195 F. App'x 898, 899-900 (11th Cir. 2006) (internal quotations omitted).

When deciding whether summary judgment is appropriate, the Court views all facts and resolves all doubts in favor of the nonmoving party. *Feliciano*, 707 F.3d at 1247. This means that the Court must draw all inferences in favor of the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378, 167 L.Ed.2d 686 (2007); *Tana v. Dantanna's*, 611 F.3d 767, 772 (11th Cir. 2010). Summary judgment "may be inappropriate where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from these facts." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the [C]ourt should not grant summary judgment." *Bd. of Pub. Educ., Bibb Cnty.*, 495 F.3d at 1315.

Cross motions for summary judgment do not change this standard. *Cooper v. Jefferson Cnty. Coroner & Med. Exam'r Off.*, 861 F. App'x 753, 755 (11th Cir. 2021). The Court must view "the evidence and all factual inferences therefrom in the light most favorable to the non-movant, and resolving all reasonable doubts about the facts in favor of the

non-moving party." *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). Nonetheless, "on cross-motions for summary judgment . . ., courts should be very careful in their analysis to ensure that the proper party receives the benefit of the summary judgment standard." *FCOA LLC v. Foremost Title & Escrow Servs. LLC*, 57 F.4th 939, 959 (11th Cir. 2023).

## IV.   Analysis

### A.   Florida Motor Vehicle No-Fault Law

Under the Florida Motor Vehicle No-Fault Law, Fla. Stat. §§ 627.730-627.7405, automobile insurance policies must include "[PIP] coverage to provide persons injured in automobile accidents with benefits for medical treatment. Pursuant to a valid assignment of PIP benefits by the insured, the **healthcare provider may submit claims directly to the insurance company to receive payment for medical services rendered**." *Gov't Emps. Ins. Co. v. Quality Diagnostic Health Care, Inc.*, No. 21-10297, 2021 WL 5157535, at *1 (11th Cir. Nov. 5, 2021) (emphasis added).

"[C]linics that wish to receive PIP reimbursement must comply with the Clinic Act." *Gov't Emps. Ins. Co. v. Right Spinal Clinic, Inc.*, No. 8:20-CV-0802-KKM-AAS, 2022 WL 2466039, at *1 (M.D. Fla. July 6, 2022), reconsideration denied, No. 8:20-CV-0802-KKM-AAS, 2022 WL 3357578 (M.D. Fla. Aug. 15, 2022) (citing Fla. Stat. § 400.9935(1), (3)). "[A]ny claim made by a licensed clinic to an insurance company or other entity is 'noncompensable and unenforceable' if the clinic is 'operating in violation' of the Clinic

Act's licensing requirements." *Allstate Ins. Co. v. Vizcay*, 826 F.3d 1326, 1328 (11th Cir. 2016) (citing Fla. Stat. § 400.9935(3)).

The Clinic Act requires, *inter ali*a, "that clinics hire a medical director to systematically review the clinic's billing and, if necessary, correct it." *Right Spinal Clinic, Inc.*, 2022 WL 2466039, at *1.; *State Farm Mut. Auto. Ins. Co. v. Muse*, No. 20-13319, 2022 WL 413417, at *2 (11th Cir. Feb. 10, 2022) ("Under Florida's Medical Director Statute, clinics are required to appoint medical directors who are then legally responsible for ensuring that treatments are administered lawfully, that record-keeping obligations are met, and that billings are not fraudulent or unlawful." (citing Fla. Stat. § 400.9935(1))).

"A clinic is not entitled to PIP benefits if it violates the rules for submitting PIP billing." *Right Spinal Clinic, Inc.*, 2022 WL 2466039, at *7 (citing Fla. Stat. § 627.736(5)(d)). All PIP bills submitted on CMS-1500 forms (also known as "HCFA-1500" forms) must comply with the CMS-1500 form instructions. *Geico Gen. Ins. Co. v. Beacon Healthcare Ctr. Inc.*, 298 So. 3d 1235, 1237 n.2 (Fla. 3d DCA 2020) (citing Fla. Stat. § 627.736(5)(d)). Box 31 of the HCFA-1500 form "must list 'the name of the individual who either personally performed or directly supervised' the treatment billed." *Right Spinal Clinic, Inc.*, 2022 WL 2466039, at *7 (quoting *Beacon*, 298 So. 3d at 1237 n.2).

Not all medical treatments are reimbursable. "Florida law clearly states that a provider can refuse payment for services unlawfully rendered." *State Farm Mut. Auto. Ins. Co. v. Med. Serv. Ctr. of Fla., Inc.*, 103 F. Supp. 3d 1343, 1355 (S.D. Fla. 2015) (citing Fla. Stat.

55

§ 627.736(5)(b)(1)(b)). "Florida law defines the term 'lawful' to mean in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." *Id.* at 1355 n.9 (citing Fla. Stat. § 627.732(11)).

The PIP statute allows an insurer to deny a PIP claim under certain circumstances "including to a 'person who **knowingly submits a false or misleading statement relating to the claim or charges**,' '[f]or **any treatment or service that is upcoded**,' or for **charges that do 'not substantially meet the applicable**' statutory requirements." *Quality Diagnostic Health Care, Inc.*, 2021 WL 5157535, at *1 (quoting Fla. Stat. § 627.736(5)(b) (emphasis added)).

The statute defines the term "knowingly" to mean "that a person, with respect to information, has actual knowledge of the information; acts in **deliberate ignorance of the truth or falsity of the information**; or acts in **reckless disregard** of the information, and proof of specific intent to defraud is not required." Fla. Stat. § 627.732(10) (emphasis added). It defines the term "upcoming" to mean "an action that submits a billing code that would result in payment greater in amount than would be paid using a billing code that accurately describes the services performed." *Id.* at § 627.732(14).

Moreover, it excludes from PIP reimbursement "**massage therapy** as defined in s. 480.033 . . . **regardless of the person, entity, or licensee providing massage therapy** . . .

and a licensed massage therapist . . . **may not be reimbursed** for medical benefits under this section." Fla. Stat. § 627.736(1)(a)(5) (emphasis supplied).

"Florida's No-Fault Law allows expressly for an insurer to challenge the validity of a claim for PIP benefits **even after the claim is paid**." *Quality Diagnostic Health Care, Inc.*, 2021 WL 5157535, at *3 (citing Fla. Stat. § 627.736(4)(b)(6) (emphasis added)).

### B.   GEICO's Summary Judgment Motion

GEICO moves for summary judgment on its: (1) **FDUTPA claims** against Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco (Count 4); Gonzalez's Medical, J.J. Gonzalez, and Seco (Count 10); and New Generation Rehab, Abreu, and Seco (Count 16); (2) **unjust enrichment claims** against Med-Union Medical, J.A. Gonzalez, Amigo, Cabrera, Angarica, and Seco (Count 6); Gonzalez's Medical, J.J. Gonzalez, and Seco (Count 12); and New Generation Rehab, Abreu, and Seco (Count 18); and (3) **declaratory action claims** against Med-Union Medical (Count 1); Gonzalez's Medical (Count 7); and New Generation Rehab (Count 13). [ECF No. 86, p. 5; *id.* at 12 ("GEICO [is entitled] to summary judgment against [ ] Defendants on its FDUTPA, unjust enrichment, and declaratory judgment claims.")].[9] GEICO is *not* seeking summary judgment on its common law fraud and RICO claims (Counts 2-3, 5, 8-9, 11, 14-15, and 17). *Id.* at 5, n.4.

---

[9]     As noted above, Plaintiffs have also moved for a default final judgment as to Count 13 (New Generation Rehab) and Counts 16-18 (New Generation Rehab and Abreu). [ECF No. 131].

In short, GEICO argues that it is entitled to summary judgment on its **declaratory judgment**, **FDUTPA**, and **unjust enrichment claims** because the Clinic Defendants sought payment for healthcare services which were either never lawfully provided or were ineligible for PIP reimbursement. Specifically, GEICO argues that Defendants were not entitled to payment because: (1) they engaged in upcoding and provided medically unnecessary treatments; (2) the physical therapy services were performed by massage therapists or unsupervised physical therapy assistants; (3) Defendants falsely represented that Seco either personally performed or directly supervised the performance of the physical therapy services; and (4) the Clinic Defendants did not have legitimate medical directors.

Defendants respond that GEICO is not entitled to summary judgment on these claims because "G[EICO]'s proof is insufficient to establish that Defendants billed for . . . physical therapy or non-compensable massage services" when, in fact, they billed GEICO for *medical services.* [ECF No. 100, p. 2]. They maintain that "PIP benefits were properly reimbursed" because "Seco examined the patients, ordered the treatment, and he exercised a degree of supervision under existing law." *Id.* at 3.

Defendants also accuse GEICO of improperly seeking to amend its Amended Complaint [ECF No. 61] through its summary judgment motion. They state that GEICO pled that the massage therapists were *unsupervised* and is now seeking summary

judgment under a theory that PIP benefits are not payable for "physical therapy" services rendered by <u>supervised</u> massage therapists. [ECF No. 100, p. 3].

The Undersigned agrees with Defendants that "a party's theory of the case at trial is, in general, limited to the party's pleadings." *Gov't Emps. Ins. Co. v. Seco*, No. 21-24155-CIV, 2022 WL 17582576, at *5 (S.D. Fla. Dec. 12, 2022). But Defendants' argument is unavailing here because they construe Plaintiffs' Amended Complaint too narrowly.

To be sure, the Amended Complaint contains repeated references to massage therapists and other individuals being <u>unsupervised</u>. But it *also* contains allegations that the billed-for services were not eligible for PIP reimbursement without any reference to supervision: "In fact, the underlying physical therapy services were **not eligible for PIP reimbursement, because they had been performed** -- to the extent they were performed at all -- **by massage therapists and other unlicensed individuals**." [ECF No. 61, ¶ 114 (emphasis added)]; *see also id.* at ¶¶ 130, 145 (containing similar language).

One of these paragraphs (¶¶ 114, 130, or 145) is incorporated by reference in each of Plaintiffs' declaratory judgment, FDUTPA, and unjust enrichment counts. Therefore, the Undersigned rejects Defendants' argument that Plaintiffs moved for summary judgment on unpled legal theories.

### 1.   Alleged Upcoding and Medically Unnecessary Treatment

The Florida PIP statute defines "upcoding" -- in relevant part -- as "an action that submits a billing code that would result in payment greater in amount than would be

paid using a billing code that accurately describes the services performed." Fla. Stat. §

627.732(14). As detailed below, GEICO contends that the Clinic Defendants engaged in

upcoding for both initial examinations and follow-up examinations. GEICO also asserts

that the billed-for services were medically unnecessary because the outcomes of the

examinations were pre-determined and without regard to each insured's individual

circumstances.

**a.**      **Initial Examinations**

GEICO states that:

> The purported initial examinations were billed through **Med-Union
> Medical** to GEICO under **[CPT] code 99204**, resulting in charges of $375.00
> for each initial examination that the Med-Union Medical Defendants
> purported to provide. Similarly, the purported initial examinations were
> billed through **New Generation [Rehab]** to GEICO under **CPT code 99205**,
> resulting in charges of $431.06 for each initial examination that the New
> Generation [Rehab] Defendants purported to provide. Likewise, the
> purported initial examinations were billed through **Gonzalez's Medical** to
> GEICO under **CPT code 99204**, resulting in charges of either $320.00 or
> $330.00 for each initial examination that the Gonzalez's Medical Defendants
> purported to provide.

[ECF No. 86, p. 13 (emphasis added; record citations omitted)].

According to GEICO, use of **CPT code 99204** for the initial examinations

constituted upcoding because:

> neither **Med-Union Medical** nor **Gonzalez's Medical's** initial examination
> billing met the criteria for the use of **CPT code 99204**, inasmuch as: (i) the
> GEICO-insured **patients** seeking treatment at Med-Union Medical and
> Gonzalez's Medical **presented with -- at a most -- low or minimal severity
> soft tissue injuries**, not moderate to high severity problems, as required for
> the use of CPT code 99204 to bill for an examination; (ii) the examinations

60

**did not legitimately entail 45 minutes** of face to face time between the doctor and the patient or their family, as required to use CPT code 99204; (iii) in purporting to perform the examinations, **no physician or health care provider** associated with Med-Union Medical or Gonzalez's Medical **performed a "comprehensive" physical examination**, as required to use CPT code 99204; and (iv) the **examinations did not involve any legitimate "moderate complexity" medical decision-making**, which is required to support a charge under CPT code 99204.

*Id.* at 14 (emphasis added).

GEICO similarly argues that use of **CPT code 99205** for the initial examinations at

**New Generation Rehab** constituted upcoding because:

(i) the GEICO-insured **patients** seeking treatment at **New Generation [Rehab] presented with** -- at a most -- **low or minimal severity soft tissue injuries**, not moderate to high severity problems, as required to bill for an examination under **CPT code 99205**; (ii) the examinations **did no [sic] legitimately entail 60 minutes** of face to face time between the doctor and the patient or their family, as required for the use of **CPT code 99205**; (iii) in purporting to perform the examinations, **no physician or health care provider** associated with New Generation [Rehab] **performed a "comprehensive" physical examination**, as required to use CPT code 99205; and (iv) the examinations **did not involve any legitimate "high complexity" medical decision-making**, which likewise is required to support an examination charge under CPT code 99205.

*Id.* (emphasis added).

GEICO asserts that there was no "legitimate medical decision-making" associated

with these initial examinations (regardless of whether they were billed using **CPT code

99204** or **99205**) because "the outcomes of the examinations were pre-determined to result

in phony diagnoses and extensive, **medically unnecessary treatment** that was billed

61

through [the Clinic Defendants] to GEICO, without regard for the insureds' true individual circumstances, symptomatology, or presentation." *Id.* at 14-15.

GEICO further asserts that:

keeping with the fact that the initial examination reports were upcoded and falsified, most of the examination reports submitted through the Clinic Defendants **falsely represented that the GEICO-insured patients reported substantially-similar symptomatology, and were experiencing "medical emergencies", to an extent that was medically impossible**, especially in light of the demonstrably-minor nature of almost all of the underlying accidents.

*Id.* (emphasis added).

### b.    Follow-up Examinations

GEICO also contends that the Clinic Defendants engaged in upcoding for follow-up examinations. *Id.* at 15-16. It notes that Defendants at all three clinics "billed the majority of the follow-up examinations to GEICO, or caused them to be billed to GEICO, under **CPT codes 99213** or **99214**." *Id.* at 15.

GEICO argues that use of these CPT codes for follow-up examinations constituted upcoding because they:

**did not meet the criteria for the use of CPT code 99213 or CPT code 99214**, inasmuch as: (i) by the time the GEICO insured patients appeared at the Clinic Defendants for the follow-up examinations, **the patients generally did not have any presenting problems** . . . **or else their presenting problems were minimal**, not low to moderate severity, or moderate to high severity, as required for the use of CPT codes 99213 and 99214; and (ii) in connection with the supposed follow-up examinations, [ ] **Defendants did not take any legitimate physical examinations, or engage in any legitimate medical decision-making at all**, which likewise is required for the use of CPT codes 99213 and 99214.

*Id.* at 15-16 (emphasis added). According to GEICO, "the outcomes of the examinations were pre-determined to result in phony diagnoses and **medically unnecessary treatment** . . . without regard for the insureds' true individual circumstances or presentation." *Id.* at 16 (emphasis added).

In addition to CPT codes 99213 and 99214, the **Med-Union Defendants** also billed follow-up examinations using **CPT code 99215**. GEICO argues that use of **CPT code 99215** for these examinations also constituted upcoding for the same reasons outlined above. *Id.*

> ### c.   Defendants' Response to GEICO's Assertions of Upcoding and Medical Necessity

Defendants contend that, at best, the evidence presented by Plaintiffs consist of non-actionable *opinions.* [ECF No. 100, pp. 24-27]. They note that GEICO's corporate representative, Victoria Spring, **could not "identify factual omissions** that came to G[EICO]'s attention later which [they contend] preclude[d] Defendants' opinion on coding and necessity." *Id.* at 24 (citing [ECF No. 89-2, pp. 57:2–58:1-25]).[10]

Defendants further argue that GEICO cannot rely on the opinion of its expert, Dr. James Dillard, to meet its burden of proof because Dr. Dillard formed his opinion based on **information Defendants disclosed to GEICO** (as opposed to undisclosed, later-

---

[10]   Ms. Spring testified that she was not a medical doctor, she could not testify to what information Seco did *not* give to GEICO, and that GEICO had a medical expert who had raised "significant concerns with what was done by [ ] Seco" concerning the treatment protocols and the purported injuries. [ECF No. 89-3, pp. 57:9–58:17].

learned information). *Id.* at 25 ("[Dr. Dillard] does not rely on undisclosed facts or omissions collateral to the disclosures.").

They further note that Dr. Dillard **did not opine that Defendants lied** in coding or prescribing treatment. *Id.* Moreover, they state that "even if Dillard had said that 'no reasonable physician could agree,' the conclusion fails because its unsupported by evidence that Seco had **superior knowledge** of <u>undisclosed</u> incompatible facts." *Id.* (citing Restatement (Second) of Torts § 539(1)(a) (emphasis added)).

At bottom, Defendants argue that GEICO cannot show "a falsehood absent proof of undisclosed facts collateral to Defendants' statements." *Id.*

They also state that because the underlying facts were disclosed (and therefore **equally known to both parties**), Defendants' statements on coding and medical necessity were opinions, not facts. *Id.* at 26 ("Defendants' opinions on coding and necessity [were] not statements of fact because the factual basis for their opinions, in its entirety, was <u>disclosed</u>; there are no material omissions." (emphasis in original)).

Defendants further argue that it is not enough for GEICO to show that the services were upcoded or medically unnecessary because Defendants have "alleged falsity" and must therefore prove Defendants were lying. *Id.*; *see also* [ECF No. 117, p. 2 ("[Plaintiffs] cannot argue now that they must prove that the services were up[]coded and unnecessary rather than deceit. Plaintiffs instead must prove what they have pled—i.e., <u>Falsity</u>." (capitalization and emphasis in original)).].

At the outset, the Undersigned rejects the argument that Plaintiffs must prove falsity because falsity is not an element of a claim for declaratory judgment, FDUTPA, or unjust enrichment -- the claims on which Plaintiffs move for summary judgment. *See, infra* (discussing the elements of each at-issue claim). To prevail on summary judgment, Plaintiffs "must show that, **on all the essential elements of [their] case** on which [they] bear[ ] the burden of proof at trial, no reasonable jury could find for [Defendants]." *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. in State of Ala.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (emphasis added). Because falsity is not an element of any of the moved-for claims, Plaintiffs do not have to show that Defendants were lying to prevail on these claims.

The Undersigned is also not persuaded by Defendants' remaining (and somewhat interrelated) arguments that: (1) there were no factual omissions because **all of the relevant information was disclosed** to GEICO and (2) Seco had **no superior knowledge** (i.e., the facts were equally known to both parties).

First, the Eleventh Circuit has noted that:

> In the insurance context, we have said that -- absent "some circumstance which directs attention to them" -- **information somewhere in an insurer's records is insufficient to put an insurer on notice of the falsity of representations made to it**. *See Schrader v. Prudential Ins. Co.*, 280 F.2d 355, 362 (5th Cir. 1960) (explaining that an "insurer is entitled to rely on the representations of an insured, without checking all its files to determine if the insured is committing a fraud.").

*Quality Diagnostic Health Care, Inc.*, 2021 WL 5157535, at *3 (emphasis added). Thus, Defendants' argument that Plaintiffs' assertions of upcoding and no medical necessity fail because the facts were equally known to both parties is not persuasive.

Second, this Court has already considered and rejected Defendants' "no superior knowledge" argument. Specifically, in the Order denying Defendants' motion to exclude Dr. Dillard,[11] the Court noted that there was evidence in the record from which the jury could conclude that Seco had superior knowledge:

> In his declaration, **Dr. Seco said "he personally evaluated the G[EICO] insureds"** at Gonzalez's Medical and was the clinic medical director for three other clinics. He also proclaimed that "the therapeutic services provided at each of the clinics in this case were passive modalities in which simple handheld devices, or physical agents, were used. **Dr. Seco's declaration also represents that he performed systematic reviews at Med-Union [Medical] and New Generation [Rehab] and "checked the billing invoices to ensure the charges [were] consistent with the medical chart to ensure there [was] no billing for services not rendered."**
>
> Thus, . . . **Dr. Seco was [or the evidence could be interpreted to show] a person "having superior knowledge of the subject of the statement."** 2020 WL 7042645, *3 (quoting [*Mejia v. Jurich*, 781 So. 2d 1175, 1177 (Fla. 3d DCA 2001)]).

*Seco*, 2023 WL 2866383, at *10 (emphasis added; some alterations in original).[12]

---

[11]    Although the Court addressed the "no superior knowledge" argument in the context of a motion to exclude GEICO's expert, the same analysis is applicable here, at the summary judgment stage.

[12]    The Court also pointed out that:

> Defendants' argument about opinions . . . [was] problematic at a more **fundamental** level. Initially, it seems as though Defendants have assumed

The Court disposed of Defendants' "no superior knowledge" argument by citing extensively to Chief Magistrate Judge Edwin G. Torres' "well-written and logical opinion" in *Mas*, which "noted . . . **well-recognized exceptions** to the general rule that fraud is not actionable if based on a mere opinion," **including "where 'the person expressing the opinion is one having superior knowledge of the subject of the statement.'"** *Id.* (quoting *Mas*, 2020 WL 7042645, at *3 (emphasis added)).

Defendants state that even though their argument was rejected by the *Mas* Court, that decision was "poorly reasoned" and should be given no weight. [ECF No. 100, p. 27]. But the Court has already determined that *Mas* was a "well-written and logical opinion"[13] and finds no reason to depart from that assessment.

In their reply, Plaintiffs assert that "in Defendants' Rule 56.1 Statement, Defendants **do not appear to take issue** with Plaintiffs' contentions that the billed-for patient examinations were upcoded and that the diagnoses provided to GEICO insureds were impossibly similar." [ECF No. 103, p. 9 (emphasis added)].

---

that Dr. Seco rendered medical **opinions**. But the evidence suggests the possibility that he merely rubber-stamped the documents completed by other healthcare providers (which means he was not actually issuing medical opinions).

*Seco*, 2023 WL 2866383, at *11 (emphasis added). In any case, Defendants' argument on medical opinions is not persuasive because to the extent Seco rendered any medical opinions, there is record evidence from which a jury could conclude that Seco had superior knowledge.

[13]     *Seco*, 2023 WL 2866383, at *9.

**The Undersigned does not agree with Plaintiffs' interpretation of Defendants' position.** In their response in opposition to Plaintiffs' statement of disputed facts [ECF No. 97], Defendants disputed that the similarities between the treatments meant that the records were upcoded or that the treatments provided were not medically necessary. *See, e.g.,* [ECF No. 97, ¶¶ 21, 28, 30, 33, 38, 43-44-45].

Moreover, Defendants cite extensively to Seco's declaration and supplemental declaration, which dispute both upcoding and that there was no medical necessity. In his declaration, Seco stated: "In my opinion, . . . **the exams were not up coded** because the memorialized history, examination, and medical decision **supported the level of coding**." [ECF No. 89-2, ¶ 15 (emphasis added)]. He also opined that "**the treatment provided for the G[EICO] insureds at the facilities in this case was medically necessary**. The treatment, which **was within the standard of care**, was necessary to assist the patients to achieve a pre-accident status." *Id.* at 19. (emphasis added).[14]

---

[14]     Seco's supplemental declaration also contained statements concerning coding and medical necessity. *See* [ECF No. 97-1, ¶¶ 5 ("[C]oding is a matter of opinion where physicians, and **even coding experts, may disagree**. . . .[T]he use of [a] particular code is not a representation that a service covered by the CPT Code was actually performed but instead an opinion that information memorialized in the examination reports satisfies the components of the coding."); 6 ("[C]oding guidelines are ambiguous; and, for example, **experts often disagree** on what separates a detailed examination from a comprehensive examination."); 7 ("[W]hether the patients' soft tissue injuries reported in this case is a 'moderate to severe' problem, rather than 'minimal,' is subjective rather than an objective fact that can be proven or disproven. **In my opinion, the problems were not minimal in the majority of these cases but instead moderate to severe**. From my experience, many patients report, as is the case here, severe discomfort from soft issue [sic] injuries from an auto collision. This is the norm, not the exception. As such, **the fact that many of the**

Thus, Defendants have presented competing evidence (through Seco's declarations) to dispute GEICO's *factual* allegations of upcoding and no medical necessity. And, as discussed above, the Court cannot weigh the credibility of this evidence at the summary judgment stage. *Anderson*, Inc., 477 U.S. at 249. A jury might surely condemn and reject Seco's opinions as the biased position of a named party. But it might not do that. The task of weighing the credibility of a witness against other evidence "is the stuff of which jury trials are made." *Feliciano*, 707 F.3d at 1253. So the Undersigned cannot at this point simply choose to disbelieve Seco's opinions.

In sum, Defendants have not shown that Plaintiffs' upcoding and "no medical necessity" theories fail as a matter of law because there must be an undisputed showing of falsity or superior knowledge (and Defendants have not established those points for summary judgment purposes). At the same time, Plaintiffs have not shown entitlement to summary judgment on these allegations either because whether Defendants engaged in upcoding and whether the billed-for treatments were medically necessary are disputed issues.

---

**patients were diagnosed with an emergency medical condition is plausible rather than impossible**.") (emphasis added)].

2.      **Allegedly Non-Reimbursable Services**

a.      **Physical Therapy Services Performed by Massage Therapists**

GEICO also argues that Defendants' billed-for physical therapy services were not compensable under the Florida No-Fault statute. GEICO notes that this statute prohibits reimbursement for **physical therapy services** provided by massage therapists. [ECF No. 86, p. 2 (emphasis added)]; *see also Quality Diagnostic Health Care, Inc.*, 2021 WL 5157535, at *4 ("Florida courts have determined that the plain language of Florida's No-Fault Law precludes reimbursement for physical therapy services provided by massage therapists *without regard to the level of supervision*." (citing *Beacon Healthcare Ctr. Inc.*, 298 So. 3d at 1239) (emphasis added)).

GEICO states that "all of the *physical therapy services* that were billed through **Med-Union Medical** between January 2014 and January 2020, **New Generation [Rehab]** between March 2017 and May 2021, and **Gonzalez's Medical** between March 2015 and May 2021 were performed by massage therapists" and were therefore ineligible for PIP reimbursement. [ECF No. 86, p. 17 (emphasis added)].

But GEICO's arguments rest on the billed-for services being physical therapy services. Here, Defendants vehemently dispute that the billed-for healthcare services were "physical therapy" services. *See, e.g.*, [ECF No. 97, ¶¶ 50, 112, 171].

They argue that the massage therapists were not practicing physical therapy because *physical therapists* did not prescribe or supervise the services; those tasks were

70

done by Seco. Defendants therefore contend that the massage therapists were practicing <u>medicine</u> under Seco's medical license. [ECF No. 100, p. 3]; *id.*, p. 10 ("In the instant case, the therapists provided <u>medical</u> treatment . . . rather than non-compensable massage or unlawful physical therapy services because the services are part of, or incidental to, Seco's medical practice.")].

Defendants rely on Seco's declarations to dispute that the services are physical therapy services. As discussed above, the Court should not disregard Seco's declarations under the sham affidavit rule. The jury should be permitted to decide whether the billed-for services were physical therapy services or properly delegated medical services.

### b.  Unsupervised Physical Therapy Assistants

GEICO further contends that the physical therapy services rendered at **Med-Union Medical** between February 2020 and May 2021 by *physical therapy assistants* were also not PIP reimbursable because Seco is not board-certified in any medical specialty and therefore in order for these services to be PIP reimbursable the *physical therapy assistants* had to be supervised by an on-site physical therapist and there were no physical therapists employed or associated with **Med-Union Medical** during that time period. [ECF No. 86, pp. 17-18 (citing Fla. Stat. § 486.021(6))].

Defendants maintain that the physical therapy assistants at **Med-Union Medical** rendered services as part of or incident to the practice of medicine and nursing and therefore were not providing physical therapy services to the GEICO insureds. [ECF No.

100, p. 13]. They note that Seco (and the referring medical physician) "prescribed physical agents within the scope of their license." *Id.*

According to Defendants, "the [physical therapy assistant] was not performing 'physical therapy' services but instead nursing services in the capacity of unlicensed assistive personnel (UAP) under Rule § 64B9-14.001(1), F.A.C." *Id.* at 14.

Defendants note that "[a]n [advanced practice registered nurse ("APRN")] prescribed the modalities and lawfully delegated to the [physical therapy assistant] under Rule 64B-14.002 to perform the modalities," which "the APRN directly supervised the [physical therapy assistant] when the services were performed." *Id.* Defendants' reason that "a UAP's use of physical agents under the APRN's direction and supervision under [Fla. Stat.] § 486.161(1) constitutes the practice of <u>nursing</u> rather than physical therapy." *Id.* at 14-15 (emphasis in original).

Applying similar reasoning, Defendants argue that the physical therapy assistants at **Med-Union Medical** provided <u>medical</u> services under Fla. Stat. § 486.161(1) (as opposed to physical therapy) because they "provided the modalities incident to [ ] Seco's services as the clinic director." *Id.* at 16. According to Defendants, these "modalities are not advanced physical therapy services but instead physical agents within the scope of Seco's license." *Id.*

The Undersigned concludes that, based on the disputed record, the Court should not grant summary judgment to GEICO on the ground that the billed-for services

(whether they were performed by massage therapists or unsupervised physical therapy

assistants) constitute physical therapy. A jury should make that determination.

### c.      Representations in Box 31

GEICO also asserts that Defendants misrepresented that Seco either personally

performed or directly supervised the physical therapy sessions. Specifically, GEICO

states that:

> in an apparent attempt to make it appear as if the "physical therapy"
> services billed through **Med-Union Medical** between January 2014 and
> January 2020, **New Generation [Rehab**] between March 2017 and May
> 2021, and **Gonzalez's Medica**l between March 2015 and May 2021 were
> eligible for PIP reimbursement, [ ] Defendants either: (i) **included Seco's**
> **name or medical license number in Box 31 of the HCFA-1500 forms**, and
> thereby falsely represented that Seco personally performed, or at least
> directly supervised, the putative physical therapy services; or (ii) in the case
> of **Med-Union Medical**, **failed to identify the name and license number**
> **of the health care provider** that personally performed or directly
> supervised the putative physical therapy services **and merely wrote**
> **"SIGNATURE ON FILE" in Box 31 of the HCFA-1500 form** for many of
> the physical therapy services.

[ECF No. 86, p. 18 (emphasis added)].

GEICO notes that pursuant to CMS guidelines, "health care providers must set

forth the name of the individual who either <u>personally performed</u> or <u>directly supervised</u>

the underlying health care" in Box 31 of the HCFA-1500 form. *Id.* (emphasis in original).

Thus, GEICO argues that "by putting Seco's name in Box 31 of the HCFA-1500 forms for

virtually all of the 'physical therapy' services that were billed through the Clinic

Defendants to GEICO, [ ] Defendants represented that Seco had personally performed,

or at least directly supervised, all of those purported physical therapy services." *Id.* at 18-

19.

GEICO maintains that these representations were false for several reasons: (1) Seco

did not personally perform the "physical therapy" services; (2) Seco did not directly

supervise the "physical therapy" services given the "**massive number**" of healthcare

services Seco was purportedly personally performing or directly supervising at other

Florida health care clinics and practices during this time; and (3) "Seco was not physically

present at the Clinic Defendants five days per week, every week, during his tenure at the

respective Clinics." *Id.* at 19.[15]

At bottom, GEICO contends that:

> there is no "genuine issue" of "material fact" regarding the Defendants'
> physical therapy billing. Rather, **it is clear from the record that** -- in a
> massive number of instances -- **the Clinic Defendants' billing falsely
> represented that Seco had personally performed or directly supervised
> the underlying "physical therapy" services**, **when in fact they had been
> performed by massage therapists**.

*Id.* at 19-20 (emphasis added).

---

[15]    GEICO also asserts that the "physical therapy" services were **not medically
necessary** because "GEICO insureds were given substantially identical physical therapy,
which was not tailored to each individual patient's individual circumstances,
presentation, and symptomatology, which in turn is at odds with the standard of care for
physical or rehabilitative medicine." [ECF No. 86, p. 19]. But the Undersigned has already
determined that the issue of medical necessity is a disputed fact in the instant case. *See*,
discussion, *supra*.

Defendants contend that Seco directly supervised the medical services that he prescribed at **Gonzalez's Medical**. [ECF No. 100, p. 24]. Seco's declaration states that: "At Gonzalez['s] Medical, I personally evaluated the G[EICO] insureds, and I prescribed the therapeutic modalites [sic] based on my evaluations. Licensed massage therapists provided the prescribed modalities at Gonzalez['s] Medical **under my direct on-site supervision**." [ECF No. 89-2, ¶ 4 (emphasis added)].

GEICO questions whether Seco could have legitimately provided direct supervision at Gonzalez's Medical, given the large number of PIP bills submitted. [ECF No. 86, p. 19 ("[D]uring the period of time when Seco purported to perform -- or at least directly supervise -- the health care services at the Clinic Defendants, Seco also simultaneously purported to personally perform or directly supervise a massive number of individual health care services that were billed to GEICO through numerous other health care clinics and practices in Florida.")]. But this is fodder for cross-examination. Seco's declaration is enough to establish -- as to Gonzalez's Medical -- a genuine issue of material fact concerning whether Defendants misrepresented in Box 31 that Seco directly supervised the billed-for services.

With respect to **Med-Union Medical** and **New Generation Rehab**, Defendants proceed on the theory that, in Box 31, there was no misrepresentation because of an ambiguity. [ECF No. 100, p. 17 ("The invoices are not deceptive, nor an unfair trade practice, because of ambiguity.")]; *see also* Seco's Declaration [ECF No. 89-2, ¶ 7 ("At Med

Union [Medical], a licensed massage therapist provided the modalities for the G[EICO]

insureds under my <u>indirect</u> supervision. At New Generation [Rehab] . . . licensed massage

therapists also provided the physiotherapy for the G[EICO] insureds under my <u>indirect</u>

supervision as well." (emphasis in original; footnote omitted)].

Defendants seek to rely on a purported ambiguity between Box 31 and Box 24J and

state:

The CMS instructions for Box 31 provides [sic] that a physician who
personally performs, or directly supervises, the services must be listed in
Box 31:

In the case of a service that is provided *incident* to the service
of a physician or nonphysician practitioner, when the
ordering physician or non-physician practitioner is *directly
supervising* the service as in 42 C[.]F[.]R[.] [§] 410.32, the
signature of the ordering physician or non-physician
practitioner shall be entered in item 31. When the ordering
physician or non-physician practitioner is not supervising the
service, then enter the signature of the physician or non-
physician practitioner providing the direct supervision in
item 31.

***

Unlike Box 31 where the "supervising" is qualified, the word "supervising"
in Box 24J is not. The CMS language for Box 24J states:

Enter the rendering provider's NPI number in the lower
unshaded portion. In the case of a service provided incident
to the service of a physician or non-physician practitioner,
when the person who ordered the service is *not supervising*,
enter the NPI of the supervisor in the lower unshaded
portion.

[ECF No. 100, p. 17 (emphasis in Response; footnote omitted)]. Defendants contend that "[u]nless qualified, the word 'supervision,' or any of its modifiers, is ambiguous" since "the law outlines three levels of supervision: 'direct,' 'general' (i.e., indirect) or 'immediate.'" *Id.* (citing 42 C.F.R. § 410.32(3)(i)-(iii); Rule 64B8-2.001(1), F.A.C.).

Defendants insist that "[t]he instructions for Box 31 and 24J must be read together because Box 31 cannot be 'properly completed' unless Box 24J is 'properly completed' too." [ECF No. 100, p. 18 (citing Fla. Stat. §§ 627.736(5)(d), 627.732(13))].

Defendants also argue that there is ambiguity or conflict between "the CMS language for Box 31" and "the PIP statue's [sic] definition of 'incident to'" because under the CMS language for Box 31, "services are 'incident to' if the physician personally performs or directly supervises the services" and the term "'[i]ncident to' in the [PIP] statutory scheme means 'such services must be an integral, even if incidental, part of a covered physician's service.'" *Id.* at 18 (citing Fla. Stat. § 627.732(9)).

They further state that "[n]othing in state law . . . suggests that . . . services are integral, or incidental, to a physician's services only if a physician personally performs or directly supervises the services" and that "Florida law suggests that it can be incidental if the physician also indirectly supervises the services." *Id.* (citing Rule 64B8-2.001(1)(b); Fla. Stat. § 458.348).

Defendants also seek to rely on *United States v. R&F Properties of Lake Cty. Inc.*, 433 F.3d 1349, 1357-58 (11th Cir. 2005), an action brought under the False Claims Act, to

support their argument that the invoices they submitted were not a deceptive act or an unfair trade practice. [ECF No. 100, pp. 18-19]. According to Defendants, "[t]here isn't a cogent reason why the rule in *R&F Properties* should not apply here where the matter at issue, just as in *R&F Properties*, deals with CMS instructions for the HCFA 1500 forms that are ambiguous." *Id.* at 19 n. 12.

But *R&F Properties* is not helpful to Defendants. In *R&F Properties*, the district court granted summary judgment to a defendant healthcare provider:

> because the Medicare statutes and regulations in effect during the period of [the qui tam plaintiff]'s employment with [the defendant] **did not adequately define the phrase "incident to the service of a physician" and because the terms "immediate," "integral," and "incidental" as used on the HCFA 1500 form "[were] inherently imprecise,"** [the defendant]'s interpretation of the terms (that nurse practitioners and physician assistants could see patients independently so long as a physician was available by pager and telephone) must be accepted as reasonable.

433 F.3d at 1354 (emphasis added).

The Eleventh Circuit reversed the district court's ruling because the district court failed to consider other evidence which would have "support[ed] findings that the Medicare regulation required that a physician be physically present in the office suite and otherwise more involved in a patient's course of care than the [defendant's] physicians were and that [the defendant] knew of these requirements." *Id.* at 1358.

Moreover, the Eleventh Circuit concluded that the district court erred in granting summary judgment on a subset of claims which "were allegedly submitted after the Medicare regulation had been amended and clarified" because:

As of January 1, 2002. . . , the regulation providing conditions for coverage of services rendered "incident to the service of a physician" was clear about the meaning of that phrase. **As of that date, all services billed as "incident to the services of a physician" must have been rendered under a physician's "direct supervision." 42 CFR § 410.26(b)(5) (2002). In order to satisfy this "direct supervision" requirement, "the physician must [have been] present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure." 42 CFR § 410.26(a)(2) (2002), 410.32(b)(3)(ii) (2002). This regulatory language unambiguously requires that a physician be present in the office.**

***

Given the clear definition of services rendered "incident to the service of a physician" that became effective January 1, 2002, [the plaintiff] should be permitted to present evidence to a fact-finder supporting her allegations that any Medicare claims [the defendant] submitted from January 1, 2002 until the date of her complaint for services of nurse practitioners or physician assistants "incident to the service of a physician," were not, in fact, rendered in compliance with the applicable Medicare regulation and, therefore, were false.

*Id.* at 1356 (emphasis added). Thus, to the extent *R&F Properties* is even relevant here, it does not help Defendants establish that Box 31 is ambiguous.

Unlike *R&F Properties*, this Court in *Mas* directly addressed the issue of whether Box 31 (and the CMS instructions) are ambiguous. Case No. 1:19-cv-21183-Williams, [ECF No. 151] (S.D. Fla. Sept. 22, 2021).

In *Mas*, as in the instant case, the defendants also argued that they did not make misrepresentations in Box 31 because "Dr. Mas legitimately supervised all of the physical therapy services through either direct **or indirect supervision**." *Id.* at 34 (emphasis added). The *Mas* defendants argued that:

79

the CMS instructions regarding Box 31 [were] "ambiguous" as to whether
it is appropriate to list the name of the individual who provided indirect
supervision, or only the individual who provided direct supervision. In
light of this "ambiguity," [they] argue[d] that listing Dr. Mas in Box 31
when he provided indirect supervision [did] not constitute an intentional
misrepresentation, but conduct that is "consistent with a reasonable
interpretation" of the instructions.

*Id.*

Judge Williams ruled that:

As an initial matter, the Court disagrees that the CMS instructions
regarding Box 31 are "ambiguous" in any way. Rather, **the instructions
clearly require clinics to identify the physician who provided "direct
supervision" in Box 31.** *See supra* n. 4; *Geico Gen. Ins. Co. v. Beacon Healthcare
Ctr. Inc.*, 298 So. 3d 1235 (Fla. 3d DCA 2020) (explaining that the CMS 1500
form instructions "[r]equire HCFA-1500 forms to set forth, in Box 31, the
name of the individual who either personally performed or **directly
supervised** the underlying health care service.").

*Id.* at 34-35 (emphasis added).

Defendants argue that *Mas* is distinguishable from the instant case because the

*Mas* Court considered the CMS instruction for Box 31 by itself and not in conjunction with

Box 24J. [ECF No. 100, pp. 20-21]. But Defendants have not shown that Box 24J creates

and ambiguity or otherwise conflicts with Box 31's clear requirement that the name of the

health care provider who performed or **directly supervised** the underlying healthcare

treatment be listed.

Next, Defendants argue that the Court should reject GEICO's interpretation of Box

31 because it would create a catch-22 in which providers would not get paid:

> Section 627.736(5)(b)1.f, provides that an insurer is not required to pay a claim for services billed by a physician in a non-hospital setting unless the services are incident to his services and the physician is included in the bill. This, of course, creates a Hobson's choice. If the supervising physician exercises indirect supervision and is listed in Box 31, then the form -- according to [GEICO] -- is not "properly completed." And therefore, the invoices are un-reimbursable under §§ 627.736(5)(d) and 627.732(13) Fla. Stat. But if the supervising physician is not listed -- because he is exercising indirect supervision instead -- reimbursement is barred under § 627.736(5)(b)1.f.

[ECF No. 100, p. 19 (footnotes omitted)]. But the Court is tasked with determining whether Box 31 is ambiguous, not whether, from a policy perspective, Defendants should be permitted to list medical providers who indirectly supervise services in Box 31.

Defendants also argue that "the CMS instruction for Box 31 conflicts with 42 C.F.R. § 410.26(B)(5)." *Id.* at 20. Defendants assert that:

> The regulation provides that services are incidental, and therefore payable, if the physician personally performs or supervises the services either directly or generally (i.e., indirect):

>> Medicare Part B pays for services and supplies incident to the service of a physician (or other practitioner): . . . (5) In general, services and supplies must be furnished under the direct supervision of the physician (or other practitioner). *Designated care management services can be furnished under general supervision of the physician (or other practitioner) when these services or supplies are provided incident to the services of a physician (or other practitioner).*

*Id.* (quoting 42 C.F.R. § 410.26(B)(5); emphasis in Response). Thus, Defendants argue that "CMS language for Box 31 must be read in accordance with 42 C.F.R. § 410.26(b)(5) to say that services are incidental if the physician personally performs the service or exercises either direct or indirect supervision of the provider who performs it." *Id.*

But Florida's No-Fault Law instructs Defendants "to the extent applicable, [to] comply with the **CMS 1500 form instructions**," Fla. Stat. § 627.736 (emphasis added), and the CMS 1500 form instructions for Box 31 require direct supervision:

> In the case of a service that is provided incident to the service of a physician or non-physician practitioner, when the ordering physician or non-physician practitioner is **directly supervising the service** as in 42 CFR 410.32, **the signature of the ordering physician or non-physician practitioner shall be entered in item 31**. When the ordering physician or non-physician practitioner is not supervising the service, then enter the signature of the **physician or non-physician practitioner providing the direct supervision** in item 31.

*See* Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Manual, The Medical Processing Form CMS 1500 Data Set: https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c26.pdf (emphasis added).

In sum, the Undersigned is not persuaded that Defendants have shown that the *instructions* for Box 31 are ambiguous as to the level of supervision required (i.e., direct supervision).

Defendants also seek to rely on Seco's Declaration. [ECF No. 100, p. 18 (citing [ECF No.89-2, ¶¶ 16-17])]. Seco attests that he did not find it necessary to take corrective action as medical director at **Med Union Medica**l concerning the "signature on file" annotation in the Box 31 of the HCFA 1500 CMS invoices because his "NPI number, as the supervising provider[ ] was properly listed in 24J because [he] was supervising the

82

activities indirectly, and the instructions for 24J does not qualify the level of supervision."

[ECF No. 89-2, ¶ 16].

He further attests that he did not find it necessary to take corrective action as medical director of **New Generation Rehab** concerning his name being listed in Box 31 of the HCFA 1500 invoices because:

> **Unlike Box 31 which seems to qualify the level of supervision to direct, the instructions for 24J does not. Therefore, the instructions are inconsistent and ambiguous in my opinion.** Further, New Generation could not recover [PIP] reimbursement unless my name is listed in the invoices because the therapeutic modalities are incident to my services as the clinic medical director.

*Id.* at ¶ 17 (emphasis added).

But Seco's attestations do not save Defendants from summary judgment with respect to representations in Box 31 made by Med-Union Medical and New Generation Rehab. This is because Box 31 and the CMS instructions for Box 31 are *not* ambiguous as a matter of law. Seco's opinion that the instructions are ambiguous is woefully inadequate to create a factual dispute here, so Plaintiffs are entitled to summary judgment to the extent that the Med-Union Medical and New Generation Rehab bills represented in Box 31 that Seco **directly** supervised the healthcare services.

### 3. Legitimacy of the Medical Directors

GEICO further argues that Defendants were not eligible to collect PIP benefits to begin with because "the Clinic Defendants never operated in compliance with the Clinic

Act" since Seco, Blasini, and Nguyen "never fulfilled their statutory duties as medical

directors, as required by the Clinic Act." [ECF No. 86, p. 4].

Seco was listed as the medical director for Med-Union Medical between December

2013 and May 2021. During part of this time period (September 2016 through May 2021),

he was also listed as the medical director for New Generation Rehab. Blasini was listed

as the medical director for Gonzalez's Medical from March 2015 until August 2017.

Thereafter, Nguyen served as medical director of Gonzalez's Medical from September

2017 until at least June 2021. *Id.* at 20.

GEICO contends that Seco, Blasini, and Nguyen never served as legitimate

medical directors because during their respective tenures, they reviewed only a small

number of patient files. *Id.* Moreover, GEICO asserts that Seco, Blasini, and Nguyen:

> either did not conduct any legitimate systemic reviews of the Clinic
> Defendants' billing and treatment records to ensure that the billing was not
> fraudulent or unlawful, or else they did perform systemic reviews of the
> Clinic Defendants' billing and treatment records and failed to take any
> action regarding the fraudulent and unlawful billing.

*Id.*

GEICO states that during their tenure, Seco, Blasini, and Nguyen allowed the

Clinic Defendants to: (1) engage in upcoding; (2) "bill for medically unnecessary 'physical

therapy' services;" (3) "unlawfully submit thousands of PIP bills for 'physical therapy'

services that were performed by massage therapists or unsupervised physical therapist

assistants;" and (4) "misrepresent that those purported 'physical therapy' services had

been personally performed -- or at least directly supervised -- by a licensed physician, namely Seco, when in fact they were not." *Id.* at 20-21.

Defendants contend that GEICO's argument that the medical directors did not perform systemic reviews fails because it is based on the false premise that: (1) the invoices misrepresented that Seco exercised direct supervision and that this misrepresentation is material and (2) that the services were upcoded and unnecessary because the providers lied. [ECF No. 100, p. 31]. Moreover, Defendants assert that "a clinic director is required to take corrective action of fraud, not second guess a treater's clinical opinion on coding and necessity." *Id.* (citing Fla. Stat. § 400.9935(1)(g)).

In their reply, Plaintiffs state that:

> Defendants admissions regarding the frequency and length of Nguyen and Blasini's visits to Gonzalez's Medical and Seco's visits to New Generation [Rehab] and Med-Union Medical, coupled with the evidence of pervasive unlawful billing submitted by the Clinic Defendants to GEICO during their respective tenures as medical directors, makes clear that neither Seco, Nguyen, nor Blasini ever legitimately served as medical directors in that they clearly did not engage in any legitimate supervision of the Clinic Defendants' operations -- must [sic] less the "day-to-day" supervision required under the Clinic Act. *See* 59A-33.008, F.A.C. (a health care clinic "may not operate or be maintained <u>without the day-to-day supervision of a single medical director</u> as defined in Section 400.9905(5), F.S.").

[ECF No. 103, pp. 9-10 (emphasis added)].

The Undersigned finds that genuine issues of material fact preclude summary judgment for GEICO on the issue of whether the Clinic Defendants had legitimate medical directors. At trial, Plaintiffs will likely present evidence through Dr. Dillard that

the Clinic Defendants' records showed highly repetitive medical findings and uniform treatments that are incompatible with legitimate clinical practice. [ECF No. 88-1, pp. 4-5]. From this evidence, a jury could reasonably and easily conclude that the medical directors at the Clinic Defendants either did not conduct systemic reviews or ignored irregularities concerning the billing and documentation.

At the same time, Defendants will likely present testimony from Seco (and other witnesses) that the medical directors complied with the requirements of the Clinic Act. For instance, Seco states that "**the treatment provided for the G[EICO] insureds at the facilities in this case was medically necessary**. The treatment, which **was within the standard of care**, was necessary to assist the patients to achieve a pre-accident status." [ECF No. 89-2 at ¶ 19. (emphasis added)]. He also states that:

> [W]hether the patients' soft tissue injuries reported in this case is a "moderate to severe" problem, rather than "minimal," is subjective rather than an objective fact that can be proven or disproven. **In my opinion, the problems were not minimal in the majority of these cases but instead moderate to severe**. From my experience, many patients report, as is the case here, severe discomfort from soft issue [sic] injuries from an auto collision. This is the norm, not the exception. As such, **the fact that many of the patients were diagnosed with an emergency medical condition is plausible rather than impossible**.

[ECF No. 97-1, ¶ 7(emphasis added)].

In any case, whether each medical director performed systemic reviews and complied with his obligations under the Clinic Act is a disputed issue of fact and is not appropriate for resolution on summary judgment.

In *Mas*, United States District Judge Kathleen M. Williams denied summary judgment for GEICO on the issue of whether the defendant clinics had legitimate medical directors because the defendants had presented evidence from the medical director and the clinic owners that the medical director *had* performed monthly systemic reviews. Case No. 1:19-cv-21183-Williams, [ECF No. 151, p. 27] (S.D. Fla. Sept. 22, 2021). Judge Williams determined that "[a]t this stage, this evidence -- along with the other testimony and reports cited by [the] [d]efendants -- are enough to raise a triable issue of fact as to whether the clinics operated in violation of the Clinic Act." *Id.*

The Undersigned similarly concludes that whether the Clinic Defendants had legitimate medical directors is a jury issue to be determined at trial. *See MY. P.I.I. LLC v. H&R Marine Eng'g, Inc.*, 544 F. Supp. 3d 1334, 1344 (S.D. Fla. 2021) (noting that at summary judgment, "the Court cannot weigh the evidence or engage in credibility determinations").

Moreover, the Court should not rule, as a matter of law, that the Clinic Defendants lacked legitimate medical directors based on Defendants' incorrect representations in Box 31 for *some* of the PIP bills submitted to GEICO. *See Mas*, Case No. 1:19-cv-21183-Williams, [ECF No. 151, p. 21 ("To the extent that it is uncontested that some of the billed-for physical therapy treatment services were performed by individuals who lacked the requisite license and/or supervision, **this fact alone does not support a finding that the Medical Clinics were operating unlawfully**. Nor does it mean that Defendants are not

entitled to receive payments for all pending claims and must reimburse GEICO for all

paid claims." (citing *Gov't Emps. Ins. Co. v. DG Esthetic & Therapy Ctr., Inc.*, No. 18-20921-

CIV, 2019 WL 1992930, at *6 (S.D. Fla. Apr. 19, 2019) (emphasis added))].

    In sum, whether the Clinic Defendants had legitimate medical directors should be

determined by the jury (not the Court on summary judgment).

> **4.    Summary Judgment on Declaratory Judgment Claims (Counts 1, 7, and 13)**

    In Counts 1, 7, and 13 of the Amended Complaint, GEICO seeks declaratory relief

in the form of a judgment that the Defendant Clinics are not entitled to receive payment

for any *pending* bills submitted to GEICO. [ECF No. 61, ¶¶ 329-37; 392-400; 447-55].

    "In a case of actual controversy within its jurisdiction, . . . any court of the United

States, upon the filing of an appropriate pleading, may declare the rights and other legal

relations of any interested party seeking such declaration, whether or not further relief is

or could be sought." 28 U.S.C. § 2201(a).

    "To satisfy Article III's standing requirement, a plaintiff seeking declaratory relief

must show a 'substantial continuing controversy between two adverse parties' and a

'substantial likelihood that [it] will suffer injury in the future.'" *Right Spinal Clinic, Inc.*,

2022 WL 2466039, at *9 (quoting *Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342,

1346–47 (11th Cir. 1999)). This showing is met "when [an insurer] argues that it is not

obligated to pay outstanding PIP bills." *Id.* (citing *State Farm Fire & Cas. Co. v. Silver Star

Health & Rehab*, 739 F.3d 579, 584 (11th Cir. 2013)).

GEICO argues that it is entitled to summary judgment on its declaratory judgment counts because there is a substantial controversy between the parties in that the Clinic Defendants have submitted PIP bills to GEICO which remain outstanding. GEICO further contends that:

> the Clinic Defendants operated in **pervasive violation of Florida law**, inasmuch as: (i) to the extent that the putative **"physical therapy" services** that were billed through **Med-Union Medical** to GEICO actually were performed at all, they **were performed by massage therapists, or by unsupervised physical therapist assistants**, and therefore were not eligible for reimbursement as a matter of law; (ii) to the extent that the putative **"physical therapy" services** that were billed through **New Generation** [Rehab] and **Gonzalez's Medical** to GEICO actually were performed at all, they **were performed by massage therapists**, and therefore were not eligible for reimbursement as a matter of law; (iii) the Clinic Defendants **falsely represented** in the vast majority of their PIP billing **that the physical therapy services were personally performed, or at least directly supervised, by Seco**, when in fact they were not; (iv) the billing for the services **misrepresented the medical necessity for the services, the nature and extent of the services, and whether the services actually were performed in the first instance**; and (v) the Clinic Defendants **lacked legitimate medical directors**.

*Id.* at 22 (emphasis added).

For the reasons discussed above, the Undersigned finds that genuine issues of material fact preclude summary judgment for GEICO as to whether the billed-for services constituted physical therapy or medical services, whether Seco actually provided direct supervision of the billed-for services at Gonzalez's Medical, whether the services were medically necessary (or upcoded), and whether the Clinic Defendants had legitimate medical directors.

**Nonetheless**, GEICO *is* entitled to summary judgment on its declaratory judgment claim to the extent any to-be-paid bills from Med-Union Medical and New Generation Rehab *list Seco in Box 31 (or list signature on file)* because there is no record evidence that Seco either personally performed or directly supervised the at issue, billed-for services at these facilities and Defendants have failed to show that Box 31 is ambiguous or otherwise permits indirect supervision.

### 5.   Summary Judgment on FDUPTA Claims (Counts 4, 10, and 16)

GEICO contends it is entitled to summary judgment on its FDUTPA claims. [ECF No. 86, pp. 24-26]. "To establish a claim for violation of the FDUTPA, a plaintiff must show '(1) a deceptive act or unfair trade practice; (2) causation; and (3) actual damages.'" *Quality Diagnostic Health Care, Inc.*, 2021 WL 5157535, at *3 (quoting *Dolphin LLC v. WCI Cmtys., Inc.*, 715 F.3d 1243, 1250 (11th Cir. 2013)). "A deceptive act or practice is 'one that is likely to mislead consumers and an unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *Med. Serv. Ctr. of Fla., Inc.*, 103 F. Supp. 3d at 1354 (quoting *Washington v. LaSalle Bank Nat'l Ass'n*, 817 F.Supp.2d 1345, 1350 (S.D. Fla. 2011)).

GEICO contends that:

the record evidence demonstrates that [ ] **Defendants engaged in numerous deceptive acts and unfair practices**. This conduct was deceptive because it was likely to -- and did -- **mislead GEICO into believing that it had an obligation to pay $1,567,829.03 worth of the Med-Union Medical Defendants' PIP charges, $354,644.73 worth of the New Generation [Rehab] Defendants' PIP charges, and $1,326,473.77 worth of the**

90

**Gonzalez's Medical Defendants' PIP charges, when in fact GEICO had no such obligation**. What is more, [ ] **Defendants' conduct amounted to unfair practices** because: (i) it **offended established public policy, as set forth in the Clinic Act's medical director requirements, the PIP billing standards set forth in the No-Fault Law, and the physical therapy licensing law**; and (ii) **it was unscrupulous and substantially injurious to consumers** -- not only GEICO, but also the patients who visited the Clinic Defendants expecting legitimate treatment, and then received phony and upcoded examinations and medically unnecessary "physical therapy" treatments on a pre-determined basis by massage therapists or physical therapist assistants under the auspices of a fake "medical director[.]"[ ] **GEICO was actually damaged as the result of this conduct because it paid Med-Union Medical $1,567,829.03, New Generation [Rehab] $354,644.73, and Gonzalez's Medical $1,326,473.77 based on the deceptive and unfair claims for PIP benefits** that the Defendants submitted or caused to be submitted through the respective Clinic Defendants to GEICO.

[ECF No. 86, pp. 25-26 (emphasis added; record citations omitted)].

Defendants argue that the invoices from **Gonzalez's Medical** are not deceptive acts as a matter of law because "[i]t is undisputed that Seco **directly supervised** the medical services that he prescribed at Gonzalez'[s] Medical." [ECF No. 100, p. 23 (emphasis added)].

As to Gonzalez's Medical, the Court should find that there is a genuine issue of material fact as to whether Seco legitimately provided direct supervision for the billed-for services. Therefore, GEICO is not entitled to summary judgment on the ground that Gonzalez's Medical made misrepresentations in Box 31.

Defendants maintain that Med-Union Medical and New Generation Rehab's representations in Box 31 of the HCFA-1500 forms (that Seco personally performed or directly supervised the underlying treatment) does not qualify as a deceptive or unfair

trade practice under FDUTPA. [ECF No. 100, p. 16 ("G[EICO] asserts that Med-Union [Medical] and New Generation [Rehab] misrepresented in the 1500-CMS invoices, particularly in Box 31, that Dr. Seco personally performed or directly supervised the prescribed treatment. And that this qualifies as a deceptive act or unfair trade practice under FDUTPA. Defendants disagree." (footnote omitted))]. But as discussed above, Box 31 is not ambiguous, and it requires that the listed provider either personally perform or directly supervise the service. As to Med-Union Medical and New Generation Rehab, Defendants argue only that Seco **indirectly** supervised the service.[16] Therefore, the Undersigned concludes that this *was* a misrepresentation.

Defendants also argue that Plaintiffs cannot prevail on their FDUPTA claims because they cannot show materiality. [ECF No. 100, pp. 21-23]. According to Defendants, "to establish that Box 31 is not 'properly completed' under [Fla. Stat.] § 627.736(5)(d), and therefore qualifies as a deceptive act, or unfair trade practice, under FDTUPA [sic], G[EICO] must prove that listing Seco in Box 31 is not a truthful response to a <u>material</u> element to an applicable request for information." *Id.* at 21 (emphasis in original).

Defendants assert that "misrepresenting that Seco exercised direct supervision in Box 31, when in fact he exercised indirect supervision, is <u>not</u> material" because had Seco's

---

[16]   *See* Seco's Declaration [ECF No. 89-2, ¶ 7 ("At Med Union [Medical], a licensed massage therapist provided the modalities for the G[EICO] insureds under my <u>indirect</u> supervision. At New Generation [Rehab] . . ., licensed massage therapists also provided the physiotherapy for the G[EICO] insureds under my <u>indirect</u> supervision as well." (emphasis in original; footnote omitted))].

indirect supervision been disclosed, GEICO would still have to pay. *Id.* at 22 ("[A]ssuming G[EICO] denied the claims on this basis, Defendants can cure the deficiency by submitting a revised invoice listing the therapist in Box 31 and keeping Seco's NPI number -- because he indirectly supervised the services -- in Box 24J."). Defendants note that "[t]he rule of law in Florida is that an undisclosed fact is not material unless the party would not have completed the transaction if the fact had been disclosed." *Id.* (citing *Nat. Bank of Fla. v. Vest*, 480 So. 2d 1328 (Fla. 2d DCA 1985)). Thus, Defendants argue that the issue of materiality should be decided in their favor as a matter of law. *Id.* at 23.

Relatedly, Defendants argue that Plaintiffs cannot prevail on their FDUTPA claims because they cannot show causation since "G[EICO] must pay even if it was disclosed that Seco was exercising indirect rather than direct supervision." [ECF No. 100, p. 23].

But Plaintiffs maintain that:

The record also is clear [ ] the Defendants identified Seco in Box 31 of the thousands of "physical therapy" bills they submitted to GEICO, and thereby falsely represented that Seco personally performed, or directly supervised, the relevant services. **The law is also clear: Insurers are not obligated to pay PIP bills which fail to properly identify, in Box 31, the individual who performed or directly supervised the underlying services**. *See* Fla. Stat. § 627.736(5)(b) and (d); *see also Beacon Healthcare*, *supra*, at 1238 ("plain language" of No-Fault Law precluded PIP reimbursement to clinic that "erroneously" indicated in Box 31 that a physician had performed or directly supervised physical therapy services); *Quality Diagnostic*, 2019 U.S. Dist. LEXIS 220674 at * 21 (S.D. Fla. 2019), aff'd 2021 U.S. App. LEXIS 32949 (11th Cir. 2021)(granting summary judgment to GEICO on unjust enrichment claim where -- as in the present case -- it was undisputed that the defendants' PIP billing listed a physician in Box 31

of their HCFA-1500 forms, when in fact the physician had not performed or directly supervised the underlying services).

[ECF No. 103, p. 9 (emphasis added)].

Plaintiffs further state that:

[T]he Clinic Defendants operated in pervasive violation of Florida law, inasmuch as: (i) to the extent that the putative "physical therapy" services that were billed through Med-Union Medical to GEICO actually were performed at all, they were performed by massage therapists, or by unsupervised physical therapist assistants, and therefore were not eligible for reimbursement; (ii) to the extent that the putative "physical therapy" services that were billed through New Generation and Gonzalez's Medical to GEICO actually were performed at all, they were performed by massage therapists, and therefore were not eligible for reimbursement; (iii) **the Clinic Defendants falsely represented in the vast majority of their PIP billing that the physical therapy services were personally performed, or at least directly supervised, by Seco, when in fact they were not**; (iv) the billing for the services misrepresented the medical necessity for the services, the nature and extent of the services, and whether the services actually were performed; and (v) the Clinic Defendants lacked legitimate medical directors. These acts were "deceptive" because they were likely to -- and did -- mislead GEICO into believing that it had an obligation to pay the Defendants['] PIP charges.

[ECF No. 103, p. 10-11 (emphasis added)].

Plaintiffs further state that "Defendants also engaged in unfair practices, which offended the public policy set forth in the Clinic Act's medical director requirements, the PIP billing standards set forth in the No-Fault Law, and Florida law that prohibits massage therapists from performing physical therapy." *Id.* at 11.

For the reasons discussed above, genuine issues of material fact abound concerning: (1) whether the billed-for healthcare services constituted physical therapy;

(2) whether the billed-for treatments were medically necessary; and (3) whether the Clinic

Defendants had legitimate medical directors.

Nonetheless, the undisputed facts demonstrate Defendants engaged in unfair

practices and deceptive acts by misrepresenting in Box 31 that Seco either personally

performed, or at least directly supervised, the billed-for services at Med-Union Medical

and New Generation Rehab, when in fact he did not.

"Fraudulent conduct in the context of billing for PIP benefits qualifies as a

deceptive act for purposes of FDUTPA." *State Farm Mut. Auto. Ins. Co. v. First Care Sol.,*

*Inc.*, 232 F. Supp. 3d 1257, 1268 (S.D. Fla. 2017); *see also Quality Diagnostic Health Care Inc.*,

2019 WL 11687706, at *8 ("The unlawful operation of a medical clinic to obtain PIP

benefits that an insurer would have the statutory right to deny has been found to

constitute 'deceptive or unfair practices.'" (citing *First Care Sol.*, Inc., 232 F. Supp. 3d at

1268)).

Defendants' argument -- that misrepresenting that Seco exercised direct

supervision in Box 31, when in fact he exercised only indirect supervision, is **not** material

-- is unpersuasive.

United States District Judge Jose E. Martinez rejected a similar argument in *Quality*

*Diagnostic Health Care Inc.*, 2019 WL 11687706. In addressing the defendant's summary

judgment motion, Judge Martinez stated:

> [The] [d]efendants claim that, although they have admitted making an
> extensive series of misrepresentations to GEICO, **those misrepresentations**

were not **"material,"** because GEICO supposedly paid the PIP claims with knowledge of Defendants' fraud. At the outset, the Court notes that **neither "materiality" nor "reliance" are elements of GEICO's declaratory judgment, unjust enrichment, or FDUTPA claims, and therefore, will have no effect on the Court's summary judgment determination in this regard**.

*Id*. at \*9 (emphasis added).

Judge Martinez further stated:

as to the fraud claim, the Court is unpersuaded by Defendants' materiality argument. **It is clear to the Court that any misrepresentation that causes an unreimbursable claim to become reimbursable and results in overpayments in excess of $145,000, is material.**

Defendants' reliance argument is similarly misplaced. In essence, Defendants fault GEICO for not doing more to uncover the falsity of their representations, as if a fraudster can somehow inoculate himself from civil liability by being really good at deceiving his victim. This is not the law, however. **GEICO was entitled to rely upon Defendants' PIP claims.** S*uite 225, Inc. v. Lantana Ins. Ltd.*, 625 F. App'x 502, 508 (11th Cir. 2015) (agreeing with lower court decision that found "absurd" an insured's argument that insurer "should have conducted a more thorough investigation" and agreeing further that "the insurer is entitled to rely on the representations of an insured, without checking all its files to determine if the insured is committing a fraud"). And, consistent with this precept, the No-Fault Law permits insurers to challenge the validity of PIP claims at any time, even after they are paid. *See* Fla. Stat. § 627.736(4)(b)(6) (permitting insurers to contest the validity and lawfulness of PIP claims "at any time, including after payment of the claim").

*Id*. (emphasis added).

He also noted that:

even if GEICO was on notice that [the massage therapist] was performing the physical therapy services, this fact by itself does not suggest that the services are unreimbursable, because all of [the clinic]'s bills for the physical therapy services **falsely represented that [the doctor] had directly supervised [the massage therapist]'s performance of the services**, which

had the effect of making the services appear on their face to be eligible for
PIP reimbursement, when in fact they were not.

*Id.* at *10 (emphasis added).

Defendants make the same misrepresentation in the instant case when they represented in Box 31 that Seco provided at least **direct** supervision of the billed-for health care services at Med-Union Medical and New Generation Rehab when in fact he had not.

On appeal, the Eleventh Circuit affirmed Judge Martinez's order granting summary judgment to GEICO on its declaratory judgment, unjust enrichment, common law fraud, and FDUTPA claims. *Quality Diagnostic Health Care, Inc.*, 2021 WL 5157535. While Defendants may quarrel with *Quality Diagnostic Health Care, Inc.,* and attempt to distinguish it, the Court should reject Defendants' "no materiality argument" for the same reasons as articulated by Judge Martinez.

First, as noted by Judge Martinez, materiality is not an element of a claim for FDUTPA (or declaratory judgment or unjust enrichment). Second, GEICO has shown that it paid the PIP claims based on the information submitted, including the information in Box 31 that Seco had at least directly supervised the healthcare services. This representation is false in the case of Med-Union Medical and New Generation Rehab to the extent he provided only **indirect** supervision. Moreover, as Judge Martinez noted, "any misrepresentation that causes an unreimbursable claim to become reimbursable and results in overpayments in excess of $145,000, is material." *Quality Diagnostic Health Care*

*Inc.*, 2019 WL 11687706, *9. GEICO has also shown causation because the misrepresentation **caused** the payment.

Thus, GEICO is entitled to summary judgment in its favor on its FDUTPA claims against Med-Union Medical and New Generation Rehab, but not Gonzalez's Medical.

### 6.  Summary Judgment on Unjust Enrichment Claims (Counts 6, 12, and 18)

GEICO also seeks summary judgment on its unjust enrichment claims. [ECF No. 86, p. 23]. "To state a claim for unjust enrichment under Florida law, a plaintiff must prove three elements: '(1) the plaintiff has conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for the defendants to retain [the benefit] without paying the value thereof.'" *Quality Diagnostic Health Care, Inc.*, 2021 WL 5157535, at *3 (quoting *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1337 (11th Cir. 2012)).

GEICO argues that it is entitled to summary judgment on its unjust enrichment claims because: (1) GEICO conferred a benefit on the Clinic Defendants in the form of PIP claim payments; (2) Defendants voluntarily accepted and retained the payments; and (3) the Clinic Defendants were never entitled to the payments. [ECF No. 86, pp. 23-24].

Defendants state that GEICO's unjust enrichment claims fail for the same reasons as its FDUTPA claims. [ECF No. 100, pp. 28-29]. They state that Plaintiffs have not proven the alleged misconduct. They further state that the Court should apply the "volunteer rule" to Plaintiffs' unjust enrichment claims and find that GEICO cannot recover because

it made the payments based on <u>disclosed</u> information. *Id.* at 29 (arguing that GEICO must show "evidence of **undisclosed facts** extrinsic to Defendants' submissions; and that these facts came to light **after the payments** and show[ ] that Defendants were lying instead of [conveying] honest opinions" (emphasis added)).

Defendants also take issue with GEICO's decision to pay the claims first and investigate them later. *Id.* at 30-31.

In their reply, Plaintiffs state that the law is clear that "Clinic Defendants cannot collect PIP reimbursement for <u>any</u> services performed by massage therapists." [ECF No. 103, p. 5 (emphasis in original; citing *Right Spinal Clinic, Inc.*, 2022 WL 2466039, at *3-*5; *Quality Diagnostic Health Care, Inc.*, 2021 WL 5157535, at *4; *Muse*, 2022 WL 413417, *6; *Gomez-Cortes*, No. 20-21558, [ECF No. 315, pp. 23, 29]; *State Farm Mut. Auto. Ins. Co. v. Health & Wellness Servs., Inc.*, 446 F. Supp. 3d 1032, 1050 (S.D. Fla. 2020); *Health & Wellness Servs., Inc.*, 446 F. Supp. 3d at 1050; *S. Owners Ins. Co. v. Hendrickson*, 299 So. 3d 524, 525 (Fla. 5th DCA 2020); *Beacon Healthcare Ctr. Inc.*, 298 So. 3d at 1239)].

The Undersigned is not persuaded by Plaintiffs' broad interpretation of the law. *Right Spinal Clinic* concerned licensed massage therapists performing **physical therapy services**. *Quality Diagnostic Health Care* concerned **physical therapy services** performed by unsupervised massage therapists. *Muse* concerned licensed massage therapists providing **advanced physical therapy services**. *Gomez-Cortes* involved massage therapists and physicians assistants who were providing **physical therapy services**.

*Health & Wellness Servs., Inc.* concerned **physical therapy treatments** performed by licensed massage therapists. *Beacon Healthcare Ctr. Inc.* concerned **physical therapy services** rendered by licensed massage therapists. In *Hendrickson* "[the] [r]espondent sought reimbursement for services provided by a person agreed upon by both parties to be a 'licensed massage therapist,'" 299 So. 3d at 525, but the court did not address the argument raised here: that the billed-for services were medical services. In short, none of those cases involve a factual dispute concerning whether the billed-for healthcare services constituted physical therapy or medical services.

To be sure, a jury could agree with GEICO and find that the billed-for services performed at the Clinic Defendants constituted physical therapy and were therefore not reimbursable under the applicable law. But, at this juncture and based on the disputed record in this case, GEICO is not entitled to summary judgment on the ground that the billed-for services constituted physical therapy. GEICO has also not shown that the cases it cites stand for the broad proposition that "Clinic Defendants cannot collect PIP reimbursement for <u>any</u> services performed by massage therapists." [ECF No. 103, p. 5].

At the same time, the Undersigned is unpersuaded by Defendants' argument that GEICO's unjust enrichment claims fail because Plaintiffs cannot pay claims and later seek to recover any allegedly wrongfully made payments. The law permits GEICO to do so.

"Florida's No-Fault Law allows expressly for an insurer to challenge the validity of a claim for PIP benefits **even after the claim is paid**." *Quality Diagnostic Health Care,*

*Inc.*, 2021 WL 5157535, at *3 (citing Fla. Stat. § 627.736(4)(b)(6) (emphasis added)). Moreover, Defendants' arguments that they rendered mere opinions, that they had no superior knowledge, and that GEICO must show that Defendants lied are not persuasive, for the reasons discussed above.

The first two elements of an unjust enrichment claim are undisputed: GEICO conferred a benefit on Defendants through the payment of PIP claims and Defendants accepted and retained the money. Moreover, to the extent that Defendants misrepresented in Box 31 that Seco either personally performed, or at least directly supervised the billed-for services, when in fact he did not, it would be inequitable to allow Defendants to retain the payment. Therefore, with respect to those PIP bills which contained the Box 31 misrepresentations (the Med-Union Medical and New Generation Rehab bills), Plaintiffs *are* entitled to summary judgment on their unjust enrichment claim.

## C.    Defendants' Summary Judgment Motion

Defendants move for summary judgment on *all* counts. [ECF No. 90, p. 19]. For the reasons discussed below, Defendants are not entitled to summary judgment in their favor on *any* counts and the Court should **deny** Defendants' motion in its entirety.

Defendants contend that "[t]o prevail on each of its causes of action for deceit, Plaintiffs must prove Defendants['] opinions on coding and medical necessity qualify as misrepresentations of fact." [ECF No. 90, p. 2].

101

According to Defendants, "[u]nder the applicable standard, it is conclusive that Defendants['] opinions on coding and medical necessity [were] not misrepresentations of fact." *Id*. at 4. They note that "[b]efore the claims were paid, [they] disclosed to G[EICO] the foundation of their opinions, in its entirety, on a case-by-case basis" and that "there is no proof that Defendants had superior knowledge of <u>undisclosed</u> incompatible facts which precludes their opinions." *Id.* (emphasis in original).

Defendants insist that "G[EICO] cannot unwind the prior payments for up[]coding or lack of necessity unless [it] can show Defendants['] opinions on these matters qualify as misrepresentations of fact under the applicable legal standard." *Id.* at 6 (citing Restatement (Second) of Torts § 539(1)(a)).

Defendants further argue that the opinion of GEICO's expert, Dr. James Dillard, is not enough because he "testified that he does not know if Defendants falsified their clinical judgment on these matters" and GEICO must show that "no reasonable physician could agree with [ ] Defendants on coding and necessity." *Id.* at 7.

According to Defendants, GEICO must show "extrinsic evidence of undisclosed facts that came to light afterwards showing that the submissions are falsified)." *Id.* at 7-8 (citing *Allstate Ins. Co., v. Advanced Health Professionals P.C.*, 256 F.R.D. 49, 62 (D. Conn. 2008)).

The Undersigned has already addressed and rejected these arguments in discussing Plaintiffs' summary judgment motion, *supra*. Briefly, to summarize, Defendants are not entitled to summary judgment on the ground that mere opinions are not actionable because of the well-recognized exception in instances where the person expressing the opinion has superior knowledge and, as noted above, there is record evidence from which the jury could conclude that Seco had superior knowledge. Moreover, **falsity** is not an element of *any* of Plaintiffs' moved-for claims.

Defendants state that they "are entitled to summary judgment with respect to whether the medical directors at Gonzalez['s] Medical performed systematic billing review audits as required by Florida law." [ECF No. 90, p. 8]. But, as discussed above, a reasonable jury could conclude, based on Dr. Dillard's testimony, that the medical directors were not performing their obligations under the Clinic Act based on highly repetitive medical findings and uniform treatments that are incompatible with legitimate clinical practice. [ECF No. 88-1, pp. 4-5]. *Neither* party is entitled to summary judgment on this issue.

Defendants also argue that they "are entitled to summary judgment because Defendants conclusively established that the therapeutic modalities provided at Gonzalez'[s] Medical are medical services rather than the unlawful practice of physical therapy without a license, or massage therapy services which are no longer reimbursable under the [PIP] statute." [ECF No. 90, p. 9]. But, as discussed above, whether the billed-

for services constitute physical therapy (or medical services) is a disputed issue of fact in this case. Thus, Defendants are not entitled to summary judgment on this ground.

Defendants further state that they are entitled to summary judgment because they have "conclusively proved that Gonzalez'[s] Medical did not misrepresent Dr. Seco as the supervising treater in Box 31 of the HCFA 1500 invoices." *Id.* at 17.

But Plaintiffs dispute that Seco legitimately supervised the billed-for services at Gonzalez's Medical. [ECF No. 99, p. 24]. For instance. Plaintiffs note that:

> Seco was in his mid to late 70s during the period from March 2015 and June 2021 when -- according to the Defendants -- Seco supposedly was physically present at Gonzalez's Medical at least three to five days per week to personally perform or directly supervise the massive amount of physical therapy services that were being billed through Gonzalez's Medical.
>
> ***
>
> [T]he thousands of "physical therapy" services that Gonzalez's Medical billed under Seco's name to GEICO were only a fraction of the overall, and even less credible, number of "physical therapy" services that Gonzalez's Medical billed under Seco's name to all of the other insurance companies in Florida.
>
> ***
>
> [D]uring the same period when Seco supposedly was physically present each day to "directly supervise" a massive amount of "physical therapy" services at Gonzalez's Medical -- Seco, while in his 70s, was also purporting to simultaneously work at and/or served as the supposed "medical director" at numerous other Florida healthcare clinics, all of which operated at different locations than Gonzalez's Medical.

*Id.*

Based on the disputed factual record, Defendants are not entitled to summary judgment in their favor on this issue.

In sum, Defendants are not entitled to summary judgment on any of the grounds raised in their motion.

## V.  Conclusion

Based on the foregoing, the Undersigned respectfully recommends that the District Court **grant in part and deny in part** Plaintiffs' summary judgment motion and **deny** Defendants' summary judgment motion. Plaintiffs are entitled to summary judgment in their favor but only to the extent that their claims stem from Seco's misrepresentation in Box 31 that he either directly performed or directly supervised the healthcare services rendered at Med-Union Medical and New Generation Rehab.

## VI.  Objections

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendations within which to file written objections, if any, with the District Judge. Each party may file a response to the other party's objection within fourteen (14) days of the objection. Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in the Report except upon grounds of plain error if necessary in the interests

of justice. *See* 29 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

      **RESPECTFULLY RECOMMENDED**, in Chambers, in Miami, Florida, on August 7, 2023.

                                          Jonathan Goodman
                                          UNITED STATES MAGISTRATE JUDGE

**<u>Copies furnished to</u>:**
The Honorable Federico A. Moreno
All Counsel of Record